1  Kurt Opsahl, Esq. (SBN 191303)
   *kurt@eff.org*
2  Jason Schultz (SBN 212600)
   *jason@eff.org*
3  Corynne McSherry (SBN 221504)
   *corynne@eff.org*
4  Marcia Hofmann (SBN 250087)
   *marcia@eff.org*
5  ELECTRONIC FRONTIER FOUNDATION
   454 Shotwell Street
6  San Francisco, CA 94110
   Telephone: (415) 436-9333
7  Facsimile: (415) 436-9993

9  Attorneys for Plaintiff
   STEPHANIE LENZ

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| STEPHANIE LENZ, | No. C 07-03783-JF |
| Plaintiff, | OPPOSITION TO MOTION TO DISMISS AND SPECIAL MOTION TO STRIKE |
| v. | DATE: December 7, 2007 |
| UNIVERSAL MUSIC CORP., UNIVERSAL MUSIC PUBLISHING, INC., | TIME: 9:00 a.m. CTRM: 3 (Hon. Jeremy Fogel) |
| and | |
| UNIVERSAL MUSIC PUBLISHING GROUP, | |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................i

INTRODUCTION ..........................................................................................................1

FACTUAL AND PROCEDURAL HISTORY ....................................................................2

ARGUMENT ...................................................................................................................3

I.  LENZ HAS STATED A CLAIM FOR RELIEF IN COUNT I UNDER SECTION 512(F) .. 3

    A.  Universal Cannot Use A Motion To Dismiss To Dispute Lenz's Allegations That It Sent A Section 512 Notice .......................................................................................... 3

    B.  Lenz Has Properly Pled The Knowledge Standard For 512(f) Actions Under Both *Rossi* And *Diebold* ..................................................................................................... 4

II.  UNIVERSAL'S MOTION TO STRIKE IS IMPROPER AND MERITLESS ..................... 9

    A.  California's Anti-SLAPP Law Has No Bearing On This Case ........................................ 9

        1.  A Private Notice to Third Party Is Not Speech in Connection with a Public Issue or Issue of Public Interest ........................................................................................ 10

        a.  The Takedown Notice Was A Pure Business Communication that Failed to Comment on any Topic of Public Interest .................................................................. 11

        b.  Lenz's Subsequent Public Criticism of Universal's Misconduct Does Not Make Its Business Email Into Speech on a Matter of Public Interest ...................................... 11

        c.  Universal Has Not and Cannot Show that Its Notice Contributed to Public Debate ..... 14

        2.  A Private Notice to a Third Party of An Alleged Infringement is Not Speech in Support of Right to Petition ......................................................................................... 14

    B.  Lenz Has Established a *Prima Facie* Case of Tortious Interference ............................... 15

        1.  Lenz Will Prevail on Her Claim For Interference With Contract. ............................... 16

        a.  A Valid Contract Existed Between Lenz and YouTube. ............................................ 16

        b.  Universal Knew About the Contract Between Lenz and YouTube. ............................. 17

        c.  Universal's Intentional Act Was Designed to Induce a Breach or Disruption of the Contractual Relationship Between Lenz and YouTube. ...................................................... 17

        d.  The Lenz/YouTube Contract Was Actually Disrupted ............................................. 17

        e.  Lenz Suffered Damage as a Result of the Disruption................................................ 18

        f.  Universal Has Not Satisfied Its Burden of Proving Its Claimed Defenses. ................. 19

            (i)  Universal Has Failed to Show That Its Interference With the Lenz/YouTube Contract was Justified as a Matter of Law.............................................. 19

(ii)  Lenz's State Claim Is Not Preempted By Federal Law ..................................... 20

III.  THE LENZ COMPLAINT PRESENTS A JUSTICIABLE CONTROVERSY ............... 24

IV.  CONCLUSION ........................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*A.F. Brown Elec. Contractor Inc. v. Rhino Elec. Supply Inc,* 137 Cal.App.4th 1118 (2006).......... 14

*Action Apartment Ass'n, Inc. v. City of Santa Monica,* 41 Cal.4th 1232 (2007) ........................... 15

*Allstate Ins. Co. v. Employers Liability Assur. Co.,* 445 F.2d 1278 (5th Cir. 1971) ...................... 24

*Beacon Const. Co. v. Matco Elec. Co.,* 521 F.2d 392 (2d Cir. 1975)............................................. 24

*Blackburn v. Brady,* 116 Cal.App.4th 670 (2004) ........................................................................ 11

*Bond v. Blum,* 317 F.3d 385 (4th Cir. 2003) .................................................................................. 9

*Bowers v. Baystate Techs., Inc.,* 320 F.3d 1317 (Fed. Cir. 2003) .................................................. 23

*Bulletin Displays, LLC v. Regency Outdoor Advertising, Inc.,* 448 F.Supp.2d 1172 (C.D.Cal. 2006)
........................................................................................................................................ 11

*Cairo, Inc. v. CrossMedia Servs., Inc.,* No. C 04-04825 JW, 2005 U.S. Dist. LEXIS 8450, at *12, 2005 WL 756610 (N.D. Cal. April 1, 2005) ........................................................................ 16

*Cipollone v. Liggett Group, Inc.,* 505 U.S. 504 (1992) ................................................................. 23

*Compare Averill v. Super. Ct.,* 42 Cal.App.4th 1170 (1996)......................................................... 13

*Connick v. Myers,* 461 U.S. 138 (1983)........................................................................................ 14

*Consumer Justice Center v. Trimedica International, Inc.,* 107 Cal.App.4th 595 (2003)............... 12

*Damon v. Ocean Hills Journalism Club,* 85 Cal.App.4th 468 (2000)............................................ 14

*Del Madera Props. v. Rhodes & Gardner,* 820 F.2d 973 (9th Cir.1987) ....................................... 21

*Dudnikov v. MGA Entmt., Inc.,* 410 F.Supp.2d 1010 (D. Colo. 2005) ........................................... 5

*Feldman v. Google, Inc.,* No. 06-2540, 2007 U.S. Dist. LEXIS 22996, 2007 WL 966011 (E.D. Penn. 2007)................................................................................................................................ 17

*Fogerty v. Fantasy, Inc.,* 510 U.S. 517 (1994) ............................................................................. 22

*Golden Door, Inc. v. Odisho,* 646 F.2d 347 (9th Cir. 1980) ......................................................... 22

*Herron v. State Farm Mutual Ins. Co.,* 56 Cal.2d 202 (1961) ............................................... 19, 20

*Horton v. Liberty Mut. Ins. Co.,* 367 U.S. 348 (1961) .................................................................. 24

*Hulteen v. AT&T Corp.,* 498 F.3d 1001 (9th Cir. 2007)................................................................ 25

*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty, USA, Inc.,* 129 Cal. App. 4th 1228 (2005) ................................................................................................................................ 10

*Hutchinson v. Proxmire,* 443 U.S. 111 (1979)............................................................................. 12

*In re World Auxiliary Power Co.*, 303 F.3d 1120 (9th Cir. 2002) .................................. 23

*Kodadek v. MTV Networks*, 152 F.3d 1209 (9th Cir. 1998) ...................................... 21

*Leatherman v. Tarrant Cty Narcotics Intell. Unit.,* 507 U.S. 163 (1993).......................... 4

*Lee v. Aiu*, 85 Hawai'i 19, 936 P.2d 655 (1997) .................................................... 22

*Lipman v. Brisbane Elementary Sch. Dist.*, 55 Cal.2d 224 (1961)................................ 18

*Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270 (1941) ................................ 24

*MedImmune Inc. v. Genentech, Inc.* 127 S.Ct. 764 (2007) ...................................... 24

*Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832 (9th Cir. 2001) ............................ 16, 19

*Nagel v. Twin Labs., Inc.*, 109 Cal.App.4th 39 (2003) .......................................... 16

*Navellier v. Sletten,* 29 Cal.4th 82 (2002)................................................... 15, 16

*New York Times Co. v. United States*, 403 U.S. 713 (1971).................................... 18

*Pacific Gas & Elec. Co. v. Energy Res. Conservation and Dev. Comm'n*, 461 U.S. 190 (1983).... 23

*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*, 133 Cal.App.4th 658 (2005) ................................................................................................ 19

*Perfect 10 v. ccBill*, 488 F.3d 1102 (9th Cir. 2007).......................................... 6, 8

*Quelimane Company, Inc., v. Stewart Title Guar. Co.*, 19 Cal. 4th 26 (1998) ................ 16, 17

