# EXHIBIT A




## Fair Use Principles
## for User Generated Video Content

Online video hosting services like YouTube are ushering in a new era of free expression online. By providing a home for "user-generated content" (UGC) on the Internet, these services enable creators to reach a global audience without having to depend on traditional intermediaries like television networks and movie studios. The result has been an explosion of creativity by ordinary people, who have enthusiastically embraced the opportunities created by these new technologies to express themselves in a remarkable variety of ways.

The life blood of much of this new creativity is fair use, the copyright doctrine that permits unauthorized uses of copyrighted material for transformative purposes. Creators naturally quote from and build upon the media that makes up our culture, yielding new works that comment on, parody, satirize, criticize, and pay tribute to the expressive works that have come before. These forms of free expression are among those protected by the fair use doctrine.

New video hosting services can also be abused, however. Copyright owners are legitimately concerned that a substantial number works posted to some UGC video sites are simply unauthorized, verbatim copies of their works. Some of these rightsholders have sued service providers, and many utilize the "notice-and-takedown" provisions of the Digital Millennium Copyright Act (DMCA) to remove videos that they believe are infringing. At the same time, a broad consensus has emerged among major copyright owners that fair use must be accommodated even as steps are taken to address copyright infringement.[1]

Content owners and service providers have indicated their mutual intention to protect and preserve fair use in the UGC context, even as they move forward with efforts to address copyright concerns. The following principles are meant to provide concrete steps that they can and should take to minimize the unnecessary, collateral damage to fair use as they move forward with those efforts.

1. **A Wide Berth for Transformative, Creative Uses**: Copyright owners are within their rights to pursue nontransformative verbatim copying of their copyrighted materials online. However, where copyrighted materials are employed for purposes of comment, criticism, reporting, parody, satire, or scholarship, or as the raw material for other kinds of creative and transformative works, the resulting work will likely fall within the bounds of fair use.

---

[1] *See* User Generated Content Principles, Principle #6, <http://ugcprinciples.com>.

But a commitment to accommodating "fair use" alone is not enough. Because the precise contours of the fair use doctrine can be difficult for non-lawyers to discern, creators, service providers, and copyright owners alike will benefit from a more easily understood and objectively ascertainable standard.

Accordingly, content owners should, as a general matter, avoid issuing DMCA or other informal takedown notices for uses of their content that constitute fair uses *or* that are noncommercial, creative, and transformative in nature.[2]

2. **Filters Must Incorporate Protections for Fair Use**. Many service providers are experimenting with automated content identification technologies ("filters") to monitor their systems for potential copyright infringements. If a service provider chooses to implement such filters, the following precautions should be taken to ensure that fair uses are not mistakenly caught in them:

    a. **Three Strikes Before Blocking**: The use of "filtering" technology should not be used to automatically remove, prevent the uploading of, or block access to content unless the filtering mechanism is able to verify that the content has previously been removed pursuant to an undisputed DMCA takedown notice or that there are "three strikes" against it:

    (1) the video track matches the video track of a copyrighted work submitted by a content owner;

    (2) the audio track matches the audio track of that *same* copyrighted work; and

    (3) nearly the entirety (e.g, 90% or more) of the challenged content is comprised of a single copyrighted work (i.e., a "ratio test").

    If filtering technologies are not reliably able to establish these "three strikes," further human review by the content owner should be required before content is taken down or blocked.

    b. **Humans Trump Machines**: Human creators should be afforded the opportunity to dispute the conclusions of automated filters. If a user's video is "matched" by an automatic filter, the user should be promptly notified by the service provider of the consequences of the "match" and given the opportunity to dispute the conclusions of the filtering process. Notice should be provided to the user whether or not the "match" results in the blocking of content (e.g., a parodist may not want the target of the parody receiving a share of revenues generated by it).

