1   Kurt Opsahl (SBN 191303)
    *kurt@eff.org*
2   Michael Kwun (SBN 198945)
    *michael@eff.org*
3   Corynne McSherry (SBN 221504)
    *corynne@eff.org*
4   ELECTRONIC FRONTIER FOUNDATION
    454 Shotwell Street
5   San Francisco, CA 94110
    Telephone: (415) 436-9333
6   Facsimile: (415) 436-9993

7

8   Attorneys for Plaintiff
    STEPHANIE LENZ

9                     **UNITED STATES DISTRICT COURT**

10           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

11                         **SAN JOSE DIVISION**

12

13  STEPHANIE LENZ,                    )   No. C 07-03783-JF
                                       )
14                      Plaintiff,     )   OPPOSITION TO MOTION TO DISMISS
                                       )   SECOND AMENDED COMPLAINT
15      v.                             )
                                       )   DATE: July 18, 2008
16  UNIVERSAL MUSIC CORP., UNIVERSAL   )   TIME: 9:00 a.m.
    MUSIC PUBLISHING, INC.,            )   CTRM: 3 (Hon. Jeremy Fogel)
17                                     )
                                       )
18      and                           )
                                       )
19  UNIVERSAL MUSIC PUBLISHING GROUP,  )
                                       )
20                      Defendants.    )
                                       )
21  _____)

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES....................................................................................................i

INTRODUCTION ...........................................................................................................1

FACTUAL AND PROCEDURAL HISTORY ........................................................... 2

ARGUMENT ................................................................................................................. 5

I.   STANDARD OF REVIEW ................................................................................ 5

II.  A KNOWING MISREPRESENTATION THAT A FAIR USE IS INFRINGING VIOLATES SECTION 512(F) OF THE DMCA ........................................................ 5

  A. Lenz Has Alleged that Universal Caused YouTube To Remove The Holden Video Pursuant To Section 512(f)(c) of the DMCA........................................................ 6

  B. Universal Made A Material Misrepresentation That Lenz's Fair Use Was Infringing ...... 8

    1. Universal Made a Material Representation that the Holden Video Was Infringing ................................................................................................................ 8

    2. If the Holden Video Was a Fair Use, Universal's Representation of Infringement was a Misrepresentation ................................................................................ 8

    3. Lenz's Allegations Suffice to Infer That Her Use Was Fair Use ................................................................................................................................ 10

  C. Lenz Has Alleged Facts Sufficient To Infer That Universal Knew Her Use Was Fair.... 13

    1. Pursuant to This Court's Order, Lenz Need Only Allege Facts From Which Knowledge May Be Inferred ...................................................................... 14

    2. A DMCA Notice Sender Must Consider Fair Use Prior To Sending a DMCA Notice ................................................................................................................ 16

    3. Fair Use Can Be Sufficiently Clear to Permit an Inference of Knowledge ................................................................................................................................ 18

    4. Lenz Has Alleged Facts Sufficient to Infer that Universal's Misrepresentation Was Knowing ................................................................................................................. 20

III. LENZ HAS ALLEGED DAMAGE. .............................................................. 23

CONCLUSION ............................................................................................................. 24

# TABLE OF AUTHORITIES

**Cases**

*ALS Scan, Inc. v. RemarQ Cmtys.*, 239 F.3d 619 (4th Cir. 2001) .................................................. 6

*Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2nd Cir. 1994) ............................................ 10

*Assoc. of Am. Medical Colleges v. Cuomo*, 928 F.2d 519 (2d Cir. 1991) ...................................... 9

*Bell Atlantic Corp. v. Twombly*, __U.S.__, 127 S.Ct. 1955 (2007) ................................ 5, 13, 14, 22

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006) ........................... 13

*Bond v. Blum*, 317 F.3d 385 (4th Cir. 2003) .................................................................................. 20

*Brown v. Budz*, 398 F.3d 904 (7th Cir. 2005) ............................................................................ 9, 13

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569  (1994) .............................................. 10, 19, 21

*Carol Burnett v. Twentieth Century Fox*, 491 F.Supp.2d 962 (C.D.Cal. 2007) ........................... 20

*Castle Rock Ent. v. Carol Pub. Group, Inc.*, 150 F.3d 132 (2d Cir. 1998) .................................... 11

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................... 5

*Doe v. United States*, 419 F.3d 1058 (9th Cir. 2005) ...................................................................... 5

*Eskanos & Adler, P.C. v. Leetien*, 309 F.3d 1210 (9th Cir. 2002) ................................................. 24

*Fisher v. Dees*, 794 F.2d 432 (9th Cir. 1986) .......................................................................... 10, 20

*Flowers v. Carville*, 310 F.3d 1118 (9th Cir. 2002) ...................................................................... 14

*General Media Comms. v. Crazy Troll, LLC,* No. 06 CIV 40581 LAK-FM, 2007 WL 102988 (S.D.N.Y. 2007) .............................................................................................................................. 15

*Google Inc. v. Am. Blind & Wallpaper Factory*, Inc., 2005 WL 832398 (N.D. Cal. March 30, 2005) .................................................................................................................................................... 16

*In re GlenFed Sec. Litig.,* 42 F.3d 1541 (9th Cir. 1994) ............................................................... 14

*Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) .............................................................. 11

*L.W. v. Grubbs*, 92 F.3d 894 (9th Cir. 1996) ................................................................................ 18

*Lamb v. Starks*, 949 F.Supp. 753 (N.D.Cal 1996) ........................................................................ 21

*Leadsinger v. BMG Music Pub.*, 512 F.3d 522 (9th. Cir. 2008) ................................................... 20

*Lenz v. Universal Music Corp.*, 2008 WL 962102 (N.D.Cal. Apr. 08, 2008) ................... 5, 6, 14, 15

*Los Angeles News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987 (9th Cir. 1998) ................ 10

*Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871 (1990) ......................................................................... 5

*Masson v. New Yorker*, 501 U.S. 496 (1991) ........................................................ 9

*Mattel Inc. v. Walking Mountains Prods.*, 353 F.3d 792 (9th Cir. 2003) ............................... 11, 22

*MCA, Inc. v. Wilson*, 677 F.2d 180 (2d Cir. 1981) ........................................................ 12

*New York Times Co. v. United States,* 403 U.S. 713 (1971) ........................................................ 24

*Online Policy Group v. Diebold, Inc*., 337 F.Supp.2d 1195 (N.D.Cal. 2004) ........................passim

*Penelope v. Brown*, 792 F.Supp. 132 (D. Mass. 1992) ........................................................ 9

*Perfect 10 v. ccBill*, 488 F.3d 1102 (9th Cir. 2007) ........................................................ 18

*Princeton Univ. Press v. Mich. Document Servs.,* 99 F.3d 1381 (6th Cir. 1996) ........................ 13

*Religious Tech. Ctr. v. Lerma,* 908 F.Supp. 1362 (E.D.Va 1995) ........................................ 20

*Rossi v. MPAA,* 391 F.3d 1000 (9th Cir. 2004) ........................................................passim

*Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417 (1984) ........................ 9

*U.S v. Real Property at 2659 Roundhill Dr., Alamo, Cal*., 194 F.3d 1020 (9th Cir. 1999)............. 18

*UMG v. Augusto*, 2008 WL 2390037 (C.D. Cal. , June 10, 2008).......................................... 15, 16

*Video-Cinema Films, Inc. v. Cable News Network, Inc.,* 2003 WL 1701904 (S.D.N.Y. 2003) ...... 20

**Statutes**

15 U.S.C. § 15 ........................................................................................ 23

17 U.S.C. § 107 ........................................................................................ 10

17 U.S.C. § 512 ..................................................................................4, 6, 19, 23

**Other Authorities**

3 Nimmer on Copyright § 12B.08 ........................................................................ 20

4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.05[A][4] (2005) ................ 13

4 *Nimmer on Copyright* § 13.05 ........................................................................ 19

**Regulations**

Cal. Civ. Code § 45........................................................................................ 9

Fed. R. Civ. P. 9(b) ........................................................................................ 14

**Legislative Materials**

S. Rep. No. 105-190 (1998) ........................................................................ 17, 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

Universal's hyperbole notwithstanding, this case is still about a 29-second home video of a toddler dancing in a kitchen.  Stephanie Lenz made this video (featuring her son Holden) and then posted it on an Internet video hosting site, YouTube.com, so that her friends and family could easily see it.  Four months later, Universal demanded that YouTube remove the video, accusing Lenz of copyright infringement, despite the video's clear non-infringing nature.  Lenz seeks to hold Defendants accountable for this knowing misrepresentation.  This Court has granted her leave to amend her Complaint to allege further specific facts regarding this misrepresentation and from which Defendants' knowledge of the misrepresentation may be inferred.  Lenz has done so, filing a Second Amended Complaint containing a wealth of additional and well-supported factual allegations that provide ample basis for such an inference.

