KELLY M. KLAUS (SBN 161091)
Kelly.Klaus@mto.com
MELINDA E. LEMOINE (SBN 235670)
Melinda.LeMoine@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA 90071-1560
Telephone:    (213) 683-9100
Facsimile:    (213) 687-3702

Attorneys for Defendants
UNIVERSAL MUSIC CORP., UNIVERSAL MUSIC
PUBLISHING, INC. and UNIVERSAL MUSIC
PUBLISHING GROUP

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| STEPHANIE LENZ,<br><br>   Plaintiff,<br><br>  vs.<br><br>UNIVERSAL MUSIC CORP., UNIVERSAL MUSIC PUBLISHING, INC. and UNIVERSAL MUSIC PUBLISHING GROUP,<br><br>   Defendants. | CASE NO. C 07-03783 JF (RS)<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL JUDGMENT ON THE PLEADINGS**<br><br>**Date:   December 11, 2009**<br>**Time:   9:00 a.m.**<br>**Judge:  Hon. Jeremy Fogel** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II.   BACKGROUND ................................................................................................ 3

III.  ARGUMENT ..................................................................................................... 5

    A.   Plaintiff Cannot Obtain Summary Judgment Where The Relevant Facts, At A Minimum, Raise Credibility Issues Or Are In Dispute ................................ 5

    B.   Plaintiff Has Prosecuted This Case In Bad Faith And With Unclean Hands .......... 5

        1.   Plaintiff's Good Faith In Claiming That Her Posting Of The "Let's Go Crazy" Video "Is A Self-Evident Non-Infringing Fair Use Under 17 U.S.C. § 107" Is Undermined By Her Own Documents And Admissions .......................................................................................... 6

        2.   Plaintiff's Good Faith In Claiming That She Has Suffered Damages And "Has Been Injured Substantially And Irreparably" Is Undermined By Her Statements ............................................................. 11

        3.   There Are Serious Factual Issues About Whether This Action Has Been Prosecuted In Good Faith, Or Whether It Is Simply A Publicity Campaign .................................................................................. 14

    C.   Plaintiff's Motion On Universal's Defense Of "No Damages" Is An Unsupported, And Unsupportable, Attempt To Gain Summary Judgment On An Essential Element Of Her Claim For Relief ............................................. 15

        1.   Plaintiff's Attempt To Rewrite § 512(f) Fails As Matter Of Law ............ 16

        2.   Plaintiff's Attempted Analogies To Inapposite Causes Of Action Fail ............................................................................................................. 21

        3.   None Of The Categories Of Damages That Plaintiff Claims Are Cognizable Under The Statute .................................................................. 22

    D.   Plaintiff's Motion Should Be Denied As To Universal's First, Fourth And Fifth Affirmative Defenses .................................................................................. 25

IV.   CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................................ 5

*Dura Pharmaceuticals, Inc. v. Broudo*,
   544 U.S. 336 (2005) ................................................................................. 18, 19, 22

*Eskanos & Adler, P.C. v. Leetien*,
   309 F.3d 1210 (9th Cir. 2002) ............................................................................. 21

*Fogerty v. Fantasy, Inc.*,
   510 U.S. 517 (1994) ............................................................................................. 19

*In re von Bulow*,
   828 F.2d 94 (2d Cir. 1987) .................................................................................... 8

*Keystone Driller v. General Excavator Co.*,
   290 U.S. 240 (1933) ....................................................................................... 5, 6, 7

*Lusa Lighting, Int'l, Inc. v. America Elex, Inc.*,
   No. SACV 07-674-DOC (MLGx), 2008 WL 4350741 (C.D. Cal. Sept. 22, 2008) .............. 22

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ............................................................................................... 5

*Mortensen v. County of Sacramento*,
   368 F.3d 1082 (9th Cir. 2004) ............................................................................. 16

*Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*,
   324 U.S. 806 (1945) ............................................................................................... 5

*Rossi v. MPAA*,
   391 F.3d 1000 (9th Cir. 2004) ............................................................................. 25

*S.T.S. Int'l, Ltd. v. Laurel Sea Transport, Ltd.*,
   932 F.2d 437 (5th Cir. 1991) ................................................................................. 5

*Southern Cal. Gas Co. v. City of Santa Ana*,
   336 F.3d 885 (9th Cir. 2003) ............................................................................... 15

*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991) ................................................................................ 8

## STATE CASES

*Bertero v. National General Corp.*,
   13 Cal. 3d 43 (1974) ........................................................................................... 21

*Ferreira v. Gray, Cary, Ware & Freidenrich*,
   87 Cal. App. 4th 409 (2001) ............................................................................... 21

- ii -

# TABLE OF AUTHORITIES
### (continued)

Page(s)

## FEDERAL STATUTES

11 U.S.C. § 362(a) ................................................................................................................ 21

11 U.S.C. § 362(k)(1) ........................................................................................................... 21

15 U.S.C. § 1114(2)(D)(iv) .................................................................................................. 20

15 U.S.C. § 1125(d) ............................................................................................................. 20

17 U.S.C. § 107 ...................................................................................................................... 3

17 U.S.C. § 505 .................................................................................................................... 19

17 U.S.C. § 512(f) .......................................................................................................... passim

## FEDERAL RULES

Fed. R. Civ. P. 56(c) ............................................................................................................... 5

## LEGISLATIVE MATERIALS

S. Rep. 105-190 ................................................................................................................... 20

## TREATISES

Bigelow, *Law of Torts* (8th ed. 1907) ............................................................................... 18

Keeton et al., Law of Torts (5th ed. 1984) .......................................................................... 18

Restatement (Second) of Torts ..................................................................................... 15, 18

1    **I.      INTRODUCTION AND SUMMARY OF ARGUMENT**

2           Simone Weil once said that "imagination and fiction make up more than three quarters of

3    our real life."  This instant motion shows that this observation understates by a quarter the

4    imagined and fictional life that is Plaintiff's complaint.  The true facts – which came to light

5    despite Plaintiff's strenuous efforts to keep them hidden – reveal that *numerous* allegations that

6    have been central to her case since day one are flat out false and that Plaintiff knew them to be

7    false.  There is overwhelming evidence of Plaintiff's bad faith and unclean hands in this case.

8           Plaintiff's undoing began on August 25, 2009, when Judge Seeborg ordered her to

9    produce numerous communications she engaged in with Theryn Fleming, a friend and trusted

10   confidante.  Plaintiff had fought tooth-and-nail to prevent the discovery of these communications

11   based on the specious ground that she believed Ms. Fleming was a lawyer, even though Ms.

12   Fleming is not and never has been anyone's lawyer.  When Plaintiff finally produced the

13   documents (two days before her September 16 deposition), it became clear why she tried to keep

14   them buried.  These and other documents, along with numerous admissions made by Plaintiff at

15   her deposition, show unequivocally that allegations that Plaintiff has made to this Court are not

16   true and were never believed by Plaintiff to be true.  This much is now known:

17   •      Although the hallmark of Plaintiff's case is that her use of the Prince song "Let's
            Go Crazy" is a "self-evident non-infringing fair use," Plaintiff admitted in writing
18          in June 2007 – *before* filing this case – that "*[m]ine's not a 'fair use' case at all*."
            Ex. Q at 2.[1]  Notably, Plaintiff made this admission *after speaking with her*
19          *counsel at EFF*.

20   •      While Plaintiff has alleged throughout this case that Universal's notice to
            YouTube was false, Plaintiff admitted at her deposition that she had no
21          recollection of ever seeing the notice until the day of her deposition – over two
            years after she filed this case.  Ex. A at 269:11-22.  In fact, when shown that notice
22          and, in particular the statement in the notice that "[Universal has] a good faith
            belief that the above-described activity is not authorized by the copyright owner,
23          its agent, or the law," *Plaintiff testified that she was "not sure" that it was false.*
            *Id*. at 270:15-25 (emphasis added).  Plaintiff also testified that someone looking at
24          her posting "could think it was non-infringing, *someone could think it was*
            *infringing*[,]" and that reasonable people could disagree whether her posting was
25          an infringement of copyright.  *Id*. at 173:1-16, 194:24-195:2 (emphasis added).[2]

26

27   ───────────────
     [1] Except as otherwise indicated, all "Ex." references are to the Declaration of Kelly M. Klaus.

