1 | ELECTRONIC FRONTIER FOUNDATION
KURT OPSAHL #191303
2 | CORYNNE MCSHERRY #221504
JULIE SAMUELS (*pro hac vice*)
3 | 454 Shotwell Street
San Francisco, CA  94110
4 | Telephone:    (415) 436-9333
Facsimile:    (415) 436-9993
5 | Email: kurt@eff.org; corynne@eff.org; julie@eff.org

6 | KEKER & VAN NEST, LLP
ASHOK RAMANI - #200020
7 | MICHAEL KWUN -#198945
MELISSA J. MIKSCH - #249805
8 | 710 Sansome Street
San Francisco, CA  94111-1704
9 | Telephone:    (415) 391-5400
Facsimile:    (415) 397-7188
10 | Email: aramani@kvn.com; mkwun@kvn.com; mmiksch@kvn.com

11 | Attorneys for Plaintiff
STEPHANIE LENZ
12 |

13 | UNITED STATES DISTRICT COURT

14 | NORTHERN DISTRICT OF CALIFORNIA

15 | SAN JOSE DIVISION

16 | STEPHANIE LENZ,                                          Case No. C 07-03783-JF

17 |                                        Plaintiff,        **PLAINTIFF'S NOTICE OF MOTION
                                                             AND MOTION FOR SUMMARY
18 |         v.                                              JUDGMENT**

19 | UNIVERSAL MUSIC CORP., UNIVERSAL             Date:        December 10, 2010
MUSIC PUBLISHING, INC., and                      Time:        9:00 a.m.
20 | UNIVERSAL MUSIC PUBLISHING                    Courtroom: 3, 5th Floor
GROUP,                                           Judge:       The Hon. Jeremy Fogel
21 |
                                       Defendants.          **REDACTED**
22 |

23 |

24 |

25 |

26 |

27 |

28 |

516364.01

1

## TABLE OF CONTENTS

2

**Page**

3  I.    INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................2

4  II.   STATEMENT OF UNDISPUTED FACTS ......................................................................3

5  III.  LEGAL STANDARD...........................................................................................................7

6  IV.   ARGUMENT .......................................................................................................................7

7      A.    Universal did not believe in good faith that the Video was infringing. ..................8

8          1.   ██████████████████████████████████████████████

9               .....................................................................................................................9

10         2.   ██████████████████████████████████████████████
                ...........................................................................................................9

11         3.   ██████████████████████████████████████████████
                .........................................................................................................10

12         4.   ██████████████████████████████████████████████

13              ...........................................................................................11

14     B.    The Video is a fair use. ........................................................................................12

15     C.    At a minimum, Universal recklessly disregarded whether the Video
             was a fair use........................................................................................................17

16     D.    Universal sent the takedown pursuant to Section 512(f). .....................................20

17     E.    Ms. Lenz was damaged by Universal's improper takedown. .................................21

18  V.    CONCLUSION....................................................................................................................23

19

20

21

22

23

24

25

26

27

28

i

516364.01

1

# TABLE OF AUTHORITIES

2
<u>Page(s)</u>

3

## Federal Cases

4

*Anderson v. Liberty Lobby, Inc.*
5
    477 U.S. 242 (1986).................................................................................7

*Blanch v. Koons*
6
    467 F.3d 244 (2d Cir. 2006) ....................................................................14

7
*Campbell v. Acuff-Rose Music, Inc.*
    510 U.S. 569 (1994)............................................................................9, 13, 15

8
*Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.*
    150 F.3d 132 (2d Cir. 1998) ............................................................13, 16

9
*Celotex Corp. v. Catrett*
10
    477 U.S. 317 (1986)..................................................................................7

*Dolman v. Agee*
11
    157 F.3d 708 (9th Cir. 1998) ..................................................................18

12
*Elvis Presley Enters., Inc. v. Passport Video*
    349 F.3d 622 (9th Cir. 2003) ..................................................................15

13
*Fisher v. Dees*
    794 F.2d 432 (9th Cir. 1986) ............................................................10, 15
14

*Gertz v. Welch*
15
    680 F.2d 527 (7th Cir. 1982) ..................................................................19

16
*Harper & Row v. Nation Enters.*
    471 U.S. 539 (1985)........................................................................13, 15

17
*Harte-Hanks v. Connaughton*
    491 U.S. 657 (1989)................................................................................19

18
*Hunt v. Liberty Lobby*
    720 F.2d 631 (11th Cir 1983) ..................................................................18
19

*In re Aimster Copyright Litig.*
20
    334 F.3d 643 (7th Cir. 2003) ..................................................................18

*In re Barboza*
21
    545 F.3d 702 (9th Cir. 2008) ..................................................................18

22
*Kane v. Comedy Partners*
    No. 00 Civ. 158 (GBD), 2003 WL 22383387 (S.D.N.Y. Oct. 16, 2003) ..................16

23
*Kelly v. Arriba Soft Corp.*
    336 F.3d 811 (9th Cir. 2003) ..................................................................14

24
*Kramer v. Thomas* No. CV 05-8381 AG (CTx), 2006 WL 4729242 (C.D.
25
    Cal. Sept. 28, 2006) ........................................................................16, 17

26
*Lennon v. Premise Media Corp.*
    556 F. Supp. 2d 310 (S.D.N.Y. 2008) ....................................................14

27
*Lenz v. Universal Music Corp.*
    572 F. Supp. 2d 1150 (N.D. Cal. 2008) ..........................................2, 8, 9

28

516364.01

**TABLE OF AUTHORITIES**
(cont'd)

Page(s)

*Los Angeles News Serv. v. Reuters Television Int'l, Ltd.*
149 F.3d 987 (9th Cir. 1998) ...................................................13

*Masson v. New Yorker*
960 F.2d 896 (9th Cir. 1992) ...................................................18

*Matsushita Elec. Indus. v. Zenith Radio*
475 U.S. 574 (1986) ...................................................7

*Mattel Inc. v. Walking Mountain Prods*
353 F.3d 792 (9th Cir. 2003) ...................................................10, 14, 16

*New York Times Co. v. Sullivan*
376 U.S. 254 (1964) ...................................................18

*Online Policy Group v. Diebold*
337 F. Supp. 2d (N.D. Cal. 2004) ...................................................8, 20

*Peer Int'l v. Pausa Records*
909 F.2d 1332 (9th Cir. 1990) ...................................................18

*Phelps-Roper v. City of Manchester, Mo.*
F. Supp. 2d    , No. 4:09-CV-1298 CDP, 2010 WL 3614182 (E.D.
Mo. Sept. 8, 2010) ...................................................22

*Princeton Univ. Press v. Mich. Document Servs., Inc.*
99 F.3d 1381 (6th Cir. 1996) ...................................................16

*Rossi v. Motion Picture Association of America*
391 F.3d 1000 (9th. Cir 2004) ...................................................8

*Sandoval v. New Line Cinema Corp.*
147 F.3d 215 (2d Cir. 1998) ...................................................10

*St. Amant v. Thompson*
390 U.S. 727 (1968) ...................................................18

*U.S v. Real Property at 2659 Roundhill Dr., Alamo, Cal.*
194 F.3d 1020 (9th Cir. 1999) ...................................................18

