KELLY M. KLAUS (SBN 161091)
Kelly.Klaus@mto.com
MELINDA E. LEMOINE (SBN 235670)
Melinda.LeMoine@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA  90071-1560
Telephone:    (213) 683-9100
Facsimile:    (213) 687-3702

Attorneys for Defendants
UNIVERSAL MUSIC CORP., UNIVERSAL MUSIC
PUBLISHING, INC. and UNIVERSAL MUSIC
PUBLISHING GROUP

**PUBLIC VERSION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| STEPHANIE LENZ,<br><br>              Plaintiff,<br><br>      vs.<br><br>UNIVERSAL MUSIC CORP., UNIVERSAL MUSIC PUBLISHING, INC. and UNIVERSAL MUSIC PUBLISHING GROUP,<br><br>              Defendants. | CASE NO.  C 07-03783 JF (PVT)<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Declarations of Kelly M. Klaus, Benjamin Edelman, and Robert E. Allen and Request for Judicial Notice filed concurrently]<br><br>Date:    December 10, 2010<br>Time:    9:00 A.M.<br>Ctrm:    3, Fifth Floor<br>Judge:  Hon. Jeremy Fogel |

1

**TABLE OF CONTENTS**

2

**Page**

3

4    I.     INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

5    II.    FACTUAL BACKGROUND ................................................................ 4

6           A.     The Widespread Use of Copyrighted Material on YouTube and Other UGC
                   Sites............................................................................................ 4

7           B.     Universal's Administration of Prince's Copyrights.................................. 4
            C.     Universal's Review and Request to Remove "Let's Go Crazy #1"..................... 7

8           D.     Plaintiff's Response to YouTube's Notice............................................. 8
            E.     What Universal Did Not Know and Could Not Have Known About

9                  Plaintiff's Use When It Sent the Notice................................................ 9
            F.     EFF and Plaintiff's Evolution to Believe that Her Use Was a "Fair Use"............ 10

10          G.     Plaintiff Suffered No Damages as a Result of Universal's Notice ..................... 12

11   III.   STANDARD OF REVIEW ................................................................ 13

12   IV.    ARGUMENT ................................................................................. 13

13          A.     Section 512 Does Not Require An *Ex Ante* Analysis of the Fair Use
                   Defense – In Any Case, and Especially Not This One ................................ 13

14                 1.     Section 512 Does Not Require an *Ex Ante* Consideration of Fair
                          Use ................................................................................. 14

15                 2.     Even If There Is Some "Extremely Rare" Case In Which Fair Use
                          Is "Obvious," Plaintiff's Posting Is Not That ............................... 16

16          B.     Even If an *Ex Ante* Consideration Is Required, Universal's Consideration
                   of Plaintiff's Posting Gave All the "Proper Consideration" to Fair Use that
                   Could Be Required "By Law".............................................................. 18

17                 1.     "The Purpose and Character of the Use"...................................... 19
                   2.     "The Nature of the Copyrighted Work"........................................ 21

18                 3.     "The Amount and Substantiality Of The Use" ............................... 22
                   4.     "The Effect of the Use On the Potential Market For Or Value of the

19                        Copyrighted Work"............................................................... 22
            C.     Plaintiff Has Incurred No Damages Under Section 512(f) ............................. 23

20   V.     CONCLUSION .............................................................................. 25

21

22

23

24

25

26

27

28

- i -                    DEFTS' MOT. FOR SUMMARY JUDGMENT
                                                                        CASE NO. CV-07-03783

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)..................................................................................... 15, 16, 22

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)..................................................................................... 13

*Gordon v. Nextel Communications*,
  2001 U.S. Dist. Lexis 25048 (E. D. Mich. August 13, 2001) ......................... 18, 22

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985)..................................................................................... 16, 22

*Higgins v. Detroit Educational Television Foundation*,
  4 F. Supp. 2d 701 (E. D. Mich. 1998)........................................................... 19

*Jackson v. Warner Bros., Inc.*,
  993 F. Supp. 585 (E. D. Mich. 1997)............................................................ 19

*Leadsinger, Inc. v. BMG Music Publishing*,
  512 F.3d 522 (9th Cir. 2008)........................................................................ 4, 19, 21

*Newton v. Diamond*,
  388 F.3d 1189 (9th Cir. 2004)...................................................................... 4

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007)...................................................................... 15

*Ringgold v. Black Entm't Television, Inc.*,
  126 F.3d 70 (2d Cir. 1997)........................................................................... 19, 21

*Rossi v. MPAA*,
  391 F.3d 1000 (9th Cir. 2004)...................................................................... 2, 13, 18

*Salinger v. Random House*,
  811 F.2d 90 (2d Cir. 1987)........................................................................... 22, 23

*Sandoval v. New Line Cinema Corp.*,
  973 F. Supp. 409 (S.D.N.Y. 1997)................................................................ 19, 22

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
  227 F.3d 1110 (9th Cir. 2000........................................................................ 21, 23

## STATUTES

17 U.S.C. § 107................................................................................................ 16, 19, 20

17 U.S.C. § 107(1)........................................................................................... 19

17 U.S.C. § 115................................................................................................ 15, 21

17 U.S.C. § 512(c)(3)(A)(v)............................................................................. 14, 18

17 U.S.C. § 512(f)............................................................................................ passim

17 U.S.C. § 512(g)........................................................................................... 15

11977494.1

DEFTS' MOT. FOR SUMMARY JUDGMENT
CASE NO. CV-07-03783

**TABLE OF AUTHORITIES**
(continued)

Page(s)

### RULES

Civil L.R. 7-4(a)(3) ................................................................................................................... 1

Fed. R. Civ. Proc. 56(a) ........................................................................................................... 13

### OTHER AUTHORITIES

3 *Nimmer on Copyright* § 12B.08 at 12B-93 n.16 .......................................................................... 15

H.R. Rep. No. 105-551 (1998) .................................................................................................. 15

DEFTS' MOT. FOR SUMMARY JUDGMENT
CASE NO. CV-07-03783

11977494.1

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

TO ALL PARTIES:  On December 10, 2010, at 9:00 a.m., Universal[1] will and hereby does move the Court for summary judgment pursuant to Fed. R. Civ. P. 56 on Plaintiff's Second Amended Complaint, D.N. 34 ("SAC"), based on this Motion and all evidence and argument submitted in connection therewith, and based on the entire record in this action.[2]

Pursuant to Civil L.R. 7-4(a)(3), this Motion presents the following issues:  Whether Universal is entitled to summary judgment where the undisputed facts show that:

[1]     Universal did not make a "knowing[] material[] misrepresent[ation]" regarding Plaintiff's "Let's Go Crazy" posting in the notice to YouTube, 17 U.S.C. § 512(f); and

[2]     Plaintiff did not "incur[]" "any damages" and was not "injured by [the claimed] misrepresentation, as the result of" YouTube's temporary removal of her posting.  *Id.*

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION AND SUMMARY OF ARGUMENT**

After two years of intrusive discovery into every aspect of Universal's inclusion of Plaintiff's "Let's Go Crazy" posting in the June 4, 2007 email to YouTube, it is clear that Plaintiff's claim for violation of 17 U.S.C. § 512(f) is legally and factually baseless.  Universal is entitled to summary judgment, as the Court said it suspected Universal might be after discovery. D.N. 45 at 8; D.N. 53 at 5 n.4 (expressing "considerable doubt" Plaintiff could prevail).

The evidence pertaining to Universal's consideration of Plaintiff's "Let's Go Crazy" posting turned out to be the exact opposite of what Plaintiff told the Court it would be.  Contrary to Plaintiff's "information and belief" contention, SAC ¶ 31, the fact is that neither Prince nor anyone acting for him "demanded" that Universal include the "Let's Go Crazy" posting in the email to YouTube.  What actually happened is that a Universal employee, acting under counsel's guidance and supervision, reviewed Plaintiff's "Let's Go Crazy" posting, along with hundreds of

---

[1] "Universal" refers to all Defendants named in the SAC:  Universal Music Corp., Universal Music Publishing, Inc., and Universal Music Publishing Group.