*Ramona Manor Convalescent Hosp. v. Care Enters.*, 177 Cal.App.3d 1120 (1986)................ 18

*Reeves v. Hanlon*, 33 Cal.4th 1140 (2004)...................................................... 16

*Religious Tech. Ctr. v. Lerma,* 908 F.Supp. 1362 (E.D.Va 1995).................................. 9

*Rivero v. AFL-CIO,* 105 Cal.App.4th 913 (2003) ................................................ 13

*Rogers v. Home Shopping Network*, 57 F.Supp.2d 973 (C.D. Cal. 1999) ........................ 19

*Rohde v. Wolfe*, 154 Cal.App.4th 28 (2007) .................................................... 14

*Sade Shoe Co. v. Oschin and Snyder*, 162 Cal.App.3d 1174 (Cal. App. 1984) ................ 19

*Sandisk Corp. v. ST Microelecs., Inc.*, 480 F.3d 1372 (Fed. Cir. 2007)..................... 24, 25

*Sebastian Intern., Inc. v. Russolillo*, 162 F.Supp.2d 1198 (C.D.Cal. 2001) .................. 18

*Sipple v. Found. For National Progress*, 71 Cal.App.4th 226 (1999)........................... 13

*Tavory v. NTP, Inc.* 2007 WL 2965048 (E.D.Va. 2007) ........................................ 9

*Uniform Prod. Code Council v. Kaslow*, 460 F. Supp. 900 (S.D.N.Y. 1978) .................... 25

OPPOSITION TO MOTION TO DISMISS AND MOTION TO STRIKE

*United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963 (9th Cir. 1999) ... 10

*Varian Med. Sys v. Delfino,* 35 Cal.4th 180 (2005).......................................................... 10

*Video-Cinema Films, Inc. v. Cable News Network, Inc.,* 2003 WL 1701904 at *3 (S.D.N.Y. 2003) 9

*Weinberg v. Feisel,* 110 Cal.App.4th 1122 (2003) ...........................................12, 13, 14

**Statutes**

17 U.S.C. § 301(a) ....................................................................................... 21

17 U.S.C. § 301(b)(3) .................................................................................. 21

17 U.S.C. § 512(c) ..................................................................................... 2, 7

17 U.S.C. § 512(f)...................................................................................... 1, 3

17 U.S.C. § 512(g) ......................................................................................... 2

28 U.S.C. § 2201 ......................................................................................... 24

Cal. Civ. Code § 1549 ................................................................................. 16

Cal. Civ. Code § 47(b) ................................................................................ 15

Cal. Code Civ. Proc. § 425.16 ........................................................9, 10, 15, 16

U.S.C. § 512 .........................................................................................1, 2, 3, 7

This case arises from a 29-second video clip of a dancing toddler. Stephanie Lenz made a short home movie featuring her toddler son, Holden, dancing in her kitchen to (barely audible) music by the artist Prince. Excited to share this video (the "Holden Video") with her family and friends, she posted the 29-second clip on an Internet video hosting site, YouTube.com. Four months later, the Holden Video disappeared from YouTube, and Lenz received an ominous notice that Universal Music Publishing Group had accused her of copyright infringement. The notice resulted in her video being removed from YouTube for over six weeks. Shocked and angered, Lenz filed this case to hold Defendants accountable for their misrepresentation to YouTube that her video infringed their copyrights.

Defendants have now moved to dismiss two of Lenz's claims and to strike the third. Yet they do not deny any of the fundamental allegations of her complaint. They do not deny that they sent the takedown notice accusing her of copyright infringement. They do not deny that the video is just 29 seconds long and contains, at best, a barely audible version of their copyrighted song in the background. They do not deny that, much like a documentary filmmaker, Lenz was simply recording the actual experience of her son dancing and sharing that moment via the medium of online digital video. Instead, Defendants bring a series of spurious legal attacks, even attempting once again to silence Lenz by claiming, without foundation, that she has broken the law. But there is no question that Lenz has the right to bring this action. Defendants' motions should be denied.

Defendants raise three arguments. First, they insist that Lenz has not made out a cause of action for knowing misrepresentation under 17 U.S.C. § 512(f), even though she has pled every necessary element of her claim. As part of their argument, Defendants challenges this Court's ruling in *Online Policy Group v. Diebold, Inc.*, 337 F.Supp.2d 1195 (N.D. Cal. 2004), arguing that it was overruled by *Rossi v. MPAA*, 391 F.3d 1000 (9th Cir. 2004), a Ninth Circuit case that neither cited nor considered *Diebold*. Second, they move to strike Lenz's interference claim on the theory that the takedown notice they sent to YouTube—a private business communication—was somehow speech in connection with a public issue. Yet Defendants fail to explain what that public

issue might be, much less show how their private email commented upon it. Nonetheless, Lenz can present more than sufficient evidence to demonstrate a prima facie case of interference and defeat this motion. Finally, Defendants argue that there is no copyright controversy between them and Lenz, even though they continue to accuse Lenz of infringing their copyright *in the very text of their motion*. For these and other reasons articulated below, both of Defendants' motions should be denied.

## FACTUAL AND PROCEDURAL HISTORY

Plaintiff Stephanie Lenz is a mother, wife, writer and editor. She and her husband have two children, Zoe (age 4) and Holden (now almost 2). Declaration of Stephanie Lenz in Opposition to Motion to Dismiss and Motion to Strike ("Lenz Decl.") at ¶ 2-3. On or about February 7, 2007, Lenz's children were playing in the family's kitchen when Holden, who was still learning to walk at the time, began dancing to the Prince song "Let's Go Crazy." *Id.* at ¶ 4. Zoe and Holden had recently heard the song on television during the Super Bowl halftime show. *Id.* at ¶ 5. Using her digital camera, Lenz decided to capture the moment on film, creating a 29-second video recording of the children's activities, which consisted primarily of Holden's dance (the "Holden Video"). *Id.* at ¶ 6. On or about February 8, 2007, Lenz uploaded the Holden Video from her computer to the YouTube website for her family and friends to enjoy. *Id.* at ¶ 7. The video was publicly available at <http://www.youtube.com/watch?v=N1KfJHFWlhQ>. *Id.* at ¶ 8.

On or around June 4, 2007, Defendants Universal Music Corp., Universal Music Publishing, Inc. and Universal Music Publishing Group (collectively, "Universal"), sent a Digital Millennium Copyright Act ("DMCA") takedown notice pursuant to 17 U.S.C. § 512(c) demanding that YouTube remove the Holden Video because of unspecified copyright violations. Declaration of Kelly Klaus in Support of Defendants' Mot. to Dismiss and Special Mot. to Strike ("Klaus Decl"), Ex. C. YouTube removed the video and sent Lenz an email notifying her that it had done so in response to Universal's accusation of copyright infringement and warning her that repeated incidents of copyright infringement could lead to the deletion of her account and all her videos. Lenz Decl. at ¶10, Ex. B .

Lenz sent YouTube a DMCA counter-notification pursuant to 17 U.S.C. § 512(g) on June

27, 2007, demanding that her video be reposted because it did not infringe Universal's copyrights. *Id*. at ¶ 12, Ex. C. Regardless, the Holden Video was unavailable on YouTube for over six weeks. *Id*. at ¶ 10, 15.

On July 24, 2007, Lenz filed a Complaint seeking redress for Universal's misuse of the DMCA takedown process, its accusation of copyright infringement, and its intentional interference with her contractual use of YouTube's hosting services. On August 15, pursuant to discussions with Universal's counsel, Lenz amended her Complaint to revise the named Defendants. On September 21, Universal moved to dismiss the Complaint and to strike the interference claim.

## ARGUMENT

### I.    LENZ HAS STATED A CLAIM FOR RELIEF IN COUNT I UNDER SECTION 512(F)

In Count I, Lenz alleges every necessary element of a claim for knowing misrepresentation under 17 U.S.C. § 512(f). Universal disputes the factual basis for these claims, as it is entitled to do, but such disputes are properly resolved only on summary judgment or at trial, not on a motion to dismiss. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986)

In order to plead a proper 512(f) claim, a plaintiff need only allege that the defendant (a) knowingly made a misrepresentation that certain online material was infringing its copyright; (b) that the misrepresentation was made in a statement or action governed by Section 512; and (c) that the misrepresentation was material. 17 U.S.C. § 512(f).

Here, Lenz has alleged exactly these elements. Specifically, she has alleged that Universal knowingly made a misrepresentation that the Holden Video infringed its copyright. Am. Cmplt. ¶¶ 1, 14, 17-20. Lenz also alleged that this misrepresentation was made pursuant to the DMCA, 17 U.S.C. § 512. *Id.* And finally, she alleged that the misrepresentation was material. *Id.* ¶ 20. Thus, all of the required elements of a Section 512(f) claim are present.