    If the user disputes a "match" pursuant to the above dispute mechanism provided by the service provider, the provider should promptly notify the relevant content owner. The service provider may choose to impose a brief "quarantine" period on the content (no more than three business days), in order to afford content owner an opportunity to issue a DMCA takedown notice after human review of the disputed content.

---

[2] Viacom's website, for example, states that "regardless of the law of fair use, we have not generally challenged users of Viacom copyrighted material where the use or copy is occasional and is a creative, newsworthy or transformative use of a limited excerpt for noncommercial purposes." <http://www.viacom.com/NEWS/YouTube Litigation/About Fair Use>

2

    c. **Minimization**: In applying automated filtering procedures, service providers should take steps to minimize the impact on other expressive activities related to the blocked content. For example, automated blocks should not result in the removal of other videos posted by the same user (e.g., as a result of account cancellation) or the removal of user comments posted about the video.

3. **DMCA Notices Required for Removals**: The DMCA's "notice-and-takedown" procedures provide two important protections for creators whose noninfringing materials are improperly targeted for removal: (1) the right to sue where the removal is the result of a knowing material misrepresentation[3] and (2) a "counternotice-and-putback" procedure that overrides a takedown notice unless a content owner is willing to file an infringement action in court.[4]

    In order to preserve these protections, service providers should require compliant DMCA takedown notices from content owners before removing content in any manner that does not afford users the ability to contest and override the removal (such as the dispute and notice procedure described in Principle #2b above).

4. **Notice to Users upon DMCA Takedown**: Upon issuance of any DMCA takedown notice by a content owner, the service provider should provide prompt notice to the user who posted the allegedly infringing material. Such notices should include (1) an entire copy of the takedown notice, (2) information concerning the user's right to issue a DMCA counter-notice and the provider's procedures for receiving such notices, and (3) information about how to contact the content owner directly in order to request a reconsideration of the takedown notice (see Principle #5 below).

    Where feasible, this information should be made available to the posting user on the page where the content formerly appeared, as well as in private communications (such as email).

5. **Informal "Dolphin Hotline"**: Every system makes mistakes, and when fair use "dolphins" are caught in a net intended for infringing "tuna," an escape mechanism must be available to them. Accordingly, content owners should create a mechanism by which the user who posted the allegedly infringing content can easily and informally request reconsideration of the content owner's decision to issue a DMCA takedown notice and explain why the user believes the takedown was improper.

    This "dolphin hotline" should include a website that provides information about how to request reconsideration, and a dedicated email address to which requests for reconsideration can be sent.[5] Service providers should ensure that users are informed of these mechanisms for reconsideration, both on the site where the removed material previously appeared, as well as in the notice described in Principle #4 above.

---

[3] 17 U.S.C. § 512(f).
[4] 17 U.S.C. § 512(g).
[5] Viacom, for example, has established a dedicated email address for this purpose: counternotices@viacom.com.

3

    Upon receiving an informal request for reconsideration of a particular takedown notice, the content owner should evaluate the request promptly, generally within three (3) business days, and retract the notice where it was issued in error.

6. **Mandatory Reinstatement upon Counter-notice or Retraction**: Service providers should establish and follow the formal "counternotice-and-putback" process contemplated by the DMCA. Service providers also should provide users with a streamlined mechanism to reinstate content in cases when a takedown notice has been retracted by the content owner.

These Principles endorsed by:

Electronic Frontier Foundation

Center for Social Media, School of Communications, American University

Program on Information Justice and Intellectual Property, Washington College of Law, American University

Public Knowledge

Berkman Center for Internet and Society at Harvard Law School

ACLU of Northern California

# EXHIBIT B

## washingtonpost.com

### Standing Up To Takedown Notices
Web Users Turn the Tables on Copyright Holders

By Catherine Rampell
Washington Post Staff Writer
Friday, October 19, 2007; D01

On a chilly February day, Stephanie Lenz decided to show her family and friends what her bouncing baby boy could do. She plopped 13-month-old Holden, then learning to walk, on the floor, cranked up Prince's song "Let's Go Crazy" and whipped out the digital camera.