Defendants have moved once again to dismiss Lenz's suit, and once again offer a series of factual arguments beyond the scope of the Complaint.  Yet they *still* cannot deny, on a motion to dismiss, any of Lenz's fundamental allegations.  They cannot deny that they sent the takedown notice accusing her of copyright infringement.  They cannot deny that the video is noncommercial and just 29 seconds long and contains, at best, an indistinct version of their copyrighted song in the background.  They cannot deny that, much like a documentary film, Lenz's blurry amateur video simply records the actual experience of her son dancing—a moment she hoped to share with family and friends via the medium of online digital video.  And they cannot deny that they sent their takedown notice at Prince's behest, based not on the particular characteristics of the video or any good-faith belief that it actually infringed a copyright but rather on a belief that, as "a matter of principle," Prince "has the right to have his music removed."

Instead, Defendants' Motion attempts to sidestep their liability by focusing attention on irrelevant facts, misstatements of law, and summary judgment-level arguments.  More broadly, Defendants attempt via their motion to completely eviscerate *any* statutory protection for fair use under the Digital Millennium Copyright Act ("DMCA"), an interpretation that flies directly in the face of both Congressional intent, this Court's decision in *Diebold*, and common sense.

-1-

Specifically, they insist that despite an express obligation under the statute to only send DMCA takedown notices *after* forming a good-faith belief that a particular use of their copyrighted material is infringing, they have no obligation to consider whether the use is a fair use and thus non-infringing before sending a DMCA notice.

Defendants' position is antithetical to controlling case law and the purpose and structure of Section 512. Under Defendants' theory, all the sender of a DMCA notice must ask herself before sending a notice is, *"Is there any chance I could win a copyright infringement lawsuit for this use?"* But that is not the relevant question. Rather, a sender of a notice must ask, *"Does this use infringe my copyrights?"* If the answer is "no"—either because the work does not actually use the sender's copyrighted work or because the use is plainly a fair use and, therefore, non-infringing by definition, or for some other reason—sending a DMCA notice constitutes a misrepresentation under the statute. And if that misrepresentation is made knowingly, the notice violates Section 512(f), whether or not a lawsuit is ever filed or contemplated.

Finally, Defendants misconstrue the relevant analytical standard to be applied at this stage. Defendants ask the Court to dismiss this case based on an extensive fact analysis, with inferences in Defendants' favor instead of Lenz's. This is both inaccurate and inappropriate on a motion to dismiss. Lenz has alleged ample facts to support her claim, based on the information available to her prior to discovery. Taking Lenz's allegations to be true and with all reasonable inferences in her favor, Lenz has more than shown why she should be permitted to develop evidence to substantiate those allegations and vindicate her rights.

**FACTUAL AND PROCEDURAL HISTORY**

Plaintiff Stephanie Lenz is a mother, wife, writer and editor. She and her husband have two children, Zoe (age 4) and Holden (age 2). Second Am. Cmplnt. ("SAC") ¶11. On or about February 7, 2007, Lenz's children were playing in the family's kitchen when Holden, who was still learning to walk at the time, began dancing to the Prince song "Let's Go Crazy." *Id*. ¶¶12, 16. Zoe and Holden had recently heard the song on television during the Super Bowl halftime show. *Id*. ¶12. Using her digital camera, Lenz decided to capture the moment on film, creating a 29-second video recording of the children's activities, which consisted primarily of Holden's dance (the

"Holden Video"). *Id.* The video bears all the hallmarks of a family home movie—it is somewhat blurry; the sound quality is poor; it was filmed with an ordinary digital video camera; and it focuses on documenting Holden's "dance moves" against a background of normal household activity, commotion and laughter. *Id.* ¶13. Due to the noise and commotion made by the children, the song "Let's Go Crazy" can only be heard in the background for approximately 20 seconds of the 29-second video and even then not all that clearly. *Id.* ¶14. The portion of the song used is near the song's end and includes only a few words of the lyrics. *Id.*

Holden was just learning to walk when Lenz made the video. *Id.* ¶16. Lenz thought her friends and family, particularly her mother in California, would enjoy seeing Holden's new ability to dance as well. *Id.* Lenz's mother has difficulty downloading email files but knows how to access the YouTube website. *Id.* On or about February 8, 2007, Lenz uploaded the Holden Video from her computer to the YouTube website for her family and friends to enjoy. *Id.* ¶17. The video was publicly available at <http://www.youtube.com/watch?v=N1KfJHFWlhQ>. *Id.*

Defendants Universal Music Corp., Universal Music Publishing, Inc. and Universal Music Publishing Group (collectively, "Universal"), are sophisticated music industry companies that have extensive experience with copyright law, and employ staff who are familiar with the Digital Millennium Copyright Act (including the Section 512 "good faith" requirements and the obligation to submit Section 512 notices under penalty of perjury), as well as the principles and application of the fair use doctrine. *Id.* ¶19.

Universal represents Prince and polices various copyrights on his behalf. *Id.* ¶10. Universal's client is notorious for his efforts to control all uses of his material on and off the Internet. Prince has threatened to sue several Internet service providers for copyright infringement as part of an effort "to reclaim his art on the internet." *Id.* ¶28. He has publicly stated that he "strongly believes that artists as creators and owners of their music need to reclaim their art." *Id.* ¶29.

Between February and June 2007, Defendants, and/or their representatives, viewed the Holden Video and decided to issue a DMCA takedown notice. *Id.* ¶20. Therefore, on or around June 4, 2007, Universal sent the notice, demanding that YouTube remove the Holden Video

because of unspecified copyright violations. *Id.* ¶21 and Ex. A thereto. Universal sent this notice to the address designated by YouTube exclusively for DMCA notices. *Id.* ¶22 and Ex. B thereto. The notice precisely tracked the language specified for a notice of claimed infringement under Section 512(c)(3) of the DMCA. 17 U.S.C. § 512; SAC ¶23. YouTube promptly removed the video and sent Lenz an email notifying her that it had done so in response to Universal's accusation of copyright infringement and warning her that repeated incidents of copyright infringement could lead to the deletion of her account and all her videos. SAC ¶¶24-25 and Ex. C thereto.

In a response to a request for comment regarding the take down of the Holden Dance Video, Universal released the following statement to ABC News:

> Prince believes it is wrong for YouTube, or any other user-generated site, to appropriate his music without his consent. *That position has nothing to do with any particular video that uses his songs.* It's simply a matter of principle. And legally, he has the right to have his music removed. We support him and this important principle. That's why, over the last few months, we have asked YouTube to remove thousands of different videos that use Prince music without his permission.

*Id.* ¶30 (emphasis added) and Ex. F thereto. Thus, Universal has admitted that it sent the DMCA notice at Prince's behest, based not on the particular characteristics of the Holden Video or any good-faith belief that it actually infringed a copyright but on its belief that, as "a matter of principle," Prince "has the right to have his music removed." *Id.* ¶31.