28   [2] All of these admissions (and others by Plaintiff, discussed below) are of course inconsistent with

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- • While Plaintiff has told this Court in briefs and declarations that she suffered damages because YouTube did not host her video for several weeks, she had admitted to Ms. Fleming at the time that the video was taken down (in another document that was withheld) that "*I don't care that YouTube doesn't want to host it.  Not like I'm paying them.*"  Ex. C at 1 (emphasis added).

- • At the same time Plaintiff was filing a complaint alleging she had been injured "substantially and irreparably" by Universal's notice, Plaintiff was mocking that very allegation in an email exchange with Ms. Fleming (again, in another document that Plaintiff withheld).  *See* Ex. D:

   Fleming:  I love how you've been injured "substantially and irreparably."  ;-)

   Plaintiff:  I have ;-)[3]

None of this evidence is mentioned in Plaintiff's motion, and the vast majority of it was only recently disclosed – much of it by Court Order.  Plaintiff obviously believes that by filing an early summary judgment motion, she can score a "quick hit" on Universal's defenses, and thereby try to sweep this evidence (and its clear import) under the rug.  That effort must fail.

Plaintiff also tries to score a procedurally improper ruling that she has established the element of damages for her claim without ever having established that she sustained any damages.  Plaintiff has apparently forgotten that it is her burden to prove compensable damages (of which she has none), not Universal's burden to disprove them.  Plaintiff's motion can and should be denied for failing to comply with her obligations under Rule 56.

But even if the Court reaches the legal question of the scope of damages available under § 512(f), Plaintiff's motion fails as a matter of law.  Plaintiff literally butchers the text of the statute, and ignores all applicable canons of statutory construction, in pressing the claim that a § 512(f) plaintiff can show the essential element of damages simply by filing a lawsuit and thereafter incurring attorneys' fees (ironically, something that Plaintiff has not done in this case and never will do since all services are being provided pro bono).  The statute and case law do not allow Plaintiff to create a claim by filing a claim.

---

the concept of a "self-evident" fair use, which is a standard found nowhere in the law.

[3] Plaintiff testified at her deposition that she used the "winky" emoticon to signify an "arm nudge" or "just kidding."  Ex. A at 147:7-16.

DEFTS' OPP. TO MOT. FOR PARTIAL S.J.
CASE NO. CV-07-03783

This case was built on allegations that Plaintiff and the EFF no doubt thought would be a "poster child" for § 512(f) cases, but that in reality are false and belied by Plaintiff's documents and testimony. There is no way that Plaintiff is entitled to summary judgment on Universal's defenses. In fact, at the appropriate time, Universal will be entitled to summary judgment.

## II.    BACKGROUND

Plaintiff filed her original complaint in this case in July 2007 (Doc. No. 1), which she amended solely to add Universal Music Corp. as a defendant (Doc. No. 5) ("FAC"). Plaintiff's central allegation in both complaints was that her posting of the "Let's Go Crazy" video on YouTube was "a self-evident non-infringing fair use under 17 U.S.C. § 107." FAC ¶ 18. Universal moved to dismiss Plaintiff's complaint and also filed an "anti-SLAPP" motion directed at Plaintiff's state law claim for tortious interference with contract. In responding to the anti-SLAPP motion, Plaintiff was forced to identify ways in which she claimed to have suffered "substantial and irreparable" damage in this case. In her brief, and in declarations filed by Plaintiff and her counsel, Plaintiff tried to claim that she had been damaged by the supposed loss of YouTube's hosting for her video (notwithstanding that YouTube charges Plaintiff nothing and never terminated her service). Exs. E ¶ 15, F ¶¶ 3-5, G at 18.

The Court dismissed Plaintiff's complaint but gave her leave to re-plead, which she did on April 18, 2008. Plaintiff's Second Amended Complaint (Doc. No. 34) ("SAC") pleads only a single claim, for violation of 17 U.S.C. § 512(f). Plaintiff continues to allege that her "Let's Go Crazy" posting is "a self-evident non-infringing fair use under 17 U.S.C. § 107." SAC ¶ 34. And Plaintiff continues to claim that she was "injured substantially and irreparably" as a result of Universal's actions. *Id*. ¶ 38. The Court specifically inquired about whether Plaintiff was alleging that she had made an "actual expense" in responding to Universal's notice. Ex. H at 5. Counsel represented that Plaintiff was making such an allegation, *id*., and the Court specifically cited that representation as a basis for denying the motion. Ex. I at 9.

Plaintiff builds much of this motion, and in particular her arguments concerning Universal's bad faith and unclean hands defenses, around Universal's *initial* responses to certain interrogatories, served in January 2009. Mot. at 6-9 (citing Miksch Decl. Ex. I). Plaintiff ignores

the fact that, when Universal served these responses in January, Universal had not taken the

deposition of Plaintiff or any of her potential witnesses; Plaintiff had not produced any of her

electronic communications relating to this case; and, even after Plaintiff started producing those

documents (in mid-April 2009), Plaintiff withheld critical documents, including numerous

communications with Theryn Fleming (who is not a lawyer) under a baseless claim of privilege.

Klaus Decl. ¶¶ 2-4.  Universal was forced to file a motion to compel, which Judge Seeborg

granted over Plaintiff's vehement opposition.[4]  (Doc. No. 150 at 3-4.)  Plaintiff produced some of

the withheld Fleming documents on September 14, 2009, just two days before her deposition.

Plaintiff has continued to produce documents since her deposition.  In fact, she made a production

on November 11, 2009, which includes never-before-produced emails with Ms. Fleming and

others related to her posting and this lawsuit.  Klaus Decl. ¶ 3.

     As detailed below, the withheld documents (which Universal obviously had not seen at

the time of serving its interrogatory responses) reveal statements by both Plaintiff and Ms.

Fleming that directly contradict numerous representations Plaintiff has made in this case, and that

call into question Plaintiff's good faith and equitable conduct in relationship to this case.  And

when Universal finally was able to depose Plaintiff on September 16, that deposition also

revealed numerous additional facts that are flatly inconsistent with Plaintiff's good faith in the

prosecution of this lawsuit.  Among the most startling are that ***Plaintiff did not even know if she***

***had ever seen Universal's notice to YouTube that her complaint alleges contains a knowing***

***falsehood; and when shown that notice, Plaintiff could not even say that it was false***.  Ex. A at

260:19-261:3, 269:11-22, 270:15-25.[5]

---

[4] Plaintiff claimed that her communications with Ms. Fleming concerning her video posting and allegations in this lawsuit were privileged despite the fact that Ms. Fleming is not a lawyer and has never served as Plaintiff's lawyer in this case or anywhere else.  Plaintiff also claimed that her communications with Ms. Fleming were irrelevant and that Universal was harassing her:  "This is not just a fishing expedition – it borders on harassment."  Pltf's Opp. to Mot. to Compel (Doc. No. 93) at 1:13-14.  At the hearing on Universal's motion, Judge Seeborg said, "I don't think [this motion is] a close call," Ex. L at 22:23, and he granted the motion.  (Doc. No. 150).

[5] These and other factual discoveries have revealed critical information that supplements the facts Universal was aware of when it served its initial interrogatory responses concerning Plaintiff's bad faith and unclean hands.  Accordingly, Universal has supplemented its interrogatory responses regarding these defenses.  Ex. M.  This causes Plaintiff no prejudice, since she herself insisted on filing this motion before any motion cut-off and without conferring with Universal's

## III.   ARGUMENT

### A.   Plaintiff Cannot Obtain Summary Judgment Where The Relevant Facts, At A Minimum, Raise Credibility Issues Or Are In Dispute

Summary judgment is proper only if there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  There is an absence of a genuine fact issue only if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  On summary judgment, the Court may not make credibility determinations or weigh evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### B.   Plaintiff Has Prosecuted This Case In Bad Faith And With Unclean Hands

Universal's second and seventh affirmative defenses are for bad faith and unclean hands, respectively.  These are equitable defenses.  They place in issue *Plaintiff's* state of mind and conduct regarding her claim and her prosecution of it.  Unclean hands is "a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief[.]"  *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814 (1945).  Where a party "seeks to set the judicial machinery in motion and obtain some remedy," but in the course of litigation "has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him[.]"  *Keystone Driller v. General Excavator Co.*, 290 U.S. 240, 245 (1933).  Unclean hands is for the Court to decide based on the entirety of the evidence, including the Court's consideration of the credibility of witnesses, here, Plaintiff herself.  *See, e.g.*, *S.T.S. Int'l, Ltd. v. Laurel Sea Transport, Ltd.*, 932 F.2d 437, 440 (5th Cir. 1991).