*Viacom Int'l Inc. v. YouTube, Inc.*
___ F. Supp. 2d ___ ...................................................21

*Wright v. Warner Books, Inc.*
953 F.2d 731 (2d Cir. 1991) ...................................................16

**Federal Statutes**

17 U.S.C. § 106...................................................8
17 U.S.C. § 107...................................................8, 9, 12
17 U.S.C. § 512...................................................2, 7, 19, 20, 21
17 U.S.C. § 512(c)...................................................21
17 U.S.C. § 512(c)(1)...................................................21
17 U.S.C. § 512(c)(3)...................................................6, 21
17 U.S.C. § 512(c)(3)(A)...................................................20
17 U.S.C. § 512(f)...................................................*passim*

iii

1

**TABLE OF AUTHORITIES**
(cont'd)

2

**Page(s)**

3   17 U.S.C. § 512(g) ...................................................................................6, 7

4   17 U.S.C. § 512(k)(1)(B) ...............................................................................21

**Federal Rules**

5

Fed. R. Civ. P. 30(b)(6) ...........................................................................9, 11

6   Fed. R. Civ. P. 56(c)(2) .................................................................................7

7

**State Statutes**

8

34 Pa. Code § 231.101(2) ...............................................................................22

9   **Other Authorities**

10   2 Howard B. Abrams, *The Law of Copyright* § 15:52 (2006) .......................14

11   3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* §
     1404[B], at 14-40.2-.3 (1989) ..................................................................18

12   4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* §
     13.05[A][4] (2005).....................................................................................16

13   Senate Report No. 105-190 ..........................................................................19

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iv

516364.01

1  **NOTICE OF MOTION AND STATEMENT OF RELIEF SOUGHT:**

2    PLEASE TAKE NOTICE, that on December 10, 2010, at 9:00 a.m., or at such other time

3  as the Court may direct, before the Honorable Jeremy Fogel, United States District Court,

4  280 South First Street, San Jose, California, 95113, Plaintiff Stephanie Lenz will, and hereby

5  does, move the Court for entry of summary judgment.

6    This Motion is based on this Notice of Motion and Motion, the Memorandum of Points

7  and Authorities below, the Declarations of Stephanie Lenz, Marcia Hofmann and Michael Kwun

8  (Volumes I-III) that are being submitted herewith, and such other and further papers, evidence

9  and argument as may be submitted to the Court in connection with the hearing on this motion.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

516364.01

1        I.      INTRODUCTION AND SUMMARY OF ARGUMENT

2        Every day, thousands of parents take pictures and make videos of their kids doing all

3   sorts of things.  Many of those pictures and videos incorporate copyrighted works in myriad

4   ways—a child may be wearing a t-shirt with a copyrighted character on it, or she may be

5   standing in front of a copyrighted sculpture, or there may be copyrighted music playing in the

6   background.  This activity doesn't make the parents of America copyright scofflaws—even if the

7   copyrighted work is, in some sense, the "focus" of the picture or video.  For example, sending a

8   picture of someone in a (copyrighted) Disney t-shirt with the note, "My son went to Disneyland

9   and all I got was this Mickey Mouse t-shirt," does not violate copyright law.  And everyone

10  versed in copyright law (such as a major music publisher) knows *why*:  because these examples

11  are fair uses.

12        To come to that conclusion, however, a person must perform one simple task:  consider

13  whether the fair use doctrine applies.  *See Lenz v. Universal Music Corp.,* 572 F. Supp. 2d 1150,

14  1154-55 (N.D. Cal. 2008).  This is exactly what Universal failed to do when it looked at the

15  blurry 29-second home video at issue in this case (the "Video").



23        This is precisely the type of improper practice that Congress meant to deter when it

24  enacted Section 512(f) of the Digital Millennium Copyright Act ("DMCA").  When Congress

25  took up the issue of online copyright infringement in the mid-1990s, it had to grapple with a

26  delicate balance:  How to allow copyright owners to quickly and efficiently stop online

27  infringement without impairing lawful uses of copyrighted works.  Out of this debate and

28  deliberation was born the DMCA, and with it, Section 512's expedited "notice and takedown"

516364.01

1   provisions.  To ensure that expedited process wasn't abused,  however, Congress also included

2   an important and powerful deterrent, Section 512(f), that would allow lawful users of

3   copyrighted works online to hold copyright owners accountable if they sent a takedown notice in

4   bad faith.

5       Ms. Lenz has brought this lawsuit to do just that—hold Universal accountable for a

6   highly improper takedown, and the wrongful practices that led to it.  If Sean Johnson, the only

7   Universal[1] employee who actually reviewed the Video, had bothered to consider the issue, he

8   would have realized, based solely on looking at the Video, that the use of the Prince song was a

9   classic example of a non-infringing fair use.  But Mr. Johnson couldn't come to that realization

10  because ████████████████████████████████████████████████████

11  Indeed, Mr. Johnson's supervisor testified that Mr. Johnson ██████████████████████

12  ████████████████████  Simply put, there is no genuine issue of material fact that Universal

13  did not form and could not have formed the requisite good faith belief that the Video was

14  infringing.  Universal is liable under Section 512(f) of the DMCA.

## II.    STATEMENT OF UNDISPUTED FACTS

16      Plaintiff Stephanie Lenz is a mother, wife, writer and editor.  Declaration of Stephanie

17  Lenz ¶ 2.  She and her husband have two children.  *Id.*  In early February 2007, Ms. Lenz's

18  children were playing in the family's kitchen and listening to a Prince CD.  *Id.* ¶ 3.  As the

19  children played in the kitchen, Ms. Lenz noticed that her youngest child, who was still learning

20  to walk at the time and using a push-toy, would pause with his toy in front of the CD player and

21  "dance," particularly if he heard her say the word "music."  *Id.*  Using her digital camera,

22  Ms. Lenz decided to capture the moment on film, especially her son's "dance."  *Id.*  Turning on

23  her camera, and prompting her son by asking him what he thought of the "music," she created a

24  29-second video recording of the children's activities.  *Id.*; Exh.[2] A (electronic video file, Depo.

---

[1] "Universal" is used herein to refer collectively to the defendants in this case, Universal Music Corporation, Universal Music Publishing, Inc., and Universal Music Publishing Group.

[2] Unless otherwise indicated, all citations to Exhibits are to Exhibits to the Declaration of Michael Kwun (Vol. I-III), submitted herewith. Exhibit A is attached to Volume I of the Kwun Declaration, manually filed herewith.  Exhibits B-O are attached to Volume II of the Kwun Declaration, electronically filed herewith.  Exhibits P-BB are attached to Volume III of the

1    Exh. 2)[3]; Exh. B (Lenz Depo.) at 40:15-25 (authenticating).  The Video bears all the hallmarks of

2    a family home movie—it is somewhat blurry, the sound quality is poor, and it focuses on

3    documenting the child's "dance moves" in a kitchen, against a background of normal household

4    activity, commotion and laughter.  *See* Exh. A.  Due to the noise and commotion made by the

5    children, the song "Let's Go Crazy" can only be heard in the background for approximately 20

6    seconds of the 29-second Video and even then not all that clearly.  *See id.*

7         Ms. Lenz's son was just learning to walk when Ms. Lenz made the Video.  Lenz Decl.

8    ¶ 3.  Ms. Lenz thought her mother, who lives across the country in California, would enjoy

9    seeing her son's new ability to dance as well.  *Id.* ¶ 4.  Ms. Lenz's mother had told her she had

10   difficulty downloading video files sent via email.  *Id.*; Exh. C (Morgan Depo.) at 41:4-42:9,

11   58:2-61:20; Exh. D (Depo. Exh. 61).  In early February 2007, Ms. Lenz uploaded the Video from

12   her computer to the YouTube[4] website for her family and friends to enjoy.  Lenz Decl. ¶ 4.