[2] "D.N." refers, by number, to documents in the Court's Docket in this matter.  Cites to Declarations and/or Exhibits submitted with this Motion are to the Declarations of Robert E. Allen ("Allen Decl."), Benjamin Edelman ("Edelman Decl.") or Kelly M. Klaus ("Klaus Decl."), or to Universal's Request for Judicial Notice ("RJN").

1   other unauthorized uses of Prince compositions on YouTube in just that first week in June alone.

2   The Universal employee did not unthinkingly place Plaintiff's posting on the list.  He reviewed

3   the posting twice and ultimately included it based on a good faith belief that Prince's musical

4   composition "Let's Go Crazy" was a central part of that posting.  The undisputed (and irrefutable)

5   facts supporting that belief include that the posting was titled "Let's Go Crazy #1"; that Prince's

6   song was prominent and played continuously throughout the posting; and that an off-camera

7   voice specifically said to the child, "What do you think of the music?"  Nothing about these facts

8   or any others in this case bespeak any bad faith or knowing misrepresentation.

9          Universal is entitled to summary judgment for at least three reasons:

10         *First*, regardless of whether a copyright owner sending a notice subject to the DMCA ever

11  is required to evaluate *ex ante* whether a particular use would be adjudicated to be a fair use, the

12  facts confirm that in this case there is no basis for imposing such a requirement.  Universal's

13  position is that nothing in the DMCA imposes such an *ex ante* requirement; on the contrary, the

14  statute's "put back" provisions – which Plaintiff used to have YouTube restore her posting (where

15  it has remained since 2007) – show that Congress had exactly the opposite intent.  This Court has

16  said that not "every takedown notice must be preceded by a full fair use investigation[,]" but

17  rather that in an "extremely rare" case, "fair use may be so obvious that a copyright owner could

18  not reasonably believe that actionable infringement was taking place."  D.N. 53 at 4.  Any such

19  "reasonable belie[f]" test is flatly inconsistent with the Ninth Circuit's controlling case on

20  § 512(f), *Rossi v. MPAA*, 391 F.3d 1000, 1005 (9th Cir. 2004), and the idea that there is such a

21  thing as "obvious" or "self-evident" fair use is contrary to § 107 and the entire body of fair use

22  case law.  Nevertheless, even if there were an "extremely rare" case of "obvious" fair use, the

23  facts from this posting, as well as Plaintiff's own admissions, establish that Plaintiff's "Let's Go

24  Crazy" posting is not it.  Those admissions establish that *not even* Plaintiff's own counsel (the

25  EFF) – who count themselves among the most vocal proponents advocating "A Wide Berth for

26  Transformative, Creative Uses," Klaus Decl. Ex. 1 – recognized Plaintiff's posting to be an

27  "obvious" fair use.  Plaintiff publicly admitted, based on conversations with EFF, that "[m]ine's

28  not a fair use case at all," and she also admitted that she and EFF only came to the conclusion that

1   it was fair use after they discussed the matter.  *Id*. Ex. 2 at 2; Ex. 3 at 3.  If the EFF did not

2   instantly recognize Plaintiff's use to be "fair use," even upon talking to Plaintiff, it is

3   inconceivable that Universal should be charged with liability for failing to recognize it as such

4   based solely on viewing the posting.

5        *Second*, even if § 512(f) required some "proper consideration" of the fair use defense in

6   this case, Universal's review indisputably satisfied any consideration that legitimately could be

7   required.  Before sending the notice, Universal considered every fact available to it that could be

8   relevant to a defense of fair use for a posting like "Let's Go Crazy #1," and the facts weigh

9   *against* a finding of fair use.  There was no way that Universal could have known "the purpose

10  and character" of Plaintiff's use instantaneously upon viewing the posting in June 2007.

11  Plaintiff's posting did not proclaim a purpose for the posting; the posting did not even identify

12  Plaintiff by name.  Indeed, Plaintiff did not even reveal the purpose behind her posting until April

13  2008 – *nine months after filing suit* – when she alleged that she put the "Let's Go Crazy" posting

14  on YouTube so that her "mother in California," who was alleged to have "difficulty downloading

15  email files," could enjoy seeing her grandson's dancing abilities.  SAC ¶ 16.  Universal did not

16  know any of that in June 2007, and there is no way Universal could have known that.  The facts

17  that Universal could know from watching the posting and that it did consider – including the title,

18  the prominence of the music and the fact that the music was the "focus" of the video – are the

19  factors deemed relevant to an analysis of fair use by federal courts (which explicate "the law")

20  that have considered cases of claimed "incidental" uses as fair uses.

21       *Third*, Plaintiff has not suffered any damages, as is required under § 512(f).  Plaintiff did

22  not suffer even a penny's worth of damage because YouTube temporarily removed the posting.

23  Indeed, when not appearing before the Court, Plaintiff candidly admitted that, "*I don't care that

24  YouTube doesn't want to host [the "Let's Go Crazy" posting].  Not like I'm paying them*."  Klaus

25  Decl. Ex. 4 (emphasis added).  Universal's motion should be granted.

26

27

28

- 3 -

## II.    FACTUAL BACKGROUND

### A.    The Widespread Use of Copyrighted Material on YouTube and Other UGC Sites

In 2007 as it is today, YouTube was a for-profit, commercial website.  RJN at 1. (Suzanne Reider Decl.).  It generates revenue by selling advertising—both on its own behalf and for those who post their videos on its site.  Klaus Decl. Ex. 5; Ex. 6B at 156:16-22.  It is often impossible to tell what the true purpose is of a YouTube video based solely on viewing the video alone.  Edelman Decl. Ex. 1 at ¶ 15.  Even videos of cute children playing in domestic settings appear in a commercial setting, sometimes with explicit advertising appearing right alongside the posting, Klaus Decl. Ex. 7, but always on a commercial site.

Since its inception, YouTube has hosted tremendous quantities of copyrighted material whose use is unauthorized.  Edelman Decl. Ex. 1 at ¶ 9.  In 2006, Google hired analysts to review a random sample of hundreds of YouTube videos.  *Id.*  The study found that 63% of YouTube videos contained copyrighted material, or had been removed and taken down.  RJN at 2 (Hohengarten Decl. ¶ 322, 362 and Ex. 328 (Duncan 30(b)(6) Dep. at 60-68, 87-91, 95)).

The ease with which YouTube users can publicly post videos to a vast Internet audience implicates an important right for songwriters:  the synchronization right.  The synchronization right, or the right to use music in timed-relation to video images, is an exclusive right held by the composition copyright owner.  *Leadsinger, Inc. v. BMG Music Publishing*, 512 F.3d 522, 527 (9th Cir. 2008).  The right to license the composition is also separate from the right to license the sound recording embodying the composition.  *Newton v. Diamond*, 388 F.3d 1189, 1191 (9th Cir. 2004).  Because the licensing of synchronization rights is within the composition copyright owner's exclusive control, the market for synchronization rights is an important source of revenue.  Allen Decl. ¶¶ 5-6; Klaus Decl. Ex. 6B at 135:7-136:8.

### B.    Universal's Administration of Prince's Copyrights

Universal is a music publishing company that administers composition copyrights for hundreds of songwriters, including Prince Rogers Nelson, professionally known as "Prince."  Allen Decl. ¶ 3.  Universal manages Prince's portfolio of valuable composition copyrights with the goal of maximizing their royalty earnings, in accordance with Universal's agreements with

1    Prince and the law. ████████████████████████████████████████████

2    █████████████████████████████████████████████████████████████████

3    █████████████████████████████████████████████████████████████████

4    █████████████████████████████████████████████████████████

5    █████████████████████████████████████████████████████████████████

6    █████████████

7            In late 2006 and 2007, █████████████████████████████████████

8    ████████████████████████████████████████████████   Allen Decl. ¶ 10.