In the face of Lenz's well-pled complaint, Universal attacks Count I in two different but equally unavailing ways, both of which are discussed below.

#### A.    Universal Cannot Use A Motion To Dismiss To Dispute Lenz's Allegations That It Sent A Section 512 Notice

Universal's begins by disagreeing with the facts alleged. While conceding that its notice

appears on its face to track perfectly *every single requirement* of a Section 512 notice, Universal states that it "does not agree that a notice in accordance with YouTube's Terms of Use is notification pursuant to the DMCA[.]" Mem. P. & A. in Supp. of Def.'s Mot. to Dismiss ("Motion") at 5. This is not a proper basis for a motion to dismiss. To the contrary, on a motion to dismiss, a court must treat all allegations in the complaint as true. *Leatherman v. Tarrant Cty Narcotics Intell. Unit.,* 507 U.S. 163, 164 (1993). Thus, Universal's disagreement with Lenz's allegations is irrelevant and improper.[1] If Universal wishes to try to raise a factual dispute about its notice, it must do so on summary judgment or at trial. *Celotex,* 477 U.S. at 327.

Universal's first asserted ground for dismissal must be denied.

**B.** **Lenz Has Properly Pled The Knowledge Standard For 512(f) Actions Under Both *Rossi* And *Diebold***

Next, Universal argues that Lenz has failed to plead that it had "actual knowledge" of the material misrepresentation it made. This is both untrue and an inaccurate statement of the proper legal standard in 512(f) cases. First, Lenz *has* pled actual knowledge. Specifically, Lenz alleges that Universal "*knew* or should have known" that the Holden Video was non-infringing when it sent its DMCA notice. Am. Cmplt. ¶ 19. The "knew" language in the allegation is an allegation of actual knowledge.

Second, Universal misapplies the "actual knowledge" standard for 512(f) *factual investigations* under *Rossi v. MPAA,* 391 F.3d 1000 (9th Cir. 2004), instead of the appropriate and controlling standard for 512(f) *legal determinations* established by this Court in *Online Policy Group v. Diebold*, 337 F.Supp.2d 1195 (N.D.Cal. 2004). In *Rossi*, the Ninth Circuit examined whether and to what extent a copyright holder must conduct a factual investigation before sending a DMCA Notice in order to meet the "good faith" standard required by the statute. Rossi had established a website bearing *per se* hallmarks of copyright infringement, such as graphics for a number of unauthorized MPAA movies and the statements "Full Length Downloadable Movies"

---

[1] Notwithstanding Universal's improper procedural argument, Section 8 of YouTube's Terms of Use expressly states "only DMCA notices should go to the Copyright Agent [with the email address copyright@youtube.com]". Klaus Decl., Ex. A. Pre-discovery evidence shows that Universal sent its notice to this exact email address. *Id.* at Ex. C.

and "NOW DOWNLOADABLE." *Rossi,* 391 F.3d at 1002. The MPAA employee investigating the site saw these indicia and correctly concluded (based on his subjective and actual knowledge of the facts) that, were such facts true, copyright infringement of MPAA movies was occurring on the site.

On appeal, Rossi argued that the MPAA lacked *sufficient information* to form a "good faith" belief under Section 512(c)(3)(A)(v) that he was infringing their copyrights and that they should have done a reasonable *factual investigation* to determine whether or not infringement was occurring. *Id.* at 1003. The Court rejected this argument, holding the statements on Rossi's website provided a sufficient basis to conclude that infringement was occurring:

> These representations on the website led the MPAA employee to conclude in good faith that motion pictures owned by MPAA members were available for immediate downloading from the site. The unequivocal language used by Rossi not only suggests that conclusion, but virtually compels it…. In fact, Rossi even admitted that his own customers often believed that actual movies were available for downloading on his website.

*Id*. Based on these facts, the Court held that the MPAA had a sufficient basis for its good faith belief under Section 512 and that such a belief need only be based on the *actual subjective knowledge* of the facts available to the notice sender and not on any further investigation. *Id.* at 1005-6; *see also Dudnikov v. MGA Entmt., Inc.*, 410 F.Supp.2d 1010, 1013 (D. Colo. 2005) (following *Rossi* and finding that DMCA notice sender had actual knowledge of sufficient facts to form good faith belief that infringement was occurring). Notably, the *Rossi* court did not refer to the standard for making the legal determination of infringement under Section 512, as there was no dispute that offering the full films for download was infringing activity.[2]

Here, we have exactly the opposite situation. Lenz has alleged that Universal had *actual subjective knowledge* of all of the relevant facts concerning the Holden Video. Watching the 29-second video gave Universal all the facts it needed to know about the Holden Video and the extent to which it used any of Universal's copyrighted works. This is all *Rossi* requires and is exactly what Lenz has plead. Universal instead disputes the standard for the *legal determination* of

---

[2] In fact, as the Ninth Circuit noted, there was no suggestion in the record that the MPAA's belief regarding Rossi's asserted infringement was other than sincere. *See Rossi*, 391 F.3d at 1005 n. 8.

whether the Holden Video infringes. However, as noted above, this standard was not addressed by *Rossi*; instead, it was addressed by this Court in *Diebold*.

In *Diebold*, as is the case here, there was no dispute as to the factual basis for the Defendant's DMCA notices. The parties agreed that the copyrighted works at issue were the email archives from Diebold's corporate email system and that the plaintiffs had posted them in their entirety on their web servers. 337 F.Supp.2d at 1198-99. At issue instead was whether the posting of those works was a fair use under the Copyright Act and, most importantly, whether Diebold knew or should have known that such postings were fair use when it sent its DMCA notice. *Id*. at 1204. This Court held on summary judgment that Diebold had violated Section 512(f) because it knew or should have known that the postings were fair.[3] *Id.*

This distinction between the knowledge standards for factual investigation versus legal determination is further supported by both the legislative history of Section 512 as well as *Perfect 10 v. ccBill*, 488 F.3d 1102 (9th Cir. 2007), another DMCA decision by the Ninth Circuit. In the Senate Report on Section 512, Congress made it clear that Section 512 was intended to "balance the need for rapid response to potential infringement *with the end-users legitimate interests in not having material removed without recourse.*" Sen. Rep. No. 105-190 at 21 (1998) (emphasis added); *see also id* at 49 (Section 512(f) "is intended to deter knowingly false allegations to service providers in recognition that such misrepresentations are detrimental to rights holders, service providers, and *Internet users*." (emphasis added)). Thus, in passing Section 512(f), Congress expressed a clear intent to protect Internet users who post non-infringing material online and to deter abuse of the Section 512 notice-and-takedown regime.

Under Universal's interpretation, Section 512(f) becomes a dead letter. By arguing an "actual knowledge" standard for legal determinations, Universal is arguing that no copyright holder can ever violate section 512(f) unless a court has previously ruled that the material at issue is non-infringing. Such a rule would directly contradict the purpose and structure of Section 512. As

---

[3] Universal argues that *Diebold* was overturned by *Rossi*, as the *Rossi* opinion was filed two months after *Diebold* was announced by this Court. However, there is no mention of *Diebold* in the *Rossi* opinion or in the briefing before the Ninth Circuit in the case. Thus, one cannot presume that the Ninth Circuit meant to address the *Diebold* rule, let alone overturn it.

noted above, Section 512 was enacted by Congress to allow for rapid responses to potential copyright infringement. 17 U.S.C. § 512(c) (describing takedown procedures), (g) (describing procedures for reinstating material contingent on copyright owner's response to counter-notice), and (h) (authorizing pre-litigation subpoenas to identify users who posted allegedly infringing material). Thus, Section 512 was meant as an alternative or, in some instances, a precursor to a possible infringement lawsuit, not an antecedent. If 512(f) liability were only available *after* an infringement action, there would be no point to the 512 process.