In the 29-second YouTube video that resulted, Holden smiles and bobs up and down to the music. According to Universal Music Publishing Group, he also helps his mom commit a federal crime: copyright infringement.

In June, Universal, which owns the rights to Prince's song, sent a notice to YouTube requesting the video be taken down but did not take action against Lenz. On the contrary, Lenz sued Universal for abusing copyright law.

"The idea that putting a little video of your kid up on YouTube can mean you have to go to court, and maybe declare bankruptcy and lose your house, is just wrong," Lenz said. "I don't like being made to feel afraid, and I don't like being bullied."

Universal did not return calls seeking comment on Lenz's case.

Companies have been pursuing copyright violations for decades, but technology -- and the proliferation of online venues like YouTube that allow self-publishing -- has created opportunities both for infringement and for ways to identify alleged violations.

With more self-publishing sites comes a boom in "takedown notices," warnings that the material is infringing a copyright and needs to be removed.



YouTube, which has been sued by many parties for hosting videos alleged to violate copyright, this week started using a filter to try to identify such content before copyright holders notice it. A group of other content holders, including NBC Universal and Microsoft, yesterday announced standards for how companies should deal with material that people post online.

But recently -- in part because of backlash among users and advocacy groups who say copyright holders are abusing the law and wrongfully taking down content -- the challenges to these copyright claims also appear to be increasing.

"These companies are trying to shoot a mouse with an elephant gun," said Gigi Sohn, director of Public Knowledge, a public-policy think tank that focuses on intellectual property. "They like to accuse their customers, the music fans and TV fans out there, of not respecting the law, but I don't think *they* respect

the law."

Copyright holders say they are trying to legitimately protect their property and that takedown notices issued for noninfringing material are usually because of mistakes and not malevolence.

"These companies are sending out 100,000 takedown notices, so of course once in a while there's going to be a fly caught in the ointment," said Douglas Lichtman, a UCLA law professor who advises Viacom on copyright matters. "Everyone's trying to be careful, though. They don't want the PR backlash that comes when they make a mistake."

Copyright exemptions for fair use generally depend on whether the allegedly infringing product is "transformative" in nature -- that is, using copyrighted material for some new, creative purpose is considered okay. One such purpose, protected by law, is comment or parody. Still, some say accusations of copyright violations are sometimes just attempts to squash criticism.

Michelle Malkin, a popular blogger, said this was the case when her video criticizing rapper Akon for misogyny was removed from YouTube after a complaint from Universal Music Group.

"It was entirely obvious that trying to wipe off criticism from YouTube is what their claim was all about," Malkin said. She sent YouTube a counternotice; Universal Music backed down, and the video went back up.

Universal Music did not return calls seeking comment on Malkin's video.

A takedown notice issued for a video debunking Uri Geller, a self-described paranormalist, has also provoked censorship claims.

Geller, who has an NBC series beginning next week, became a household name in the 1970s for saying he could bend spoons with his mind. The YouTube video in question features several seconds of footage that Geller's brother-in-law filmed and that Geller says was used without permission. He ardently disputes that his copyright claim is meant to squelch free speech.

"I've been controversial all my life, and more controversy means more publicity for me," Geller said. "They can say whatever they want to about me . . . I just want them to edit out the part of the clip that they stole from us."

Other alleged infringers claim that copyright holders abuse the law because of overly zealous creative control.

Ric Silver, the choreographer of the Electric Slide, says he spent three years contacting 17,000 Web sites about what he says is their "incorrect portrayal" of the famous line dance. Silver also told YouTube to take down a number of videos showing the dance, including one clip of a concert filmed by Kyle Machulis.

Machulis sued Silver for copyright abuse. As part of the settlement, Silver agreed to allow the video to be reposted with a tagline crediting him for the choreography, but he now says he's waiting for paperwork from the Library of Congress that will allow him to open new lawsuits over clips like Machulis's.