YouTube's June 5 email advised Lenz that she was entitled to submit a counter-notice and directed her to webpages that explained the procedures for a counter-notice pursuant to Section 512(g) of the DMCA. *Id.* ¶26 and Ex. D thereto. On June 27, 2007, Lenz sent YouTube a DMCA counter-notification pursuant to 17 U.S.C. § 512(g), demanding that her video be reposted because it did not infringe Universal's copyrights. *Id.* ¶27. Nonetheless, the Holden Video was unavailable on YouTube for over six weeks. *Id.*

On July 24, 2007, Lenz filed a Complaint seeking redress for Universal's misuse of the DMCA takedown process, its accusation of copyright infringement, and its intentional interference with her contractual use of YouTube's hosting services. *See* Dkt No. 1. On August 15, pursuant to discussions with Universal's counsel, Lenz amended her Complaint to revise the named defendants. *See* Dkt No. 5. On September 21, Universal moved to dismiss the Complaint and to

-4-

1  strike the interference claim. *See* Dkt No. 10.

2      On April 8, 2008, 2008, this Court granted the motion to dismiss with leave to amend, and

3  denied the motion to strike. *Lenz v. Universal Music Corp.*, 2008 WL 962102 (N.D.Cal. Apr. 08,

4  2008). The Court held that Lenz had failed to allege facts sufficient to infer a knowing

5  misrepresentation, and failed to allege "why her use of 'Let's Go Crazy' was a self-evident fair

6  use." *Id.* at *3. On April 18, 2008, Lenz filed a Second Amended Complaint, replete with detailed

7  factual allegations to support her claim that Universal knew her video did not infringe any

8  copyrights it owned or controlled. *See* Dkt No. 34. Five weeks later, Universal moved once again

9  to dismiss Lenz's Complaint. *See* Dkt No. 38.

10                    **ARGUMENT**

11  **I.    STANDARD OF REVIEW**

12      "For purposes of a motion to dismiss, the plaintiff's allegations are taken as true, and the

13  Court must construe the complaint in the light most favorable to the plaintiff." *Lenz*, 2008 WL

14  962102 at *1 (citing *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969)). To defeat such a motion,

15  the factual allegations must simply be "enough to raise a right to relief above the speculative

16  level…on the assumption that all the allegations in the complaint are true (even if doubtful in

17  fact)." *Bell Atlantic Corp. v. Twombly*, __U.S.__, 127 S.Ct. 1955, 1965 (2007) (quoting 5 Charles

18  Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216 (3d ed. 2004)). Further,

19  the court must draw all reasonable inferences in the plaintiff's favor, *Doe v. United States*, 419

20  F.3d 1058, 1062 (9th Cir. 2005), and presume that general allegations embrace those specific facts

21  that are necessary to support the claim," *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 889 (1990).

22  Thus, factual disputes are properly resolved only on summary judgment or at trial, not on a motion

23  to dismiss. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986).

24  **II.   A KNOWING MISREPRESENTATION THAT A FAIR USE IS INFRINGING
        VIOLATES SECTION 512(F) OF THE DMCA**

25
26      In order to plead a proper 512(f) claim, a plaintiff must allege that (a) the defendant

27  represented that certain online material infringed its copyright; (b) that representation was

28  inaccurate (e.g., the material was actually non-infringing); (c) the misrepresentation was material;

and (d) the misrepresentation was made knowingly.  17 U.S.C. § 512(f); *see also generally ALS Scan, Inc. v. RemarQ Cmtys.*, 239 F.3d 619, 625 (4th Cir. 2001) ("To the extent that ALS Scan's claims about infringing materials prove to be false, RemarQ has remedies for any injury it suffers as a result of removing or disabling noninfringing material.  *See* 17 U.S.C. § 512(f), (g).")  As a threshold matter, the misrepresentation must be made in a statement or action governed by Section 512.  *Id.*  Lenz has alleged that Section 512 governed Universal's notice.

Lenz has alleged each of these elements, along with ample facts to support the claim.  Universal does not dispute that it represented that the material was infringing, satisfying the first element.  Under the plain language of the Copyright Act, a fair use is not infringing, and Lenz has alleged that she engaged in a fair use and set forth a factual basis for that allegation, satisfying the second element.  Since Lenz alleges that YouTube took down the Holden Video in response to Universal's DMCA notice, the third element is met.  Finally, Lenz has alleged that Universal knew that the Holden Video was not infringing, and set forth a factual basis for that allegation, more than satisfying the fourth element.

## A.    Lenz Has Alleged that Universal Caused YouTube To Remove The Holden Video Pursuant To Section 512(f)(c) of the DMCA

As an initial matter, Universal attempts once again to avoid Section 512 liability by insisting that its Notice of Infringement was not made pursuant to Section 512 of the DMCA.  Mem. P. & A. in Supp. of Def.'s Mot. to Dismiss Second Complaint ("Mot.") at 6.  First and foremost, the test upon a motion to dismiss is whether the Complaint alleges facts sufficient to establish a claim for relief.  Here, a claim under 17 U.S.C. § 512(f) requires the plaintiff to allege that an improper takedown notice was sent pursuant to Section 512 of the DMCA.  Lenz has done that.  The fact that Universal disagrees with this allegation and contests these facts is the subject for a motion for summary judgment, not a motion to dismiss.  As this Court already recognized, because Lenz alleges in her Complaint that the notice was made pursuant to § 512 (f), her allegations must be taken as true for purposes of the instant motion.  *Lenz*, 2008 WL 962102 at *1, n.3.

Moreover, Universal's argument on this point is not that its notice failed to conform with

1  the requirements of Section 512, but rather that because it attached a disclaimer stating its
2  subjective belief regarding YouTube's ability to qualify for Section 512's protections, its notice
3  magically transformed into a non-DMCA notice. *See* SAC at Ex. A. However, that expression of
4  belief does not make the statement true.

5          Universal's argument defies common sense. Section 8 of YouTube's Terms of Use, a
6  document Universal relies upon heavily to make this argument, expressly states "only DMCA
7  notices should go to the Copyright Agent [with the email address "copyright@youtube.com".]".
8  SAC ¶22 and Ex. B thereto. Pre-discovery evidence shows that Universal sent its notice to this
9  exact email address. *Id*. ¶21 and Ex. A thereto. Further, the Notice tracks perfectly *every single*
10 *requirement* of Section 512 notice, i.e., it is (1) a written communication; (2) provided to the
11 designated agent of a service provider; (3) signed, (4) identifying a work claimed to be infringed,
12 (5) identifying allegedly infringing material, including the submitter's contact information, (6)
13 alleging a good faith belief that the alleged infringement is not authorized by the copyright owner
14 or by the law, and (7) stating that the information in the notification is accurate and that the
15 complaint is authorized by the copyright holder. Indeed, if the notice had not met those
16 requirements, YouTube would not have responded to it. *See* YouTube DMCA Policy,
17 http://www.youtube.com/t/dmca_policy ("To file a copyright infringement notification with us,
18 you will need to send a written communication that includes substantially the following (please
19 consult your legal counsel or see Section 512(c)(3) of the Copyright Act to confirm these
20 requirements)"). Instead, YouTube treated the notice as a Section 512 notice—as Universal knew
21 it would—by taking the material down, providing Lenz with an opportunity to counter-notice
22 pursuant to the DMCA, and then re-posting the material when Universal chose not to pursue its
23 bogus allegations. SAC ¶¶21-27 and Exs. C and D thereto.

24         Having obtained the benefits of a "takedown notice" mapped to the requirements of the
25 DMCA, Universal now hopes to avoid its concomitant obligations under Section 512(f) by
26 claiming that the notice was not sent pursuant to that statute. Such an outcome would effectively
27 eviscerate Section 512(f)—putative rightsholders could send intentionally false copyright
28 infringement notices that conform to Section 512(c)(3) in order to interfere with non-infringing

1    activities and then simply disclaim any intention to invoke Section 512 to avoid liability under

2    Section 512(f).  This is surely not what Congress intended when it enacted the 512(f) remedy.

3        The Court should refuse to countenance Universal's thinly-veiled effort to gain all of the

4    benefits of the DMCA's notice and takedown system while assuming none of the risks.