Plaintiff's motion as to her bad faith and unclean hands is directed entirely to the facts that Universal was aware of when it served its initial interrogatory responses, back in January 2009.  *See* Mot. at 7 (citing Miksch Decl. Ex. I).  Even if there was nothing more that Universal had discovered regarding Plaintiff's conduct in relation to the matters in this case, the facts identified in Universal's original interrogatory responses would not entitle Plaintiff to summary judgment

counsel or even asking Universal if it intended to supplement the responses.  Klaus Decl. ¶ 5.

on these defenses.  Universal identified several facts, from information then available, that were inconsistent with Plaintiff's allegations and raised questions about the veracity of those allegations and the prosecution of this case.  These included the fact that, while Plaintiff claimed that she made the posting for, *inter alia*, her mother, who was alleged to "ha[ve] difficulty downloading email files[,]" SAC ¶ 26, Plaintiff in reality posted the video publicly, where anyone could view it, as has been done close to a million times.  This fact and others relating to the veracity of Plaintiff's allegations as of January present, at a minimum, factual and credibility issues for the Court to resolve after hearing the evidence and evaluating witness demeanor.

The factual record, however, has developed considerably since January.  That more complete factual record – which Plaintiff has tried artificially (and improperly) to cordon off – makes summary judgment to Plaintiff absolutely inappropriate.  The facts show that Plaintiff over and over again has made factual representations that she intended the Court to rely on (and in some cases it did) that are flatly undermined by Plaintiff's documents, including documents withheld based on a specious assertion of privilege, as well as Plaintiff's sworn deposition testimony.  These are issues that have an "immediate and necessary relation to the equity that [s]he seeks in respect of the matter in litigation." *Keystone Driller*, 290 U.S. at 245.  Indeed, these issues go to the heart of the case that Plaintiff has filed and pursued in this Court.[6]

> 1.  **Plaintiff's Good Faith In Claiming That Her Posting Of The "Let's Go Crazy" Video "Is A Self-Evident Non-Infringing Fair Use Under 17 U.S.C. § 107" Is Undermined By Her Own Documents And Admissions.**

From day one, the cornerstone of Plaintiff's claim has been that anyone who looked at her video posting would have immediately recognized that it made what Plaintiff has called a "self-evident non-infringing fair use" of "Let's Go Crazy."  Plaintiff has pressed this point repeatedly:

---

[6] While Plaintiff has tried to limit the record artificially to what Universal wrote in its interrogatory responses as of January, Plaintiff and her lawyers were fully on notice of the issues discussed herein prior to the filing of this motion.  Following the remarkable disclosures in Plaintiff's Court-Ordered production of the Fleming communications, as well as at Plaintiff's recent deposition, Universal wrote to Plaintiff's counsel questioning whether Plaintiff's counsel knew (or, at a minimum, should have known) of the falsity of these allegations, and thus whether they had signed pleadings and presented argument in violation of Rule 11.  *See* Ex. N (Oct. 28, 2009 Letter to Plaintiff's counsel); Ex. O (Plaintiff's counsel's response).

- "*[T]his is not an edge case*. …. Lenz alleges that *in this case, on these facts, fair use was plainly applicable and Universal knew it*."  Plaintiff's Opp. to Mot. to Dismiss (Doc. No. 39) (June 20, 2008) at 19:8-11 (emphases added).

- "[T]he video bears all the hallmarks of a family home movie and is clearly transformative in that it uses the Prince song in a distinct and creative way.  SAC ¶¶ 13-18.  *Simply put, it looks like the personal, noncommercial home movie that it was*."  *Id*. at 21:2-5 (emphasis added).

- "Ms. Lenz has alleged that Universal violated 17 U.S.C. § 512(f) when it told YouTube that her video was 'not authorized by the copyright owner, its agent, or the law' because *her video made an obvious fair use of the Prince song and Universal could not have formed—and did not form—a good faith belief to the contrary*."  Plaintiff's Reply in Support of Mot. to Compel (Doc. No. 131) (Aug. 5, 2009) at 1:10-13 (emphasis added).

As Plaintiff's complaints and briefs filed on her behalf in this Court make clear, Plaintiff's contention has been that it was (and is) "self-evident" and "obvious" that her posting is a fair use, and that anyone looking at the posting would have discerned that "immediately."  Plaintiff's documents and testimony make it clear that not even Plaintiff believed this to be true.

To start with, in a "blog" posting made on June 12, 2007 (just a week after receiving notification from YouTube and after speaking with the EFF), Plaintiff admitted that "[m]ine's not a 'fair use' case at all."  Ex. Q at 2 (emphasis added).  Plaintiff made this statement as part of a "comment" string to a posting in which she recounted her initial contact with EFF.  Plaintiff said she had learned about a prior takedown dispute involving the commentator Michelle Malkin and Universal.  The following day, a poster named "Richard Z" (known to Plaintiff to be a reader of her blog, Ex. A at 283:6-14) wrote Plaintiff that "the difference between your video and Malkin[]'s is that she had some kind of commentary associated with the copyrighted material *whereas your video was simply a home video with music playing in the background* (correct me if I'm wrong please).  *Malkin has the stronger fair use argument*."  Ex. Q at 1 (emphasis added).  "Richard Z" was telling Plaintiff that her posting was *not* an obvious fair use.  And Plaintiff's response to Richard Z *agreed with his assessment*.  Plaintiff wrote:

> *You're right Richard.  Mine's not a "fair use" case at all.*  Nor is it a parody.  It's something different.  I've never heard of anything like it, which is why I contacted EFF.

*Id*. at 2 (emphasis added).

Plaintiff cannot in good faith have pressed the contention that it is "self-evident" and "obvious" to anyone looking at her posting that it was a fair use when, within a week of YouTube's takedown, Plaintiff admitted that "*[m]ine's not a 'fair use' case at all*." Plaintiff may try and re-write and explain away her statement, but she certainly cannot avoid the disputed fact it raises on summary judgment. Moreover, in light of her deposition testimony regarding this statement, the law is clear that Plaintiff cannot now dispute it. At Plaintiff's deposition, Universal's counsel attempted to inquire what Plaintiff meant by this statement. Plaintiff tried to claim that "[a]t the time it may have been my opinion. *It may have been I was misunderstanding what I'd been told by counsel*." Ex. A at 286:8-14 (emphasis added). When Universal's counsel tried to inquire about this purported "misunderstanding," Plaintiff's counsel instructed her not to answer based on privilege. *Id*. at 286:15-287:19. Having asserted privilege to block Universal's inquiry into this statement, Plaintiff cannot now try to offer an explanation for the statement as to which there has been no opportunity for cross-examination. *See, e.g.*, *In re von Bulow*, 828 F.2d 94, 103 (2d Cir. 1987) (privilege cannot be used "as both a sword and a shield"); *United States v. Bilzerian*, 926 F.2d 1285, 1292-93 (2d Cir. 1991) (same). Plaintiff's admission that she knew, even before her complaint was filed, that hers is "not a 'fair use' case at all," stands on its own and undermines her repeated claims to this Court that her posting is a "self-evident" fair use.

Plaintiff's supposed good faith in asserting that her posting is a "self-evident non-infringing fair use" is further undermined by her repeated admissions that someone looking at her video could conclude it *was* infringing. Over two years into this case, Plaintiff admitted over and over again that someone could look at her posting and conclude that it *was* infringing:

- "Q: [A]s of June 6th [2007], did you think anyone who saw [the video posting] would recognize it to be a fair use? A: I don't know. Q: Is it possible that somebody could have looked at it and thought it wasn't fair use? A: Anyone can have any opinion they like. Someone could think it was non-infringing, *someone could think it was infringing*." Ex. A at 173:1-16 (emphasis added).