13        Universal represents Prince and administers various copyrights on his behalf.  Exh. Q

14   (Allen Depo.) at 84:15-24, 175:25-176:20 & Exh. U (Depo. Exh. 83). ███████████████

15   ██████████████████████████████████████  Exh. Q (Allen Depo.) at 234:14-235:8.

16   Universal believes ██████████████████████████████████████████████

17   ██████████████████████████████████████████████████████████

18   ████████████████████████  *See id.* at 165:16-166:16; Exh. H at 13:9-15:8

19   (supplemental responses to Request for Admission Nos. 33 & 34).  Universal also believes that

---

Kwun Declaration, submitted herewith along with an application to file under seal.

[3] The cited electronic video file is the file that was uploaded by Ms. Lenz to YouTube.  The video can also be viewed on the YouTube site, at <http://www.youtube.com/watch?v=N1KfJHFWlhQ>; *see also* Exh. E (screen capture of the "view" page for the video on YouTube, taken shortly after this lawsuit was filed and previously submitted by Universal in support of its initial motion to dismiss (*see* 9/21/2007 Declaration of Kelly M. Klaus, Exh. B)).

[4] YouTube, LLC is a Delaware limited liability company with its principal place of business in San Bruno, California, and is a wholly owned subsidiary of Google Inc., a Delaware corporation with its principal place of business in Mountain View, California (collectively "YouTube").  Exh. V (Hubbard Aff.) ¶ 3.  YouTube hosts (i.e., provides storage of and access to) videos provided by its users.  *Id.* ¶ 4.  At their direction (i.e., upon their decision to post their videos to the YouTube system), YouTube stores those videos on its servers, and allows others to access to them according to the choices made by the users posting those videos.  *Id.*  YouTube has registered a designated agent to receive notification of claimed infringement with the United

1  ████████████████████████████████████████████████

2  ████████ Exh. Q (Allen Depo.) at 61:22-62:1. As Universal put it in response to a media

3  inquiry in connection with this case:

> Prince believes it is wrong for YouTube, or any other user-generated site, to appropriate his music without his consent. *That position has nothing to do with any particular video that uses his songs.* It's simply *a matter of principle.* And legally, he has the right to have his music removed. We support him and this important principle. That's why, over the last few months, we have asked YouTube to remove thousands of different videos that use Prince music without his permission.

Exh. I (Exh. F to Second Amended Complaint (Depo. Exh. 110)) (emphasis added); *see also* Exh. J (Lofrumento Depo. at 47:18-49:11) (authenticating).

Therefore, Universal's takedown guidelines ████████████████████████████ ██████████████████████████████ Exh. Q (Allen Depo.) at 62:1-4.  In other words, Universal would send a takedown notice for ██████████████████████████ ████████████████████ *Id.* at 62:8-19.[5]  Indeed, it is Universal's general policy, ████████████████████████████████████ ████████████████████████████████████████████████████████ *Id.* at 60:15-61:6; *see also* Exhs. X-AA (Depo. Exhs. 91, 92, 97, 102).[6] ████████████████████████████████ ████████████████████████████████████████████ *See* Exh. P (Johnson Depo.) at 60:7-22.

████████████████████████████████████████████████ *Id.* at 75:4-76:7.  Mr. Johnson had only a vague understanding of fair use. *See id.* at 12:12-13:8. Mr. Johnson's boss, Robert Allen, ██████████████████████████████████████ ████████████████████████ Exh. Q (Allen Depo.) at 130:7-131:4; *see also* Exh. H at 17:14-23:7 (supp. resps. to RFA Nos. 41-43).  Alina Moffatt, the attorney who actually sent

States Copyright Office. *Id.* ¶ 5.

[5] One result of applying this policy so strictly was that Universal Music Publishing Group accidentally removed some videos that Universal Music Corp had specifically authorized. *See, e.g.,* Exh. Q (Allen Depo.) at 177:9-182:14; Exh. T (Depo. Exh. 85).

[6] *See also* Exh. Q (Allen Depo.) at 195:20-196:15, 199:3-16, 240:19-241:4, 258:6-19

5

516364.01

1   the notice that led to this case, has never had occasion to consider whether a given use of

2   material was fair in the course of her work for Universal.  Exh. F (Moffat Depo.) at 54:17-55:1.

3   ████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████

6   Exh. P (Johnson Depo.) at 35:17-36:1; Exh. R (Depo. Exh. 70).  Less than two hours later, at the

7   direction of her superior, Mr. Allen, Ms. Moffat sent the list to YouTube embodied in the

8   aforementioned notice.  *See* Exh. F (Moffat Depo.) at 14:16-15:25, 17:3-10, 30:25-31:6; Exh. R

9   (Depo. Exh. 70); Exh. S (Depo. Exh. 77).  Neither Ms. Moffat nor Mr. Allen reviewed the Video

10  before Ms. Moffat sent the notice.  Exh. F (Moffat Depo.) at 19:23-25; Exh. Q (Allen Depo.) at

11  26:15-19, 55:15-20.  The sole basis for Ms. Moffat's asserted belief that the listed videos were

12  infringing was that she was instructed to send the notice.  Exh. F (Moffat Depo.) at 22:16-24; *see*

13  *also id.* at 22:25-27:22.  ████████████████████████████████████████

14  ███████████████████████████████████   Exh. Q (Allen Depo.) at 57:15-20.

15  ████████████████████████████████   *Id.* at 60:11-14.

16       Universal sent this notice to the address designated by YouTube for DMCA notices.

17  Exh. V (Hubbard Aff.) ¶¶ 7-11 & Exh. B (to the Hubbard Aff.), intending to cause YouTube to

18  take it down.  Exh. H at 8:23-9:10 (supp. resp. to RFA No. 4).  The notice precisely tracked the

19  language specified for a notice of claimed infringement under Section 512(c)(3) of the DMCA.

20  On June 4, 2007, YouTube disabled public access to the Video due to the accusation of

21  infringement.  Exh. K (Hubbard Aff.) ¶ 11.  YouTube also sent Ms. Lenz an email notifying her

22  that it had done so in response to Universal's accusation of copyright infringement, and warning

23  her that repeated incidents of copyright infringement could lead to the deletion of her account

24  and all her videos.  Lenz Decl. ¶ 5; Exh. U (Depo. Exh. 9); Exh. A (Lenz Depo.) at 110:3-6

25  (authenticating).

26       On June 7, 2007, Ms. Lenz sent a counternotice that did not comply with all of the

27  particulars of Section 512(g) of the DMCA.  Lenz Decl. ¶ 6; Exh. K (Depo. Exh. 11); Exh. B

28  (authenticating exhibits).