9    The works exploited through YouTube and other Internet sites included Prince's most successful

10   and valuable copyright assets, including tracks off of the popular "Purple Rain" album (of which

11   "Let's Go Crazy" is one).  Allen Decl. ¶ 6; Klaus Decl. Ex. 6B at 135:7-136:8. ████████████

12   █████████████████████████████████████████████████████████████████

13   ███████████████████████████████████████████   Allen Decl. ¶¶ 7, 10;

14   Klaus Decl. Ex. 6B at 61:15-62:19; 64:24-65:14; 135:7-136:8; 241:23-244:13. ████████████

15   █████████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████   Allen Decl. ¶ 6;

17   Klaus Decl. Ex. 6B at 135:16-136:8. ██████████████████████████████████

18   █████████████████████████   Klaus Decl. Ex. 6B at 240:25-242:18.  In summer 2007,

19   when Prince was set to play 21 shows in London, ████████████████████████

20   ██████████████████████████████████████████████████████████████

21   *Id*.; Allen Decl. ¶ 10.

22          At the pleading stage, Plaintiff alleged on information and belief that Universal

23   maintained a so-called "Prince Policy," pursuant to which Universal removed uses of Prince's

24   compositions from YouTube and the Internet in general without exception.  SAC ¶ 31.  The

25   record showed that Universal followed no such policy.  Universal did not reflexively and

26   immediately send a cease-and-desist or removal request for any use of Prince's compositions –

27   including uses that Prince or his representatives specifically complained about.  Allen Decl. ¶¶ 8-

28   9.  Universal investigated and determined whether the composition had been authorized by Prince

1   or one of his agents – or by the law.  Allen Decl. ¶¶ 8-9, Exs. 2 & 3 .  If the use was so

2   authorized, Universal did not send a takedown notice or cease and desist letter in response.  *Id.*

3   For example, ███████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████████████████

5   ██████████████████████████████████████████████████████████████████████

6   █████████████████████████████████████████████████████████████████████

7   █████████████████████████████████████████████████████████████████████

8   ████████████████████████████  *Id.*  Universal also confirmed whether a particular use was authorized

9   by "the law."  For example, the composition copyright is subject to a statutory exception known

10  as a compulsory license that allow users to manufacture and distribute recordings of compositions

11  without the consent of the copyright owner.  Allen Decl. ¶ 8; 17 U.S.C. § 115.  This is why artists

12  can make "cover" recordings of previously recorded compositions.  ██████████████████████

13  ████████████████████████████████████████████████████████████████████████

14  ██████████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████████████████

19  █████████████████████████████████████████████████.  Plaintiff's contention that Universal

20  sought to remove uses without considering if they were "authorized … by law" is baseless.

21          In responding to Prince's concerns about the unauthorized use of his works on YouTube,

22  Universal followed a similar protocol to the one used to address other potentially unauthorized

23  uses.  Allen Decl. ¶ 11.  Universal implemented a process of thoughtful review, and took action

24  once it had convinced itself that a video embodied a Prince composition to such a degree as to

25  constitute an unauthorized or infringing use.  *Id.*  Universal began monitoring YouTube daily for

26  unauthorized uses of Prince's most popular compositions.  Allen Decl. ¶ 11; Klaus Decl. Ex. 6B

27  at 67:11-68:18; 120:25-121:11.  Robert Allen chose Sean Johnson, an assistant in the legal

28  department, as the designated "YouTube person."  Klaus Decl. Ex. 6B at 120:2-127:22.  Johnson

and Allen worked together to establish a process for reviewing the videos and determining which should be removed pursuant to set guidelines. *Id.* Ex. 6B at 60:15-61:6; 123:12-124:18; Ex. 8B at 94:23-97:25. Allen determined that he could entrust Johnson with the monitoring and removal task. *Id.* Johnson sat right outside Allen's office, Allen communicated with him every day, and Johnson knew he could come to Allen with questions about any posting. Ex. 6B at 123:23-20.

Over a period of several months, Johnson viewed thousands of postings to determine whether they should be included on a list for requesting removal from YouTube. Allen Decl. ¶ 12; Allen Decl. Exs. 4-8. In conducting his review, Johnson first entered the titles of the most popular Prince songs in the YouTube search field. Klaus Decl. Ex. 8B at 40:9-20. Then, Johnson viewed each posting in the search results to determine whether it should be included on a list to be sent to YouTube. *Id.* at 60:7-64:10. To decide whether to include a posting, Johnson considered whether it embodied a Prince composition to such a degree that the composition was a focal point of the posting. *Id.* Johnson assessed whether the posting used the Prince composition so much so that "there was a significant use of it . . . specifically if the song was recognizable, was in a significant portion of the video or was the focus of the video." *Id.* at 60:17-22, 64:1-10. Johnson did not include in notices to YouTube postings that did not meet these criteria. *Id.* at 60:25-63:15.

**C.    Universal's Review and Request to Remove "Let's Go Crazy #1"**

Among the thousands of postings Johnson reviewed was one posted by Plaintiff, entitled "Let's Go Crazy #1," www.youtube.com/watch?v=N1KfJHFWlhQ. Johnson located the posting by searching for "Let's Go Crazy." When Johnson reviewed the posting, he "recognize[d] the song 'Let's Go Crazy' by Prince right off the bat." *Id.* at 76:3-81:16. The song was playing loudly in the background. *Id.* The title of the posting expressly took the name of the composition, "Let's Go Crazy." *Id.* Johnson noted that the videographer asked the child specifically about the music, and the child danced around in response. *Id.* Johnson distinguished this postings from others he did not include on the removal lists because the Prince composition was immediately recognizable and not obscured by other sounds in the foreground. *Id.* Based on

1  this review and in accordance with Universal's policies, Johnson concluded that the composition

2  was a significant focus of the posting and that it should be included on the removal list.

3  But that is not all he did.  Johnson reviewed the posting a second time to confirm that his

4  initial decision was correct.  *Id.* at 85:15-88:24.  Johnson testified that he "wanted to confirm

5  what I initially thought watching it the first time so as to make a careful decision whether or not

6  to put it on the list."  *Id.* at 86:2-7.  Johnson stated that the number of times he reviewed a posting

7  would vary depending on what was required to make the decision for each video.  *Id.* at 86:11-20,

8  87:22-88:24.  He typically reviewed postings with multiple voices and other ambient noise a

9  second time "to make sure that I'm making the right decision and confirm that the Prince clip —

10  clips are significant portions of the videos."  *Id.* at 88:8-13.

11  After reviewing the "Let's Go Crazy #1" posting two times, Johnson confirmed his initial

12  decision was correct and put the posting on the list – a list that included *more than 200* other

13  unauthorized uses of Prince's compositions *for just that week alone*.  *Id.* at 88:15-24; Ex. 9.  Allen

14  instructed another Universal employee, Alina Moffat, to transmit the list in an email to YouTube.

15  *Id.* Ex. 6B at 52:4-57:13; Ex. 6A at 52:4-53:25; Ex. 6B at 54:1-57:13; Ex. 10 at 14:22-17:25.

16  Moffat incorporated the list into Universal's standing email format, which contained language

17  dictated by YouTube's Terms of Use.  Klaus Decl. Ex. 9.

**D.     Plaintiff's Response to YouTube's Notice**

18

19  YouTube removed the video and sent Plaintiff an email notifying her that it had done so.

20  *Id.* Ex. 11.  Three days later, Plaintiff sent YouTube a counter-notification demanding that her

21  video be re-posted because, according to her, the posting did not infringe Universal's copyright.