Moreover, such an interpretation of 512(f) would fail to achieve the two goals set forth by Congress in the legislative history – to protect end users posting non-infringing material from frivolous takedowns and to deter abuse of the DMCA notice process. Under Universal's theory, a copyright owner's subjective belief that infringement had occurred, no matter how unreasonable, could shield frivolous or malicious DMCA takedowns from any form of review or redress under 512(f). For example, Universal could incorrectly claim that a video that merely mentioned the phrase "Let's Go Crazy" (without copying a single note) was an infringement of its copyright, or that a review of Prince's new album was infringing. DMCA takedowns for these examples would be excused, under Universal's interpretation, because there was no *ex ante* legal determination on the issue and thus, no way for Universal to "actually know" the legal status of the material's use.[4]

In fact, under Universal's incorrect standard, even Diebold, whom this Court held violated

---

[4] Such abusive takedown practices are not hypothetical. Attacks on free speech through Section 512 misuse are well-documented. *See Landmark Education at* http://www.eff.org/cases/landmark-and-internet-archive (last visited Nov. 9, 2007) (controversial education foundation sent DMCA takedown against critical documentary that showed a few pages of its manual for a few seconds); *Sapient v. Geller at* http://www.eff.org/cases/sapient-v-geller (last visited Nov. 9, 2007) (Well-known spoon-bending paranormalist sent DMCA takedown against critical 15-minute documentary based on an alleged infringing eight seconds of introductory footage); *MoveOn, Brave New Films v. Viacom at* http://www.eff.org/cases/moveon-brave-new-films-v-viacom (last visited Nov. 9, 2007) (Viacom sent DMCA takedown notice for parody of Colbert Report), *Malkin v. Universal at* http://www.eff.org/deeplinks/2007/05/malkin-fights-back-against-copyright-law-misuse-universal-music-group (last visited Nov. 9, 2007) (Universal sent DMCA notice for criticism of Akon using short clips of videos for purposes of criticism); *Diehl v. Crook at* http://www.eff.org/cases/diehl-v-crook (last visited Nov. 9, 2007) (interviewee sent DMCA takedown notice claiming copyright in Fox News' use of his image in the interview).

512(f) because it sent a DMCA takedown notice when "no reasonable copyright holder could have believed that the portions of the email archive discussing technical problems with [its] voting machines were protected by copyright[,]" *Diebold*, 337 F.Supp.2d at 1204, would have escaped 512(f) liability because at the time Diebold sent the notice, no court had expressly ruled on the legal status of posting the email archive. Such a standard would provide no protection for end users and no deterrence for abuse of the DMCA process. It cannot be what Congress intended.

Finally, the *Rossi/Diebold* standards are supported by the Ninth Circuit's recent decision in *Perfect 10 v. ccBill,* 488 F.3d 1102 (9th Cir. 2007). In *ccBill*, the Court stated:

> The DMCA requires a complainant to declare, under penalty of perjury, that he is authorized to represent the copyright holder, and that he has a good-faith belief that the use is infringing. This requirement is not superfluous. Accusations of alleged infringement have drastic consequences: A user could have content removed, or may have his access terminated entirely. If the content infringes, justice has been done. But if it does not, speech protected under the First Amendment could be removed. We therefore do not require a service provider to start potentially invasive proceedings if the complainant is unwilling to state under penalty of perjury that he is an authorized representative of the copyright owner, and that he has a good-faith belief that the material is unlicensed.

488 F.3d at 1112. As the Ninth Circuit emphasized, the requirements of 512(c) are important safeguards of a user's First Amendment rights. Section 512(f) is the primary remedy that Congress gave those users to vindicate abuse of those rights. Thus, the "good faith belief" requirement must have some teeth in order to offer users recourse. The requirement that copyright holders face liability for 512 notices when they knew or should have known, based on their actual knowledge of the facts, that material is non-infringing provides that recourse. This is the balance struck by *Rossi* and *Diebold* and intended by Congress.

Lenz's complaint meets these standards. Lenz has pled that, having actual subjective knowledge of all the relevant facts, Universal sent its DMCA notice to YouTube *in bad faith*, knowingly misrepresenting that an infringement had taken place. Am. Cmplt. ¶ 14, 17-20. Lenz has pled under *Diebold* that Universal knew or should have known when it sent its notice that Lenz's use of the work was non-infringing and by sending their notice, Universal was materially misrepresenting that knowledge.[5] *Id.*

---

[5] Universal also argues that there is no way for a copyright owner to tell, prior to an express court ruling, whether or not a particular use is infringing or fair. *See* Motion at 12-14. This argument

## II. UNIVERSAL'S MOTION TO STRIKE IS IMPROPER AND MERITLESS

### A. California's Anti-SLAPP Law Has No Bearing On This Case

In a sad perversion of the spirit and letter of California's anti-SLAPP law, Cal. Code Civ. Proc. § 425.16, Universal attempts to convince this Court that Lenz violated the law by seeking to vindicate her rights in this case. Universal claims that its private infringement notice to YouTube, identifying Lenz's video, among 227 others in list of allegedly infringing works, was speech "in connection with a public issue." Universal's sole basis for this claim is not the communication itself, or its contents, both of which were unmistakably private. Instead, it relies entirely on the efforts by Lenz and her counsel–well after the communication was sent and the video taken down—to raise awareness about this case and misuse of the DMCA takedown process. In other words, unable show that its *own speech* was connected to a public issue, Universal attempts to turn *Lenz's* free speech against her to dismiss her suit and sanction her.

Universal's bootstrap approach runs directly contrary to the purpose of Section 425.16: to promote public discourse and the right to petition. On Universal's theory, virtually any tort that involves a communication, no matter the communication's subject matter, forum or size of the audience, is vulnerable to an anti-SLAPP claim if the complainant calls public attention to the tortious acts after the fact. If that were the rule, litigants and potential litigants could never publicly discuss or drawn media attention to their cases, for fear of incurring the additional legal expenses of defending against an anti-SLAPP motion. The California legislature never intended

---

was expressly rejected by this Court in *Diebold,* 337, F.Supp.2d at 1204 (finding no reasonable copyright holder could have believed the material at issue was infringing) as well as numerous other courts that have awarded attorneys fees in copyright cases where plaintiffs have brought frivolous claims of infringement against fair uses of their material. *See Tavory v. NTP, Inc.* 2007 WL 2965048 (E.D.Va. 2007) *See also, e.g., Bond v. Blum,* 317 F.3d 385, 397-8 (4th Cir. 2003) (affirming copyright defendants fee award because fair use question was 'not a close one' and copyright holders position was frivolous and unreasonable). *Video-Cinema Films, Inc. v. Cable News Network, Inc.,* 2003 WL 1701904 at *3 (S.D.N.Y. 2003) (awarding defendants' fees because copyright holder's position on fair use was 'objectively unreasonable'); *Religious Tech. Ctr. v. Lerma,* 908 F.Supp. 1362, 1368 (E.D.Va 1995) (awarding defendants' fees because "no reasonable copyright holder could have in good faith brought a copyright infringement action."). Finally even Professor Nimmer, whose treatise Universal relies upon for this argument, acknowledges that while some fair use determinations are "clouded", there are exceptions (such as *Diebold*) where copyright owners have no realistic chance of succeeding in their copyright claims. *See* 3 Nimmer on Copyright §12B.08 n.16. This case presents a textbook example of such an "unclouded" fair use.

the anti-SLAPP statute to have such a chilling effect, nor does it.[6]

Universal's "petition" theory is equally specious, and foreclosed by its own briefing and conduct, which demonstrates that it never seriously contemplated suing Lenz for copyright infringement.

Given that no stretch of the imagination can put the speech at issue within Section 425.16's ambit, it appears that Universal's true purpose is to accomplish precisely what California's anti-SLAPP law was designed to prevent: the use of a meritless pleading to obtain "an economic advantage over a citizen party by increasing the cost of litigation to the point that the citizen party's case will be weakened or abandoned, and of deterring future litigation." *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 970-71 (9th Cir. 1999) (citation omitted). The threat of an attorneys' fees award, no matter how unlikely, is a serious one for Lenz and her family, who are raising two children on one income and have few assets. This Court should remove that improper threat immediately by denying the Motion to Strike.[7]

> 1. <u>A Private Notice to Third Party Is Not Speech in Connection with a Public Issue or Issue of Public Interest</u>

Under Section 425.16, it is Universal's burden to show that Count II is subject to a special motion to strike, *i.e.* that Universal's accused actions are protected as acts in furtherance of the right of petition or free speech in connection with a public issue. *Varian Med. Sys v. Delfino,* 35 Cal.4th 180, 192 (2005). To meet that burden, it must demonstrate that its DMCA notice (1) involves a topic of widespread public interest; and (2) itself contributes to public debate on that topic. *See Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty, USA, Inc.,* 129 Cal. App. 4th 1228, 1246 (2005). Universal falls far short of meeting its burden.