"I can't go to every wedding and bar mitzvah in the country, so this is all I can do to make sure people

learn it right," Silver said.

YouTube isn't the only hosting site on which copyright law is sometimes allegedly abused. EBay has been the setting of many of these infringement claims, too, but generally over the "first sale doctrine" -- a portion of copyright law regarding legal resale of licensed goods -- rather than fair use.

Take, for example, Karen Dudnikov and Michael Meadors. They run a mom-and-pop eBay store out of rural Colorado, 10 miles from the nearest power line. When they opened, Dudnikov began sewing pillows, potholders and other items out of fabric with licensed images of cartoon characters and other trademarked or copyrighted images. Soon they found their auctions were being taken down because of infringement allegations.

To date they've taken 15 corporate heavyweights to court -- including Disney Enterprises, Major League Baseball and M&M/Mars -- and gotten them all to back down. Facing off against these legal powerhouses, they represented themselves.

"They think we are just some country bumpkins they can push around," Meadors said. "This is our livelihood, and we stick up for ourselves."

Embroiled in their 16th lawsuit over a Betty Boop fabric, the couple has accepted outside legal help for the first time, from Public Citizen. On the fabric, the cartoon character is wearing a dress that closely resembles a design by artist and fashion designer ErtÂ¿. SevenArts, the British company that owns the rights to ErtÂ¿'s designs, told eBay through a U.S. associate to remove the auction for copyright violation.

"One of the most famous ErtÂ¿ designs has been used as a costume on this fabric, and we had to defend it," said Ray Perman, managing director of SevenArts. "We have contracts with various licensees, and we are obliged under the terms of those contracts to do this."

View all comments that have been posted about this article.

**Post a Comment**

View all comments that have been posted about this article.

You must be logged in to leave a comment. Log in | Register

Submit

Comments that include profanity or personal attacks or other inappropriate comments or material will be removed from the site. Additionally, entries that are unsigned or contain "signatures" by someone other than the actual author will be removed. Finally, we will take steps to block users who violate any of our posting standards, terms of use or privacy policies or any other policies governing this site. Please review the full rules governing commentaries and discussions. You are fully responsible for the content

that you post.

© 2007 The Washington Post Company

Ads by Google

**Beach Cities Protection**
Executive Protection, World Wide Services 1 877 PROTCU-2
www.beachcitiesprotection.com

**Security Guards Service**
Armed/Unarmed Security Guards 24/7 Low Hourly Rates. Call 800-955-8417
www.Alliednationwide.com

**Security Alarm System**
Free Alarm System - Signup Now! Includes Equipment, 24/7 Monitoring
www.PinnacleSecurity.com

# EXHIBIT C



  Good Morning America | World News | 20/20 | Primetime | Nightli

Monday, December 03, 2007

Register | Sign In

Home | News Brief | World | U.S. | Investigative | Politics | Money | Health | Entertainment | ESPN Spor

Home > The Law

# The Home Video Prince Doesn't Want You to See
### Pa. Mom Fights Back With Lawsuit Against Music Company



(YouTube)

More Photos

**By JIM AVILA, CHRIS FRANCESCANI and MARY HARRIS**
**ABC News Law & Justice Unit**
Oct. 26, 2007

A bouncing YouTube baby has be-bopped his way right into the legal cross-hairs of the pop star Prince, sparking a lawsuit that could test the boundaries of U.S. copyright law.

Holden Lenz, 18 months old, is the pajama-clad star of a 29-second **home movie** shot by his mother in the family's rural Pennsylvania kitchen and posted last

Font Size
A **A** A
E-mail
Print
Share

**WHAT OTHERS ARE SAYING**    187 Comments

Quote: "File-sharing and illegally downloa...
F0ckDisney Dec-2

"People: Recently in the summer of 2007, P...
Tanelitaneli Nov-1

This has-been queen should be glad his mus...
RidallDJ Oct-28

Connect with Newsmakers

February on the popular video site YouTube.



Vote

Do You Think Prince is Right?