5    **B.    Universal Made A Material Misrepresentation That Lenz's Fair Use Was Infringing**

6

7            1.    Universal Made a Material Representation that the Holden Video Was Infringing

8        Two of the four elements of Lenz's DMCA 512(f) claim can be addressed quickly.  Lenz

9    has alleged and Universal does not dispute that Universal represented that the Holden Video was

10   infringing.  Mot. at 4.  Thus, the first element is satisfied. Lenz has alleged and Universal does not

11   dispute that YouTube removed the Holden Video in response to Universal's DMCA notice.  Mot.

12   at 4.  As this Court has recognized, "'[m]aterial' means that the misrepresentation affected the

13   ISP's response to a DMCA letter."  *Online Policy Group v. Diebold, Inc*., 337 F.Supp.2d 1195,

14   1204 (N.D.Cal. 2004).  Thus, the third element is satisfied.

15           2.    If the Holden Video Was a Fair Use, Universal's Representation of Infringement was a Misrepresentation

16

17       The second element, whether the representation of infringement was accurate, turns on the

18   facts of the use.  Universal attempts to sidestep this element by claiming that because fair use is

19   procedurally raised as an affirmative defense, Lenz's claim that her use was fair necessarily admits

20   that her use was technically infringing unless and until a court says otherwise—and, therefore

21   "everything in Universal's notice was true."  Mot. at 9.  Nonsense; Lenz admits no such thing.

22       Universal's argument directly contradicts the plain language of the Copyright Act.  Section

23   107 of the Copyright Act is unambiguous on this point:

24       Notwithstanding the provisions of section 106 and 106A, the fair use of a copyrighted work . . . is not an infringement of copyright.

25   Pursuant to the plain language of the Copyright Act, then, a fair use is not infringing.   Thus,

26   Universal's representation of infringement was a *misrepresentation,* as Lenz has alleged, if the use

27

28

1  was actually a non-infringing fair use.[1]

2      As the Supreme Court put the matter in *Sony Corp. of America v. Universal City Studios,*

3  *Inc.,* 464 U.S. 417 (1984):

> [T]he definition of exclusive rights in § 106 of the present Act is prefaced by the words "subject to sections 107 through 118." *Those sections describe a variety of uses of copyrighted material that "are not infringements of copyright notwithstanding the provisions of § 106."* The most pertinent in this case is § 107, the legislative endorsement of the doctrine of 'fair use.'

7  *Id.* at 447, (emphasis added).  Because a fair use is never a violation of the rights identified in

8  section 106, a fair use is a non-infringing use whether or not the user files a counter-notice, or is

9  herself sued and raises fair use as a defense.[2]  Indeed, the Supreme Court could hardly be clearer:

10  "Anyone . . . who makes a fair use of the work is not an infringer of the copyright with respect to

11  such use." *Id.*; *see also Diebold,* 337 F.Supp.2d at 1200 ("a fair use is not infringement of a

12  copyright.") (citations omitted); *see also Assoc. of Am. Medical Colleges v. Cuomo*, 928 F.2d 519,

13  523 (2d Cir. 1991) ("[i]t has long been recognized that certain unauthorized but 'fair' uses of

14  copyrighted material do not constitute copyright infringement"); *Penelope v. Brown*, 792 F.Supp.

15  132, 136 (D. Mass. 1992) ("The fair use of a copyrighted work is not an infringement of

16  copyright.").  The affirmative defense is simply the procedural vehicle through which the question

17  is raised.

18      Universal's assertion that Lenz's use was infringing necessarily embodied a corollary

19  representation that her use was not a fair use.  Leaving aside for the moment what Universal knew,

20  if this Court finds that the Holden Video was a fair use, then that representation was a

21  *mis*representation.

---

[1] To be clear, this element is separable from the question of knowledge.  In *Rossi*, for example, there was no question that Defendant MPAA had made a mistake, *i.e.,* had misrepresented that the plaintiff's site was infringing; the only question was whether the MPAA could have formed a subjective good faith belief to the contrary.  *Rossi*, 391 F.3d at 1003.

[2] For example, in many states truth is an affirmative defense to defamation.  *Masson v. New Yorker*, 501 U.S. 496 (1991).  Nonetheless, if a statement was truthful, that statement was not defamatory, whether or not the truth of the statement is raised as an affirmative defense, because a true statement cannot be defamatory.  *See, e.g.,* Cal. Civ. Code § 45. "Libel is a false and unprivileged publication by writing ... which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."  Similarly, an infringing use cannot be a fair use.

3.    Lenz's Allegations Suffice to Infer That Her Use Was A Fair Use

Lenz has offered detailed support for her claim that her use was a fair use.  The fair use doctrine "creates a limited privilege in those other than the owner of a copyright to use the copyrighted material in a reasonable manner without the owner's consent," *Fisher v. Dees*, 794 F.2d 432, 435 (9th Cir. 1986).  Pursuant to the Copyright Act:

> In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107; *see generally Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577-78 (1994).

With respect to the first factor, the purpose and character of the use, Lenz has pled—and Universal does not dispute—that the video was made available on YouTube for noncommercial purposes.  SAC ¶¶17-18.  In determining the "purpose and character of the use," courts consider whether the use is commercial or nonprofit.  *See Campbell*, 510 U.S. at 578.  "The crux of the profit/non-profit distinction is…whether the user stands to profit from exploitation of the copyrighted material without paying the customary price."  *Los Angeles News Serv. v. Reuters Television Int'l, Ltd*., 149 F.3d 987, 994 (9th Cir. 1998) (quoting *Harper & Row v. Nation Enters*., 471 U.S. 539, 562 (1985)).  "The greater the private economic rewards reaped by the secondary user (to the exclusion of broader public benefits), the more likely the first factor will favor the copyright holder and the less likely the use will be considered fair."  *Am. Geophysical Union v. Texaco Inc*., 60 F.3d 913, 922 (2nd Cir. 1994).  In this matter, Lenz has no private economic rewards.

Lenz has further alleged that her use was transformative in that it made a use of the work that was distinct and separate from its original context and added additional creative elements, such as Holden's dancing.  SAC at ¶¶13, 16, 18.  *See Campbell*, 510 U.S. at 579 ("[Transformative]

No. C 07-03783-JF                                      -10-

1    works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the

2    confines of copyright, . . . and the more transformative the new work, the less will be the

3    significance of other factors, like commercialism, that may weigh against a finding of fair use.").

4    A transformative work "is the very type of activity that the fair use doctrine intends to protect for

5    the enrichment of society." *Castle Rock Ent. v. Carol Pub. Group, Inc.*, 150 F.3d 132, 142 (2d Cir.

6    1998). Thus, Lenz has alleged the two most fundamental fair use purposes recognized by the

7    Supreme Court.

8         With respect to the second factor, the nature of the original work, no one disputes that

9    Prince's song was creative. But this factor does not decide the matter; rather, this factor tends to

10   carry the least weight in the fair use analysis. Where, as here, the use is transformative, the nature

11   of the work is "not . . . terribly significant in the overall fair use balancing." *Mattel Inc. v. Walking

12   Mountains Prods.*, 353 F.3d 792, 803 (9th Cir. 2003) (finding fair use of the Barbie doll, a clearly

13   creative work, when the incorporation of the original work is necessary for the secondary use).

14        With respect to the third factor, the amount and substantiality of the use, Lenz has alleged

15   that, due to the noise and commotion made by the children, the song "Let's Go Crazy" can only be

16   heard in the background for approximately 20 seconds of the 29-second video and even then not all

17   that clearly.  SAC ¶¶14, 18. Lenz has also alleged that the portion of the song used just - 20

18   seconds of a 3 1/2 minute song, including a few words – the necessary background of the almost

19   equally brief video. *Id.* "If the secondary user only copies as much as is necessary for his or her

20   intended use, then this factor will not weigh against him or her." *Kelly v. Arriba Soft Corp.*, 336

21   F.3d 811, 820-21 (9th Cir. 2003). Universal does not dispute that the use was necessary to make

22   and post the video on YouTube, given that this was spontaneous documentation of what actually

23   happened in Lenz's kitchen. Thus, under clear Ninth Circuit precedent, Lenz has pled an amount

24   and substantiality that qualify as fair use.