- "Q: Do you think reasonable people can disagree about whether [Plaintiff's video posting] is an infringement of copyright? A: I think so." *Id*. at 194:24-195:2.

- "Q:  Do you think anybody watching the video would have had to have known that it was a fair use?  A:  In my opinion, some people may have thought it was infringing, some wouldn't."  *Id*. at 271:19-25.

- "Q:  Do you believe that anyone looking at your video would have to conclude that your use of Let's Go Crazy in the posting was fair use?  A:  I would say that—I would say that most people would think that it wasn't infringing, *but it is possible that someone could look at it and find it infringing*."  *Id*. at 276:23-277:3-6 (emphasis added).

Plaintiff's case-ending admissions in her deposition regarding her "self-evident" claim are not the result of a recent epiphany.  In fact, Ms. Fleming told Plaintiff in the days immediately after Universal sent its notice to YouTube that her posting *was* infringing.  This was revealed in the documents that Plaintiff withheld until September.  On June 5, 2007, (the day that YouTube had contacted Plaintiff about the removal of the video) and the next day, Plaintiff had multiple email exchanges with Ms. Fleming (a person Plaintiff described as "knowledgeable" about copyright law, Ex. A at 164:2-4) regarding the notice.  Ms. Fleming did not say that she immediately recognized the posting to be "self-evident" fair use.  Rather, she told Plaintiff that:

> [T]he way copyright law now stands, using copyrighted music as background music *is* copyright infringement, unless you have obtained permission and (generally) paid a royalty.

Ex. B at 2 (emphasis in original).

Plaintiff did not challenge Ms. Fleming's conclusion.  Instead, she fumed that, "[t]his is seriously the stupidest thing I've heard in a long time, going after someone for a video with music playing in the background."[7]  *Id*. at 1.  Ms. Fleming's reiterated her original conclusion:

> It's stupid, yes.  But *they're also well within their legal rights*.  (And it's not just you.  UMG has been doing this for a while; Google for more articles & stuff on it.)

*Id*. at 1 (emphasis added).[8]

---

[7] Plaintiff has continued to assert that it was merely happenstance that the song "Let's Go Crazy" was playing in the background of the video and that it was not the focus of the posting.  In fact, as Plaintiff testified, she specifically chose this song for the video because it got her children dancing; Plaintiff recorded not one but two different videos using the song (*i.e.*, she stopped the video and then started recording again); Plaintiff specifically chose to title the posting with the song title, and both the title and music match the recorded action.  Ex. A at 31-41, 67.

[8] At her deposition, Plaintiff admitted that she understands it is "more likely" that Ms. Fleming was referring to *Universal* being within its legal rights in sending the notice than YouTube in taking the video down.  Ex. A at 176:3-9.

1    Ms. Fleming's statements, made immediately in the wake of YouTube's removal of

2    Plaintiff's video are at odds with Plaintiff's oft-repeated contention that it would be "self-evident"

3    upon viewing her posting that it was a "non-infringing fair use" of "Let's Go Crazy."  Stated

4    simply, it was not "obvious" or "immediately discern[able]" to Ms. Fleming that Plaintiff's

5    posting was a "self-evident non-infringing fair use."

6    Having tried to claim that her communications with Ms. Fleming were privileged, it

7    would now be strange for Plaintiff to distance herself from those communications by arguing that

8    Ms. Fleming's opinions are unreliable and should be ignored by the Court.  That by itself just

9    creates triable issues of fact and issues concerning Plaintiff's credibility.  But more importantly, it

10   would be disingenuous for Plaintiff to do that.  Plaintiff admitted that even before the events in

11   issue, she and Ms. Fleming had discussed diverse issues relating to copyright, including the

12   "ways the copyright is viewed, misconceptions about copyright, and … Creative Commons and

13   Lawrence Lessig"; Plaintiff also testified that Ms. Fleming published an article about copyright

14   issues on the web site that she and Plaintiff operate.  Ex. A at 179:15-180:13.  Plaintiff admitted

15   that she was communicating with Ms. Fleming because she "respected" her views and considered

16   her to be "knowledgeable" about copyright law.  *Id*. at 163:7-164:4.  In fact, in resisting

17   Universal's attempt to discover these communications, Plaintiff swore that she "believed that Ms.

18   Fleming would be able to help me understand my options and the nature of the claims against me,

19   and advise me on how I might proceed."  Ex. J ¶ 13.

20   Whether Ms. Fleming was right or wrong in her opinion that Plaintiff's posting was

21   infringing really is of no consequence to this motion.  What is important is that Plaintiff had been

22   told by a person that she trusted and relied on that the posting infringed copyright.  Plaintiff has

23   demonstrated bad faith and unclean hands by turning around and trying to persuade the Court that

24   *anyone* with any knowledge about copyright issues would had to have known just by looking at

25   her video posting that it was non-infringing.  In fact, Plaintiff knew from before she filed this case

26   that this was not true.  Summary judgment could not be more inappropriate given the questions

27   regarding Plaintiff's good faith and equitable conduct in making and prosecuting her claim.

28

1

2

2.      **Plaintiff's Good Faith In Claiming That She Has Suffered Damages And "Has Been Injured Substantially And Irreparably" Is Undermined By Her Statements**

3       Plaintiff has claimed throughout this case that, as a result of Universal sending its notice

4    to YouTube, "Plaintiff has been injured substantially and irreparably." SAC ¶ 38.  Damages are a

5    core element of Plaintiff's claim for relief under § 512(f), and (as discussed below) there is no

6    evidence that Plaintiff has compensable damages under § 512(f).  For purposes of Universal's bad

7    faith and unclean hands defenses, the important point is that Plaintiff has not prosecuted in good

8    faith the assertion that she has been damaged.  Multiple facts demonstrate this bad faith.

9       *First*, Plaintiff misled the Court in representing that Plaintiff suffered damages in order to

10   defeat Universal's motion to dismiss the SAC.  Universal argued that Plaintiff failed to allege any

11   damages as required to support a claim under 17 U.S.C. § 512(f).  *See* Doc. No. 38 at 18-19.  At

12   the hearing on that motion, the Court stated that it wanted to "focus on the issue that I have the

13   most concern about which is the *damages element of this claim*."  Ex. H at 3:18-20 (emphasis

14   added).  The Court asked Plaintiff's counsel to identify "what actual damages did the plaintiff

15   incur[,]" and specifically, "is the representation that plaintiff alleged she expended attorneys fees

16   in responding to the take down notice?"  *Id.* at 3:25-4:1, 5:11-14.  This colloquy followed:

17          Plaintiff's counsel:  I have to be a little careful in responding because I don't want to reveal communications, but my client did need to seek legal counsel along the way in determining how to respond.

18

19          The Court: *There could, hypothetically, be an allegation that a response to the original take down notice involved an actual expense to get professional services.*

20          Plaintiff's counsel: *Yes, Your Honor*.

21   *Id*. at 5:15-24 (emphasis added).  The Court relied on this representation in denying Universal's

22   motion to dismiss the SAC.  *See* Ex. I at 9:4-7 ("At oral argument, counsel for Lenz indicated that

23   while the damages incurred in preparing Lenz's counter-notice cannot be elaborated upon for

24   reasons of privilege, Lenz did incur actual damages in reviewing counter-notice procedures,

25   seeking the assistance of an attorney, and responding to the takedown notice.").

26      In fact, as Plaintiff admitted at her deposition, she did not incur *any* actual expense in

27   responding to Universal's notice to YouTube or in obtaining professional services.  Plaintiff did

28

1   not lose even one penny in actual wages for her time spent responding to Universal's notice, and

2   she did not pay even one penny to any professional advisers (*i.e.*, her lawyers) for their work

3   either before or since this lawsuit has been filed. Ex. A at 313-315, 325-330. The

4   misrepresentations to the Court were made on Plaintiff's behalf, for the purpose of avoiding

5   dismissal. Plaintiff's lawyers are her agents in prosecuting this case; their representations bind

6   her, and (at least) raise a factual question about Plaintiff's good faith in prosecuting her claim.