6

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 07-03783-JF

1  (Lenz Depo.) at 116:10-20 (authenticating). █████████████████████████████

2  █████████████████████████████████ Exh. W (Depo. Exh. 72); Exh. F (Moffat

3  Depo.) at 32:13-19.  Ms. Moffat reviewed the counternotice and concluded that the use must be

4  infringing because it was unlicensed.  *See* Exh. F (Moffat Depo.) at 41:3-25, 45:15-46:6, 46:24-

5  47:8.  Ms. Moffat wrote back to YouTube to insist that the Video was infringing and note that

6  the counternotice was invalid because it did not comply with the particulars of Section 512(g).

7  *See* Exh. W (Depo. Exh. 72).  With the assistance of counsel, Ms. Lenz then sent YouTube a

8  second DMCA counternotice on June 27, 2007, demanding that the Video be reposted because it

9  did not infringe Universal's copyrights.  Lenz Decl. ¶ 7.  The Video was restored in mid-July,

10  approximately six weeks after it had been disabled.  *Id.* ¶ 8.

## III.   LEGAL STANDARD

12      A court may grant summary judgment when the submissions in the record "show that

13  there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

14  matter of law."  Fed. R. Civ. P. 56(c)(2).  A "genuine issue" of material fact means that there is

15  sufficient evidence in favor of the non-moving party to allow a jury to return a verdict in its

16  favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The burden is on the non-

17  moving party to designate specific facts showing a genuine issue for trial.  *See Celotex Corp. v.*

18  *Catrett*, 477 U.S. 317, 322 (1986).  However, a mere "scintilla" of evidence will not suffice to

19  meet that burden.  *Anderson,* 477 U.S. at 252.  Nor is it enough for the non-moving party to show

20  that there is some "metaphysical doubt as to the material facts," provided that any inferences

21  from the underlying facts are viewed in the light most favorable to the non-moving party.

22  *Matsushita Elec. Indus. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986).

## IV.   ARGUMENT

24      Ms. Lenz seeks summary judgment that Universal has violated 17 U.S.C. § 512(f).

25  Section 512(f) provides,

26      Any person who knowingly materially misrepresents under this section . . . that
        material or activity is infringing . . .shall be liable for any damages, including
27      costs and attorneys' fees, incurred by the alleged infringer . . . who is injured by
        such misrepresentation, as the result of the service provider relying upon such
28      misrepresentation in removing or disabling access to the material or activity

516364.01

1    claimed to be infringing . . . .

2    17 U.S.C. § 512(f).  The Court has held that Ms. Lenz must show that Universal acted with

3    subjective bad faith in sending its false takedown notice.  *See Lenz,* 572 F. Supp. 2d at 1155

4    (citing *Rossi v. Motion Picture Association of America,* 391 F.3d 1000, 1004 (9th. Cir 2004)).[7]

5           As set forth below, Ms. Lenz has made that showing.  The undisputed evidence

6    demonstrates Universal failed to form a good faith belief that the Video is infringing, either

7    because it never considered whether it was a fair use and therefore authorized by law, or because

8    it chose to be willfully blind to that fact. Universal has violated Section 512(f), and the Court

9    should therefore grant summary judgment in Ms. Lenz's favor.

10   **A.     Universal did not believe in good faith that the Video was infringing.**

11          The Court has long since rejected Universal's argument that a copyright owner need not

12   consider fair use prior to sending a DMCA takedown notice.  *See Lenz,* 572 F. Supp. 2d at 1156.

13   ("The purpose of Section 512(f) is to prevent the abuse of takedown notices.  If copyright owners

14   are immune from liability by virtue of ownership alone, then to a large extent Section 512(f) is

15   superfluous.")  The Court held that "[a] good faith consideration of whether a particular use is

16   fair use is consistent with the purpose of the statute."  *Id.*  As the Court explained, "[t]he DMCA

17   already requires copyright owners to make an initial review of the potentially infringing material

18   prior to sending a takedown notice . . . . A consideration of the applicability of the fair use

19   doctrine simply is part of that initial review."  *Id.* at 1155.

20          The requirement that a copyright owner consider fair use prior to sending a takedown

21   notice is consistent with the Copyright Act, which provides that the exclusive rights granted a

22   copyright owner are "[s]ubject to sections 107 through 122" of the Act.  17 U.S.C. § 106.

23   Section 107 codifies the fair use doctrine, and expressly provides that "the fair use of a

24   copyrighted work . . . is not an infringement of copyright."  *Id.* § 107; *see also Lenz,* 572 F.

---

25   [7] As set forth in detail in the briefing on Universal's first motion to dismiss, the parties dispute

26   whether a subjective standard applies solely to the factual basis for the DMCA notice or to the
     legal basis as well.  Ms. Lenz contends that *Rossi* sets out an "actual knowledge" standard for

27   512(f) factual investigations, while the Court's holding in *Online Policy Group v. Diebold,* 337
     F. Supp. 2d, 1195 (N.D. Cal. 2004), presents the appropriate and controlling standard for Section

28   512(f) legal determinations.  *See* Opp'n to Mot. to Dismiss and Special Mot. to Strike (Dkt #22)

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 07-03783-JF

1    Supp. 2d at 1155-56. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

2    ▓▓▓▓▓▓▓▓▓▓▓

3        **1.**   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

4        ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

5    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

6    ▓▓▓   Exh. Q (Allen Depo.) at 76:8-11. ▓▓▓▓▓▓▓▓▓▓▓▓▓

7    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

8    ▓▓▓▓   *Id.* at 76:14-19, 77:12. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

9    ▓▓▓▓▓▓▓▓   *Id.* at 77:13-25. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

10   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓   Indeed, Mr. Allen did not

11   even know whether a fair use would be one that would be "authorized by law." *Id.* at 18:25-

12   19:18.

13       **2.**   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

14

15   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

16   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

17   ▓▓▓▓▓▓

18   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

19   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

20   ▓▓▓▓▓▓▓▓▓▓▓▓▓

21   *Id.* at 61:1-6. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓   *Id.* at
     61:22-62:4.

22   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓   the use was

23   noncommercial or transformative.[8]   *See Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 578-

24   79 (1994). ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓   the original work was creative or

25   unpublished. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓   the amount and substantiality of the

26

27   _____

     at 4.  Ms. Lenz reserves the right to re-raise this issue on appeal, if necessary.

28   [8] The statutory fair use factors are set forth at 17 U.S.C. § 107.

516364.01

1   use, ████████████████████████████████████████████████

2   ████████████████ Exh. Q (Allen Depo.) at 62:14-19. ██████████████████

3   ████████ market harm. *See also id.* at 64:19-23.

4   ████████████████████████████████████████████████████

5   ████████████ *Id.* at 56:20-24.  Of course, any number of fair uses might fall within this

6   rubric.  *See, e.g., Mattel Inc. v. Walking Mountain Prods,* 353 F.3d 792, 803-04 n.8 (9th Cir.

7   2003) ("entire verbatim reproductions are justifiable where the purpose of the work differs from

8   the original"); *Fisher v. Dees*, 794 F.2d 432 (9th Cir. 1986) ("When Sonny Sniffs Glue," a 29-

9   second parody of "When Sunny Gets Blue" that altered the original lyric line and borrowed six

10   bars of the song found to be noninfringing fair use).