22  *Id.* Ex. 12.  Plaintiff initially sent a notice that did not conform to YouTube's requirements (or the

23  text of the DMCA), because Plaintiff did not want to consent to jurisdiction over any copyright

24  suit – in other words, she did not want to comply with the statutory procedures that direct

25  unresolved disputes about the propriety of a use of a copyrighted work to be resolved in an

26  infringement action.  *Id.* Exs. 4 & 13. After finally receiving Plaintiff's conforming counter-

27  notice, YouTube restored Plaintiff's video to the site, where it remains.  *Id.* Ex. 14 at 228:22-

28  229:21.  To date, Plaintiff's posting has been viewed over one million times.  *Id.* Ex. 7; Ex. 15.

E.     **What Universal Did Not Know and Could Not Have Known About Plaintiff's Use When It Sent the Notice**

Universal's review could only consider what was evident from Plaintiff's "Let's Go Crazy #1" posting itself.  The title of the posting referenced the Prince composition, which played loudly and recognizably throughout the video.  The section of the composition accompanying the posting referred to the action, with Prince saying "C'mon baby, let's get nuts" and the ensuing frenetic guitar solo playing as the child "danced around."  Klaus Decl. Ex. 8B at 75:4-81:16.  A voice off-camera specifically asked the child, "What do you think of the music?"  Plaintiff was not identified by name – but rather as "edenza" – nor did the website provide contact information. *See* Edelman Decl. ¶ 15.

In 2007, Universal could not know facts (or even allegations of fact) that only came to light after Plaintiff filed multiple pleadings – and in some cases not until she was deposed in October 2009.  Universal could not have known, for example, that Plaintiff's posting was the *second* video of "Let's Go Crazy" she had filmed that day, and that she had set up the second video specifically to capture her son bouncing to the music.  Klaus Decl. Ex. 14 at 30:16-32:17; 37:6-21.  It could not have known that Plaintiff had chosen Prince's song specifically because the children had recently seen the Super Bowl halftime show and liked to dance to Prince.  Klaus Decl. Ex. 16.  It could not have known that (as Plaintiff alleged for the first time in April 2008) she posted the video to YouTube because her mother in California had difficulty watching videos as email attachments; that she told her mother that the song "Let's Go Crazy" by Prince made her son dance around the kitchen; or that Plaintiff's mother ███████████████████████████ ████████████████████████████████████████████ when she watched the posting on YouTube.  SAC ¶ 16; Klaus Decl. Ex. 17 at 63:3-66:25.  None of that information was available to Universal when it conducted its June 2007 review.  It was not even available to Universal after Plaintiff sent her counter-notice; at that time, a Universal employee contacted Plaintiff, and Plaintiff refused to talk to her.  Klaus Decl. Ex. 14 at 150:24-151:25.

Plaintiff, however, knew that she could post the video privately if she wanted to do so.  *Id.* at 96:19-98:23.  She also knew that YouTube's Terms of Use required her to agree that she would

DEFTS' MOT. FOR SUMMARY JUDGMENT
CASE NO. CV-07-03783

only post works of her own, original creation.  Klaus Decl. Ex. 18.  In fact, YouTube's "Copyright Tips" at the time specifically advised Plaintiff and other YouTube posters that YouTube would remove videos that incorporated copyrighted music as the music for the user's posting – as is the case with "Let's Go Crazy #1."  Klaus Decl. Ex. 19.

### F.    EFF and Plaintiff's Evolution to Believe that Her Use Was a "Fair Use"

After YouTube notified her of the posting's removal, Plaintiff immediately began consulting her friends about what steps she should take in response.  Although her claim depends on the allegation that her video is a "self-evident, non-infringing fair use," her communications contemporaneous with the posting's removal show that Plaintiff, her friends and her lawyers did *not* think that the posting was such a "self-evident, non infringing fair use."

Plaintiff consulted a friend, Theryn Fleming, to whom she looked as a source of legal guidance.  Klaus Decl. Ex. 14 at 162:25-164:4.  Fleming said nothing about fair use.  Instead, she explained to Plaintiff that "using copyrighted music as background music is copyright infringement, unless you have obtained permission."  Klaus Decl. Ex. 20.  Fleming suggested Plaintiff support "those who are trying to reform copyright," and in particular to contact Lawrence Lessig.  *Id.*  Plaintiff ultimately contacted EFF, an advocacy organization that for years has advocated against the DMCA and its "notice-and-takedown" processes.  *See* www.eff.org/takedowns.

Plaintiff has made multiple public statements revealing the content of her discussions with counsel at EFF, including in the earliest days following YouTube's removal of her posting.  The communications that Plaintiff revealed are highly relevant, because they show that EFF did not recognize Plaintiff's posting as the "obvious" and "self-evident" fair use that their legal pleadings now claim it to be.  For example, Plaintiff in an exchange on her "blog" discussing her initial discussions with EFF, admitted that "*[m]ine's not a 'fair use' case at all.*"  Ex. 2 at 2 (emphasis added).  Plaintiff said on her blog that she had learned from EFF about a prior takedown dispute involving the commentator Michelle Malkin and Universal.  The following day, a poster named "Richard Z" (known to Plaintiff to be a reader of her blog, Klaus Decl. Ex. 14 at 283:6-14) wrote Plaintiff that "the difference between your video and Malkin[]'s is that she had some kind of

11977494.1

DEFTS' MOT. FOR SUMMARY JUDGMENT
CASE NO. CV-07-03783

commentary associated with the copyrighted material *whereas your video was simply a home video with music playing in the background* (correct me if I'm wrong please).   *Malkin has the stronger fair use argument*."   Klaus Decl. Ex. 2 (emphasis added).   Plaintiff's friend was saying that her posting was *not* an obvious fair use – and Plaintiff's response *agreed with his assessment*:

> *You're right Richard.   Mine's not a "fair use" case at all*.   Nor is it a parody.   It's something different.   I've never heard of anything like it, which is why I contacted EFF.

*Id*. at 2 (emphasis added).[3]

This is not Plaintiff's only public admission that her EFF lawyers did not immediately recognize her to be an "obvious" fair use.   In an interview with "Zerogossip.com," Plaintiff admitted that EFF only came to the fair use conclusion after discussing the case with Plaintiff:

> [Plaintiff]:  When I contacted EFF, I did so at the suggestion of a friend of mine who's a lawyer in Canada.  I wanted to know my rights, how to protect myself in case UMPG sued me and in what way (if any) I had infringed copyright.  *In discussing the situation with one of the EFF lawyers, we came to the conclusion that I did not infringe the copyright and eventually we decided to file this lawsuit*.

*Id*. Ex. 3 at 3 (emphasis added).

At her September 2009 deposition, Plaintiff testified repeatedly that someone could look at her posting and reasonably conclude that it was infringing and not a fair use.   Klaus Decl. Ex. 14 at 271:19-25.   ("Q:  Do you think anybody watching the video would have had to have known that it was a fair use?  A:  In my opinion, *some people may have thought it was infringing, some wouldn't*.")  (emphasis added); *id*. at 173:1-16, 194:24-195:2, 276:23-277:6.

As discussed below, all of these facts – Plaintiff's admissions about the fact that EFF did not immediately recognize her posting to be a fair use, and Plaintiff's deposition admissions that

---

[3] At her deposition, Plaintiff tried to walk away from her "blog" admission with the excuse that "*It may have been I was misunderstanding what I'd been told by counsel*."   Klaus Decl. Ex. 14 at 286:8-14 (emphasis added).   Universal's attempt to inquire into the purported "misunderstanding" was blocked by privilege instructions by Plaintiff's counsel.   Having invoked the privilege at deposition, Plaintiff cannot claim in opposition to this Motion that her words reflect any kind of misunderstanding.   Universal filed a motion to compel to get the entirety of the communications with counsel that Plaintiff has selectively (and repeatedly) waived.   D.N. 297.   The Magistrate Judge took that Motion under submission on August 27, 2010, D.N. 310, and has not yet decided it.   Universal reserves the opportunity to supplement this Motion with any evidence it may obtain as a result of that Motion.

DEFTS' MOT. FOR SUMMARY JUDGMENT
CASE NO. CV-07-03783

people could reasonably go either way on the fair use question – establish that this is not the "extremely rare" case of "obvious" fair use the Court said might exist.  D.N. 53 at 4.