---

[6] Moreover, such a rule would be unfair to litigations from a Due Process perspective. Few litigants can predict what interest the public will take in their legal case prior to publicizing it. Under Universal's theory, a case that garners no public attention is not subject to 425.16, while a case that does achieve public interest is sanctionable. To hold plaintiffs subject to mandatory sanctions under 425.16 based on such unpredictable post-filing facts is fundamentally unfair.

[7] Further, because the Motion is frivolous, Lenz reserves the right to seek costs and attorneys' fees incurred in defending against Universal's motion. Cal. Code Civ. Proc. § 425.16 (c).

### a. The Takedown Notice Was A Pure Business Communication that Failed to Comment on any Topic of Public Interest

Universal's DMCA notice was nothing more than a private business communication that made no comment on any topic of public interest or matter of public debate. Universal's notice concerned allegations of copyright infringement against 228 specific videos, including the Holden Video. Klaus Decl. at ¶ Ex. C. The notice made no comment other than to notify YouTube, pursuant to the DMCA, of the alleged infringements and to request their removal. *Id.* It did not refer to any public controversy regarding any of the videos or the DMCA, nor did it mention any public debate or comment on any public issue or concern. *Id.* Simply put, it was merely a private business communication to which Section 425.16 does not apply. *See, e.g., Blackburn v. Brady*, 116 Cal.App.4th 670, 676-77 (2004) (section 425.16 did not apply to private communication containing allegations of fraud in connection with real estate because allegations concerned a "purely business type event or transaction and is not the type of protected activity contemplated under Section 425.16(e)."); *Bulletin Displays, LLC v. Regency Outdoor Advertising, Inc.,* 448 F.Supp.2d 1172 (C.D.Cal. 2006) (statements concerning bidding strategy were related to business dealings and not issue of public interest.). Thus, Universal has not met its burden of demonstrating that its DMCA notice itself meets the Section 425.16 standards for protection.

### b. Lenz's Subsequent Public Criticism of Universal's Misconduct Does Not Make Its Business Email Into Speech on a Matter of Public Interest

Having failed to qualify for Section 425.16 protection based on the actual content and context of its notice, Universal vaguely asserts that the notice *must* have been made in connection with a matter of public interest because Lenz publicly criticized the censorial effect of that conduct after the notice was sent and had its effect of taking down the Holden Video. Motion at 16. Universal's theory defies both anti-SLAPP jurisprudence and common sense.

The anti-SLAPP analysis turns on specifics, not generalities. Since the lawsuit was filed, Lenz and her counsel have indeed talked publicly about the takedown as an example of misuse of

the DMCA, and the video as an example of obvious fair use.[8] DMCA misuse and fair use are, of course, both topics of public interest. But the existence of those broad public interests does not retroactively transform Universal's notice into commentary about or a contribution to those topics. In *Consumer Justice Center v. Trimedica International, Inc.*, 107 Cal.App.4th 595 (2003), for example, a California appellate court rejected the defendant's argument that its herbal supplement brochure was speech relating to an issue of public interest simply because there was general public interest in the topic of herbal supplements. "If we were to accept [Defendant's] argument that we should examine the nature of the speech in terms of generalities instead of specifics, then nearly any claim could be sufficiently abstracted to fall within the anti-SLAPP statute . . . even though it is obvious that the case was not filed for purposes of chilling participation in matter of public interest." *Id.* at 601-02. *See also Weinberg v. Feisel,* 110 Cal.App.4th 1122, 1132 (2003), citing *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979) (assertion of broad, amorphous, public interest insufficient).

The specific speech in question here involved a simple (albeit improper) notice of infringement that included a reference, among 227 others, to a short home movie of a toddler dancing. Until it was removed from YouTube, that video was of concern only to Universal, the toddler's family and their friends, and possibly YouTube. "[A] matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest." *Weinberg*, 110 Cal.App.4th at 1132 (collecting cases). When the notice was sent, Lenz was not a public figure, nor had she thrust herself into any public issue. While Universal makes much of the 115,000 views and many comments the video had received as of the filing date of Universal's Motion, that public attention occurred *after* Lenz's Complaint was filed. As of June 3, 2007 (one day before the notice was sent), the video had been viewed just 273 times, and only a single comment had been posted even though the video had been public for months. Declaration of Micah Schaffer in Support of Plaintiff's Opp. to Mot. to Dismiss and Special Motion to Strike ("Schaffer Decl.") at ¶¶ 3-4.

---

[8] Lenz also posted a few statements on her blog expressing her shock and anger at Universal's allegation of infringement, shortly after YouTube informed her of the allegation, and followed up with a few posts mentioning her contact with counsel. Lenz Decl. at 11

Declaration of Corynne McSherry in Support of Plaintiff's Opp. to Mot. to Dismiss and Special Motion to Strike ("McSherry Decl.") at ¶2, Ex. A. Thus, at the time of the improper takedown request, there was no public interest in the Holden Video.

Subsequent media attention to the takedown and the video does not alter the analysis. Indeed, Universal's bootstrapping approach has been rejected by two California appellate courts as directly contrary to the limiting purpose of the public interest requirement. In *Rivero v. AFL-CIO,* 105 Cal.App.4th 913 (2003), the court held that statements concerning a work place dispute were not made in connection with a matter of public interest where the employee had previously received no attention or media coverage and only a few individuals were directly affected by the situation. *Id.* at 924. The dispute, the court concluded, was a private matter between the parties. Moreover, the subsequent publication of the statements (in a union newsletter) did not alter the analysis: "If the mere publication of information . . .were sufficient to make that information a matter of public interest, the public-issue limitation would be substantially eroded, *thus undercutting the obvious goal of the Legislature that the public-issue requirement have a limiting effect.*" *Id.* at 926 (emphasis added).[9] Similarly, in *Weinberg*, the court held that an advertisement in a hobbyist newsletter (received by over 700 people) accusing an individual of thievery was not a statement in connection with a public interest or issue where the individual accused was not a public figure and had not thrust himself into any public issues. *Weinberg*, 110 Cal.App.4th at 1132-34. "Simply stated, causes of action arising out of false allegations of criminal conduct, made under [these circumstances] are not subject to the anti-SLAPP statute. Otherwise wrongful accusations of criminal conduct . . . automatically would be accorded the most stringent protections provided by the law . . . a result that would be inconsistent with the purpose of the anti SLAPP

_____

[9] *Compare Averill v. Super. Ct.*, 42 Cal.App.4th 1170, 1175 (1996) (425.16 applied to private statements about battered women's shelter that had already been subject of considerable public controversy, including local land use hearings); *Sipple v. Found. For National Progress*, 71 Cal.App.4th 226, 238-39 (1999) (425.16 applied to allegations of domestic violence against nationally-known political consultant who used domestic violence issue in political campaigns).

statute." *Id.* at 1136.[10]

### c. Universal Has Not and Cannot Show that Its Notice Contributed to Public Debate

Equally importantly, there "should be some degree of closeness between the challenged statements and the asserted public interest." *Weinberg*, 110 Cal.App.4th at 1132. Even if the video were an "issue of public interest" before this lawsuit was filed—which it was not—Universal's notice did not "contribute" to public debate about it; rather, the notice was designed to *cut off* any public commentary on the video by making it unavailable. Moreover, since the notice was sent solely to YouTube via private email, there is no evidence that Universal intended any member of the public to ever see it. It would be a curious perversion of the anti-SLAPP law to construe a private email intended to cause the removal of a visual work (as well as 227 other works) as a contribution to "public debate" about that work. *Huntingdon,* 129 Cal.App. 4th at 1246; *see also Weinberg*, 110 Cal.App.4th at 1132-33 (the focus of the speaker's conduct should be the public interest rather than a mere effort "to gather ammunition for another round of [private] controversy....") citing *Connick v. Myers,* 461 U.S. 138, 148 (1983).

### 2. A Private Notice to a Third Party of An Alleged Infringement is Not Speech in Support of Right to Petition

Universal's alternative claim—that the notice was speech in furtherance of Universal's right of petition—is equally unavailing.