In the video, the child is seen bouncing and swaying for the camera, as, faintly, the Prince hit "Let's Go Crazy" plays on a CD player in the background.

Twenty eight people, mostly friends and family, had viewed the YouTube video by June, when mom Stephanie Lenz said she received an e-mail from YouTube informing her that her video had been removed from the site at the request of Universal Music Publishing Group, the recording industry's largest label, and warning her that future copyright infringements on her part could force the Web site to cancel her account.

## 'Frightened, Then Angry'

**Sponsored Links**

**Trade Stocks? Try Forex!**
Many ways to trade only 1 GFT. Try Forex Trading Today!
www.GFTForex.com

**Mortgage Rates at 4.65%**
$170,000 loan for $656/month. See New Payment - No SSN Rqd....
Refinance.LeadSteps.com

Buy a link here

"All of my [YouTube] videos are home videos, so I thought it was some kind of scam," Lenz told ABC News' Law & Justice Unit. When she realized YouTube had actually taken her video down, she said she was shocked.

"At first it frightened me, because I saw who had filed" the takedown notice, she said.

"It was Universal Music Publishing Group, and I was afraid that ... they might come after me. ... And the more afraid I got, the angrier I got. ... I was afraid that the recording industry might come after me the way they've come after other people for downloading music or file sharing.

"I thought even though I didn't do anything wrong that they might want to file some kind of suit against me, take my house, come after me.

"And I didn't like feeling afraid," she continued. "I didn't like feeling that I could get in trouble for something as simple as posting a home video for my friends and family to see."



Photos

Lenz filed a "counter-notice" with YouTube, and the Web site put her video back up about six weeks later.

## What Constitutes a Ripoff of an Artist's Work?

But Lenz was angry, and she said



Capture video of a news event? Upload it now.

**Message Boards**

DISCUSS THIS TOPIC WITH THE ABC NEWS COMMUNITY                      Read All

View All Message Boards

**Most Viewed**

AUDIENCE FAVORITES                                                  View All

 Police Probe Could Cost Peterson Pension

 Stunning Defeat for Hugo Chavez

 Julia Roberts Goes Nuts

 Photos That Make You Look Twice

 Latest From the 'Sex' Set

 Items Only the Rich Can Afford

**Related News**

EXCESS HOLLYWOOD: Musician Meltdowns

Prince Through The Years

Google Testing YouTube Antipiracy System

YouTube Unveils Anti-Piracy Protection

Led Zeppelin to sell music online

Madonna drops Warner Music for tour promoter

EXCESS HOLLYWOOD:
Musician Meltdowns

she wasn't ready to let it go.

She contacted a leading cyber rights legal organization called the Electronic Frontier Foundation, and filed a **civil lawsuit** against the music publisher, claiming they were abusing the Digital Millennium Copyright Act by sending out reams of what are known in the industry as "take down notices" to Web sites like YouTube, claiming their artists' copyrights had been infringed upon -- when in fact, sometimes they may not have been at all.

The Home Video Prince Doesn't Want You to See

1  2  3  4  Next

BOOKMARK    |    Read All 187 Comments and Post Your Own

**Sponsored Links**

**Trade Stocks? Try Forex!**
Many ways to trade only 1 GFT. Try Forex Trading Today!
www.GFTForex.com

**Mortgage Rates at 5.125% Fixed**
Fed Fund Rates Drop Again. Lower Your Monthly Payment. Act Fast!
www.MortgageSavingZone.com

**Hot Stock Alert - GFET**
Ethanol, Biofuels, Green Energy. Alternative Energy Stock.
www.GulfEthanolCorp.com

Buy a link here

Feedback  |  Wireless  |  E-mails & News Alerts  |  Message Boards  |  RSS Headlines  |
Contact Us  |  ABC.com  |  Site Map  |  Advertising Info  |  Terms of Use  |  Privacy Policy
External links are provided for reference purposes. ABC News is not responsible for the content of external internet sites