25        Finally, with respect to the fourth factor, market harm, Lenz has alleged facts that support a

26   finding that her use would have absolutely no impact on Universal's market for its work, an

27   allegation that plainly meets the test for fair use under this factor. Moreover, Lenz has pled only

28   those facts known to her at this time, *i.e.*, that the snippet of "Let's Go Crazy" that plays in the

1  background (not dubbed as a soundtrack) of the Holden Video could not substitute for the original

2  Prince song in any conceivable market due to

3     • the abbreviated nature of the use of the work;

4     • the poor audio quality of the ordinary digital video camera Lenz used;

5     • the household noises, laughter and talking of Lenz that partially obscure the music;

6       and

7     • the sounds made by the toys that Holden and his sister are pushing around the

8       kitchen during the video.

9  SAC ¶¶13-15, 18.  All of these facts are apparent on the face of the Holden Video.

10      The market harm factor balances the benefit the public will derive if the use is permitted

11  and the personal gain the copyright owner will receive if the use is denied.  *MCA, Inc. v. Wilson*,

12  677 F.2d 180, 183 (2d Cir. 1981).  However, "a use that has no demonstrable effect upon the

13  potential market for, or the value of, the copyrighted work need not be prohibited in order to

14  protect the author's incentive to create."  *Sony*, 464 U.S. at 450.  Under the facts alleged by Lenz,

15  the Holden Video could have no demonstrable effect on the market for "Let's Go Crazy."

16      Nevertheless, Universal takes issue with these allegations, not because they are insufficient,

17  but because Universal disagrees with the facts as pled.

18      Universal claims that analysis of this factor depends on consideration of all of the possible

19  effects of "unrestricted and widespread" uses like the Holden Video.  Mot. at 15.  If Universal

20  means to say that it believed it was missing out on a "market" for licensing widespread use of its

21  recordings as incidental background music in home videos, that argument fails because it would

22  render the fourth factor entirely circular.  Under that theory, an identical claim could be made for

23  many fair uses.  For example, if copyright owners could license widespread use of short quotations

24  from their works in high school students' papers, that might be a potential source of revenue.  That

25  does not mean those uses count as market harm.  *See Bill Graham Archives v. Dorling Kindersley*

26  *Ltd.*, 448 F.3d 605, 614 (2d Cir. 2006); *Princeton Univ. Press v. Mich. Document Servs.,* 99 F.3d

27  1381, 1387 (6th Cir. 1996) ("Only 'traditional, reasonable, or likely to be developed markets' are

28  to be considered in this connection, and even the availability of an existing system for collecting

1  licensing fees will not be conclusive." (citation omitted)); *see also* 4 Melville B. Nimmer & David

2  Nimmer, Nimmer on Copyright § 13.05[A][4] (2005) ("it is a given in every fair use case that

3  plaintiff suffers a loss of a potential market if that potential is defined as the theoretical market for

4  licensing the very use at bar").  Here, Lenz has alleged that the particular use at issue – music

5  captured in real time by a documentary-style home video – is not a use that will harm Universal's

6  market.  There is no reason to believe that this use will have a widespread negative impact on

7  Universal's market for its work.

8      Universal also suggests that Lenz's use—a fuzzy version of a song playing in the

9  background of a home video—could somehow impact the market for syncing music to videos or a

10  musical performer posting a video of himself performing a Prince song and to construe its market

11  accordingly.  Mot. at 15.  It is difficult, at best, to conceive of the market relationship between

12  these types of uses.

13      More generally, if Universal wishes to claim that the market harm of Lenz's use is broader

14  than that alleged, it should do so subsequent to discovery.  Lenz cannot be required to allege facts

15  not within her ability to ascertain prior to discovery; she must only allege facts sufficient to "raise a

16  reasonable expectation that discovery will reveal evidence" of claim alleged.  *Bell,* 127 S.Ct. at

17  1965.  Where, as here, "pleadings concern matters peculiarly within the knowledge of the

18  defendants . . . pleading on 'information and belief' should be liberally viewed." *Brown v. Budz*,

19  398 F.3d 904, 914 (7th Cir. 2005), quoting *Tankersley v. Albright*, 514 F.2d 956, 964 n. 16 (7th

20  Cir. 1975) (internal quotations omitted).

21      Lenz has alleged that her use was fair, and offered ample factual support for the claim.

22  Taking these allegations as true, Universal's claim to the contrary was a misrepresentation.

23  **C.    Lenz Has Alleged Facts Sufficient To Infer That Universal Knew Her Use**
24  **Was Fair.**

25      The only real question, then, is whether it may be inferred, assuming the facts alleged to be

26  true and taking all reasonable inferences in her favor, that Universal did not have a good-faith

27  belief, at the time it sent the DMCA notice, that Lenz's use was infringing.

28      Universal argues that Section 512 does not require Universal to even consider whether a use

is fair before issuing a takedown, and that, had it considered the question, it could not possibly have known that Lenz's use was fair because it could not predict the exact outcome of the case in subsequent litigation.  Both arguments are ill-conceived.

           1.    <u>Pursuant to This Court's Order, Lenz Need Only Allege Facts From Which Knowledge May Be Inferred</u>

To survive Universal's motion with respect to the fourth element of her claim, Lenz must allege facts from which knowledge can be inferred.  On April 8, 2008, this Court held that "Under *Rossi,* there must be a showing of a knowing misrepresentation on the part of the owner."[3]  *Lenz,* 2008 WL 962102, at *3.  As set forth in detail in the briefing on Universal's first motion to dismiss, the parties dispute whether the subjective standard applies solely to the factual basis for the DMCA notice or to the legal basis as well.  Lenz contends that *Rossi v. MPAA,* 391 F.3d sets out an "actual knowledge' standard for 512(f) *factual investigations,* while this Court's holding in *Diebold*, 337 F.Supp.2d, presents the appropriate and controlling standard for 512(f) *legal determinations*.  Opp'n to Mot. to Dismiss and Special Mot. to Strike (Dkt No. 22) at 4

Even under its preferred standard, however, Universal misconstrues the proper test for actual knowledge.  Universal contends that, under *Rossi,* a party only violates Section 512(f) if it knows, with *absolute certainty,* that a given use is non-infringing, no matter what the basis for it's representation to the contrary.  392 F.3d at 1005.  As this Court recognized, that is not the rule.  In *Diebold*, it was possible to infer knowledge from the facts alleged and developed through

---

[3] The Court's April 8 order appears to have assumed that, under *Bell Atlantic v. Twombly,* 127 S.Ct. 1955 (2007), Lenz must plead specific facts from which knowledge can be inferred.  *Bell Atlantic* construed Rule 8 of the Federal Rules of Civil Procedure.  *Id.* at 1964-65.  However, even under the heightened pleading standard set for by Rule 9 for fraud, "knowledge . . . may be alleged generally."  Fed. R. Civ. P. 9(b).  As the Ninth Circuit has explained, this requirement derives an English standard that states, "Wherever it is material to allege malice, fraudulent intention, knowledge, or other condition of the mind of any person, it shall be sufficient to allege the same as a fact *without setting out the circumstances from which the same is to be inferred*."  *In re GlenFed Sec. Litig.,* 42 F.3d 1541, 1545 (9th Cir. 1994) (en banc) (quoting Order 19, Rule 22 of the English Rules of Practice of 1937) (Ninth Circuit's emphasis).  If something need only be alleged generally, it may be averred "simply by saying that [it] existed."  *Id.* at 1547.  And, although Rule 9(b) states the heightened standard for pleading fraud, its relaxed standard for pleading condition of mind applies generally.  *See, e.g., Flowers v. Carville,* 310 F.3d 1118, 1130-31 (9th Cir. 2002) (malice may be alleged generally in a defamation case).

discovery that called into question the defendant's assertion that its belief in infringement was sincere. *Lenz,* 2008 WL 962102 at *5