7       *Second*, Plaintiff misled the Court in contending that she suffered damages as a result of a

8   loss of access to YouTube while the "Let's Go Crazy" video was offline. As noted, Universal

9   filed an "anti-SLAPP" motion directed at Plaintiff's claim that Universal allegedly interfered with

10  her purported contract with YouTube. FAC ¶¶ 22-27. In opposing that motion, Plaintiff

11  proffered evidence to show that she had a prima facie claim based on that tort, including the

12  element of damages. In this regard, Plaintiff's "evidence" included her sworn declaration, stating

13  that "[a]s a result of Universal's allegation of infringement, I lost access to YouTube's service for

14  the Holden Video from June 5, 2007 until July 20, 2007." Ex. E ¶ 15. Plaintiff's counsel

15  submitted a declaration of her own, purporting to detail the expense that Plaintiff would have

16  incurred had she attempted to place her video on certain services that charge for hosting. Ex. F

17  ¶¶ 3-5. In opposing Universal's motion to dismiss the SAC, Plaintiff asserted that "YouTube's

18  video hosting services represent valuable consideration to Lenz." Ex. R at 23:18.

19      In fact, well before Plaintiff and her counsel submitted these declarations and briefs,

20  Plaintiff had admitted in a written document that YouTube's hosting services *did not* represent

21  any type of value to Plaintiff and that she did not care if YouTube hosted the video or not. This

22  admission, like numerous others detailed in this brief, was contained in one of Plaintiff's

23  communications with Ms. Fleming that was also withheld until September based on a groundless

24  claim of privilege. This is what Plaintiff said about YouTube's removal of her video:

25          Like I said, *I don't care that YouTube doesn't want to host it. Not like I'm paying
            them.* That's their business.

26  Ex. C at 1 (emphasis added). Plaintiff's admission that "I don't care" about YouTube not hosting

27  her video directly undermines her contention that she suffered a loss of "valuable consideration"

28

1   when YouTube removed the video.  This, too, is evidence of bad faith that precludes summary

2   judgment on these equitable defenses.

3       *Third*, Plaintiff's claim that she has suffered damage to her "free speech" rights is (in

4   addition to being legally insupportable) contradicted by the actual facts.  Plaintiff in her SAC

5   asserted as fact that "[b]ecause Universal's notice was intimidating, Ms. Lenz is now fearful that

6   someone might construe some portion of a new home video to infringe a copyright.  *As a result,*

7   *she has not posted a single video on YouTube since she received the takedown notice*."  SAC ¶ 38

8   (emphasis added).  At her deposition, Plaintiff admitted this allegation is false.  Plaintiff's

9   documents show that at least as of *July 2007* – the month after Plaintiff received notification from

10  YouTube – Plaintiff posted another video to YouTube, this one of Plaintiff appearing on a

11  copyrighted television program.  Ex. S; Ex. A at 105:12-25.  Plaintiff's claim that she is fearful

12  about rights owners "accus[ing] her of a federal crime" for her online postings is further belied by

13  Plaintiff's internet postings, as recently as a few months ago, of her children wearing clothing

14  with copyrighted and trademarked characters.  *See* Exs. T & U.  Plaintiff's claim of harm to her

15  "free speech" rights is a contrivance.  It is based on allegations that Plaintiff has admitted are

16  false, and that the facts show are false.  This is further evidence of Plaintiff's unclean hands.

17      *Fourth*, Plaintiff's documents reveal that she does not believe the contention that she was

18  "injured substantially and irreparably" as a result of Universal's notice.  The true evidence of

19  Plaintiff's beliefs is found, once again, in an email exchange with Ms. Fleming that Plaintiff

20  withheld as privileged and did not produce until the eve of her deposition.  Ex. D.[9]  This exchange

21  began on the date that Plaintiff filed her original complaint, July 24, 2007.  Ms. Fleming wrote, "I

22  love how you've been injured 'substantially and irreparably[,]'" followed by a "winky" emoticon

23  (";-)").  Plaintiff responded:  "I have ;-)."  Plaintiff testified in her deposition that a "winky"

24  emoticon signifies, to her, "something kind of like an arm nudge" or "just kidding."  Ex. A at

---

25  [9] Notably, Plaintiff's counsel admitted that this document not only was withheld from production,
26  but in fact was never identified on one of Plaintiff's privilege logs.  Ex. V.  Given that the
    document does not reflect any conceivable request for (or provision of) anything resembling legal
27  advice, its omission from a privilege log is not surprising.  What is surprising is why this
    document was not produced until literally hours before Plaintiff's deposition, something
28  Plaintiff's counsel have never explained.

1    147:87-16.  In other words, ;-) signifies a joke.  Federal Court complaints, however, must be

2    based on something more than a joke.  Plaintiff has known from the moment she filed this case

3    that her allegation that she was "injured substantially and irreparably" was false.  At a minimum,

4    the evidence raises factual and credibility issues whether Plaintiff is to be believed when she

5    inevitably tries to explain away her "wink."  This also precludes summary judgment.

6              3.    **There Are Serious Factual Issues About Whether This Action Has**
                     **Been Prosecuted In Good Faith, Or Whether It Is Simply A Publicity**
7                    **Campaign**

8              In belittling Universal's original interrogatory responses, Plaintiff states in her brief that

9    "[a]ny suggestion that this lawsuit was instigated as part of a master plan to call attention to a tiny

10   home video does not pass the proverbial laugh test."  Mot. at 8 n.7.  Actually, what the evidence

11   (much of it withheld from Universal until only recently) shows is that this lawsuit has been

12   prosecuted not because of a violation of Plaintiff's rights, but rather to serve the interests of

13   Plaintiff's counsel in publicizing their hostility to the rights of copyright owners, and in particular

14   the sending of takedown notices to sites like YouTube.  From the outset, this case has been

15   prosecuted as a "cause célèbre," ignoring numerous facts in the documented record that

16   undermine critical allegations.

17             Plaintiff's documents disclose the substance of her early communications with EFF, and

18   they reveal that the organization instantly saw the opportunity for a publicity vehicle:

19        •    Email June 14, 2007 (from Plaintiff to her mother):  I spoke w/ a lawyer from EFF
               today about the YouTube/Universal thing.  I can't say much but *there may be a*
20             *publicity blitz* and/or a lawsuit against Universal.  Ex. Y (emphasis added).

21        •    Email June 14, 2007 (from Plaintiff to Theryn Fleming):  I had a 40 minute phone
               call [with EFF] this morning ….  They are very, very interested in the case.  I
22             imagine so.  I've never heard of anything like it.  She [the EFF lawyer] said that
               Universal Music Group is creating a trend of just going all over the web claiming
23             copyright infringement left & right & that they're breaking laws & such to do it.
               *So EFF is pretty well salivating over getting their teeth into UMG yet again.*  Ex.
24             Z (emphasis added).[10]

25

---

26   [10] This document ("EFF is pretty well salivating") also was withheld based on the groundless
     claim of privilege over Plaintiff's communications with Ms. Fleming.  At deposition, Plaintiff's
27   counsel repeatedly refused to allow Universal's counsel to explore any of the communications
     between Plaintiff and EFF that Plaintiff voluntarily disclosed in these and other email messages.
28   *See, e.g.,* Ex. A at 199:19-200:10; 204:15-205:21.

For Plaintiff, providing EFF a vehicle for "getting their teeth into UMG yet again" is a costless undertaking. Pursuant to her retainer agreement with counsel, Plaintiff is not obligated to pay her lawyers anything for litigating this case. In fact, Plaintiff has assigned any recovery in this lawsuit to her lawyers. Miksch Decl. Ex. E at ¶ 5(a). Plaintiff has undertaken a substantial press promotional tour. *See* Ex. P at 11-12. And Plaintiff also has laced her blog with numerous expletives and invective directed at Prince and Universal. *See, e.g.,* Ex. AA ("the amended complaint zeroes in on His Purpleness as well .... now we know he's just a little dick in a crushed velvet suit"); Ex. BB ("Prince is going to sh*t his little purple pants"). And EFF has repeatedly trumpeted this case as a prime example of takedown abuse. *See, e.g.*, Ex. CC (EFF "Takedown Hall of Shame," although *Lenz v. Universal* now merits inclusion only as an "other honoree").