11         Simply put, █████████████████████████████████████████████

12   ████████████████████████████████████████ *See, e.g., Sandoval v. New Line*

13   *Cinema Corp.*, 147 F.3d 215 (2d Cir. 1998).

14         **3.**   ████████████████████████████████

15

16   ████████████████████████████████████████████████

17   ████████████████████████████████████████████████

18   ████████████████████████████████████████████████

19   ████████████████████████████████████████████

20   ████████████████████████████████████████████████

21   ████████████ Exh. P (Johnson Depo.) at 60:17-22.

22   ████████████████████████████████████████████████

23   ████████████████████████████████████████████

24   ████████████████████████████████████████████████

25   ████████████████████████████████████████████

26   ████████ *Id.* at 62:4-10-63:15.  ████████████████████ a given use

27   was transformative, noncommercial, or likely to cause market harm.  *See id.* at 63:16-17.  ████

28   ████████████████ the video maker might have used more or less than necessary to achieve

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 07-03783-JF

1    a transformative purpose. *See id.*

2        **4.**  ████████████████████████████████████████████

3

4    ████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████

8    ███  *Id.* at 75:16-76:7, 79:7-20.

9    ████████████████████████████████████████████████████████

10   ███   Indeed, Universal finally admitted that Mr. Johnson was never told that a fair use was not

11   infringing (and therefore not an appropriate candidate for takedown), and that he neither was

12   instructed to consider nor did consider whether Ms. Lenz's use was fair. *See* Exh. H at 17:14-

13   23:7 (supp. resps. to RFA Nos. 41-43). ████████████████████████

14   ██████████████████████████████████████████  Hoping to soften the effect of its

15   admission, Universal paired it with a half-baked assertion that some of the factors Mr. Johnson

16   supposedly considered *might* bear on fair use, specifically:

17       1.  The factors identified above ████████████████████████████

18       ██████████████████████;

19       2.  That the Video was posted on YouTube, a for-profit entity;

20       3.  That the use had not been authorized by Prince or Universal;

21       4.  That "Let's Go Crazy" is a "significant musical composition" and a popular song.

22   Exh. H at 9:11-11:22 (supp. resp. to RFA No. 16); Exh. L at 6:4-17 (supp. resp. to Interrog.

23   No. 17).

24       Universal's attempt to manufacture a fair use consideration by Mr. Johnson fails for at

25   least two reasons. ████████████████████████████████████

26   ████████████████████████████████████████████████████████

27   ████████████████████████████  Exh. Q (Allen Depo.) at 76:8-25, 87:1-

28   89:23. Second, a consideration of the facts identified falls far short of a fair use consideration:

11

516364.01

1    ████████████████████████████████ does little to explain whether it is a fair

2    use or not.  YouTube's for-profit nature has no bearing on whether an individual user is making a

3    commercial use.  Whether the use is licensed also does not illuminate the question—if a use is

4    fair, no license is needed.  The only fact Universal raised that might bear on fair use is that "Let's

5    Go Crazy" is a creative work, which is relevant to analysis of the second factor.  However, that

6    fact would also be true of any number of songs and hardly suffices to substitute for an actual

7    consideration of fair use.

8           As for the attorney who actually sent the notice, Alina Moffat, she did not even review

9    the Video, much less attempt to consider whether it was a fair use. Exh. F (Moffat Depo.) at

10   19:23-25.  According to Ms. Moffat, the sole basis for her belief that the listed videos were

11   infringing was that she was instructed to send the notice.  *Id.* at 22:16-24; *see also id.* at 22:25-

12   27:22. ████████████████████████████████████████████

13   ████████████████████████████████████████████████

14   ████████████████████████████████████████████████

15   ████████████████████████████████████████████████

16   ████████████████████████████████████████████

17   ████████████████████████████████████████████

18   ████████       *See* Exh. W (Depo. Exh. 72) at UMC-0000212. ████████████████

19   ████████████████████████████

20          The undisputed evidence demonstrates that Universal was interested in only two things:

21   ████████████████████████████████████████████████ There

22   was simply no room in its rubric to assess whether the fair use doctrine applied to *any* video,

23   much less Ms. Lenz's video.

24   **B.     The Video is a fair use.**

25          Based on nothing more than its review of the Video, Universal would have known, if it

26   had ████████████, that Ms. Lenz's use was fair.  *See* 17 U.S.C. § 107.  It certainly did

27   not have any basis to form a good faith belief in the opposite proposition—that Ms. Lenz's use

28   was infringing.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 07-03783-JF

516364.01

First the *purpose and character of the use* was both noncommercial and transformative. There was no reason—none—to imagine that her blurry 29-second home video was created for any commercial purpose. *See Campbell,* 510 U.S. at 578.[9] The Video bears all the hallmarks of a family home movie: like many such videos, it is blurry and somewhat shaky, with poor sound quality, and documents nothing more or less than a brief moment in the everyday chaos of a family life with young children. *See* Exh. A. In other words, it looks and sounds exactly like the personal, noncommercial home movie that it was. Indeed, Universal has never attempted to suggest that it actually thought Ms. Lenz had any commercial purpose. *See* Exh. M at 7:3-8:2 (resp. to Interrog. No. 3).

Ms. Lenz's use was transformative in that it made a use of the work—a use in the genre of family home videos—that was distinct and separate from its original context and added additional creative elements, such as the children dancing and running around. *See Campbell*, 510 U.S. at 579 ("[Transformative] works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright, . . . and the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use."). A transformative work "is the very type of activity that the fair use doctrine intends to protect for the enrichment of society." *Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.*, 150 F.3d 132, 142 (2d Cir. 1998). Again, the transformative aspect of the use was apparent to Universal from the Video itself, namely, that the use of Prince's composition was not for the bald entertainment value of that song, but as the background trigger to the dancing of Ms. Lenz's children.

Second, while the *nature of the original work* is indisputably creative, this factor tends to carry the least weight in the fair use analysis. Indeed where, as here, the use is transformative, the nature of the work is "not . . . terribly significant in the overall fair use balancing." *Mattel*,

---

[9] To the extent that Universal intends to argue that *YouTube* is a commercial enterprise, that is irrelevant. "The crux of the profit/non-profit distinction is . . . whether *the user* stands to profit from exploitation of the copyrighted material without paying the customary price." *Los Angeles News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 994 (9th Cir. 1998) (emphasis added) (quoting *Harper & Row v. Nation Enters.*, 471 U.S. 539, 562 (1985)). Universal accused *Ms. Lenz* of infringement, and thus it is her use that matters, not YouTube's.

516364.01

353 F.3d at 803 (finding fair use of the Barbie doll, a clearly creative work, when the

incorporation of the original work is necessary for the secondary use).  Moreover, there is no

question that the original work was published many years ago, which means the composer has

already been amply compensated and this factor carries even less weight.  *Kelly,* 336 F.3d at 820

("published works are more likely to qualify as fair use because the first appearance of the

artist's expression has already occurred"); *Blanch v. Koons,* 467 F.3d 244, 256 (2d Cir. 2006)

(second factor turns on (1) "whether the work is expressive or creative, such as a work of fiction,

or more factual, with a greater leeway being allowed to a claim of fair use where the work is

factual or informational," and (2) "whether the work is published or unpublished, with the scope

of fair use involving unpublished works being considerably narrower.") (quoting 2 Howard B.