### G.    Plaintiff Suffered No Damages as a Result of Universal's Notice

Plaintiff has abandoned her contention – made to get her past the motion to dismiss – that she incurred some "actual expense to get professional services" to respond to Universal's notice. D.N. 45 at 9; Tr. of Hr'g, July 18, 2008, at 5:15-24.  In fact, she has shifted her damages contentions multiple times, serving three different Initial Disclosures purporting to identify her claimed damages.  Plaintiff's currently operative Disclosure identifies three categories of damages she contends she has suffered:  the loss of her time and "other resources" spent responding to YouTube's removal of her video, the loss of access to YouTube's hosting services, and attorneys' fees and costs.  Klaus Decl. Ex. 21.

Plaintiff admitted that she did not suffer these claimed damages, or any kind of economic loss as the result of YouTube's temporary removal of her video.  In out-of-court writings, Plaintiff admitted:  "Like I said, I don't care that YouTube doesn't want to host it.  Not like I'm paying them."  Klaus Decl. Ex. 4.  She further admitted that she has not held a paying job for years, and that she lost no wages or other moneys as a result of having to deal with YouTube or Universal's notice in any way.  Klaus Decl. Ex. 14 at 28:28-29:17.  And Plaintiff has admitted that she did not incur any attorneys' fees or costs in responding to the notice (or in any other way), and that she does not expect to incur any such fees or costs in the future.  Klaus Decl. Ex. 14 at 216:1-217:1; 324:2-330:1. While Plaintiff has alleged damage from unspecified First Amendment violations (an curious allegation in a case with no state action), Plaintiff has hardly been deterred from speaking her mind, as she has done repeatedly in multiple media, including her "blogs" (including one devoted to this case).  *See* http://piggyhawk.wordpress.com/; http://edenza.wordpress.com/.  These blogs also reveal that Plaintiff is not (as she alleged) "fearful" about posting videos – or even videos with copyrighted content – to the Internet.  SAC ¶ 38.  In fact, just a glance at one of her blogs reveals several examples of posted, copyrighted videos:  an entire sketch from "Monty Python's Flying Circus," a clip from Bruce Springsteen's

performance at the Super Bowl, and a scene from "Gone With The Wind."

http://edenza.wordpress.com/page/3/; http://edenza.wordpress.com/page/4/.

## III.    STANDARD OF REVIEW

"The Court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. Proc. 56(a) (eff. Dec. 1, 2010). Once the moving party (here, Universal) demonstrates the

absence of disputed issues, the burden shifts to Plaintiff to present specific facts showing that

there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).

## IV.    ARGUMENT

### A.    Section 512 Does Not Require An *Ex Ante* Analysis of the Fair Use Defense – In Any Case, and Especially Not This One

Plaintiff alleges that Universal violated the following federal statute :

> Any person who ***knowingly materially misrepresents*** under this section … that
> material or activity is infringing ... shall be liable for any damages, including costs
> and attorneys' fees, incurred by the alleged infringer ... as the result of the service
> provider relying upon such misrepresentation in removing or disabling access to
> the material or activity claimed to be infringing[.]

17 U.S.C. § 512 (f) (emphasis added).[4]

The Ninth Circuit has made it clear that § 512 (f) applies only where the party sending a

notice has the *subjective* mental state of "actual knowledge" that it is making a material

misrepresentation. *Rossi*, 391 F.3d at 1004-05. In affirming summary judgment for the MPAA,

the court held that the "interpretive case law and the statutory structure [of the DMCA] support

the conclusion that the 'good faith belief' requirement ... *encompasses a subjective, rather than*

*objective*, standard." *Id.* at 1004 (emphasis added).

> *In § 512 (f), Congress included an expressly limited cause of action* for improper
> infringement notifications, imposing liability only if the copyright owner's
> notification is a knowing misrepresentation. *A copyright owner cannot be liable*
> *simply because an unknowing mistake is made, even if the copyright owner acted*

---

[4] As Universal has pointed out previously, its notice to YouTube was not even sent "under this
section," *i.e.*, 17 U.S.C. § 512, but rather pursuant to YouTube's terms of use, Klaus Decl. Ex. 9
at 6 (emphasis added), because Universal does not agree that YouTube is eligible for protection
under the DMCA's "safe harbors," or that Universal has to send notices "under" the DMCA in
order to insist on the removal of infringing material. Universal does not move for summary
judgment on this ground but reserves the issue for trial, if necessary.

*unreasonably in making the mistake. Rather, there must be a demonstration of some actual knowledge of misrepresentation on the part of the copyright owner.*

*Id.* at 1004-1005 (emphasis added) (citations omitted).

In denying Universal's motion to dismiss, the Court stated that a copyright owner may be liable under § 512 (f) in certain cases if it " issu[es] a takedown notice without *proper consideration* of the fair use doctrine[.]"  D.N. 45 at 6 (emphasis added).  The Court did not define what a "proper consideration" of fair use is.  Universal addresses that issue in Section III.B.  Before getting to whether Universal made a "proper consideration" of fair use, the Court first must determine whether Universal was required to undertake *any* type of fair use consideration before sending its notice to YouTube.  The Court expressly held in its Order denying Universal's motion for interlocutory review that it is *not* the case that "every takedown notice must be preceded by a full fair use investigation."  Rather, the Court said that, in an "extremely rare" case, "fair use may be so obvious that a copyright owner could not reasonably believe that actionable infringement was taking place."  D.N. 53 at 4.  The Court did *not* say that Plaintiff's case was one of these "extremely rare" cases.  Indeed, the Court expressed its "considerable doubt" (as it had in the Order denying the motion to dismiss) that Plaintiff could prevail on her claim.  D.N. 53 at 5 n.4.  *See also* D.N. 45 at 8.  As discussed in Section 1, below, it is Universal's position that § 512 does *not* require an *ex ante* good faith determination that a use, if challenged and a fair use defense raised, would be held not to be a fair use.  But *even if* there are "extremely rare" cases where such an inquiry is required, this case is not it, as we demonstrate in Section 2.

### 1.  Section 512 Does Not Require an *Ex Ante* Consideration of Fair Use

Nothing in the text, structure or legislative history of § 512 in particular, or the DMCA as a whole, suggests that an *ex ante* consideration of fair use is required.  In fact, all indications point to the result that Congress did *not* intend to require such *ex ante* consideration.  In reaching a contrary conclusion, the Court said that the words "authorized … by law" in § 512(c)(3)(A)(v) "unambiguous[ly]" include the fair use defense codified in § 107.  D.N. 45 at 5.  That holding cannot be squared with the statute.  Fair use is not an authorized or "permitted" use.  It is a use

- 14 -

1   that is excused, and it is excused *only* when a defendant raises it as a defense and satisfies its

2   undisputed burden of proof on the defense.  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569,

3   590 (1994); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1163 (9th Cir. 2007).

4          The language and structure of the DMCA point away from requiring that a copyright

5   owner consider fair use before sending a notice.  First, there *are* provisions of "the law" that

6   affirmatively give users authorization to make certain uses of copyrighted works even if "the

7   copyright owner [or] its agent" have not given such authorization.  The Copyright Act has several

8   provisions that provide for the issuance of compulsory licenses.  Most notably here, the Copyright

9   Act creates a compulsory license for the reproduction and distribution in phonorecords of musical

10  compositions previously released to the public.  17 U.S.C. § 115.  As with the question of

11  whether a copyright owner or its agent has authorized the particular use, the question whether the

12  compulsory license provisions – *i.e.*, "the law" – have provided the necessary authority for the

13  use are matters that the party sending the takedown notice can verify relatively quickly and

14  efficiently.[5]  The same cannot be said about fair use determinations, which, in the words of the

15  leading commentator, "[u]sually … are so clouded that one has no sure idea how they will fare

16  until the matter is litigated."  3 *Nimmer on Copyright* § 12B.08 at 12B-93 n.16.  Second, the

17  DMCA's counter-notification and "put-back" procedures further indicate that Congress did not

18  intend to impose an *ex ante* fair use obligation on copyright owners.  17 U.S.C. § 512(g).  As

19  recounted in the legislative history, "[t]he put-back procedures were added to balance the

20  incentives created in new Section 512 for service providers to take down material against third

21  parties' interests in ensuring that material not be taken down."  H.R. Rep. No. 105-551, pt. 2, at

22  59 (1998).  These procedures allow the user to assert that their use is excused as a fair use, and for

23  the copyright owner to evaluate that defense (including whatever purpose the user asserts) in

24  deciding whether to pursue litigation.  Notably, after Plaintiff submitted a counter-notification in

25  compliance with YouTube's terms of service, her posting was restored for all her "friends and

26  family" to see, and Plaintiff has suffered no damages whatsoever.