Universal cannot succeed because it cannot meet its burden of showing that it "seriously considered" pursuing litigation against Lenz when it sent its DMCA notice. *See, e.g. A.F. Brown Elec. Contractor Inc. v. Rhino Elec. Supply Inc,* 137 Cal.App.4th 1118 (2006), *as modified, rehearing denied, review denied.* For example, in *Rohde v. Wolfe*, 154 Cal.App.4th 28 (2007)—a

[10] Even Universal's own citation demonstrates the inadequacy of its claim. In *Damon v. Ocean Hills Journalism Club,* 85 Cal.App.4th 468 (2000)*,* the court held that statements about the governance of a 3,000 member gated community, including upcoming elections, were made in connection with a matter of public interest. Observing that homeowners associations were equivalent to a "second municipal government," and that the statements involved "fundamental choices" about that government, the court held that they were made in connection with a topic of public interest because they concerned "an inherently political question of vital importance to each individual and to the community as a whole." *Id.* at 479. A notice of infringement about a home movie hardly compares..

case Universal itself cites—the court held that threatening messages from attorney in connection with an asset that was already subject to specific legal threats by both parties "had to be in anticipation of litigation 'contemplated in good faith and under serious consideration.'" *Id.* at 36-7, quoting *Action Apartment Ass'n, Inc. v. City of Santa Monica,* 41 Cal.4th 1232, 1251 (2007).[11]

Here, Universal itself demonstrates it never seriously contemplated litigation against Lenz. Universal conceded that its notice "did not indicate any intent or threat to sue." Motion at 3, 21. Universal did not file suit following Lenz's DMCA counter-notice nor at any time since. Universal has not contacted Lenz or her attorneys to threaten such a suit. Having admitted it had no serious intent to sue when the notice was sent, and affirmed that lack of intent through its own subsequent conduct, Universal cannot now—in hindsight—go back and claim otherwise.[12]

Plaintiff's cause of action bears none of the "hallmarks of a SLAPP." *Lockheed,* 190 F.3d at 970. She is hardly seeking to use legal process to chill speech in connection with a public issue, shut down debate, or thwart anyone's right of petition. Quite the contrary: Plaintiff's interference claim seeks redress for *Universal's* effort to silence *her* speech. Not surprisingly, Universal has not and cannot meet its threshold burden of showing the anti-SLAPP statute applies. The motion to strike should be denied on that basis alone. *Navellier v. Sletten,* 29 Cal.4th 82, 88-9 (2002).

## B. Lenz Has Established a *Prima Facie* Case of Tortious Interference

Even if Universal could show that Section 425.16 applied to Lenz's interference claim, Universal's anti-SLAPP motion still must be denied because Lenz can make a *prima facie* showing that she will prevail on the claim. Cal. Code Civ. Proc. § 425.16(b)(1).

In considering whether Lenz has made that showing at this early stage in the litigation, the Court "shall consider the pleadings, and supporting and opposing affidavits stating the facts upon

---

[11] Contrary to Universal's protestations, a legal controversy over intellectual property rights that is sufficiently concrete to merit a declaratory judgment may easily exist even where an intellectual property owner has not seriously considered litigation. *See, e.g., Sandisk Corp. v. ST Microelectronics, Inc.,* 480 F.3d 1372 (Fed. Cir. 2007) (finding declaratory judgment jurisdiction even where defendants had affirmed that they had no plans to file suit).

[12] This standard is derived from cases addressing the California's litigation privilege, Cal. Civ. Code § 47(b). *See, e.g., Action Apartment*, 41 Cal.4th at 1251. Thus, Universal's assertion of the litigation privilege, Motion at 16 n.19, fails for the same reason.

which the liability . . . is based," Cal. Code Civ. Proc. § 425.16(b)(2), and, in light of same, determine whether a "reasonable jury" could find in her favor. *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 840 (9th Cir. 2001). "In ruling on a motion to strike, the trial court does not weigh the evidence or determine questions of credibility; instead the court accepts as true all of the evidence favorable to the plaintiff." *Nagel v. Twin Labs., Inc.*, 109 Cal.App.4th 39, 45-46 (2003). Indeed, the California Supreme Court has recognized that the anti-SLAPP "statute poses no obstacle to suits that possess minimal merit." *Navellier,* 29 Cal.4th at 93.

### 1. Lenz Will Prevail on Her Claim For Interference With Contract.

Lenz's claim of tortious interference with contract requires only that she show "1) a valid contract between the plaintiff and a third party; 2) defendant's knowledge of the contract; 3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; 4) actual breach or disruption of the contractual relationship; and 5) resulting damage*." Reeves v. Hanlon*, 33 Cal.4th 1140, 1148 (2004); *see also Quelimane Company, Inc., v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55 (1998). "Wrongfulness independent of the inducement to breach the contract is not an element of the tort of intentional interference with *existing* contractual relations[.]" *Quelimane*, 19 Cal.4th at 55 (emphasis in original).

### a. A Valid Contract Existed Between Lenz and YouTube.

Under the California Civil Code, a contract is simply defined as "an agreement to do or not do a certain thing." Cal. Civ. Code § 1549. There is ample evidence of such an agreement here. When Lenz signed up for her YouTube account, she explicitly agreed to the terms of use and privacy policy by clicking a button with the words "Sign Up" next to a checked checkbox stating "I agree to the terms of use and privacy policy." *See* Lenz Decl. at ¶ 9 and Ex. A.

Courts have had no difficulty concluding that web site Terms of Use like YouTubes's establish a contractual relationship. *See, e.g., Cairo, Inc. v. CrossMedia Servs., Inc.,* No. C 04-04825 JW, 2005 U.S. Dist. LEXIS 8450, at *12, 2005 WL 756610 (N.D. Cal. April 1, 2005); *Feldman v. Google, Inc.,* No. 06-2540, 2007 U.S. Dist. LEXIS 22996, 2007 WL 966011 (E.D.

Penn. 2007).[13]

Lenz and YouTube entered into a binding contract by which Lenz used YouTube's video hosting services.

### b. Universal Knew About the Contract Between Lenz and YouTube.

Universal was certainly aware of the YouTube Terms of Service and that videos are posted (and removed) pursuant to those terms. *See* Motion at 2 (takedown request sent "pursuant to YouTube's posted 'Terms of Use.'"), 5 (citing Klaus Decl., Ex. A).

### c. Universal's Intentional Act Was Designed to Induce a Breach or Disruption of the Contractual Relationship Between Lenz and YouTube.

As for the third element, Universal's own admissions demonstrate that Universal knew of the agreement and that interference with that agreement was a necessary consequence of its action As the Restatement of Torts explains:

> The rule stated in this Section applies . . . to an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action.

*Quelimane,* 19 Cal.4th at 56 (quoting Rest. 2d. of Torts, § 766, comment j).[14]  Universal has admitted that it sent its notice, pursuant to YouTube's Terms of Use (see above), in order to have Lenz's video taken down. *See* Motion at 1 ("Universal's notice … requested that YouTube remove or disable access to the postings."), 6 (quoting Universal's notice to YouTube, Klaus Decl., Ex. C.).  Thus, Universal knew that sending the takedown notice would cause Lenz's video to be removed from YouTube, and would thereby disrupt the agreement Lenz and YouTube entered into when she accepted YouTube's Terms of Use. *Id.*

### d. The Lenz/YouTube Contract Was Actually Disrupted

Universal incorrectly suggests that Lenz must identify and prove interference with particular contractual rights.  Not so.  Lenz need only establish that a "disruption of the contract relationship occurred." *Quelimane,* 19 Cal.4th at 55; *see also Sebastian Intern., Inc. v. Russolillo,*

---

[13] Even Universal admits that the Terms of Use "sets forth the standards that users *must* conform to if they wish to use the website." Motion at 18 (emphasis added).
[14] While Universal's act was wrongful, Lenz need not show it to be wrongful other than the fact that it interfered with the contract. *Quelimane*, 19 Cal.4th at 56.

162 F.Supp.2d 1198, 1204 (C.D.Cal. 2001) ("the California courts have made clear that 'interference' does not necessarily require evidence of any 'breach.'"). Indeed, the California Supreme Court has held the tort "permit[s] liability where the defendant does not literally induce a breach of contract, but makes plaintiff's performance of the contract 'more expensive or burdensome.'" *Ramona Manor Convalescent Hosp. v. Care Enters.*, 177 Cal.App.3d 1120, 1131 (1986) (quoting *Lipman v. Brisbane Elementary Sch. Dist.*, 55 Cal.2d 224, 232 (1961)).

As this Court has held, "[b]y sending a letter, the copyright holder can effectuate the disruption of ISP service to clients." *Diebold*, 337 F.Supp.2d at 1205-06. That is precisely what occurred here. Lenz's video was removed as a direct result of Universal's takedown notice, and took her a step closer to having her account revoked under YouTube's takedown policy. *See* Motion at 6-7 (describing takedown process) and Lenz Decl. ¶ 10 and Ex. B.