Indeed, in *Rossi*, the court took such an approach. Although it observed that "[t]here is no suggestion in the record that MPAA's belief regarding Rossi's asserted infringement was other than sincere," the court nonetheless devoted several paragraphs to a careful examination of the disputed website. *Rossi,* 391 F.3d at 1005 and n.8. There would have been no need to examine Rossi's website if all the court had needed to know was the subjective thoughts of the MPAA reviewer, without any inquiry as to the basis for those thoughts. Instead, the court detailed the information available to the MPAA agent, and, concluded that "[g]iven the explicit nature of the statements on Rossi's website, the district court properly found that no issue of material fact existed as to MPAA's 'good faith belief' that Rossi's website was infringing upon its copyrighted materials." *Id.* at 1005-06. In light of its close attention to the information that the agent actually saw, the *Rossi* court's holding must be read to allow the possibility that different information on Rossi's website (e.g., no explicit statements) would have led to a different conclusion. *See also, e.g., UMG v. Augusto*, 2008 WL 2390037, at *8-9 (granting summary judgment for Universal Music Group on Section 512(f) claim, finding that legal question—whether the first sale doctrine applied to promotional CDs—was unsettled when notices were sent, Universal's agents had carefully documented defendants' actions, language on CDs led Universal to believe first sale doctrine did not apply, and Universal knew that defendant had admitted to violating copyright on similar facts in prior consent judgment); *General Media Comms. v. Crazy Troll, LLC,* No. 06 CIV 40581 LAK-FM, 2007 WL 102988, at *7 (S.D.N.Y. 2007) (finding no knowing material misrepresentation in trademark context where claimant had evidence of every element of its claim.).

As set forth below, the facts alleged in Lenz's Second Amended Complaint more than permit an inference of knowledge under any standard. In light of the uncertain state of this issue, however, the Court should be particularly hesitant to dismiss Lenz's claim at the outset of this case. *See Google Inc. v. Am. Blind & Wallpaper Factory*, Inc., 2005 WL 832398, *5 (N.D. Cal. March 30, 2005). Section 512(f) is a key component of the DMCA's notice and takedown provisions, and

OPPOSITION TO MOTION TO DISMISS SECOND AMENDED
COMPLAINT

determining its proper scope is an important legal question. Given the "importance of this case to the parties and others similarly situated, ... resolution of the novel legal questions presented by this case should await the development of a full factual record." *Id.* at *6. Indeed, the leading Section 512(f) cases all decided the issue of knowledge on a summary judgment, after the parties had had an opportunity to develop their evidence. *See, e.g. Rossi v. MPAA,* 391 F.3d 1000 (9th Cir. 2004); *Online Policy Group v. Diebold*, 337 F.Supp.2d 1195 (N.D.Cal. 2004)*, UMG v. Augusto*, 2008 WL 2390037 (C.D. Cal., June 10, 2008).

### 2. A DMCA Notice Sender Must Consider Fair Use Prior To Sending a DMCA Notice

Lenz has alleged that Defendants are sophisticated music industry companies that have extensive experience with copyright law, including Section 512 and the fair use doctrine. SAC ¶19. And, she has alleged that Universal issued the notice based not on the particular characteristics of the Holden Video or any actual belief that it actually infringed a copyright but on its belief that, as "a matter of principle," Prince "has the right to have his music removed." SAC at ¶30-31. Lenz has submitted substantial evidence in support of this allegation, including statements from Universal and its client. *See id.* at Exs E and F. Universal does not dispute these allegations. If these allegations are true, then it is entirely reasonable to infer that either Universal failed to look at Lenz's video, or it simply did not care whether Lenz's use was fair. Either inference, if true, indicates a failure to form a good faith belief as to the status of the Holden video.[4]

Universal responds that it is free to issue takedowns "as a matter of principle." Mot. at 16. Universal insists that, under *Rossi*, it has no duty to form *any* specific belief (let alone a good faith belief) as to whether a particular video (such as the Holden Video) is a non-infringing fair use*. Id.* Instead, it can simply issue takedowns for any video carte blanche as long as it believes it has the right generally to do so, and think about fair use later, if the target of the notice sends a counternotice. Mot. at 17.

Universal's interpretation of 512(f) would drastically undermine the two goals set forth by

---

[4] If Universal failed to form any sort of belief at all regarding whether the video infringed, that would mean that its notice—which stated under penalty of perjury that Univeral *had* formed a good faith belief of infringement—included a material misrepresentation.

Congress in the legislative history: to protect end users posting non-infringing material from frivolous takedowns and to deter abuse of the DMCA notice process.  *See* S. Rep. No. 105-190 at 21 (1998) (Section 512 was intended to "balance the need for rapid response to potential infringement *with the end-users legitimate interests in not having material removed without recourse.*") (emphasis added);  *see also id.* at 59 (Section 512(f) "is intended to deter knowingly false allegations to service providers in recognition that such misrepresentations are detrimental to rights holders, service providers, and *Internet users*.") (emphasis added).   Under Universal's theory, virtually any copyright owner's claim, no matter how preposterous, would be immune from any form of review or redress under 512(f) as long as the owner held that belief sincerely.  For example, Universal could cause the takedown of a negative review that briefly quoted lyrics from a new Prince CD for at least two weeks, simply because it believed it had the right to do so, notwithstanding the fact that that use would be a quintessential fair use.[5]

Under Universal's incorrect theory, even Diebold, whom this Court held violated Section 512(f) because it sent a DMCA takedown notice when "no reasonable copyright holder could have believed that the portions of the email archive discussing technical problems with [its] voting machines were protected by copyright[,]"  *Diebold*, 337 F.Supp.2d at 1204, would have escaped Section 512(f) liability.  Under Universal's theory, Diebold would not have been obliged to even to consider the question.  And, although Diebold "appeared to acknowledge that at least some of the emails were subject to the fair use doctrine," at the time Diebold sent the notice, no court had expressly ruled on the legal status of posting the email archive.  As Diebold shows, there must be

---

[5] Such abusive takedown practices are not hypothetical.  Attacks on free speech through Section 512 misuse are well-documented.  *See Landmark Education at* http://www.eff.org/cases/landmark-and-internet-archive (controversial education foundation sent DMCA takedown against critical six-hour documentary that showed two pages of its manual for a few seconds); *Sapient v. Geller at* http://www.eff.org/cases/sapient-v-geller (well-known spoon-bending paranormalist sent DMCA takedown against critical 15-minute documentary based on eight seconds of introductory footage infringed copyright); *MoveOn, Brave New Films v. Viacom at* http://www.eff.org/cases/moveon-brave-new-films-v-viacom (Viacom sent DMCA takedown notice for parody of Colbert Report), *Malkin v. Universal at* http://www.eff.org/deeplinks/2007/05/malkin-fights-back-against-copyright-law-misuse-universal-music-group (Universal sent DMCA notice for criticism of Akon using short clips of videos for purposes of criticism); *Diehl v. Crook at* http://www.eff.org/cases/diehl-v-crook (interviewee sent DMCA takedown notice claiming copyright in Fox News' broadcast of interview).

some requirement that a copyright owner both consider fair uses and determine honestly whether any exist before sending their DMCA notice.  Otherwise, Universal's standard would provide no protection for end users and no deterrence for abuse of the DMCA process.  As this Court recognized, that is not and cannot be what Congress intended.[6]

Certainly *Rossi* does not compel this result; quite the contrary.  In *Rossi*, the court adopted the "subjective standard traditionally associated with a good faith requirement." *Rossi,* 391 F.3d at 1004.  *Rossi* goes on to define good faith: "'Good faith' is '[a] state of mind consisting [of] ... honesty in belief or purpose.' Black's Law Dictionary, 701 (7th ed.1999)." *Id*. at n.5.  Thus, *Rossi* does not authorize willful blindness—including willful indifference to whether a use was fair and therefore non-infringing.  Indeed, courts do not countenance such a "willful blindness" standard in other contexts, *see, e.g. U.S v. Real Property at 2659 Roundhill Dr., Alamo, Cal*., 194 F.3d 1020, 1028 (9th Cir. 1999) ("An owner cannot deliberately avoid actual knowledge through "willful blindness").  *See also, e.g, L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996) (finding of "deliberate indifference" to civil rights violation may rest on "deliberate indifference to a known, or so obvious as to imply knowledge of, danger, by a supervisor who participated in creating the danger").  There is no reason to do so here.