Contrary to Plaintiff's contention, Universal is not asserting that Plaintiff and her lawyers do not have the right to publicly discuss this case or their views about copyright law, Universal, Prince, or anything else. They do. But the desire for a publicity campaign does not give anyone the right to pursue a case based on facts known to be false. The motivation behind this case is directly relevant to whether Plaintiff has prosecuted it in good faith. Universal's equitable defenses (including bad faith and unclean hands) easily survive summary judgment.

**C.    Plaintiff's Motion On Universal's Defense Of "No Damages" Is An Unsupported, And Unsupportable, Attempt To Gain Summary Judgment On An Essential Element Of Her Claim For Relief**

Plaintiff's motion for judgment on Universal's defense of "no damages" is an audacious and unsupported attempt to obtain summary disposition of an essential element of *Plaintiff's* claim under § 512(f). As demonstrated below, the statute itself makes it clear that damages are a required element of a claim for a knowing misrepresentation under § 512(f), just as damages are an essential element of *any* claim for misrepresentation. *See* Restatement (Second) of Torts § 525 (1976) ("Restatement").

There can thus be no doubt that Plaintiff has the burden of establishing damages as an element of her claim and cannot bypass it with this motion. This means that Plaintiff must introduce *evidence* – not attorney argument – to establish that no reasonable fact-finder could find against her on this element. *See, e.g.*, *Southern Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885,

1   888 (9th Cir. 2003).  Plaintiff does not introduce evidence of her various categories of damages.

2   Instead, she submits a copy of her initial disclosures.  Miksch Decl. Ex. D (*see* Mot. at 13:16-17,

3   23).  But the disclosures are not evidence; they are lawyers' descriptions of what Plaintiff claims

4   as damages.  They are as inadmissible as Plaintiff's brief.

5       Instead of introducing evidence, Plaintiff tries to pretend that Universal has the burden of

6   proving that she has no damages since Universal has a "no damages" affirmative defense.  What

7   Plaintiff ignores is that this defense does not go to any issue on which Plaintiff has the burden,

8   nor does it operate to switch burdens.  Universal's defense is applicable to Plaintiff's request for

9   *injunctive* relief.  To that end, Universal's defense is that Plaintiff has not suffered any cognizable

10  harm in the past, and cannot show any likelihood of incurring such harm in the future.  Absent

11  such a showing, Plaintiff has no entitlement to the extraordinary relief of the injunction she

12  requests.  *See, e.g.*, *Mortensen v. County of Sacramento*, 368 F.3d 1082, 1086 (9th Cir. 2004)

13  (party seeking injunction "must show a very significant possibility of future harm" to be entitled

14  to injunction) (quotations omitted).  Had Plaintiff served an interrogatory asking Universal to

15  explain the basis for this affirmative defense – or even had she met-and-conferred with Universal

16  before filing this motion – Universal would have explained that to Plaintiff.  Plaintiff did neither.

17      The balance of Plaintiff's damages argument is based on a tortured re-writing of § 512(f)

18  to allow Plaintiff to count as damages under the statute items that as a matter of law do not count.

19  The reason for Plaintiff's re-writing of the statute is that, contrary to what Plaintiff represented to

20  the Court at the motion to dismiss, she has no evidence of pecuniary loss as a result of YouTube

21  removing her video.  *See* Ex. A at 310-330.  Every category of "damage" that Plaintiff claims are

22  not compensable under the statute.

23          1.      **Plaintiff's Attempt To Rewrite § 512(f) Fails As Matter Of Law**

24              a.      **Under § 512(f), "Damages" Are Actual Economic Loss Caused**
                        **As The Result Of A Service Provider's Removal Or**
25                      **Replacement Of The Material In Issue**

26      Plaintiff opens her argument by claiming that the damages component of § 512(f) reads,

27  "'shall be liable for *any damages, including costs and attorneys' fees*, incurred by the alleged

28  infringer ....'"  Mot. at 9:22-23 (Plaintiff's emphasis and ellipses).  Plaintiff's use of the ellipses

artificially to cut-off the text of the law is the springboard for her primary argument that the word

"*any*" means there is no limitation on what counts as damages under § 512(f).  That is incredibly

misleading.  The unadulterated text of the statute is:

> (f)     **Misrepresentations**.—Any person who knowingly materially misrepresents under this section—
>
> (1)     that material or activity is infringing, or
>
> (2)     that material or activity was removed or disabled by mistake or misidentification,
>
> shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee, or by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.

17 U.S.C. § 512(f).

The statute thus makes clear that it is concerned with two types of knowing material

misrepresentations, specifically, those enumerated in clauses (1) and (2).  The statute further

makes clear that there are three types of potential plaintiffs: "the alleged infringer"; the

"copyright owner or copyright owner's authorized licensee"; and the "service provider."  The

statute also makes clear that the potential plaintiff must be "injured by such misrepresentation."

And, critically, the statute also makes clear what the nature of that injury must be to count as

damages:  specifically, "any damages, including costs and attorneys' fees," that are "incurred" by

the eligible plaintiff "as the result of the service provider relying upon such misrepresentation in

removing or disabling access to the material or activity claimed to be infringing, or in replacing

the removed material or ceasing to disable access to it."  The "damages" that a plaintiff "incur[s]"

may include "costs and attorneys' fees," but what is critical is that the plaintiff actually has to

have "incurred" those fees, and the plaintiff must have done so "*as the result of*" the service

provider's removal or replacement of the material in question, *not as the result of filing the

litigation*.  Reading § 512(f) to make fees and costs for *bringing the § 512(f)* claim "damages" is a

bootstrap:  it would allow a plaintiff to establish an element of a claim just by filing suit.

1    Plaintiff tries to justify her reading of the statute by arguing that the definition of what

2    counts as damages ends after the word "fees."  Plaintiff insists that everything that follows "fees"

3    defines "who is a proper plaintiff," not what counts as damages  Mot. at 17:10-11.  Plaintiff then

4    further rewrites the statute, inserting bracketed numbers where they do not exist, supposedly to

5    show the three types of plaintiffs who can bring a claim under the statute.  *See id*. at 17:14-19.

6    Plaintiff's proposed re-writing of the statute is wrong under every known canon of

7    statutory construction.  *First*, it does violence to the plain language of the statute.  It divorces the

8    word "damages" from the word "incurred."  It further divorces the word "incurred" from what

9    those "damages" must be "incurred" "as the result of," namely, the service provider's removal or

10   replacement of the material in question.  By Plaintiff's own admission, Plaintiff's proposed

11   interpretation reads the proximate causation requirement out of the statute, Mot. at 16:4-15, and

12   allows any plaintiff to satisfy an essential element of her or his claim simply by filing suit.

13   *Second*, Plaintiff's proposed construction would make § 512(f) a radical departure from

14   the well-established law of misrepresentation.  As stated by a *unanimous* Supreme Court in *Dura*

15   *Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), the common law tort of misrepresentation

16   imposes two important requirements.  The first is that "the common law has long insisted that a

17   plaintiff in such a case show not only that had he known the truth he would not have acted *but*

18   *also that he suffered actual economic loss*." *Id*. at 343-44 (emphasis added).[11]  The second is that

19   the plaintiff must show that the alleged misrepresentation was not just a "but for" cause of the

20   claimed damage (which is Plaintiff's contention, *see* Mot. at 16:4-15), but that the alleged

21   misrepresentation *proximately* caused those damages.  *Id*. at 344.

22   The Court quoted the seminal treatises on tort law to make the point that "damage 'must

23   already have been suffered *before* the bringing of the suit'" and that "plaintiff 'must have suffered

24   substantial damage,' *not simply nominal damages*, before 'the cause of action can arise[.]'" *Id*.