Abrams, *The Law of Copyright* § 15:52 (2006)); *see also Lennon v. Premise Media Corp.,* 556 F.

Supp. 2d 310, 325 (S.D.N.Y. 2008) (wide publication of John Lennon's song "Imagine" weighed

in favor of fair use).  Given that it administers the copyrights to "Let's Go Crazy," Universal is

better positioned than most to evaluate this factor, and cannot claim it was not capable of

assessing it.

Third, the *amount and substantiality of the use* is minor.  While Universal claims ▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the entire Video is less than 30 seconds long.  *See* Exh. A.  In

fact, due to the noise and commotion made by the children, the song "Let's Go Crazy" can only

be heard in the background for approximately 20 seconds of the 29-second Video and even then

not all that clearly.  *See id.*  Universal is also best positioned to be aware that this amount was

minimal—▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Exh. BB at 12:1-9 (resp. to RFA No. 12).

Moreover, Universal cannot dispute that Ms. Lenz used no more than necessary to fulfill her

purpose:  a video of her newly-walking son "dancing" to music in her kitchen.  "If the secondary

user only copies as much as is necessary for his or her intended use, then this factor will not

weigh against him or her."  *Kelly v. Arriba Soft Corp.,* 336 F.3d 811, 820-21 (9th Cir. 2003).

Universal has tried to suggest that Mr. Johnson was struck by the "frenetic guitar solo"

that happened to coincide with the "frenetic" children.  *See* Exh. M at 7:27-28 (resp. to Interrog.

No. 3).  In other words, Universal posits that he could have imagined that the home video was not

14

516364.01

1  a mom's spontaneous recording but rather a carefully orchestrated production that deliberately

2  took "the heart of the work." But ████████████████████████████████████████████████

3  ███████████████████████ *See* Ex. P (Johnson Depo.) at 75:16-76:7-20. Moreover, a

4  "heart of the work" theory makes no sense in this context. The heart of the work doctrine is

5  based on the notion that even a small taking can harm a copyright owner if the portion taken is

6  precisely what others might pay for. *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471

7  U.S. 539, 565-66 (1985). No potential customer or licensee, however, could possibly look to

8  Ms. Lenz's video as a replacement for the Prince song—no matter what portion she happened to

9  capture.

10     Fourth, there is no remotely plausible *market harm*. As the entity responsible for

11  licensing "Let's Go Crazy," Universal knew that the snippet of the composition that plays in the

12  background (not dubbed as a soundtrack) of the Video could not substitute for the original Prince

13  song in any conceivable market, *Fisher v. Dees*, 794 F.2d 432, 438 (9th Cir. 1986), given the

14  brief use of the work, the low audio quality of the ordinary digital video camera Ms. Lenz used,

15  the household noises, laughter and talking that partially obscure the music, and the sounds made

16  by the toys that Ms. Lenz's children are pushing around the kitchen during the Video. All of

17  these facts are apparent on the face of the Video. Moreover, because Ms. Lenz's use was

18  noncommercial and transformative market harm cannot be presumed and is in fact unlikely.

19  *Campbell*, 510 U.S. at 591 ("No 'presumption' or inference of market harm . . . is applicable to a

20  case involving something beyond mere duplication for commercial purposes."); *Elvis Presley*

21  *Enters., Inc. v. Passport Video*, 349 F.3d 622, 631 (9th Cir. 2003) ("The more transformative the

22  new work, the less likely the new work's use of copyrighted materials will affect the market for

23  the materials.")

24     Indeed, Universal has not tried seriously to contend that the Video itself could have a

25  demonstrable effect on an actual market for "Let's Go Crazy." Universal itself declares that the

26  only relevant market is the "synchronization license" market for this specific song, and concedes

27  that it has never issued a synch license for the home video market. Ex. H at 11:23-12:19 (supp.

28  resp. to RFA No. 26). Moreover, Un██████████████████████████████████████████████████

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 07-03783-JF

516364.01

1    ███████████████  Exh. X (Depo. Exh. 91); *see also Mattel,* 353 F.3d at 806 (no market

2    harm where copyright owner would not enter the relevant market).

3    ████████████████████████████████████████████████████

4    ████, it is preposterous to imagine that any parent would seek such a license in order to share a

5    video of their children playing in the kitchen.  Indeed, court after court has rejected similar

6    attempts to manufacture market harm where there was no *likely* market for the challenged use of

7    the copyrighted works.  *See Mattel,* 353 F.3d at 806; *see also Wright v. Warner Books, Inc.,* 953

8    F.2d 731, 739 (2d Cir. 1991) (affirming district court's finding of no reasonable likelihood of

9    injury to alleged market where, inter alia, alleged potential market was "highly improbable");

10   *Princeton Univ. Press v. Mich. Document Servs., Inc.,* 99 F.3d 1381, 1387 (6th Cir. 1996) ("Only

11   'traditional, reasonable, or likely to be developed markets' are to be considered in this

12   connection, and even the availability of an existing system for collecting licensing fees will not

13   be conclusive." (citation omitted)); *see also Castle Rock,* 150 F.3d at 145 (copyright owners may

14   not preempt exploitation of transformative markets, which they would not "in general develop or

15   license others to develop," by actually developing or licensing others to develop those markets);

16   *Kane v. Comedy Partners,* No. 00 Civ. 158 (GBD), 2003 WL 22383387, at *7 (S.D.N.Y. Oct.

17   16, 2003) (to avoid danger of circularity, copyright owner not entitled to license fees for uses that

18   otherwise qualify as fair uses); 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*

19   § 13.05[A][4] (2005) ("it is a given in every fair use case that plaintiff suffers a loss of a

20   *potential* market if that potential is defined as the theoretical market for licensing the very use at

21   bar").

22          Universal has also tried to suggest that this factor turns on consideration of all of the

23   possible effects of "unrestricted and widespread" uses like the Video.  Courts have rejected

24   similar efforts to ignore the key issue of substitution, particularly where the copyrighted work is

25   embedded in another, transformative work.  In *Kramer v. Thomas*, No. CV 05-8381 AG (CTx),

26   2006 WL 4729242 (C.D. Cal. Sept. 28, 2006), for example, the court found that there was no

27   market harm where a composition was embedded in a DVD collection, and specifically rejected

28   the plaintiff's "unrestricted and widespread" use theory:

1     Nobody who wanted to listen to the compositions would choose to do so by
paying $65 for a 12-hour 3-DVD set in which sonically limited portions of the

2     compositions are anonymously nested in less than 1% of the work. . . .
Unrestricted and wide-spread collection of these DVD's would not result in a

3     substantially adverse impact on the potential market for the original composition.

4 *Id.* at *11. Similarly, unrestricted and widespread use of "Let's Go Crazy" as incidental

5 background music in home videos could not possibly harm any market for Prince's works.

6     Universal had all the facts it needed to recognize that Ms. Lenz's use was lawful, if only

7 it had ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

8 **C.    At a minimum, Universal recklessly disregarded whether the Video was a fair use.**

9     If Universal had not recklessly disregarded the obvious implications of the facts with

10 which it was presented, it would have realized it could not send its takedown notice in good

11 faith. Its willful blindness cannot excuse it from liability.