27  [5]  ████████████████████████████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████████████████████████████████████████

1       Nor is there any basis in law for holding that any use of a copyrighted work can be

2  deemed to be so "obvious" or "self-evident" that a copyright owner must be charged with having

3  known that it was making a misrepresentation in sending a takedown notice.  "Obvious" fair use

4  is not a concept that is found in the statute – which makes it clear that fair use must be decided "in

5  any particular case" in which it is raised, 17 U.S.C. § 107 – or in any case decided under that

6  statute.  The Supreme Court has made it clear that fair use does not lend itself to "bright-line

7  rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis." *Campbell*,

8  510 U.S. at 577.  The Court has instructed that all of the statutory factors "are to be explored, and

9  the results weighed together, in light of the purposes of copyright." *Id.* at 578. "Since the doctrine

10  is an equitable rule of reason, no generally applicable definition is possible, and *each case raising*

11  *the question must be decided on its own facts*."  *Harper & Row, Publishers, Inc. v. Nation*

12  *Enters.*, 471 U.S. 539, 560 (1985) (emphasis added) (quotation and alteration omitted).  Whether

13  a use does or does not amount to a fair use is never "obvious," but is reached only after a

14  defendant first affirmatively pleads it and then proves it after an intense equitable balancing of

15  multiple factors, including the four factors set out in the text of Section 107.

16           2.    **Even If There Is Some "Extremely Rare" Case In Which Fair Use Is "Obvious," Plaintiff's Posting Is Not That**

17       There is *no* evidence in this case that Universal knew Plaintiff's posting would be

18  adjudicated a fair use and decided to send the notice to YouTube anyway.  Following this Court's

19  Orders at the dismissal stage, therefore, the entire basis for Plaintiff's § 512(f) claim is that it was

20  so "obvious" that Plaintiff's "Let's Go Crazy" posting would be determined to be a fair use that

21  Universal must have willfully blinded itself to the defense.  But the facts of this case show

22  conclusively that Plaintiff's posting was *not* an "obvious" fair use.  First, based just on what is

23  visible from Plaintiff's posting on YouTube, that posting cannot in any way be described as an

24  "obvious" case of fair use.  *See* Section III.B, *infra*.  Second, the facts are undisputed that Plaintiff

25  and *her lawyers at EFF* did not instantly recognize her use to be a fair use.  The facts that show

26  the latter point come from Plaintiff's public disclosures of her communications with her lawyers,[6]

27

---

28  [6] As noted, Universal filed a motion to compel the entirety of the communications as to which
Plaintiff has waived privilege.  That motion was taken under submission without argument and

11977494.1                                       DEFTS' MOT. FOR SUMMARY JUDGMENT
                                                    CASE NO. CV-07-03783

and from her own deposition admissions.  In a June 12, 2007 blog posting – made after Plaintiff

had spoken with an EFF lawyer – Plaintiff admitted to a fellow blogger that "*[m]ine's not a 'fair*

*use' case at all*."  Klaus Decl. Ex. 2 at 2 (emphasis added).  Plaintiff further admitted in the

interview with "Zerogossip.com" that her EFF lawyers did not immediately recognize that her

posting to be an obvious fair use, but rather:  "*In discussing the situation with one of the EFF*

*lawyers, we came to the conclusion that I did not infringe the copyright* and eventually we

decided to file this lawsuit."  Klaus Decl. Ex. 3 at 3 (emphasis added).  And Plaintiff testified

repeatedly at deposition that someone looking at her posting could conclude it was not a fair use.

Section II.F, *supra*.

Plaintiff has tried to neutralize these repeated admissions by saying that what the EFF or

she thought about the posting is irrelevant to the question whether Universal should have

recognized her use to be a fair use.  *See* D.N. 219 at 7-8.  That contention cannot withstand

analysis.  If there were such a creature as a "self-evident" or "obvious" fair use, then *anyone* must

be able to recognize it as such.  Recall, the premise of Plaintiff's argument is not that Universal

*did* recognize her use as fair use, but rather that Universal should and would have recognized it as

such, if Universal had conducted a proper fair use analysis.  That type of analysis by hindsight is

exactly what *Rossi* forbids.  But even if *Rossi* is disregarded, Plaintiff's "should and would have

recognized" theory is destroyed by the facts just recounted.  If there were such a thing as an

"obvious" fair use, then the EFF, of all organizations, would have recognized that immediately.

EFF is not neutral when it comes to fair use.  It has advocated repeatedly for a "Wide Berth" for

fair use, on UGC sites and elsewhere.  Klaus Decl. Ex. 1.  The fact that, by Plaintiff's own

admission, the EFF did not immediately recognize her use to be a "fair use" is among the

strongest evidence one can imagine that her posting is not an "obvious" fair use.  The fact that

Plaintiff – more than two years into this litigation and after thinking and writing about this case,

fair use and her repeated conversations with EFF during that time – would testify under oath that

has been pending for nearly two months.  D.N. 297, D.N. 310.  Because Plaintiff has blocked
inquiry into her admissions by claiming privilege, Plaintiff cannot attempt to contradict her
factual admissions recounted in the text by claiming that they reflect a "misunderstanding" of
what counsel told her.

DEFTS' MOT. FOR SUMMARY JUDGMENT
CASE NO. CV-07-03783

one could reasonably conclude her posting was not a fair use, is further dispositive evidence that her posting was not an "obvious" fair use.  Those admissions end Plaintiff's case.

> **B.     Even If an *Ex Ante* Consideration Is Required, Universal's Consideration of Plaintiff's Posting Gave All the "Proper Consideration" to Fair Use that Could Be Required "By Law"**

Even if Universal was required to give "proper consideration" to fair use *ex ante* with respect to Plaintiff's posting, Universal still is entitled to summary judgment.  The undisputed facts show that Universal considered every factor that was then available to it that could conceivably be relevant to a fair use analysis of Plaintiff's posting.  This Court did not define what the scope of a "proper consideration of the fair use doctrine" must be in this context.  *See* D.N. 45 at 6.  The Court recognized, however, that a "proper consideration" *cannot* require a "full [fair use] investigation," because any such requirement would be inconsistent with *Rossi*.  *Id.* at 7; D.N. 53 at 4 (citing *Rossi*, 391 F.3d at 1003-4).  A "full fair use investigation" would be *impossible* in the context of reviewing content before sending a notice, because the copyright owner necessarily will not have access to all the facts required to conduct such an investigation.