Universal's contention that the contract was "not interfered with; the 'contract' was followed," is belied by the Terms of Use: DMCA notices are only permitted when the copyright holder "believe[s] that any User Submission or other content infringes upon your copyrights." Klaus Decl., Ex. A. Thus, the contract only provides for removals based on receipt of proper DMCA notices, i.e., notices based on a good faith belief of infringement. Universal's improper notice misled YouTube to remove a video it would not have otherwise taken down.

### e. Lenz Suffered Damage as a Result of the Disruption.

Lenz was damaged by Universal's interference in at least two ways. First, she was deprived of YouTube's video hosting services for six weeks. While YouTube provides storage for video files and the bandwidth needed to transfer such files at no cost to users, comparable replacement services can cost up to $39.00 per month. McSherry Decl. ¶¶3-5, Exs. B-D. Thus, YouTube's video hosting services represent valuable consideration to Lenz. Lenz Decl. ¶15.

Second, but perhaps more importantly, Universal's conduct caused Lenz to lose the First Amendment benefit of having her video posted on YouTube and chilling her First Amendment-based right to fair use of "Let's Go Crazy." Lenz Decl. ¶16. The loss of First Amendment freedoms, for even minimal periods of time, harms Lenz. *See New York Times Co. v. United States*, 403 U.S. 713 (1971) (any loss of First Amendment rights can cause irreparable injury).

**f. Universal Has Not Satisfied Its Burden of Proving Its Claimed Defenses.**

"[A]lthough section 425.16 places on the plaintiff the burden of substantiating its claims, a defendant that advances an affirmative defense to such claims properly bears the burden of proof on the defense." *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*, 133 Cal.App.4th 658, 675-676 (2005). Universal has again failed to meet its burden.

(i) Universal Has Failed to Show That Its Interference With the Lenz/YouTube Contract was Justified as a Matter of Law.

Justification normally cannot be determined on a motion to dismiss, and this case is no exception. Establishing the existence of justification depends on a detailed and highly fact-specific inquiry: "[b]alancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances including the nature of the actor's conduct and the relationship between the parties." *Herron v. State Farm Mutual Ins. Co.*, 56 Cal.2d 202, 206-207 (1961); *see also* Rest.2d Torts, § 767. Thus, the question of "whether the actor's conduct was fair and reasonable under the circumstances … is a question for determination by the trier of *fact*." *Sade Shoe Co. v. Oschin and Snyder*, 162 Cal.App.3d 1174, 1180 (Cal. App. 1984) (emphasis added).

Universal has made no serious attempt to provide this Court with the necessary factual basis to conduct such an inquiry. Indeed, its argument on justification does not cite to any record evidence. *See* Motion at 19.[15] It is therefore inappropriate to determine the applicability of Universal's justification defense at such an early stage, before Lenz has had any opportunity to conduct any discovery on whether Universal's conduct was fair or reasonable.[16]

Further, the available facts show that Universal's conduct was not justified because its takedown notice had no lawful foundation and was made in bad faith. *See* Section I. B, above.

---

[15] For example, Universal has provided no evidence about who reviewed the Holden Video prior to sending its DMCA notice, what those people knew about the video at the time, or any other evidence of their various states of mind.

[16] Because the case is in a federal court, anti-SLAPP discovery limitations do not apply. *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001); *Rogers v. Home Shopping Network*, 57 F.Supp.2d 973, 982 (C.D. Cal. 1999). In addition, if the Court determines that it requires further evidence in order to rule on Universal's motion to strike, Lenz requests that the Court defer its ruling pending completion of discovery.

Lenz has pled and can prove that Universal has not "complied with its statutory obligations [and] its actions were [not] sincere and proper in means and purpose." *Rossi*, 391 F.3d at 1006. Even the most cursory review of the video would have given Universal actual knowledge that the takedown notice wrongfully suppressed Lenz's right to fair use of "Let's Go Crazy." *See* Motion at 6 (describing video, and thereby showing that Universal has actual knowledge of its content). Universal was not legitimately protecting its copyright interests, but abusing the takedown process. Indeed, Universal has publicly admitted that it sent the notice at Prince's behest, based not on the particular characteristics of the Holden Video but solely on its belief that as "a matter of principle" Prince "has the right to have his music removed." McSherry Decl. Ex. E. Thus, if anything, the available evidence shows a lack of justification.[17]

    (ii) Lenz's State Claim Is Not Preempted By Federal Law

Finally, Universal briefly suggests Lenz's interference claim is preempted in light of this Court's determination that Section 512(f) preempted an interference with contract claim under the facts in *Diebold*. In that case, this Court said:

> Preemption occurs "when compliance with both state and federal [laws] is a physical impossibility or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hillsborough County Fla. v. Automated Med. Labs. Inc.*, 471 U.S. 707, 713 (1985) (internal citations omitted); *see also In re Cybernetics Servs., Inc.*, 252 F.3d 1039, 1045 (9th Cir. 2001) (internal citation omitted). Even if a copyright holder does not intend to cause anything other than the removal of allegedly infringing material, compliance with the DMCA's procedures nonetheless may result in disruption of a contractual relationship: by sending a letter, the copyright holder can effectuate the disruption of ISP service to clients. If adherence to the DMCA's provisions simultaneously subjects the copyright holder to state tort law liability, there is an irreconcilable conflict between state and federal law. To the extent that Plaintiffs argue that there is no conflict because Diebold's use of the DMCA in this case was based on misrepresentation of Diebold's rights, their argument is undercut by the provisions of the statute itself. In section 512(f), Congress provides an express remedy for misuse of the DMCA's safe harbor provisions.

337 F.Supp.2d at 1205-06. For the reasons set forth below, Lenz respectfully urges the Court to reconsider its prior holding.

---

[17] In an attempt to bolster its justification argument, Universal points to *Rossi*, which dismissed an interference with contract claim because plaintiff Rossi had failed to establish the *absence* of justification, as required by Hawaiian law. Motion at 19 (citing *Rossi*, 391 F.3d at 1006). Under California law, however, justification is an affirmative defense and Lenz need not establish the absence of justification to make a prima facie case of interference. *Herron* 56 Cal.2d at 207.

First, it is crucial that any preemption analysis be rooted in Section 301 of the Copyright Act, which limits Copyright Act preemption to the "the subject matter of copyright as specified by sections 102 and 103." 17 U.S.C. § 301(a). Further, the Copyright Act expressly states that *"[n]othing in this title* annuls or limits any rights or remedies under the common law or statutes of any State with respect to … activities violating legal or equitable rights that are *not equivalent to* any of the exclusive rights within the general scope of copyright as specified by *section 106*." 17 U.S.C. § 301(b)(3) (emphasis added). Thus, where "qualitatively other elements are required, instead of, or in addition to, the acts of reproduction, performance, distribution, or display, in order to constitute a state-created cause of action, then the right does not lie 'within the general scope of copyright,' and there is no pre-emption." 1 NIMMER ON COPYRIGHT §1.01[B][1]; *see also Kodadek v. MTV Networks*, 152 F.3d 1209, 1212 (9th Cir. 1998) (citing NIMMER).

When Congress passed the DMCA, it added Section 512 but elected not to modify Section 301 to expand the scope of preemption beyond Section 106.[18] Moreover, nothing in the legislative history of the DMCA gives any indication that Congress intended Section 512(f) to preempt state law tort claims. *See* H.R. Conf. Rep. 105-796 (October 08, 1998); H.R. Rep. 105-551(II) (July 22, 1998); H.R. Rep. 105-551(I) (May 22, 1998); and S. Rep. 105-190 (May 11, 1998). While, as this Court noted, *Diebold,* 337 F.Supp.2d at 1205, Section 512(f) created an "express remedy for misuse of the DMCA's safe harbor provisions," a plaintiff suing under Section 512(f) is not asserting any rights *equivalent* to those specified by Section 106: the exclusive rights of reproduction, preparation of derivative works, distribution, and display. Rather, it is seeking redress for misuse of the DMCA takedown procedures.

Accordingly, because Section 512 is part of the same title (Title 17) as Section 301, it should not be construed to "annul or limit" any state law claim, as long as that claim includes elements that are in addition to or instead of, the acts specified in Section 106. *See Del Madera Props. v. Rhodes & Gardner*, 820 F.2d 973, 976 (9th Cir.1987), *overruled on other grounds,*

---

[18] In the same year, Congress did modify Section 301 in the Sonny Bono Copyright Term Extension Act, Pub.L. 105-298, § 102(a) in light of other legislative changes. Thus, Congress was aware of Section 301 and the effect that amendments to the Copyright Act might have on its scope.