3.    Fair Use Can Be Sufficiently Clear to Permit an Inference of Knowledge

Universal insists that, even if it did look at the video, its misrepresentation could not have

---

[6] The Ninth Circuit's decision in *Perfect 10 v. ccBill,* 488 F.3d 1102 (9th Cir. 2007) underscores the point.  In *ccBill*, the Court stated:

> The DMCA requires a complainant to declare, under penalty of perjury, that he is authorized to represent the copyright holder, and that he has a good-faith belief that the use is infringing.  This requirement is not superfluous. Accusations of alleged infringement have drastic consequences:  A user could have content removed, or may have his access terminated entirely.  If the content infringes, justice has been done.  But if it does not, speech protected under the First Amendment could be removed.  We therefore do not require a service provider to start potentially invasive proceedings if the complainant is unwilling to state under penalty of perjury that he is an authorized representative of the copyright owner, and that he has a good-faith belief that the material is unlicensed.

488 F.3d at 1112.  As the Ninth Circuit emphasized, the requirements of 512(c) are important safeguards of a user's First Amendment rights.  Section 512(f) is the primary remedy that Congress gave those users to vindicate abuse of those rights.

1   been knowing because there is no way for a copyright owner to tell, prior to an express court

2   ruling, whether or not a particular use is infringing or fair. *See* Mot. at 10-11 and n.11.  Universal

3   makes much of the Supreme Court's observation that fair use does not have "bright-line rules,"

4   *Campbell,* 510 U.S. at 577, and that each case must be "decided on its own facts," *Harper & Row,*

5   471 U.S. at 560, as well as Professor Nimmer acknowledgement of the "malleability" of the fair

6   use inquiry, 4 *Nimmer on Copyright* § 13.05 at 13-156.  The lack of a bright-line test means that *at*

7   *the margins* reasonable minds can differ; and the malleability of the inquiry is part of what creates

8   that fuzziness *at the margins.*  But this is not an edge case.  And of course it is true that each case

9   must be decided on its own facts.  No one is asking the court to decide this case without looking at

10  the facts on which it is based.  Rather, Lenz alleges that *in this case, on these facts,* fair use was

11  plainly applicable and Universal knew it.

12      Universal can find no support for its view in the DMCA.  In fact, Universal's view flies

13  directly in the face of both 512(c)'s good faith requirement and 512(f)'s purpose of preventing

14  abuse.  Moreover, Universal's impoverished view of Section 512(f) directly contradicts the purpose

15  and structure of Section 512.  Section 512 was enacted by Congress to allow for rapid responses to

16  potential copyright infringement.  17 U.S.C. § 512(c) (describing takedown procedures), (g)

17  (describing procedures for reinstating material contingent on copyright owner's response to

18  counter-notice), (h) (authorizing pre-litigation subpoenas to identify users who posted allegedly

19  infringing material).  Thus, Section 512 was meant as an alternative or, in some instances, a

20  precursor to a possible infringement lawsuit, not an antecedent.  If 512(f) liability were only

21  available *after* an infringement action, there would be no point to the 512 process.

22      Nor can Universal find support in the case law.  As explained above, Diebold  holds that a

23  party can and should evaluate fair use before issuing a takedown.  337 F.Supp.2d at 1204.  Further,

24  Universal's theory that fair use can never be assessed before discovery and trial flies in the face of

25  the numerous cases finding (or rejecting) fair use based solely on the pleadings.  In *Carol Burnett*

26  *v. Twentieth Century Fox*, 491 F.Supp.2d 962, 967, 975 (C.D.Cal. 2007), for example, a federal

27  district court dismissed a copyright claim without leave to amend based on a finding of fair use.

28  *See also Leadsinger v. BMG Music Pub.*, 512 F.3d 522, 532-33 (9th. Cir. 2008) (affirming motion

to dismiss without leave to amend fair use allegations where three factors "unequivocally militate[d]" against fair use).  There have also been numerous rulings awarding attorneys fees in copyright cases where plaintiffs have brought frivolous claims of infringement against fair uses of their material.  *See, e.g., Bond v. Blum*, 317 F.3d 385, 397-8 (4th Cir. 2003) (affirming copyright defendants' fee award because fair use question was "not a close one" and copyright holder's position was frivolous and unreasonable); *Video-Cinema Films, Inc. v. Cable News Network, Inc.,* 2003 WL 1701904, *3 (S.D.N.Y. 2003) (awarding defendants' fees because copyright holder's position on fair use was "objectively unreasonable"); *Religious Tech. Ctr. v. Lerma,* 908 F.Supp. 1362, 1368 (E.D.Va 1995) (awarding defendants' fees because "no reasonable copyright holder could have in good faith brought a copyright infringement action."); *see generally Fisher v. Dees*, 794 F.2d 432 (9th Cir. 1986) (fair use determination is matter of law for the court when facts not at issue or deemed admitted.).

Even Professor Nimmer, upon whose treatise Universal relies for this argument, acknowledges that while some fair use determinations are "clouded," there are exceptions (such as *Diebold*) where copyright owners have no realistic chance of succeeding in their copyright claims. *See* 3 Nimmer on Copyright § 12B.08 n.16.  That is why, for example, MoveOn.org's filing of a Section 512(f) claim against Viacom Entertainment caused Viacom to immediately admit that a DMCA takedown notice, targeting a short parody by MoveOn.Org that used clips from the Colbert Report (a television show produced by Viacom), was a "mistake."  *See EFF, MoveOn.org, Brave New Films v. Viacom*, http://www.eff.org/cases/moveon-brave-new-films-v-viacom.   This case, like *Diebold, Burnett* and *MoveOn.org,* presents a textbook example of an "unclouded" fair use.

While some, even many, fair uses are close calls, others are clear enough to permit determination in advance of a lawsuit.  The Holden Video falls into the latter category, and neither *Rossi, Diebold,* nor the DMCA gave Universal permission to ignore it.

### 4.    Lenz Has Alleged Facts Sufficient to Infer That Universal's Misrepresentation Was Knowing

Meeting her final obligation at this stage, Lenz has alleged more than sufficient facts to infer that Universal *knew* its misrepresentation was knowing.

1    If Universal had looked at the video, as Lenz has pled, it would have immediately discerned

2    that it involved a noncommercial, transformative use.  As explained above, the video bears all the

3    hallmarks of a family home movie and is clearly transformative in that it uses the Prince song in a

4    distinct and creative way.  SAC ¶¶ 13-18.  Simply put, it looks like the personal, noncommercial

5    home movie that it was.  Lenz has further pled that the video was made available on YouTube, *id.*

6    ¶17, and Universal has offered no reason to imagine that such a use was for Lenz's commercial

7    benefit.  Rather, Universal insists that it could not have known Lenz's use was fair because the

8    posting was not clearly encompassed by the illustrative purposes described in the preamble to

9    Section 107.  Mot. at 12.

10    However, a fair use does not automatically become an "edge case" if it is not included in

11    the examples set forth in Section 107.  *See Lamb v. Starks*, 949 F.Supp. 753 (N.D.Cal 1996) ("The

12    Supreme Court has noted that the § 107 text "employs the terms 'including' and 'such as' in the

13    preamble paragraph to indicate 'illustrative and not limitative' functions of the examples given, ...

14    which thus provide only general guidance about the sorts of copying that courts and Congress most

15    commonly had found to be fair uses.'" (quoting *Campbell*, 510 U.S. at 577) (internal quotes

16    omitted).    Nor does it automatically become an edge case if it is seen by many people, Mot. at 12:

17    a documentary film that captures a snippet of music in the background makes fair use of that music

18    whether the film is seen by ten people or ten thousand.  Moreover, relatively few people had seen

19    Lenz's video when it was taken down—which is the only time frame that matters under 512(f).[7]

20    Based on these allegations, the Court may easily infer that Universal knew this factor weighed in

21    Lenz's favor.

22    Lenz does not dispute that Prince's original song was creative.  As noted above, for a

23    transformative use such as Lenz's, that point is "not . . . terribly significant in the overall fair use

24    balancing." *Mattel*, 353 F.3d at 803.  Lenz has alleged that Defendnats are sophisticated entities

25

26    [7] As of June 3, 2007 (one day before the notice was sent and four months after the Holden Video was loaded on YouTube), the video had been viewed just 273 times and just one comment had been posted.  Decl. of Micah Schaffer in Supp. of Opp. to Mot. to Dismiss and Mot. to Strike (Dkt.