25   (quoting, respectively, Bigelow, *Law of Torts* 101 (8th ed. 1907) and Keeton et al., Law of Torts

26   § 110 at 765 (5th ed. 1984) (emphases added)).  These requirements make it clear that a

27

28   _____

[11] The Restatement describes this as "pecuniary loss."  *See* Restatement § 525.

9414541.1                                        - 18 -                    DEFTS' OPP. TO MOT. FOR PARTIAL S.J.
                                                                           CASE NO. CV-07-03783

misrepresentation plaintiff may *not* bootstrap her or his expenses *after* filing suit into the damages element of the misrepresentation claim.  In *Dura*, the Court held that the Ninth Circuit had erred in construing the 10b-5 cause of action to dispense with these venerable requirements of the misrepresentation tort.  *Id*. at 344-45.  The Court likewise should resist Plaintiff's invitation to construe § 512(f) – which, according to its title, provides a claim for "**Misrepresentations**" – to jettison these requirements, which is what Plaintiff urges.

*Third*, Plaintiff's proposed construction of § 512(f) cannot be squared with other provisions of Title 17, and in particular § 505, the attorneys' fees provision.  Section 505 by its terms applies to "*any* civil action under this title," *i.e.*, including an action under 17 U.S.C. § 512(f).  17 U.S.C. § 505 (emphasis added).  Section 505 provides that fees and costs are not awarded as a matter of right, but rather within the court's "discretion."  *Id*.  And, as the Supreme Court has held, "[p]revailing plaintiffs and prevailing defendants are to be treated alike" for fee awards.  *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994).  Plaintiff's reading of § 512(f) would distort Congress's prescribed scheme for fee and cost awards under Title 17.  A successful plaintiff in a § 512(f) action *automatically* would recover its attorneys' fees and costs incurred in litigating the claim, because (according to Plaintiff) those fees and costs are "damages."  And the courts would have to treat prevailing defendants in a § 512(f) action differently, subjecting their requests to the discretionary inquiry under § 505.  There is no indication in the text, structure or legislative history of § 512(f) that shows Congress intended such an anomalous result.[12]

*Fourth*, contrary to Plaintiff's assertion, the Legislative History of § 512(f) shows that Universal's, not Plaintiff's, reading of the statute is correct.  As discussed above, Plaintiff's reading of the statute requires the Court to ignore the link between damages "incurred" and what they are incurred "as the result of."  Under Plaintiff's reading, the inclusion of a clause describing who the proper plaintiffs may be in a § 512(f) action marks the end of the statutory definition of

---

[12] Congress did not indicate its intent to do this by using the word "any," instead of "actual" before the word damages.  Mot. at 11:2-14.  The significance of the word "actual" is not (as Plaintiff contends) that it means economic loss, whereas "any damages" (in § 512(f)) means anything the Plaintiff claims are damages.  "Actual damages and profits" are defined remedies for copyright infringement.  17 U.S.C. § 504(b).  "Actual" is contrasted not with "any" but rather with "*statutory*" damages, which are the alternative damages for infringement.  *Id*. § 504(c).

what constitutes damages.  The Senate Report, however, makes it clear that "as a result of" limits

the range of cognizable damages:

> Defendants who make such a knowing misrepresentation are liable for ***any
> damages, including costs and attorneys' fees, incurred by any of these parties as
> a result of*** the service provider's reliance upon the misrepresentation.

S. Rep. 105-190, May 11, 1998 (attached as Ex. K) at 49 (emphasis added).  The legislative

history refutes Plaintiff's attempt to rewrite the statute.  *Compare* Mot. at 17:8-19.

This shorthand description of the damages provision in the legislative history is

remarkably similar to the analogous language that Congress adopted one year later, in the Anti-

Cyber-Squatting Consumer Protection Act.  Plaintiff admits that the language in that statute is

nearly identical to the pertinent language in § 512(f), but she notably fails to quote that language

or give the Court the correct statutory citation.  The analogous language actually is found not in

15 U.S.C. § 1125(d), which Plaintiff cites (Mot. at 14:2-4), but in 15 U.S.C. § 1114(2)(D)(iv).

The Act as a whole provides a limitation on the liability of domain name registrars who take

certain actions or implement certain policies regarding domain names that are confusingly similar

to registered trademarks.  That statute, too, contains a proscription on "knowing and material

misrepresentation[s]," and it provides that one who violates that proscription

> shall be liable for any damages, including costs and attorney's fees, incurred by the
> domain name registrant as a result of such action.

15 U.S.C. § 1114(2)(D)(iv).

This 1999 statute, as well as the 1998 legislative history, show that these

misrepresentation statutes do *not* break the link between damages "incurred" and what they are

incurred *as the result of*, *i.e.*, the proximate cause element.  There is no plausible basis for

concluding that Congress intended § 512(f) to have a different meaning simply because the final

text of the law inserts "by the alleged infringer, by any copyright owner or copyright owner's

authorized licensee, or by a service provider, who is injured by such misrepresentation" between

these words.  Indeed, all of the foregoing tools of statutory construction show that Congress did

not intend the statute to be a significant departure from the tort of misrepresentation.

2.     **Plaintiff's Attempted Analogies To Inapposite Causes Of Action Fail**

Recognizing that her proposed construction of § 512(f) is unreasonable and a radical break from the law of misrepresentation, Plaintiff urges the Court to import into § 512(f) principles from inapposite causes of action and statutes.  These efforts fail.

Plaintiff first claims that this Court should construe § 512(f) as though it were a malicious prosecution statute, even though there is absolutely no indication in the text of the law or the legislative history that Congress thought it was adopting such a law.  On the contrary, the title of the section is "**Misrepresentations**."  The analogy itself does not withstand scrutiny.  A threshold requirement for a malicious prosecution action is that the plaintiff must show a preceding *institution* and *favorable termination* of prior *litigation*.  *See, e.g.*, *Ferreira v. Gray, Cary, Ware & Freidenrich*, 87 Cal. App. 4th 409, 412-13 (2001).  A notice under the DMCA, in contrast, does not involve any institution or termination of litigation.  (Indeed, one of the purposes of such a notice is to avoid costly and burdensome litigation.)  A more fundamental distinction is that the malicious prosecution plaintiff does not bootstrap an element of that tort by filing the malicious prosecution suit.  The fees and costs that the malicious prosecution plaintiff seeks to recover are those incurred in defending the *prior* lawsuit.  *See, e.g.*, *Bertero v. National General Corp.*, 13 Cal. 3d 43, 59 (1974).  Plaintiff, in contrast, would have the Court read § 512(f) to allow the claimant to bootstrap in her or his fees and costs in prosecuting the *later* action.  There is no basis for such a result, not even in the inapposite tort of malicious prosecution.

Plaintiff likewise is wrong that the Court should look to cases decided under an inapposite provision of the *Bankruptcy Code* in construing § 512(f).  The provision that Plaintiff cites is 11 U.S.C. § 362(k)(1) (formerly § 362(h)).  As the Ninth Circuit has held, this is a statute that "permits *sanctions* for willful violations" of the automatic stay the Bankruptcy Code imposes upon the filing of a bankruptcy petition.  *Eskanos & Adler, P.C. v. Leetien*, 309 F.3d 1210, 1215 (9th Cir. 2002) (emphasis added).  The statute's long enumeration of actions that the petition stays makes it clear that they often will involve legal proceedings, and hence, legal action may be necessary to stop those stay violations.  *See* 11 U.S.C. § 362(a).  There is absolutely nothing to indicate that Congress, in enacting § 512(f), thought it was importing a standard from a

1    bankruptcy court decisions construing an inapposite sanctions statute, much less that Congress

2    intended that a § 512(f) plaintiff could establish damages simply by filing suit.

3                    3.       **None Of The Categories Of Damages That Plaintiff Claims Are**
                             **Cognizable Under The Statute**
4
         When § 512(f) is read correctly, it is clear that none of the categories of damages that
5
     Plaintiff claims count as "damages" for the statute.
6
                    a.       **Plaintiff's Time Preparing A Counter-Notice Resulted In No**
7                            **Compensable Economic Loss And Is Not Damages**

8        Plaintiff asserts that her damages include "time spent reviewing counternotice procedures,

9    seeking the assistance of counsel, and responding to the takedown notice." Mot. at 13:15-16.