12     Nonetheless, Universal hopes to save itself from liability by claiming that Sean Johnson

13 *did* form the necessary good faith belief because, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

14 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ he did consider some facts

15 it contends might be relevant to a fair use analysis. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

16 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

17 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ But Universal's analysis is flawed in another way: it is

18 based on the misguided notion that unless the sender of a takedown *affirmatively knows*, as a

19 matter of fact and law, that the use is a fair use, the sender cannot be held liable under Section

20 512(f). On this theory, directly contrary to this Court's holding, failure to consider fair use could

21 never be a basis for Section 512(f) liability because the sender of a takedown notice could always

22 claim there was a smidgen of doubt as to one factor. Such a theory would gut Section 512(f),

23 which is presumably why Universal continues to press it.

24     However, Universal's theory finds no support in copyright law or the legislative history

25 of the DMCA. In effect, Universal argues that it can be willfully blind to fair use and still escape

26 Section 512(f) liability. Yet, under the DMCA, as with any other body of law,[10] proof of willful

27

---

28 [10] *See, e.g. U.S v. Real Property at 2659 Roundhill Dr., Alamo, Cal.,* 194 F.3d 1020, 1028 (9th Cir. 1999) ("An owner cannot deliberately avoid actual knowledge through 'willful blindness'").

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
CASE NO. C 07-03783-JF

516364.01

1  blindness and reckless disregard will suffice to establish knowledge. "Willful blindness is

2  knowledge, in copyright law . . . as it is in the law generally." *In re Aimster Copyright Litig.*,

3  334 F.3d 643, 650 (7th Cir. 2003).  For example, to prove willful infringement, a plaintiff must

4  show that the infringer acted "with knowledge that [its] conduct constitutes copyright

5  infringement." *See Peer Int'l v. Pausa Records*, 909 F.2d 1332, 1335 n.3 (9th Cir. 1990)

6  (quoting 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 1404[B], at 14-40.2-

7  .3 (1989)). Willfulness can be based "on either 'intentional' behavior, or merely 'reckless'

8  behavior." *In re Barboza*, 545 F.3d 702, 707-08 (9th Cir. 2008) (collecting cases from multiple

9  circuits).  In *Dolman v. Agee*, 157 F.3d 708 (9th Cir. 1998), a record producer was found to have

10  willfully infringed where it continued to produce and market a song collection "despite knowing

11  that *someone* owned the copyrights in the music, and being presented with evidence regarding

12  [plaintiff]'s claim of ownership." *Id.* at 715.  In other words, the producer was charged with

13  knowledge when it was shown that he knew certain facts but actively disregarded their

14  implications—just as Universal did here.

15       Even under what may well be the most rigorous knowledge standard in U.S. law, the

16  "actual malice" standard applicable to defamation claims against public figures, *New York Times*

17  *Co. v. Sullivan*, 376 U.S. 254, 280 (1964), knowledge may be inferred from circumstance. *See*

18  *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) ("recklessness may be found where there are

19  obvious reasons to doubt the veracity of the informant or the accuracy of his reports").  The

20  Ninth Circuit has held that a plaintiff may show actual malice by showing that despite obvious

21  reasons to doubt the truth of an author's statements, the "publisher failed to take reasonable steps

22  to dispel those doubts." *Masson v. New Yorker*, 960 F.2d 896, 900 (9th Cir. 1992); *see also Hunt*

23  *v. Liberty Lobby,* 720 F.2d 631, 643-44 (11th Cir 1983) ("evidence which shows that the

24  statement was inherently implausible or that there were obvious reasons to doubt the veracity of

25  the informant is relevant to establishing actual malice." (citing cases).  Thus, a defendant "cannot

26  feign ignorance *or profess good faith* when there are clear indications present which bring into

27  question the truth or falsity of defamatory statements." *Gertz v. Welch*, 680 F.2d 527, 538 (7th

28  Cir. 1982) (emphasis added).  Moreover, "the purposeful avoidance of the truth" can establish

516364.01

1   actual malice.  *See Harte-Hanks v. Connaughton*, 491 U.S. 657, 692 (1989) (jury finding that "it

2   is likely that the newspaper's inaction was a product of a deliberate decision not to acquire

3   knowledge of facts that might confirm the probable falsity" of facts in its story supports a finding

4   of actual malice).

5         In varying ways, each of these doctrines recognize the injustice of absolving malfeasors

6   who took steps to avoid gaining actual knowledge of their improper acts, as Universal did in

7   ███████████████████████████████████ and its agents Mr. Johnson and Ms.

8   Moffat did in ████████████████████████████████████████████████████

9   ███████████  Such injustice would be particularly improper here, given that the entire

10  purpose of Section 512(f) is to help carry out Congress's intent in enacting Section 512 to

11  facilitate the growth of the Internet as a platform for free speech.  As the Senate Report on

12  Section 512(f) noted,

13        The Committee was acutely concerned that it provide all end-users . . . with
          appropriate procedural protections to ensure that material is not disabled without
14        proper justification.  The provisions in the bill balance the need for rapid response
          to potential infringement with the end-users legitimate interests in not having
15        material re-moved without recourse.

16  Sen. Rep. No. 105-190 at 21 (1998).  If a defendant can establish subjective good faith through

17  willful blindness to law or fact, this would eviscerate the protections Congress created in

18  Section 512(f).

19        In this case, there is ample undisputed evidence that Universal ████████████████

20  ████████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████████

26  █████████████████████████████████████████  on facts such as the title of the work

27  (irrelevant for copyright purposes), whether the song was recognizable in the background, and

28  whether anyone in the Video talked about the song.  Universal was confronted with actual facts

1   showing fair use (and thus non-infringement).  When it willfully ignored those facts—indeed,

2   when it ████████████████████████████████████████████—it acted in

3   bad faith.  It cannot now pretend it did not know that it was doing so.

4   **D.    Universal sent the takedown pursuant to Section 512(f).**

5          The remaining elements of a Section 512(f) claim can be addressed quickly.  There is no

6   dispute that Universal represented that the Video was not authorized by a copyright holder or the

7   law.  *See* Exh. R (Depo. Exh. 70) at UMC-0000625.  As this Court has recognized, "'[m]aterial'

8   means that the misrepresentation affected the ISP's response to a DMCA letter."  *Online Policy*

9   *Group v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1204 (N.D. Cal. 2004).  YouTube removed the

10  Video in response to Universal's notice, as Universal intended that it would.  Exh. H at 8:23-9:10

11  (supp. resp. to RFA No. 4); Exh. V (Hubbard Aff.) ¶ 11.

12         Nonetheless, Universal has suggested that its Notice of Infringement was not made

13  pursuant to Section 512 of the DMCA.  That claim can be dismissed as a matter of law.  First,

14  Universal sent its notice to the email address "copyright@youtube.com," *see* Exh. R (Depo.

15  Exh. 70), the address designated by YouTube for receipt of DMCA notices.[11]

16         Second, the Notice tracks perfectly *every single requirement* of a Section 512 notice:  It is

17  (1) a written communication; (2) provided to the designated agent of a service provider;

18  (3) signed; (4) identifying a work claimed to be infringed; (5) identifying allegedly infringing

19  material; including the submitter's contact information; (6) alleging a good faith belief that the

20  alleged infringement is not authorized by the copyright owner or by the law; and (7) stating that

21  the information in the notification is accurate and that the complaint is authorized by the

22  copyright holder.  *See* 17 U.S.C. § 512(c)(3)(A).