The scope of the inquiry necessary to satisfy any obligation to "consider fair use" must derive from the language of the statute that Plaintiff claims creates the obligation in the first place:  the copyright owner's "good faith belief" that the complained-of use is "not authorized by . . . *the law*."  17 U.S.C. § 512(c)(3)(A)(v) (emphasis added); *see also* D.N. 45 at 6.  The only source of "the law" that could define "proper consideration" of the fair use defense is Section 107 of the Copyright Act, setting forth the non-exhaustive list of fair use factors, and the cases decided under that statute.  An analysis of the statute and its relevant case law — particularly the handful of cases addressing "incidental uses," as Plaintiff claims hers to be — reveals that Universal's review considered precisely the factors observable from the video that would be considered if Plaintiff had been sued for infringement, asserted a fair use defense, and a court were to analyze that defense.  For example, Universal's review assessed whether Plaintiff's use was the "focus" of her posting, a significant factor in a number of cases reviewing "incidental uses."  *See e.g. Gordon v. Nextel Communications*, 2001 U.S. Dist. Lexis 25048, *7-*10 (E. D. Mich. August 13, 2001) (considering whether a copyrighted illustration is the "focus" of the

DEFTS' MOT. FOR SUMMARY JUDGMENT
CASE NO. CV-07-03783

secondary work); *Higgins v. Detroit Educational Television Foundation*, 4 F. Supp. 2d 701, 707 (E. D. Mich. 1998) (upholding fair use defense to use of composition that was not "by any means the focal point of the action"); *Jackson v. Warner Bros., Inc*., 993 F. Supp. 585, 589 (E. D. Mich. 1997) (analyzing whether copyrighted paintings were the "focus" of the motion picture in weighing fair use defense).  Universal further considered whether the composition was "recognizable," another factor deemed relevant in the incidental use cases.  *See Sandoval v. New Line Cinema Corp.*, 973 F. Supp. 409, 413 (S.D.N.Y. 1997) (considering whether copyrighted photographs were "recognizable" in the secondary work).  Universal's review must satisfy whatever "proper consideration of fair use" is required by Section 512(f).  A "proper consideration of fair use" cannot require more than what "the law" dictates.

Critically, the question is not whether the EFF or Plaintiff or even this Court would have reached the same conclusion or followed the same steps in conducting the review of Plaintiff's video.  The issue is Universal's subjective "good faith," and in particular, whether Universal's review was sufficient to permit it to say, in good faith, that it believed Plaintiff's use was unauthorized by the copyright owner, its agent, or the law – even if "the law" implies a "proper consideration of fair use."

When Universal's review is considered in the context of the statute and its relevant case law—including the leading Circuit Court of Appeals case analyzing the fair use defense asserted to excuse an "incidental use" — Universal's review satisfied any obligation to "properly consider fair use" that reasonably can be required under the statute and the case law construing it.  *See* 17 U.S.C. § 107; *Ringgold v. Black Entm't Television, Inc.,* 126 F.3d 70, 79 (2d Cir. 1997) (incidental use of copyrighted poster of painting in episode of television program not a fair use).

### 1.    "The Purpose and Character of the Use"

The law analyzing the first fair use factor considers generally (1) whether the use is commercial or non-commercial, an inquiry derived directly from the statute, 17 U.S.C. § 107(1); and (2) whether the use is "transformative," meaning whether it merely supplants the original, or repurposes the original work to create something new.  *Leadsinger*, 512 F.3d at 530.

1       Here, Universal considered and concluded that Plaintiff's use was commercial.

2  Universal's review focused on the unauthorized use of Prince's composition in an indisputably

3  commercial setting.  Allen Decl. ¶¶ 10-12; Klaus Decl. Ex. 6B at 156:16-22.  Plaintiff publicly

4  posted her video to YouTube, a commercial website, and titled it to be retrievable by a search for

5  the popular Prince composition it contained.  YouTube itself is ad-supported, as are many of its

6  individual users' videos.  *See* Klaus Decl. Ex. 7 (sample videos).  Plaintiff contends that her video

7  "bears all the hallmarks of a family home movie" depicting "normal household activity,

8  commotion and laughter."  SAC ¶ 13.  But on YouTube, *many* videos that appear to fit precisely

9  this description *are* commercial, earning advertising revenue and soliciting subscribers.  *See*

10  Klaus Decl. Ex. 7 (sample videos); Edelman Decl. ¶ 15.  Plaintiff's public posting placed her

11  video alongside these in a commercial context.

12       Plaintiff claims her purpose was "transformative" in that she used the music as

13  background to a posting intended to be viewed by a far-away mother who had difficulty viewing

14  email attachments.  Plaintiff's claimed "transformative" use fits within none of the typical

15  examples of fair uses offered in the preamble to Section 107.  It is not "criticism, comment, news

16  reporting, teaching . . ., scholarship. or research."  17 U.S.C. § 107.[7]  More important, Plaintiff's

17  summary contention that her use is "transformative" could not have been part of Universal's

18  analysis.  If Universal had the hypothetical obligation to conduct an *ex ante* analysis, then its

19  assessment of the use's "purpose and character" must be confined to what was observable from

20  the posting itself and its immediate context.  Universal would have no way to know Plaintiff's

21  claimed "transformative" purposes, made for the first time almost a year later in her Second

22  Amended Complaint.  Universal had no way of knowing who Plaintiff was, much less her

23  purpose in making the posting, when it reviewed the posting.  Indeed, even when Universal

24  contacted Plaintiff following her counter-notice, Plaintiff refused to talk to Universal.  Klaus

25  Decl. Ex. 14 at 150:24-151:25.  Universal's review considered what was observable from the

---

[7] To be a "transformative" work of critique or commentary, the use must comment on the work itself – not simply use the work to comment on something else.  *Dr. Seuss Enterprises v. Penguin*, 109 F.3d 1394, 1400-01 (9th Cir. 1997).  Plaintiff has never claimed that her video was meant to be a "critique or commentary" on "Let's Go Crazy."

DEFTS' MOT. FOR SUMMARY JUDGMENT
CASE NO. CV-07-03783

posting.  The factors evident to Universal – whether the composition was the focus of the posting and whether "Let's Go Crazy" was simply the synchronized soundtrack to the posting, Klaus Decl. Ex. 8B at 75:4-81:16; 79:14-20 – are factors that weigh *against* a transformative purpose.  The questions that Universal considered are substantially the same questions under the leading Circuit decision on a claimed "incidental" or background use:  whether the use of the copyrighted work was a "central purpose" of the secondary use.  *Ringgold*, 126 F.3d at 79 (assessing whether use of copyrighted work for the "central purpose for which it was created" constituted a transformative use).  In the caselaw and in Universal's review, a use is not "transformative" when it is used for the same central purpose intended by the copyright holder (*i.e.*, a piece of music as a soundtrack.).  A copyrighted work used "for the same intrinsic purpose as the copyright holder's . . . seriously weakens a claimed fair use."  *Worldwide Church of God v. Philadelphia Church of God, Inc*., 227 F.3d 1110, 1117 (9th Cir. 2000).

Finally, Universal also understood that this use is not subject to compulsory licensing.  Allen Decl. ¶ 5.  If synchronization with visual images were all it took to make a secondary work "transformative," then presumably Congress would not have implicitly recognized the copyright holder's right to control synchronization rights.  Where Congress intended to recognize a compulsory license for compositions, it did so in § 115.  There is no basis to conclude it intended the same kind of compulsory licensing for synch rights through broad application of a fair use defense to copyrighted works synchronized with video.

### 2. "The Nature of the Copyrighted Work"

The second factor looks to whether the copyrighted work is the sort that is subject to core copyright protections.  Universal's review assessed how publicly posted videos incorporated Prince's musical compositions—indisputably core works of artistic expression.  As the Ninth Circuit and the Supreme Court have explicitly held, a musical composition is "precisely the sort of expression that the copyright law aims to protect." *Leadsinger*, 512 F.3d at 531; *see also Campbell*, 510 U.S. at 586.  That is particularly true in this instance.  ████████████

███████████████████████████████████

██████████████████████████  Allen Decl. ¶¶ 6, 10; Klaus Decl. Ex. 6B at 96:9-

97:22.  "Let's Go Crazy" indisputably is among Prince's most artistically significant works.
Allen Decl. ¶ 6; Klaus Decl. Ex. 6B at 135:7-19.