Fogerty v. Fantasy, Inc., 510 U.S. 517 (1994) (stating test for Section 301 preemption); NIMMER ON COPYRIGHT § 1.01[a][ii], n.96 ("to the extent that contract interference emerges from activity other than unauthorized reproduction, distribution, performance, etc., then the elements are distinct and pre-emption should not lie."). Lenz's interference claim does not touch on any right equivalent to Section 106 of the Copyright Act. It also includes numerous additional elements. Thus, it is not and cannot be preempted under Section 301.

In *Diebold*, this Court did not conduct a Section 301 analysis. Rather, it briefly examined the doctrines of conflict and field preemption. In so doing, it found that conflict preemption could exist *where proper adherence to the DMCA's provisions* simultaneously subjects the copyright holder to state tort law liability. *Diebold*, 337 F.Supp.2d at 1205-06 (emphasis added). Here, however, Lenz has alleged that Universal *violated* the DMCA's provisions through its knowing misrepresentation of infringement. By the same token, Lenz's claim for intentional interference does not create an irreconcilable conflict between state and federal law. The affirmative defense of "justification" discussed above provides that *proper* adherence to the DMCA's notice provisions does not, and indeed cannot, simultaneously subject a defendant to state tort liability.[19] Thus, in this case, Lenz's interference claim complements rather than conflicts with Section 512.[20]

Indeed, far from than "stand[ing] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hillsborough County Fla.,* 471 U.S. at 713, Lenz's claims enhance the purposes of Congress in crafting Section 512(f): "to deter knowingly false allegations to service providers in recognition that such misrepresentations are detrimental to rights holders, service providers, and Internet users." H.R. Rep. 105-551(II) (July 22, 1998) at 59.[21] *See*

---

[19] This complimentary structure is consistent with the holding in *Rossi*, where the Ninth Circuit considered a tortious interference with contractual relations claim arising from a takedown notice, but did not find conflict preemption. Rather, the Court found that Rossi has not met his burden to "prove 'the absence of justification on the defendant's part ...'" *Rossi,* 391 F.3d at 1006 (citing *Lee v. Aiu*, 85 Hawai'i 19, 936 P.2d 655, 668 (1997)). Had Rossi proven an absence of justification, it appears that the Ninth Circuit would have allowed his claim to stand.

[20] In addition, Universal has waived any claim for a conflict between the DMCA and state law, since it asserts that it did not send the notice pursuant to the DMCA.

[21] Similarly, in trademark law, state law can expand the rights of a federal registrant without causing conflict preemption. *See Golden Door, Inc. v. Odisho*, 646 F.2d 347 (9th Cir. 1980).

*In re World Auxiliary Power Co.*, 303 F.3d 1120, 1131 (9th Cir. 2002) (recognizing a presumption against preemption of state laws and applying presumption in copyright case).

As to field preemption, this Court noted in *Diebold* that "[i]n section 512(f), Congress provides an express remedy for misuse of the DMCA's safe harbor provisions." 337 F.Supp.2d at 1206. However, the provision of an *express* remedy is not the same as the provision of an *exclusive* remedy. If that were the case, then any time a party infringed a copyright, the copyright owner could only sue her for copyright infringement and not for any concurrently violated state tort or breach of contract. Courts have consistently found that supplemental state causes of action are not preempted in comparable circumstances. *See, e.g., Bowers v. Baystate Techs., Inc.,* 320 F.3d 1317, 1325-26 (Fed. Cir. 2003) (enforcement of contracts for copyrighted works not preempted).

Moreover, the Supreme Court has held that

> Congress' intent to supersede state law altogether may be found from a scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, because the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject, or because the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose.

*Pacific Gas & Elec. Co. v. Energy Res. Conservation and Dev. Comm'n*, 461 U.S. 190, 204 (1983). Thus, in order for a court to infer that Congress has meant to occupy a field and provide exclusive remedies, there must be evidence that Congress intended to leave "no room for the States to supplement" the federal scheme. Here, as noted above, there is no such evidence in the text of Section 512 or its legislative history.

Furthermore, "[w]hen Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a 'reliable indicium of congressional intent with respect to state authority,' 'there is no need to infer congressional intent to pre-empt state laws from the substantive provisions' of the legislation." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517 (1992) (internal citations omitted). Congress enacted and has preserved Section 301, a provision that explicitly addresses preemption and expressly states that nothing in Title 17, which includes Section 512, would eliminate state law claims like Lenz's – a "reliable indicium of congressional intent" if there ever was one.

**III.      THE LENZ COMPLAINT PRESENTS A JUSTICIABLE CONTROVERSY**

Under the Declaratory Judgment Act ("DJA"), an individual may file suit in federal court or counterclaim in an existing suit to obtain a declaration of rights with respect to another party– whether or not other relief (such as damages or an injunction) is or could be sought.  28 U.S.C. § 2201 (2006).  To seek declaratory judgment, a party need only file an "appropriate pleading" that establishes (1) jurisdiction; and (2) the existence of an actual case or controversy between parties having adverse legal interests.  *Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348, 357 (1961).  There is no universal rule for compliance with the latter element; rather, the analysis is tied to the facts of the case.  "[T]he question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941); *quoted and affirmed in MedImmune Inc. v. Genentech, Inc.* 127 S.Ct. 764, 771-72 (2007).  Addressing this question, courts have stressed that the DJA "should be liberally construed to accomplish its intended purpose of affording a speedy and inexpensive method of adjudicating legal disputes . . . and to settle legal rights and remove uncertainty and insecurity from legal relationships . . . ."  *Beacon Constr. Co. v. Matco Elec. Co.,* 521 F.2d 392, 397 (2d Cir. 1975); *see also Allstate Ins. Co. v. Emp. Liab. Assur. Co.*, 445 F.2d 1278, 1280 (5th Cir. 1971) ("[DJA] is to be liberally construed to achieve its  . . . salutary purpose.")

The Supreme Court has recently reaffirmed that the actual controversy requirement is satisfied if the dispute is "definite and concrete, touching the legal relations of parties having adverse interests" and "real and substantial" such that it will permit "specific relief through a decree of a conclusive character."  *MedImmune* 127 S.Ct. at 771.  Thus, in *Sandisk Corp. v. ST Microelecs., Inc.,* 480 F.3d 1372 (Fed. Cir. 2007), for example, the Federal Circuit Court of Appeals held that a party had standing to seek a declaratory judgment of non-infringement where a patentee took a position that forced the plaintiff to choose between pursuing arguably illegal behavior or abandoning that which he claimed to have a right to do.  Indeed, even a "direct and unequivocal statement" that, as appears to be the case here, defendants had "absolutely no plan" to

sue plaintiffs did not eliminate jurisdiction. *Id.* at 1376; *see also Uniform Prod. Code Council v. Kaslow*, 460 F. Supp. 900, 903 (S.D.N.Y. 1978) ("ultimate exposure of plaintiff to an action by defendant ... clearly gives plaintiff standing to bring an action for declaratory judgment . . . ."). And in a case cited by Universal itself, a court found declaratory judgment jurisdiction applied to a claim by an employee who, though currently employed by the defendant, would be exposed to an adverse calculation of benefits, based on a disputed policy, in the event that she left the company or was terminated. *Hulteen* v. *AT&T Corp.,* 498 F.3d 1001, 1004 n.1 (9th Cir. 2007). In other words, the defendant's's refusal to change the policy created a sufficiently substantial dispute to justify jurisdiction even though legal action might never occur.

Lenz, like the plaintiffs in *Sandisk* and *Hulteen*, is exposed to a possible action by Universal. The dispute is definite and concrete—Universal has claimed that a particular video is infringes its copyrights, and that statement has already had the real and substantial consequence of causing the removal of the video from YouTube for six weeks. Like the Defendant in *Hulteen*, Universal refuses to admit that its view of the law is incorrect, forcing Lenz, like the *Hulteen* plaintiff, to exist in a legal limbo, awaiting an infringement claim that may or may not come. *See* Motion at 4 (alleging Plaintiff's use has resulted in thousands of infringements). Until Lenz is released from potential liability, the dispute between the parties remains alive.

## IV.    CONCLUSION

For the reasons stated above, this Court should deny the special motion to strike and the motion to dismiss Lenz's claims.

DATED: November 13, 2007          By _____/s/_____
                                        Corynne McSherry, Esq.

                                        ELECTRONIC FRONTIER FOUNDATION
                                        454 Shotwell Street
                                        San Francisco, CA  94110
                                        Tel: (415) 436-9333/Fax: (415) 436-9993

                                        Attorneys for Plaintiff Stephanie Lenz