27    no. 24) ¶¶ 3-4; Decl. of Corynne McSherry in Supp. of Pl.'s Opp. to Mot. to Dismiss and Mot. to

28    Strike  (Dkt no. 22)  ¶ 2 and Ex. A thereto.

1    with extensive experience with copyrighat law, *see* SAC ¶19, and thus it would be reasonable to

2    infer that Universal knew that the second factor did not sufficiently militate against a finding of fair

3    use.

4         Lenz has also provided allegations sufficient to infer that Universal knew the third fair use

5    factor, amount and substantiality of the use, weighed in her favor.  The reasons this factor favors

6    Lenz, explained above,[8] are all clear to anyone who views the video.  Nonetheless, Universal

7    insists that, despite these facts, it would have been "entirely reasonable" for Universal to have

8    believed that this factor weighed against fair use because a use may be found to be unfair even

9    where it involves a small portion of a work.  Mot. at 14.  Lenz obviously disagrees that Universal

10   held that belief with respect to the Holden Video, on a motion to dismiss, Universal's point is

11   irrelevant.  Given the facts, it is perfectly reasonable to infer that Universal knew full well that the

12   third factor favored fair use.  Universal's suggestion that it may have though to the contrary is pure

13   attorney argument that seeks to upend the principle that, on this motion to dismiss, factual

14   inferences must be drawn in Lenz's favor, not Universal's.  *See Bell Atlantic,* 127 S. Ct. at 1965

15   (Rule 8 "does not impose a probability requirement at the pleading stage").[9]

16        Finally, Universal claims that it could not have known that Lenz's use would not cause

17   market harm because the market may be broader than Lenz has pled based on the facts available to

18   her.  Mot. at 15.  As set forth above, Universal's market harm theory does not hold water.  Further,

19   Universal is confused about the standard: the question is whether it is *possible to infer* Universal's

20   knowledge of fair use, taking the facts alleged as true, *not* whether Lenz has yet proven that

21   knowledge—that question must wait for further development of the evidence such that it can be

22

23   [8] Namely, that due to the noise and commotion made by the children, the song "Let's Go Crazy"
     can only be heard in the background for part of the 29-second video, and even then not very
24   clearly; that the portion of the song used was just 1/10 of the original song; and that the use
     comprised the necessary background of the almost equally brief video.  SAC ¶13-14, 18.
25   [9] It is important to note that Universal does not disclose who decided to send the DMCA notice at
     issue, what knowledge they had, and what beliefs they had about infringement versus fair use for
26   the Holden video.  Instead, they merely provide hypothetical *ex post* justifications and theories why
     it was not a fair use.  But this is not the basis for the 512(f) inquiry.  Thus, discovery into the exact
27   identity of the sender and their exact actual knowledge is essential to get to the heart of this case;
     Universal's conjecture and argument shed no light on the basis of their alleged good faith belief.
28

OPPOSITION TO MOTION TO DISMISS SECOND AMENDED
COMPLAINT

1  decided at summary judgment or trial.  Indeed, Universal itself concedes as much, noting that it

2  would have been "reasonable to believe" that there was a potential for market harm.  Mot. at 15.

3  Perhaps so, perhaps not—but in any event the question should not be decided now, before Lenz has

4  had an opportunity to develop her case.

5      Taking Lenz's allegations as true, in combination with the factors identified above, the

6  Court (and a jury) could easily find that Universal's notice was made in bad faith.

7  **III.      LENZ HAS ALLEGED DAMAGE.**

8      Universal's last ditch argument, attacking Lenz's damage allegations, is equally unavailing.

9  Section 512(f) imposes liability for "*any* damages."  17 U.S.C. § 512(f) (emphasis added).[10]  Lenz

10  has alleged that Universal's conduct caused her to spend her limited time considering whether

11  Universal's notice was proper, and filing a counter-notice.  SAC ¶¶27, 38; Lenz Decl ¶ 12.

12  Moreover, as Lenz has previously noted, Lenz's access to YouTube's services was interrupted by

13  Universal's conduct.  SAC ¶27; Lenz. Decl. ¶15.  First, she was deprived of YouTube's video

14  hosting services for the Holden video for six weeks. SAC ¶27.  While YouTube provides storage

15  for video files and the bandwidth needed to transfer such files at no cost to users, comparable

16  replacement services can add up to $39.00 per month.  Decl. of Corynne McSherry in Supp. of

17  Pl.'s Opp. to Mot. to Dismiss and Special Mot. to Strike  (Dkt. no. 22) ¶ 3-4 and Exs. B-D thereto.

18  Thus, YouTube's video hosting services represent valuable consideration to Lenz.[11]

19      Further, Lenz has alleged that Universal's conduct caused her to lose the First Amendment

20  benefit of having her video posted on YouTube and chilled her First Amendment-based right to fair

21  use of "Let's Go Crazy." SAC at ¶38.  The loss of First Amendment freedoms, for even minimal

22  periods of time, harms Lenz.  *See New York Times Co. v. United States,* 403 U.S. 713 (1971) (any

23  loss of First Amendment rights can cause irreparable injury).  Universal argues that neither it nor

24  YouTube is a state actor, and thus the First Amendment does not apply.  But Lenz is not arguing

25

26  [10] It does not by its terms limit recovery to, for example, economic injury.  *Compare id. with, e.g.,*
    15 U.S.C. § 15 (in private antitrust actions, the plaintiff must have been "injured *in his business or*

27  *property* by reason of anything forbidden in the antitrust laws" (emphasis added)).

    [11] Indeed, if they did not, YouTube's terms of service would fail for lack of consideration.

28

No. C 07-03783-JF                                   -23-

that she has an independent cause of action against Universal for violating her First Amendment rights; that claim would fail for lack of state action. The point is simpler than that: Lenz has a constitutionally protected right of free speech. Universal squelched Lenz's speech and that harmed her. *See* SAC ¶38; *see also* Decl. of Stephanie Lenz in Supp. of Opp. to Mot. to Dismiss and Special Mot. to Strike (Dkt. no. 23) ("Lenz. Decl.") ¶¶ 15-16.

Finally, the statute explicitly notes that attorneys' fees and costs are to be *included* in the damage calculation. This language comports with the policy of Section 512(f): to protect the growth of the Internet as a vibrant public sphere by encouraging targets of DMCA abuse to vindicate their free speech rights. *See* S. Rep. No. 105-190 at 21, 59. Lenz has incurred and continues to incur just this sort of damage, and deserves compensation for it. *Compare, e.g. Eskanos & Adler, P.C. v. Leetien*, 309 F.3d 1210, 1216 (9th Cir. 2002) (finding actual damage under bankruptcy code provision allowing for damages "including costs and attorneys' fees" as compensation for willful violation of a stay, where defendant incurred legal costs in defending against continuing stay violation and preventing default judgment).

## CONCLUSION

Universal asks this Court to adopt the radical position that a fair use can never be the basis of a 512(f) claim, thereby giving Universal and anyone else who wishes to do so free rein remove content they do not like from the Internet. That is not what *Rossi* mandates, it is not what *Diebold* mandates, and it is not what Congress intended. For the reasons stated above, this Court should deny the motion to dismiss Lenz's claim and permit her to develop the evidence necessary to vindicate her claim.

DATED: June 20, 2008              By:_____/s/_____
                                        Corynne McSherry, Esq.

                                   ELECTRONIC FRONTIER FOUNDATION
                                   454 Shotwell Street
                                   San Francisco, CA  94110
                                   Telephone:  (415) 436-9333
                                   Facsimile:  (415) 436-9993

                                   Attorneys for Plaintiff
                                   STEPHANIE LENZ