10   Plaintiff asserts that this Court already has held that this is "cognizable injury under the

11   DMCA[.]" *Id*. at 13:20. That is false. What the Court actually held – based on Plaintiff's

12   misrepresentation that what she alleged was "actual expense," Ex. H at 5 – was that Plaintiff's

13   complaint survived a motion to dismiss. Plaintiff has not introduced *any* evidence – because

14   there is none – that any of her pre-suit activities involved any actual expense or economic loss.

15   *See* Ex. A at 310-330.

16       Plaintiff also has suggested that she will seek "nominal" damages for the use of her

17   computer before the lawsuit. *See* Ex. A at 317:11-318:14. As the Supreme Court's decision in

18   *Dura* (and the authorities it cites there) make clear, nominal damages are *not* an available remedy

19   for a misrepresentation claim. *See Dura*, 544 U.S. at 344. *See also Lusa Lighting, Int'l, Inc. v.*

20   *America Elex, Inc.*, No. SACV 07-674-DOC (MLGx), 2008 WL 4350741, at *9 (C.D. Cal. Sept.

21   22, 2008) ("neither nominal damages nor loss of profits satisfy the element of damages in a fraud

22   claim"). The result is no different under § 512(f).

23                   b.       **Plaintiff's Litigation Costs, And The Gratis Fees Being**
                             **Accumulated By Her Pro Bono Counsel, Are Not Damages**
24
         Plaintiff also claims that she can recover as damages the amount of money she spent for a
25
     hard drive in December 2007 – five months after filing this lawsuit – to preserve evidence in
26
     accordance with her litigation obligations. And, of course, she claims as "damages" the more
27
     than $400,000 that her pro bono lawyers have "billed" for this matter – even though Plaintiff has
28

1   never seen a bill, has no idea how many hours any of her lawyers has worked, and cannot identify

2   a single instance of her making a decision to exercise any control over the litigation being

3   prosecuted in her name.  Ex. A. at 326-330.  As discussed extensively in the preceding section,

4   these are not "damages" under § 512(f).  They are the fees and expenses associated with

5   prosecuting the claim itself, but they do not satisfy the damages element of the § 512(f) claim.

6                           c.      **EFF's Pre-Suit Legal Work**

7        Plaintiff also claims that she is entitled to recover damages for pre-lawsuit work by EFF

8   involving her counter-notice.  Again, there is no evidence that Plaintiff paid EFF a dime for any

9   pre-trial work.  The evidence actually shows that Plaintiff did not pay EFF for any such work and

10  never in the future will be obligated to pay EFF for that work.  Ex. A at 325-326.  And Plaintiff

11  has not introduced a shred of evidence with this motion showing that the lawyers at EFF actually

12  did any such work, again violating Rule 56.

13       Even if the Court were to consider Plaintiff's unsupported claim for damages based on

14  EFF's pre-suit work, summary judgment cannot be granted on this record.  In the first place, there

15  is no evidence that any work that Plaintiff's lawyers did relating to the counter-notice were

16  separate from the planned litigation, rather than being part-and-parcel of a comprehensive

17  strategy for litigating this case.  If EFF's work on the counter-notice was done to further its

18  strategy for litigating this case, then by definition it is not "damages" under § 512(f), because it

19  would not represent any damages "incurred" by reason of YouTube's removal of Plaintiff's

20  video.  It would be work done to further the litigation of a claim that either had every element

21  satisfied or it did not (and, as demonstrated, it did not).

22       The evidence that is available on this issue shows that EFF's pre-suit work *was* part of the

23  litigation.  Some of this evidence came to light only within the last week, with Plaintiff's

24  unexplained late production of still additional documents.  Those documents show that Plaintiff

25  revealed to an online "chat" friend that EFF was planning to file the original complaint as early as

26  June 21, 2007 but first wanted the video re-posted for maximum publicity effect.  *See* Ex. W (P-

27  E003040 at 9:18 pm) Plaintiff:  "they [the lawyers] said I can blog it [the case] discretely but *I've*

28  *decided it's less hassle just to point on Monday and what [sic] the hit counter on my video go*

9414541.1                                - 23 -              DEFTS' OPP. TO MOT. FOR PARTIAL S.J.
                                                            CASE NO. CV-07-03783

1   *ding ding ding.  It should be reinstated by YouTube then what=watch.*"  (Emphasis added.)  The

2   video in fact was not restored by YouTube until July, and EFF therefore held the suit, as Plaintiff

3   revealed in a different chat on July 18, 2007 (just a week before this suit was filed):

4         me [Plaintiff]: hey, EFF may file my suit today

5         Erin [Plaintiff's friend]: oh?  that's good, yes?

      me [Plaintiff]:  *yeah[,] it was held up b/c we were waiting for YouTube to restore*
6         *the video, which they never did*

7   Ex. X (emphasis added).  These (even-later-produced) documents confirm that EFF's work on the

8   counter-notice was not an independent effort to have the posting restored, but part of a carefully

9   coordinated litigation and public-relations strategy—a "*publicity blitz* and/or a lawsuit," as

10  Plaintiff described it in June 2007.  Ex. Y (emphasis added).  This is not damages under § 512(f).

11        Even if EFF's pre-suit work was unrelated to the litigation (and at a minimum the facts of

12  that are in dispute), Plaintiff did not "incur" any damages for that work, because she did not pay

13  EFF and never was or will be obligated to pay EFF that work.  Ex. A at 325.  Plaintiff cannot

14  avoid this problem with cases that say that pro bono counsel can recover the imputed value of

15  their fees under certain fee-award statutes.  Mot. at 17-19.  In the first place, § 512(f) is not a fee-

16  shifting statute.  It provides a remedy for certain plaintiffs who have "incurred" real economic

17  loss.  Moreover, as a factual matter, Plaintiff fails to show that she has "incurred" any obligation

18  to pay her lawyers for any work on the counter-notice to YouTube.  The cases that allow recovery

19  of pro bono fees do so based on the plaintiff's contingent obligation to pay over amounts to their

20  lawyers in the event of a favorable result.  Here, *all* of Plaintiff's obligations to pay her counsel

21  relate to her litigation.  *See* Miksch Decl. Ex. E at 3 ¶ 5(a).  Plaintiff has no contingent obligation

22  to pay her lawyers for anything related to the re-posting of her video.  The only contingent

23  obligation she has is to "pay" them for their work on the litigation with a litigation recovery.  As

24  demonstrated at length, litigation expenses are not damages, and that is the most that EFF's

25  contingent right to payment for any services can be.

26

27

28

**D.    Plaintiff's Motion Should Be Denied As To Universal's First, Fourth And Fifth Affirmative Defenses**

Plaintiff's motion to dismiss Universal's defense that her complaint fails to state a claim is absurd.  For reasons that Universal has set forth at length, the complaint that Plaintiff filed does not state an actionable claim for numerous reasons, including that it is barred by the Ninth Circuit's decision in *Rossi v. MPAA*, 391 F.3d 1000 (9th Cir. 2004).  The fact that even those allegations upon which Plaintiff has based her complaint are false and were known at least to Plaintiff to be false is all the more reason why the complaint fails to state a claim.

Plaintiff's motion for summary judgment on the defenses of waiver and estoppel is, as Plaintiff tacitly admits, an untimely motion for a more definite statement, and the motion should be denied as such.  Moreover, the facts discussed above show, at a minimum, triable questions on whether Plaintiff prosecuted this lawsuit knowing her allegations to be false.  She can and should be estopped from seeking relief against Universal based on false filings.  There also are (at a minimum) disputed questions as to whether Plaintiff waived any claim under § 512(f).  Indeed, Plaintiff very well may have waived that claim, since, as she put it, "I don't care that YouTube doesn't want to host" the "Let's Go Crazy" video, and instead is simply pursuing this case as part of her and EFF's "publicity blitz."

**IV.    CONCLUSION**

Plaintiff's motion should be denied in its entirety.

DATED:  November 16, 2009                    MUNGER, TOLLES & OLSON LLP


By: _____*/s/ Kelly M. Klaus*_____
                    KELLY M. KLAUS

Attorneys for Defendants