23         Third, Universal cannot seriously dispute that YouTube is a service provider as defined

24  by the DMCA.  *See* 17 U.S.C. § 512(c)(1) & (k)(1)(B); Exh. V (Hubbard Aff.) ¶¶ 4-5.  In fact,

25  Univeral has taken the position that the proper forum for resolution of the question of whether

26  YouTube is a service provider within the meaning of 17 U.S.C. § 512 is *Viacom Int'l Inc. v.*

27

28  [11] Indeed, YouTube's Terms of Service specify that "only DMCA notices" should be sent to this
    address.  *See* Exh. N (Depo. Exh. 5) § 8; Exh. B (Lenz Depo.) at 51:14-23 (authenticating).

516364.01

1   *YouTube, Inc.,* ___ F. Supp. 2d ___, Nos. 07 Civ. 2103 (LLS) & 07 Civ. 3582 (LLS).  Exh. H at

2   7:19-24, 8:16-21 (supp. resps. to RFA Nos. 1 & 2).  The *Viacom* court has determined that

3   YouTube is such a provider.  ___ F. Supp. 2d ___, Nos. 07 Civ. 2103 (LLS) & 07 Civ. 3582

4   (LLS), 2010 WL 2532404, at *3 (S.D.N.Y. June 23, 2010) ("As a 'provider of online services or

5   network access, or the operator of facilities therefor' as defined in 17 U.S.C. § 512(k)(1)(B),

6   YouTube is a service provider for purposes of § 512(c).").

7         Finally, Universal's self-serving protestations notwithstanding, everyone involved in the

8   takedown process—Universal, YouTube, and Ms. Lenz—treated the notice as a Section 512

9   notice. YouTube advised Ms. Lenz of her right to counternotice, and directed her to its help-

10   center, which explains how to draft a DMCA-compliant counternotice.  *See* Exh. G (Depo.

11   Exh. 9).  YouTube also called Ms. Lenz's attention to Section 512(f) of the DMCA.  *Id.*  When

12   Ms. Lenz did counternotice, ████████████████████████████████████████

13   ████████████████████████████████████████████████████████████

14   ████████████     Exh. C to Exh. V (Hubbard Aff.) at YT00001236-37.  ████████████

15   ████████████████████████████████████████████████████████████

16   ████████████████   Exh. W (Depo. Exh. 72).  After learning of Universal's concern,

17   Ms. Lenz submitted a fully DMCA-compliant notice, and the material was restored following a

18   second waiting period.  *See* Exh. E to Exh. V (Hubbard Aff.).

19         Having obtained the benefits of a takedown notice mapped to the requirements of the

20   DMCA—including delayed restoration when Ms. Lenz submitted a noncompliant

21   counternotice—Universal cannot avoid its concomitant obligations under Section 512(f) by

22   claiming that the notice was not sent pursuant to that statute.  Such an outcome would render

23   Section 512(f) a dead letter—rightsholders could rely on Section 512(c)(3) to craft intentionally

24   false copyright infringement notices in order to interfere with noninfringing activities, without

25   fear of liability under Section 512(f).

26   **E.**    **Ms. Lenz was damaged by Universal's improper takedown.**

27         There can be no dispute that Ms. Lenz was damaged by Universal's action; the Court has

28   already held as much.  Exh. O (2/25/2010 Order Granting Partial Summary Judgment) at 16:19-

21

516364.01

1   21 ("Accordingly, because there is no genuine issue of material fact as to whether Ms. Lenz

2   incurred *some* damages as defined under the statute, Ms. Lenz's motion will be granted as to

3   Universal's affirmative defense of no damages.")

4         First, Ms. Lenz's video was unavailable on YouTube for many weeks as a result of

5   Universal's takedown notice, and her sense of her freedom to express herself, including

6   expressing herself by making home videos, making particular kinds of videos as opposed to

7   other kinds, and sharing home videos with her friends and family, was diminished as a result of

8   Universal's takedown notice. Lenz Decl. ¶ 10. As with other kinds of speech harms, however,

9   these losses are difficult to translate into economic numbers. Thus, Ms. Lenz seeks only an

10  award of nominal damages for these harms. *See Phelps-Roper v. City of Manchester, Mo.*, \_\_\_

11  F. Supp. 2d \_\_\_, No. 4:09-CV-1298 CDP, 2010 WL 3614182 (E.D. Mo. Sept. 8, 2010)

12  (awarding nominal damages of $1 for violations of free speech rights).

13        Second, Ms. Lenz was forced to expend time and resources to get her video restored. She

14  spent at least ten hours before filing this lawsuit on tasks such as obtaining counsel, determining

15  how to send a counternotice, sending the counternotice, sending a revised counternotice after

16  Universal objected to the first counternotice, and ensuring that access to her video had been

17  restored. Lenz Decl. ¶ 9. Ms. Lenz's time can be valued at the Pennsylvania minimum wage at

18  the time, which was $6.25/hour. 34 Pa. Code § 231.101(2). For her time, Ms. Lenz therefore

19  claims an amount of $62.50 for her time prior to filing this lawsuit. Ms. Lenz also expended

20  resources on her pre-lawsuit efforts, including the use of her computer, Lenz Decl. ¶ 9, but seeks

21  only nominal damages for her pre-lawsuit expenditure of these resources.

22        Finally, Ms. Lenz retained attorneys, acting *pro bono*, to advise her in connection with

23  ensuring access to her video was restored. Lenz Decl. ¶ 7; *see also* Exh. O (2/25/2010 Order

24  Granting Partial Summary Judgment) at 15:26-16:1 ("any fees incurred for work in responding

25  to the takedown notice and prior to the institution of suit under § 512(f) are recoverable under

26  that provision"). Ms. Lenz seeks compensation for Ms. Hofmann's time in the amount of

27

28

1    $1,275.  *See* Declaration of Marcia Hofmann ¶¶ 1-7.[12]

2         In sum, Ms. Lenz seeks damages in the amount of $1,337.50, plus nominal damages for

3    the harm to her speech rights and her expenditure of personal resources in connection with

4    ensuring restoration of the Video on YouTube.

5               **V.**    **CONCLUSION**

6         For the foregoing reasons, the Court should grant summary judgment in Ms. Lenz's

7    favor.

8    Dated:  October 18, 2010                KEKER & VAN NEST, LLP

9

10                               By:  /s/Michael Kwun

11                                  MICHAEL KWUN

12                                  Attorneys for Plaintiff
                               STEPHANIE LENZ

---

[12] Ms. Lenz contends that time and resources attributable to efforts spent on this litigation are recoverable as damages under section 512(f).  Ms. Lenz recognizes that the Court has held that "any fees incurred for work in responding to the takedown notice and prior to the institution of suit under § 512(f) are recoverable under that provision, [but] recovery of any other costs and fees is governed by § 505."  Exh. O (2/25/2010 Order Granting Partial Summary Judgment) 15:26-16:1.  Ms. Lenz reserves the right to challenge the latter aspect of this holding on appeal.

23