### 3.   "The Amount and Substantiality Of The Use"

The third factor considers what portions of the copyrighted work were taken in relation to
the whole, and conversely to what degree the copyrighted work is embodied in the second work.
*See Harper & Row*, 471 U.S. at 565-66.  The inquiry has both qualitative and quantitative
dimensions—what was taken is as significant as how much was taken.  *Salinger v. Random
House*, 811 F.2d 90, 98-99 (2d Cir. 1987).  Universal's review considered precisely the factors a
Court would consider in evaluating this factor for incidental uses:  the significance of the taking,
and the prominence of the use.  *See Sandoval,* 973 F. Supp. at 413.  Universal observed that the
composition played *throughout the video*, considering the substantiality of the use in the
infringing work.  *See Gordon,* 2001 U.S. Dist. Lexis 25048 at *7-*10 (considering whether a
copyrighted illustration is the "heart of" the secondary work).  Universal also noted that the
soundtrack was *immediately recognizable* as "Let's Go Crazy."  Klaus Decl. Ex. 8B at 76:3-6. ("I
recognize the song 'Let's Go Crazy' by Prince right off the bat.").  *Sandoval*, 973 F. Supp. at 413
(assessing how many viewings of the film were required to recognize the copyrighted
photographs).  The composition was immediately recognizable because the portion lifted is "the
heart of" the work—the climactic peak at which Prince says "C'mon baby, let's get nuts," and the
ensuing frenetic guitar solo.  Klaus Decl. Ex. 8B at 75:4-81:16.

### 4.   "The Effect of the Use On the Potential Market For Or Value of the Copyrighted Work"

The fourth statutory factor looks at the effect of the use on the potential market for the
copyrighted work.  Not whether "Let's Go Crazy #1" itself resulted in any lost revenue, but
"'whether unrestricted and widespread conduct of the sort engaged in by [Lenz] . . . would result
in a substantially adverse impact on the potential market' for the original."  *Campbell*, 510 U.S. at
590.

Allen Decl. ¶ 6; Klaus

DEFTS' MOT. FOR SUMMARY JUDGMENT
CASE NO. CV-07-03783

1   Decl. Ex. 6B at 135:7-136:8.  Universal's knowledge at the time it sent the notice to YouTube

2   included this knowledge that the ███████████████████████████████████████████

3   ████████████████████████████████████████████████████████████

4   Universal's decision also considered the fact that YouTube postings are part of a commercial

5   service, which would weigh against any finding of fair use.  *Campbell*, 510 U.S. at 590-91.

6   ████████████████████████████████████████████████████████████

7   █████████████████████████████████████████ Controlling Ninth Circuit

8   precedent holds otherwise. ██████████████████████████████████

9   ████████████████████████████████████████████████████████████

10   ███████████████████ *Salinger*, 811 F.2d at 99.  This factor looks to the *potential* market for the

11   synchronization of "Let's Go Crazy," and protects the copyright holder's "right to change his

12   mind." *Worldwide Church of God,* 227 F.3d at 1119.  The copyright owner had every right under

13   the law to maintain the scarcity of synchronized uses of his works.

14                                              * * * *

15            Whatever Plaintiff or her counsel believe the result of Universal's review *should have*

16   *been*, it is undisputed that Universal's consideration of Plaintiff's posting included those aspects

17   of Plaintiff's posting that would be considered in any "fair use" analysis, and in particular a "fair

18   use" analysis of the kind of "incidental use" Plaintiff claims hers to be.  Plaintiff's disagreement

19   with Universal's decision to send the notice and her attempts to argue fair use in hindsight are

20   immaterial under *Rossi.*  The undisputed facts show that Universal did not act in bad faith or

21   make any knowing misrepresentation.  Summary judgment for Universal is required.

22        **C.      Plaintiff Has Incurred No Damages Under Section 512(f)**

23            Damages are a required element of a claim for a knowing misrepresentation under

24   § 512(f), just as damages are an essential element of *any* claim for misrepresentation.  *See*

25   Restatement (Second) of Torts § 525 (1976).  Section 512(f) requires proof of damages "incurred

26   by the alleged infringer . . .who is injured by such misrepresentation, as the result of the service

27   provider relying upon such misrepresentation."  17 U.S.C. § 512(f).  This Court has construed

28   § 512(f) to mean that Plaintiff must prove that she "incurred" damages "proximately caused by

- 23 -

DEFTS' MOT. FOR SUMMARY JUDGMENT
CASE NO. CV-07-03783

1    the misrepresentation to the service provider and the service provider's reliance on the

2    misrepresentation." D.N. 250 at 14. With respect to Universal's affirmative defense that Plaintiff

3    had "no damages" – a defense relevant to Plaintiff's request for injunctive relief (which requires a

4    showing of irreparable harm) – the Court further construed § 512(f) to mean that damages need

5    not be "economic and substantial." *Id.* at 14, 16. Universal respectfully submits the Court's latter

6    holding was wrong as applied to Universal's affirmative defense. That holding cannot be applied

7    to Plaintiff's burden to prove *actual economic loss* as a component of her claim for relief.

8         Plaintiff's disclosures list three categories of claimed damages: the loss of YouTube's

9    posting services for several weeks, the loss of "time and other resources" as a result of her efforts

10   to reinstate her YouTube posting, and attorney's fees and costs. Klaus Decl. Ex. 21. There is not

11   a shred of admissible evidence showing the loss of even a penny to Plaintiff in connection with

12   any of these categories.

13        ***The Loss of YouTube's Hosting Services***. YouTube is free to Plaintiff, and she has

14   admitted she has no damages on this score: "*I don't care that YouTube doesn't want to host it.*

15   *Not like I'm paying them.* That's their business." *Id.* Ex. 4 (emphasis added). Plaintiff's

16   admission eliminates any claim of "damages" from this category.

17        ***Lost Time and Resources***. Plaintiff claims she lost five to ten hours of time responding to

18   Universal's notice, and that such time should be compensated at the applicable minimum wage.

19   *Id.* Ex. 21. But Plaintiff admits that this alleged lost time did not translate into any actual loss in

20   economic terms. Plaintiff has admitted that this did not actually cost her even a cent in lost

21   wages, since she has earned no wages for years. *Id.* Ex. 14 at 28:18-20; 315:2-24.

22        ***Attorney's Fees and Costs***. Finally, Plaintiff claims that she has "incurred" damages from

23   pre-litigation work done by her lawyers in responding to Universal's notice. Plaintiff testified

24   that she has no obligation to pay those lawyers anything for any of this work. *Id.* Ex. 14 at 325:3-

25   23. The only document that speaks of any contingent obligation Plaintiff may have to pay those

26   lawyers is for ████████████████████ *id.* Ex. 22, which this Court has held is not "damages"

27   under § 512(f). D.N. 250 at 15-16.

28        Plaintiff has no damages. This is an independent ground for summary judgment.

1  **V.     CONCLUSION**

2         This Court has said that requiring a plaintiff to prove both the high standard of actual,

3  subjective knowledge of a misrepresentation (which the statute and *Rossi* require) as well as

4  actual economic loss (which the statute requires) "would vitiate the deterrent effect of [§ 512(f)]."

5  D.N. 250 at 14.  What we have in this case is a Plaintiff who – through more than three years of

6  litigation prosecuted by some of the most determined fair use advocates in the country – has not

7  produced any evidence of a knowing misrepresentation by Universal or any evidence of even a

8  penny's worth of actual damages.  Allowing a Plaintiff to proceed to trial in these circumstances

9  imperils Congress's purpose to have an efficient and expeditious notice-and-takedown procedure.

10  S. Rep. 5 No. 105-190, at 44-45 (1998).  Universal's motion should be granted.

11  DATED:  October 18, 2010                          MUNGER, TOLLES & OLSON LLP

12

13                                                     By: _____/s/ Kelly M. Klaus_____
                                                              KELLY M. KLAUS

14                                                     Attorneys for Defendants

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11977494.1                                         DEFTS' MOT. FOR SUMMARY JUDGMENT
                                                   CASE NO. CV-07-03783