Pages 1 - 44

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Howard R. Lloyd, Magistrate Judge

| | |
|---|---|
| Stephanie Lenz,<br><br>          Plaintiff,<br>     vs.<br><br>Universal Music Group Inc., et al,<br><br>          Defendant. | )<br>)<br>)   No. C07-03783 JF<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

San Jose, California
Tuesday, February 8, 2011

**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
RECORDING**

**APPEARANCES:**

For Plaintiff:

                         Electronic Frontier Foundation
                         454 Shotwell Street
                         San Francisco, CA 94110
              **BY:   CINDY ANN COHN**
                         **ATTORNEY AT LAW**

For Defendant:

                         Munger Tolles & Olson LLP
                         355 South Grand Avenue
                         35th Floor
                         Los Angeles, CA 90071
              **BY:   KELLY MAX KLAUS**
                         **ATTORNEY AT LAW**

Transcribed By:    Stacy Wegner
                         Transcriber
                         smwtyping@yahoo.com
                         (859) 539-2802

1   Tuesday, February 8, 2011                          10:08 a.m.

2

3          **THE COURT:**   (Audio malfunction)... Universal Media

4   Group.

5          **MS. COHN:**   Good morning, Your Honor.   My name is

6   Cindy Cohn, and I'm representing the Plaintiff, Ms. Lenz, in

7   this matter.

8          **MR. KLAUS:**   Good morning, Your Honor.   Kelly Klaus

9   for the Universal Defendant.

10          **THE COURT:**   Hi, Mr. Klaus.   Hello, Ms. Cohn.   This

11   is the Defendant's motion for a -- a contempt order

12   (inaudible) sanctions.

13          By way of background, I inherited this case from

14   Judge Trumbull when she retired.   I guess it went to Grewal

15   first and he recused himself.

16          Judge Trumbull issued an order with respect to the

17   Defendant's claims that the Plaintiff had waived certain

18   attorney-client privileged information with respect to certain

19   subject areas on account of her disclosures to third parties.

20   Judge Trumbull did find that there was some waiver and issued

21   an order.

22          And now we're fussing with interpreting the disclose

23   -- the intent and meaning to that order.   Plaintiff says it

24   comply -- says she complied with the order.   And now the

25   Defendant says no way you did, not even close.

1          Let's talk about some of the specifics here.

2     Plaintiff's motions for pursuing this litigation.  That was

3     the subject matter of communications with the Plaintiff's

4     attorney -- between Plaintiff and the Plaintiff's attorneys

5     regarding the possible motives for bringing the action.

6     That's one of the things that Trumbull said there was a waiver

7     of the attorney-client privilege.

8          Plaintiff has produced communications between

9     herself and her lawyers during the prelitigation phase, as

10    well as early on in the litigation, dealing with publicity as

11    a possible motive, but had stopped at that point.

12         And Defendant says there's no time limit, keep

13    going.  In other words, there may be an email or communication

14    yesterday that dealt with the motivations for bringing the

15    lawsuit.  I think that's your point, Mr. Klaus.

16         **MR. KLAUS**:  Your point is, Your Honor, that there --

17    we actually know from Plaintiff's counsel's representation,

18    and from documents that we have that have been produced

19    already, that there are numerous communications revealing the

20    publicity blitz, at least through the end of 2007 and then

21    through 2008.

22         Whether it goes through yesterday, I don't know, but

23    there's a substantial amount of communications that are being

24    cut off because of the -- the argument that the publicity

25    blitz died down within a few weeks of the filing of the case.

4

1          **THE COURT:**  Okay.  Well, the order doesn't say they

2    pro -- produced communications dealing with a publicity blitz.

3    It says, "Subject matter of communications about possible

4    motives."  That would be your point?

5          **MR. KLAUS:**  Right.  But one of the -- one of the

6    documents that Judge Trumbull cited as -- and I think this is

7    in Judge Fogel's order as well -- as evidence of the

8    motivation was the one to the -- from Plaintiff to her mother

9    where she says, "I've talked with counsel at the EFF.  They've

10   told me there's going to be a lawsuit or there -- or the -- or

11   -- and/or a publicity blitz," so it was one of the -- it was

12   one of the disclosures that gave rise to the -- to the waiver.

13         **THE COURT:**  Okay.  Why don't you just put the

14   microphones right down the middle.  You don't need the lean

15   into them.  It will pick you up.

16         **MR. KLAUS:**  Gotcha.

17         **THE COURT:**  I had a feeling you were crowding on Ms.

18   Cohn there.

19         So Ms. Cohn, what is the rationale for stopping at

20   the point in time you did stop with reference to publicity

21   related communications?

22         **MS. COHN:**  Well, Your Honor, we -- we read the

23   waiver -- the order as being about Ms. Lenz's motives for

24   filing the lawsuit, and we have produced all documents,

25   regardless of time, concerning her motives for bringing or

1  maintaining the lawsuit.

2         So for instance, we produced in -- emails in July of

3  2007 between Ms. Lenz and her counsel where she said, "Well, I

4  talked to this reporter and I told the reporter why I was

5  bringing the case."

6         We produced emails between Ms. Lenz and her counsel

7  in October of 2007 when Universal filed an anti-slap motion --

8         **THE COURT:**  Okay.  Well, what are they -- what --

9         **MS. COHN:**  -- against Ms. Lenz.

10        **THE COURT:**  Because I -- you two are making

11  distinctions, which are fairly nuanced here, and I'm --

12        **MS. COHN:**  I think that the --

13        **THE COURT:**  I'm just learning the ropes so --

14        **MS. COHN:**  I -- I think that the distinction here is

15  that we read the order as being a waiver as to Ms. Lenz's

16  motives, and I think Universal reads the order as being a

17  waiver as to anything remotely having to do with publicity,

18  regardless if -- of whether that relates to her motives or

19  not.

20         And there's lots of communications that we've had

21  with Ms. Lenz about publicity that have nothing to do with her

22  motives for bringing or maintaining the case.

23         So for instance, we gave her advice about how to not

24  waive the attorney-client privilege when you're talking to

25  reporters.

1      **THE COURT:**  All right.  So you're saying the order

2   talks about motive -- or -- or -- or directs you to produce

3   communications about motives.

4      You say the order requires the production of

5   communications about publicity because publicity is, you would

6   allege, one of the motives?

7      **MR. KLAUS:**  I -- yes.  It's -- it's reflected in one

8   of the documents that was a waiver, and I'm reading from Judge

9   Fogel's order overruling the objection.

10      It says, "While Lenz argues that her motivations for

11   filing the suit and EFF's motivations for representing her are

12   distinct subject matter, the circumstances of her disclosures

13   indicate that the two subjects are closely intertwined and

14   cannot be easily separated."

15      He then says, "Such integration is well illustrated

16   in Lenz's statement to her mother that EFF was planning a

17   publicity blitz and/or a lawsuit against Universal."

18      **MS. COHN:**  So if I may, Your Honor, I -- I think

19   that what Judge -- Judge Fogel is talking about there is a

20   fight we actually below.  There's a different fight going on

21   here in contempt that I have to say we feel a little like

22   we're chasing the sunset to try to make Universal -- to hear

23   what Universal thinks the order means.

24      Underneath this there was a question about whether

25   it was just Ms. Lenz's motives or EFF's motives that were at

1    issue in the waiver.  And we argued in front of Judge Trumbull

2    and Judge -- Judge Fogel that EFF's motives weren't the -- the

3    motives that were relevant here.  It was just Ms. Lenz's

4    motive.

5          Judge Fogel disagreed with us and -- and ruled that

6    we needed to produce information as to motives, whether those

7    motives or EFF's or those motives were Ms. Lenz's, and we

8    complied with that order.

9          So when -- what Judge Fogel is talking about there

10   is whether my organization's motives matter, and he disagreed

11   with us on that, and we produced all documents as to motive,

12   whether the motive was EFF's or Ms. Lenz reflected in the

13   correspondence between the two of us.  That was what we

14   thought Judge Fogel -- that is actually what Judge Fogel

15   ordered us to do, and we have complied with that.

16         Now Universal comes back and they say, "No.  No.

17   No.  That's not what we meant.  That's not what Judge Fogel

18   meant.  Judge Fogel meant everything regarding to publicity,

19   regardless of the context, regardless of whether it has

20   anything to do with anybody's motives.  If -- if it has

21   something to do with publicity, it has to be inside the scope

22   of the order" --

23         **THE COURT:**  Well, didn't you just --

24         **MS. COHN:**  -- and that's the disagreement that we're

25   having.

1        **THE COURT:**  Didn't you just read me something, which

2  said -- said that -- was that Fogel talking or --

3        **MR. KLAUS:**  That was Judge Fogel's --

4        **MS. COHN:**  That was Judge Fogel.

5        **MR. KLAUS:**  -- order, Your Honor, at page four.

6        **THE COURT:**  Who said that was awfully hard to

7  separate out this motive from publicity?

8        **MS. COHN:**  No.  I -- I -- I'm sorry, Your Honor.

9  What he says is it's very hard to separate out EFF's motives -

10  -

11        **THE COURT:**  Oh.

12        **MS. COHN:**  -- from Ms. Lenz's motives, and we agree

13  -- we -- again, I -- we argued mightily in front of Judge

14  Fogel, but we lost that.  So we produced everything,

15  regardless of whether the motives were EFF's or Ms. Lenz's.

16  That's what Judge Fogel was talking about.

17        And now Universal comes back and says, "No.  No.

18  No.  This means anything with regard to publicity, regardless

19  of whether that publicity is -- has anything to do with either

20  EFF's motives or Ms. Lenz's motives."

21        But the subject matter waiver was on motive, and

22  what Judge Fogel clarified was that the motive of counsel and

23  the motive of client needed to both be included, and we did

24  that.

25        Now, again, and -- and you'll see this as a theme

1  throughout this -- universal is saying, "No.  No.  No.  It

2  means even more than that," and that's where we have the

3  disagreement.

4      **THE COURT:**  Okay.

5      **MS. COHN:**  There's also another way that we have a

6  disagreement, which is whether the actual waiver had to do

7  with the initial publicity blitz, which is what Ms. Lenz is

8  talking about -- she's talking about what was being planned in

9  July of 2007 -- or whether that includes all publicity over

10  the life of the case, whether it has anything to do the

11  initial filing of the case or not.

12      We also produced all documents having to do with the

13  initial publicity blitz, even if, say, a year later she said,

14  "Oh, yeah, when we did that initial publicity blitz that was

15  really an issue."  We -- we didn't -- we didn't limit it as to

16  time, but we do think that the waiver had to do with the

17  initial publicity blitz at -- only as to publicity.

18      And as to motive, we produced all motive as to time.

19  As to the initial publicity blitz -- blitz, we produced all

20  publicity as to time.

21      We thought that with those two we would have

22  satisfied Universal because that's what Judge Fogel -- that's

23  what they were arguing about below, and now they're trying to

24  expand what they're seeking --

25      **THE COURT:**  Well --

1     **MS. COHN**:  -- on contempt.

2     **THE COURT**:  Okay.  Thank you.

3         Mr. Klaus, I guess what she's arguing is that the --

4  the focus of the order and the discussion was on -- was on

5  communications about motive, and that you broadened this to

6  mean communications about publicity, even if the publicity

7  communication has nothing to do with motive.  Although, I'm

8  not sure how you'd know whether it did or didn't.

9         What do you say?

10    **MR. KLAUS**:  What I say, Your Honor, is that I think

11 what Plaintiff's counsel is doing, with all due respect, is

12 hairsplitting.

13        She says that, "We were ordered to produce things

14 that go to Plaintiff's motive and to our motive."  It's plain

15 from one of the communications -- this is in Mr. Kwun's

16 declaration, Exhibit E -- "The very communication that Judge

17 Trumbull cited as the basis for the waiver, the very key

18 indication that Judge Fogel in his order said showed the

19 intertwining of the two."

20        And what she said is I -- this is Ms. Lenz speaking

21 -- "I spoke from a lawyer -- with a lawyer from EFF today

22 about the YouTube/Universal thing.  I can't say much, but

23 there may be a publicity blitz and/or a lawsuit against

24 Universal.  Any lawyer fees would come out of the settlement."

25        And Ms. Cohn says, "Well, we've agreed.  We'll give

1  you some of the publicity blitz documents."

2          But they say after the fact, "Ms. Lenz, well, she

3  wasn't really talking about the publicity that would be

4  generated by this lawsuit and during this lawsuit.  That

5  wasn't the motive she was talking about.  She was talking

6  about the publicity for an initial couple of weeks."  And

7  that's a post-talk rationalization, one of several that are in

8  Ms. Lenz's current declaration.  Now, to come in and say, "No.

9  No.  No.  No.  That's not what I meant.  What I meant was X,

10  Y."

11          And so that goes to the point, Your Honor, how can

12  we know what -- where the publicity blitz died down?  What

13  they said to us before dur -- when we tried to resolve this

14  dispute without the need for a motion, was they said, "We will

15  draw the line at the publicity blitz at the first couple of

16  weeks, and after that there's a lull."

17          But we know there wasn't a lull, Your Honor.  We

18  know that it continued -- continued through the -- the lawsuit

19  was filed in July of 2007.  There are documents from October

20  29th, 2007, from EFF's media coordinator arranging publicity

21  with the Plaintiff.  That's my Declaration Exhibit 8.

22          There's the interview she gave, which affected

23  another waiver, notwithstanding what we've heard for the first

24  time today.  That EFF was advising her on how not to waive the

25  privilege during communications with a --

1    **MS. COHN:**  Clients don't always listen to you.

2       **MR. KLAUS:**  -- with a -- with a reporter.  That's

3    Mr. Kwun's declaration, Exhibit F.

4       There are -- attached to my declaration at Exhibits

5    11 through 12, there was an originally redacted, later

6    unredacted, discussion of the publicity and -- and the

7    discussions with reporters between one of Ms. Cohn's

8    colleagues, Ms. McSherry, and the Plaintiff.

9       The publicity -- the publicity motive continued to -

10   - continued, not just beyond the first couple of weeks of this

11   case.  It continued for years, Your Honor.

12      **THE COURT:**  For how long?

13      **MR. KLAUS:**  It certainly -- well, we know from the -

14   - we know from EFF's posting and the summary judgment motion

15   in two -- in October of 2010 -- as soon as that went up, they

16   posted something on their website that linked to articles

17   going up through January or February of 2010 about the case.

18      It's a case that both EFF and the Plaintiff have

19   continued to publicize and talk about repeatedly.  It goes

20   directly to the -- to the basis for the waiver, which was

21   whether publicity and publicizing this case and the claims

22   against Universal were a motivation for filing and pursuing

23   and continuing this lawsuit.

24      **THE COURT:**  Well, I guess I -- haven't you

25   established that?

1    **MR. KLAUS**:  We have -- I -- I -- but I don't think

2    we are limited, Your Honor, to the communications that we

3    have.  There was an order saying that Plaintiff has --

4    Plaintiff has waived the subject matter.

5         Judge Fogel's order denying it -- they -- one of

6    their arguments was -- one of their arguments to Judge Fogel

7    was, "There's no denying that this case has received

8    publicity, so there's no harm, no foul."

9         What Judge Fogel said is, "That's not the law.  When

10   you waive the privilege, you waive the privilege, and the

11   other side is entitled to all the communications, so that they

12   can -- they can -- they can -- they can assess --

13        **THE COURT**:  Including going forward?

14        **MR. KLAUS**:  It has to be going forward, Your Honor.

15   She said the motivation for -- for -- for filing and pursuing

16   the lawsuit, one of them was publicity.

17        **THE COURT**:  So having -- having waived the -- the

18   privilege as to publicity going forward, then -- then -- then

19   the Plaintiff cannot talk to the Plaintiff's lawyers about

20   publicity without -- and -- and -- and make it privileged

21   because it's waived?

22        **MR. KLAUS**:  That's the basis -- that is the basis --

23        **MS. COHN**:  (Inaudible - - due to simultaneous

24   colloquy.)

25        **MR. KLAUS**:  The problem with it --

1          **THE COURT:**  That's going forward, waiver of the

2   privilege.

3          **MR. KLAUS:**  But --

4          **THE COURT:**  That's not something I'm used to dealing

5   with.

6          **MR. KLAUS:**  It -- I -- I think of it, Your Honor,

7   somewhat differently, which is that there's no time limitation

8   to the subject matter waiver here.  We know because we got

9   these document -- these documents weren't produced to us right

10  away.  It wasn't clear to us that there was a waiver of this

11  privilege back in 2007.

12          When we finally got them -- when we finally put

13  these -- when we finally put these documents together, it was

14  apparent that there had been a waiver at that time.

15          And that is -- that is a -- that is just a

16  fundamental problem with waiving the privilege, Your Honor.

17  The privilege is -- it -- it impedes the access to evidence

18  that you -- that one otherwise has a right to discover.  It --

19          **THE COURT:**  Including evidence that hasn't yet been

20  created?

21          **MR. KLAUS:**  It -- it has -- it has been -- it has

22  been created as of the time of the -- as of the time of the

23  waiver ruling, Your Honor.

24          I don't see how somebody can say, "I'm going to --

25  I'm going to disclose my attorney's advice on a particular

1   subject, but the only thing I will have been waiving is what's

2   been said to me before.  And if I continue to have a

3   conversation with my attorney on exactly the same subject,

4   those are off limits because I didn't intend to affect a

5   prospective waiver."

6          That's just -- the -- the law is clear, Your Honor.

7   That's not the way that subject matter waiver works.  If it's

8   within the subject matter, there is no time limitation.

9          **MS. COHN**:  Your Honor, if I may?  I -- I think that

10  -- that Mr. Klaus is overreading what Judge Fogel and Judge

11  Trumbull said.

12         What Judge Trumbull said was that the waiver applied

13  to the specific factual allegations that were included in what

14  Stephanie Lenz told her mom in 2007.  What Stephanie Lenz told

15  her mom in 2007 was, "There might be a lawsuit and/or a

16  publicity blitz."

17         The specific factual allegations were about what was

18  about to happen in her situation, a lawsuit and/or a publicity

19  blitz.  It's a specific waiver about a specific factual time.

20  It wasn't, "I might do publicity for the next three years, and

21  my lawyers and I had extensive discussions about that."

22         The specific factual allegation that she told her

23  mom -- granted, she shouldn't have told her mom this -- but

24  what you -- is very narrow, and what Judge Fogel said was also

25  very narrow.  Judge Fogel said, "Universal is entitled to

1   examine the context of Lenz's voluntary statements in order to

2   assess their probative value, if any."

3          The context of Ms. Lenz's voluntary statements to

4   her mom is what she was talking about to her mother in July of

5   2007, and she was talking about a specific publicity blitz at

6   that particular time.  We produced all documents about that

7   specific publicity blitz as that -- as to that time in -- no -

8   - regardless of whether they happened -- whatever time.

9          There's no a temporal limitation.  We didn't say oh,

10  two, three weeks after it, we're done.  We said, "Two or three

11  weeks after that they don't talk about that initial publicity

12  blitz anymore.  There are no responsive documents."

13         But we didn't limit what we searched for.  We're

14  just reporting what we found, which was the discussions about

15  the initial publicity blitz ended quite soon after the case

16  was filed, which isn't particularly surprising.

17         The fact that the press has continued to be

18  interested in this case is not a surprise to anyone.  It's an

19  incredibly interesting case.  In fact, Judge Fogel has said on

20  a number of occasions it's the most interesting case on his

21  docket.  The press is interested in this case.  It's true.

22         But we weren't talking about publicity -- Ms. Lenz

23  is not telling her mother about a lifetime-of-the-case

24  publicity plan.  She's talking about specifics.

25         What we produced though -- what the waiver was

1  about, and what Judge Trumbull and Judge Fogel said the waiver

2  was about, was about motive -- about her motive for bringing

3  the case.  And we have produced all documents about her

4  motive, and after Judge Fogel's ruling, about her counsel's

5  motive for bringing this case for the life of the case.

6         I -- I think that Judge -- I think what Universal is

7  trying to do here is to take an inch and turn it into a mile.

8  They're trying to say that any time there was any publicity --

9  any time any reporter called and asked about the case, any

10  time any news report actually talked about this case -- and

11  this case has been much discussed in the press -- that somehow

12  that has to be turned over because -- because you -- because

13  Stephanie Lenz told her mother in 2007 that there might be an

14  additional --

15         **THE COURT**:  Well, then whenever --

16         **MS. COHN**:  -- publicity blitz.

17         **THE COURT**:  -- a reporter calls and talks to either

18  you or to Ms. Lenz that's not privileged?

19         **MS. COHN**:  No.  No.  But we talk internally -- the

20  communications with her about that, so we talk about logistics

21  with her.  "Somebody is going to call you at 2:00 o'clock this

22  afternoon."

23         We talk about how she can describe -- how she should

24  talk about Judge Fogel's rulings, because a layperson often

25  doesn't understand what's going on in rulings.

1    We talk to her about -- again, about not waiving the

2    privilege, advice that I wish she would have taken earlier on

3    but she didn't, as we were just getting started with the case.

4    I mean, she's a small town mom, and learning about the

5    privilege took a little while.

6    You know, we talk about what the likely timing of

7    the case could be.  What she could tell the press about the

8    likely timing of the case.  How best to talk about her video.

9    You know, "Why did you take a video of your -- of your son

10   dancing around in the kitchen?"

11   How to best present that stuff to the press, so

12   frankly, people like Kelly Klaus didn't later come and try to

13   use that information against her.  That advice doesn't have

14   anything to do with her motive for bringing the case.

15   And it's going over multiple years.  Again, there

16   was a waiver here, a small waiver about initial publicity

17   blitz.  The subject matter of the waiver -- Universal's big

18   arguments below was that these demonstrate that she had a

19   motive other than a First Amendment motive.

20   I have a little bit of confusion about how publicity

21   isn't part of a First Amendment motive, but nonetheless, Judge

22   Trumbull found a waiver, and the waiver was as to motive, and

23   Judge Fogel confirmed that that waiver included EFF as well as

24   Ms. Lenz.

25   But that's it.  It doesn't reach any publicity

1   discussions over the life of the case.  It reaches discussions

2   about motive, and it --

3           **THE COURT:**  Okay.  You're --

4           **MS. COHN:**  -- may reach that additional (inaudible).

5           **THE COURT:**  You're -- you're repeating yourself.

6           **MS. COHN:**  I'm sorry.

7           **THE COURT:**  Go ahead.  Last --

8           **MR. KLAUS:**  Couple of -- couple of quick points.

9   Number one, when Ms. Cohn says that the order of Judge

10  Trumbull referred to publicity motives as specific -- actual

11  allegations, she's conflating two different parts of Judge

12  Trumbull's order.  The specific factual allegations are within

13  part C of the order on page seven.  That's not what she said

14  with respect to motive.

15          The second thing is if what -- if what Ms. Cohn is

16  saying is that they understand the order, as we do, to mean

17  both Lenz's and EFF's motives, not just for filing the case,

18  but for pursuing that, then that, by definition, includes

19  publicity under -- under both of -- under both of the orders.

20          And we know at a minimum, Your Honor -- at a

21  minimum, the publicity blitz had to have continued through

22  2007 when the motion to dismiss this case was filed and was

23  pending and when there were numerous interviews that I've --

24  that I've already cited that are in the record that show that

25  there were specific communications between Plaintiff and EFF.

1   And then between Plaintiff and numerous members of the media

2   trying to publicize this case and the allegations.

3          **THE COURT:**  So what -- what -- what was the time

4   period that you -- the cutoff -- they stopped from your

5   standpoint?

6          **MR. KLAUS:**  They -- they have told us that they have

7   not been -- they have not clearly stated what the date is, but

8   what they've told us is that they were willing to have the

9   publicity documents go out for a couple of weeks after the

10  filing of the case.

11          What Mr. Kwun said in one of his letters to me,

12  which is Exhibit 18 to my declaration, Your Honor, is that --

13  and I'm -- this is my Exhibit 18, page four.

14          Under the heading of publicity blitz what he said

15  is, "I explained there's some communications on the topic

16  before and shortly after the filing of the lawsuit."  He says,

17  "There's a several week lull" -- that's his word -- "in which

18  there are no communications.  That's where we think everything

19  should have to stop.  That would take you from July to earlier

20  August."

21          And what we know --

22          **THE COURT:**  Of what year?

23          **MR. KLAUS:**  Of 2007.

24          **THE COURT:**  Thank you.

25          **MR. KLAUS:**  What we know from the -- what we know

1   from the exhibits that I've cited that show a -- a -- a wave

2   of publicity about this case, about the video, about the

3   contentions about Universal the Plaintiff and the EFF have

4   been making publicly, is that they were going on through the

5   end of 2007, at least, Your Honor.

6            THE COURT:  Okay.  Can we move on?

7            MR. KLAUS:  Yes.

8            THE COURT:  Litigation strategy with respect to the

9   *Rossi* case concerning changing or clarifying the legal

10  standard articulated in that case.  This is one of the issues

11  that's been waived.  Plaintiff says they produced -- she

12  produced everything there is.  Defendant says --

13           MR. KLAUS:  If they are certifying that they

14  produced everything on *Rossi*, then we accept that.

15           THE COURT:  Are you?

16           MS. COHN:  I don't know what a certification is.  We

17  produced everything --

18           THE COURT:  And you --

19           MS. COHN:  -- on *Rossi*.

20           THE COURT:  And you gave them everything you -- you

21  --

22           MS. COHN:  Absolutely, Your Honor.

23           THE COURT:  -- through a diligent --

24           MS. COHN:  There's nothing left.

25           THE COURT:  -- search and there's a magic

1    (inaudible).

2        **MS. COHN:**  Yeah.  Yeah.  We've done a reasonable and

3    diligent search -- whatever those magic words are.  Yes.  We

4    have produced everything that relates to *Rossi*.

5        **MR. KLAUS:**  And Your Honor, just -- I don't know if

6    this is on your -- your list of -- of the many issues to get

7    through here.  We do have a dispute about what is a reasonable

8    and diligent search for (Inaudible - - due to simultaneous

9    colloquy.)

10       **THE COURT:**  I'm coming to that.

11       **MR. KLAUS:**  Okay.

12       **THE COURT:**  The waiver was found as to four factual

13   allegations, or maybe they're assertions that the Plaintiff

14   made.  How to interpret the -- the specific allegations or the

15   entire subject matter behind the allegations?  Because if it's

16   the subject matter behind the allegations, then it would be

17   anything to do with infringement or non-infringement going

18   forward, which is probably the whole ...(Court speaking sotto

19   voce.)

20       **MR. KLAUS:**  Your Honor, the real dispute on these --

21   the specific factual allegations has to do with Plaintiff's

22   statement on her blog -- public posting.

23       So on June 11th, 2007, she writes a blog post and

24   starts talking immediately about what the people from EFF are

25   telling her when she's contacted them about her post.

1   Clearly, a waiver.

2          Later that day, or the next day, a friend of her

3   says, "I don't think you actually have a fair use case."

4          She replies on her public blog on June 12th and

5   says, "You're right.  Mine's not a fair use case at all.

6   That's why I contacted EFF."

7          The core allegation in this case, Your Honor -- the

8   -- the allegation that they have made from day one, that they

9   continue to make through the opposition in their papers, is

10  that anyone looking at this video posting on YouTube should

11  have instantly and immediately said, "Ah-ha.  That's fair use.

12  I know it when I see it.  Anyone should have seen it."

13         The Plaintiff said in her blog posting, "Mine's not

14  a fair use case at all."

15         So we go to her deposition in 2009 and I ask her,

16  "What did you mean by that?"

17         And what she says is, "I really don't remember.  I

18  may have been misinterpreting something that my lawyer told

19  me."

20         I said, "What did your lawyer tell you that you

21  might have misinterpreted?"

22         And what she -- and at that point there were

23  repeated instructions not to answer.  This went through --

24  this was a -- this was a core component of the motion before

25  Judge Trumbull.  It was a core component of was -- of what was

1  before Judge Fogel. And what Judge Fogel said -- Judge --

2  Judge Trumbull said the privilege had been waived.

3  And what Judge Fogel said is, "A party may not

4  attempt to explain an apparent admission based on a

5  misinterpretation of a conversation with counsel and then deny

6  counsel access to the very communications that are at issue."

7  Now, the -- as the dispute had worked itself out

8  here as to what this means, Mr. Kwun, who -- with whom we had

9  the discussion, said, "Well, first of all, she hadn't actually

10  talked to any lawyer at EFF prior to June the 12th, so there's

11  no actual communication with a lawyer from EFF that we can

12  produce to you regarding this communication."

13  But the second thing he said is, "We've also gone

14  back to try to figure out if at some point between the time of

15  that posting, June 12th, 2007, and the date of her deposition,

16  which was in September of 2009, there was any communication

17  regarding whether or not her use was a fair use that she might

18  have been referring to and trying to explain away."

19  Now, it would be one thing if what they had done was

20  they had actually searched their files for communications

21  about what was or was not a fair use, but -- but that's not

22  what they did, Your Honor.

23  What they did, instead of saying -- in -- in terms

24  of saying that there was no communication that she was

25  thinking about, is they asked her. They said, "What

1   communication were you thinking about at your deposition?"

2           And what she said in paragraph 10 of her declaration

3   that she's submitted now -- something that doesn't really

4   sound like it was written by somebody from small town,

5   Pennsylvania, as it's trying to be portrayed during this

6   argument -- is, "I did not recall why I made this statement.

7   When I said that, it may have been a misunderstanding of what

8   I've been told by counsel.  I was speculating.  I did not have

9   in mind any particular thing I've been told by any of my

10  attorneys that might have caused a misunderstanding."

11          So what we have is we have a waiver at her

12  deposition where she has said very clearly, "I was -- I may

13  have been relying on something that my counsel had told me."

14  And they are not searching the -- they are not producing to us

15  the communications between Plaintiff and her counsel on that

16  subject, between June 12th, 2007, when she made that posting,

17  and September of 2009 at her deposition when she said she may

18  have been misremembering or relying on something by counsel.

19          And instead what we have is her statement in her

20  declaration simply saying, as she did in her unsuccessful

21  opposition to this motion to compel, "I was speculating.  I

22  wasn't remembering."

23          We're entitled to go behind that to -- to challenge

24  the assertion that she has made that what she was saying in

25  her original posting was based on a misunderstanding of

1   something counsel --

2             **THE COURT:**  Okay.  But --

3         **MR. KLAUS:**  -- had told her.

4             **THE COURT:**  -- but -- but I -- I'm not -- I'm not

5   clear on a basic point here, and maybe I'm just not picking it

6   up.  That she made this assertion on June 11th, 2007.  So

7   certainly it's fair game for communications between her and

8   her lawyers up to June 11th, 2007.  I -- I've got you on that

9   one.  But after that, what's the relevance?

10         **MR. KLAUS:**  The deposition testimony, Your Honor.

11  What she said at deposition when we said, "What does this

12  mean?  Why did you say this?"

13             She said, "I may have been -- I may have been

14  relying on that something that counsel had told me."

15             **THE COURT:**  Well, that would have had to have been

16  something before June 11th, 2007.

17         **MR. KLAUS:**  No.  It could have been -- it -- as --

18  as -- as -- this is not disputed by the EFF, Your Honor.  It's

19  conceded in their opposition.  In fact, it was conceded in Mr.

20  Kwun's letter, which is -- if you look at Plaintiff's

21  opposition at pages 16 through 17, they admit that, "There may

22  be a category of documents between the June 12th, 2007,

23  statement and the deposition that she could have been relying

24  on."

25             But what they say is, "The reason we know there are

1  no such documents is because Plaintiff has now told us she was

2  just speculating at the deposition."

3          **THE COURT:**  Well, I still don't understand you -- if

4  you -- if you want to test where she got that point of view as

5  of June 11th, 2007, information that she got from her

6  attorneys afterwards doesn't test that point of view.

7          **MR. KLAUS:**  I want to test the assertion that she

8  made at her deposition.  That the -- the point she made at her

9  deposition was she tried to explain it away by saying, "I may

10 have been misremembering something that I was told by

11 counsel."  If there were -- if --

12         **THE COURT:**  Before June 11th, 2007.

13         **MR. KLAUS:**  No.  If there were no commune -- they

14 told us there were no communications with her before June

15 11th, 2007.  So she necessarily would have had to have been

16 talking about some other communication between June 2007 and

17 the deposition.

18         And the reason that that's important, Your Honor, is

19 that this is a -- this is -- this is a -- this is a bad

20 admission from -- from their perspective.  They don't like

21 this admission.  Their client doesn't like the admission.

22         To have somebody who has come into federal court and

23 to have said, "My case is a self-evident fair use and anyone

24 would know it" -- for her to be confronted with her statement

25 saying, "Mine's not a fair use case at all."  And what she

1  tried to do was to explain that away, based on her

2  communications with counsel on the subject.

3         And what Judge Fogel said is, "You cannot come in

4  and try to explain away your statement by citing your

5  communications with counsel and then refuse to produce those."

6         **THE COURT:**  What do you say?

7         **MS. COHN:**  Your Honor, we have produced all the

8  documents that exist with regard to how we came to the

9  conclusion that she engaged in a fair use, and the -- the

10 corresponding one about infringement.  We've produced all the

11 documents about how we came to that conclusion.

12        I mean, I think Universal just doesn't want to admit

13 that what Stephanie Lenz is saying now might be true, which is

14 at her deposition she was speculating.  There is no

15 communication -- I mean, were there a communication -- so I

16 guess I should be clear about this.

17        We agreed -- we thought that the right way to read

18 this was to look at any -- any -- any communication between

19 counsel and Ms. Lenz prior to when she said, "Mine's not a

20 fair use case at all."  I mean, I have a theory for why she

21 said that because the case was brought under Section 512.

22 It's not brought under the Fair Use Doctrine.

23        But in any event, that's not what Stephanie Lenz

24 think -- thought -- said, and that's not her testimony.  I --

25 I mean, I -- I think I know why she said what she said.  It

1  doesn't have anything to do with whether a use is a fair use.

2          But in any event, we produced all the documents

3  prior to when she said the statement.  We -- we already

4  produced that.  And we thought well, let's see if we can even

5  go over and above and try to make Universal happy.  Let's see

6  if we can actually go above that, and let's speculate that at

7  her deposition she wasn't remembering something that happened

8  before she said it.  She was misremembering something that --

9  there might have been some other discussion about whether this

10  was a fair use or not, between when she said it and her

11  deposition and she's just putting the time wrong.  We'll

12  produce that too.

13          Well, we looked.  There wasn't anything, but --

14  which is why she testifies that she was speculating.  There

15  wasn't anything that she was misremembering something that she

16  was told by counsel at a time other than before June 12th and

17  that's what she was referring to in her deposition.  That she

18  got the date -- time wrong.

19          But that was our effort to trying to over and above

20  what we thought the scope of the order was, in order to try to

21  get this done so we can get to trial, which is set for May

22  9th, and get through this and have the waiver issue be done.

23          And this is another example of Universal never being

24  -- always ex -- trying to expand this beyond what it -- what

25  really your mind can even comprehend is reasonable here.  What

```
1    --

2         THE COURT:  So you didn't find any documents --

3         MS. COHN:  We didn't.

4         THE COURT:   -- or communications?

5         MS. COHN:  No.  Because we didn't ever revisit.  And

6    this is in Stephanie Lenz's declarations and it's in Ms.

7    McSherry's declaration.

8         THE COURT:  But did you look through your -- your --

9    your electronically stored information?  You, meaning --

10        MS. COHN:  Counsel's?

11        THE COURT:   -- the lawyers?

12        MS. COHN:  Well, Your Honor, I mean that kind of

13   gets to the other question.  Ms. Lenz kept all of her -- all

14   of her correspondence with her counsel.

15        THE COURT:  Okay.  We'll get to that in a minute.

16   So the answer would be no.  You looked through her -- her

17   information?

18        MS. COHN:  Yes.  But we did a spot-check on counsel,

19   and there wasn't anything that was missing from her -- from

20   her collection.  There -- her collection is complete.  There's

21   nothing in her collection -- and -- because we didn't revisit

22   the question.  This is, obviously -- her use is obviously a

23   fair use.  It's her child dancing the kitchen with a barely

24   audible song in the last --

25        THE COURT:  You don't have --
```

1      **MS. COHN**:  -- in the background.

2      **THE COURT**:  -- to convince me about the fair use.

3  It's not my case.

4      **MS. COHN**:  Well, I'm just saying, Your Honor, that

5  the -- what Universal is trying to do is create a lot of dust

6  around the idea that reasonable people might have differed

7  about whether this is a fair use or not, based upon something

8  that Stephanie Lenz said in her blog, and what -- what -- in a

9  -- in response to a comment on her blog.

10      And what -- what Judge Trumbull and Judge Fogel says

11  is they're entitled to look at the specific context of these

12  specific factual statements, and I think the right reading of

13  that is any communications with her counsel before she said

14  it.

15      We tried to go over and above that to -- to try to

16  deal with what happened between the deposition -- you know,

17  what -- try to figure out why she said that at her deposition

18  because it didn't make any sense, and what we found was there

19  was nothing there.  But all of the documents that relate to

20  how we came to the con -- she and her lawyers came to a

21  conclusion that this is a fair use, and also on the

22  infringement, we have produced.

23      And we know that this is what Universal was seeking

24  at the time, and the reason we know it is because that's what

25  they put in their proposed order.  Their proposed order --

1      **THE COURT:**  Okay.

2      **MS. COHN:**  -- sought a waiver.

3      **THE COURT:**  I'm familiar with that proposed order.

4  That's enough on that.  Thank you.

5      Let's talk about the adequacy --

6      **MR. KLAUS:**  Your Honor -- Your Honor, I apologize

7  for interrupting.  May I just -- there's one point that Ms.

8  Cohn made that I have to correct, which is Ms. Cohn just

9  represented to Your Honor that there was an actual search of

10  files that was done for any documents between June 2007 and

11  September of 2009 --

12      **THE COURT:**  In -- in -- in the Plaintiff's

13  documents.  Yes.

14      **MR. KLAUS:**  In the Plaintiff's documents, yes.

15  There's no statement anywhere in the record that shows that

16  that happened.

17      Mr. Kwun's letter -- and I -- this is -- this is --

18  this is at my Declaration Exhibit 18, page six.

19      When he's talking about this category, whether there

20  are these other communications, he doesn't say, "We searched

21  and we didn't find any."  What he said is, "We asked our

22  client whether in her -- in her testimony and deposition she

23  was thinking of some communications with counsel that might

24  have been the basis."

25      **THE COURT:**  Well --

1    **MR. KLAUS:** If she was, we would consider producing

2  those communications.  She told us she wasn't thinking about

3  any such communications."

4    **THE COURT:** So Ms. Cohn, are you representing that

5  the Plaintiff did go through all of her documents and

6  electronically stored information post-June 11, 2007, up --

7  and up to the deposition with this question in mind?

8    **MS. COHN:** Your Honor, let me check with my co-

9  counsel because I want to make sure that I -- I mean, I

10  believe that we have produced all documents about how we came

11  to the conclusion that her use wasn't a fair use.

12    **THE COURT:** Did you --

13    **MS. COHN:** I think he's framing this slightly

14  differently, and I want to make sure that I'm correct.

15    So they say that he is right.  That we discussed

16  this possibility with Mr. -- with Mr. Klaus, but that that

17  wasn't it.  That -- that there -- there wasn't a separate

18  search done on the question of whether after June 12th, 2007,

19  there was some discussion related to fair use that Ms. Lenz

20  misremembered at her deposition.  We did ask Ms. Lenz --

21    **THE COURT:** Okay.

22    **MS. COHN:** -- again.

23    **THE COURT:** Can we move on?

24    **MS. COHN:** Uh-huh.

25    **THE COURT:** Adequacy of the search for documents.

1   The Plaintiff only looked at her own documents.

2          Now, did the Plaintiff actually conduct that search

3   of her electronically stored information or did --

4          **MS. COHN:**  No, Your Honor.

5          **THE COURT:**  -- the lawyers do it for her?

6          **MS. COHN:**  They're Gmail accounts, and we have her

7   passwords.  We have full access to -- she has two Gmail

8   accounts.  We have full access to them.  Counsel did all the

9   searches.

10          **THE COURT:**  Okay.  But you didn't look at any of her

11   attorneys' electronically stored information.  And you say,

12   "Well, it's the same as the Plaintiff's.  The Plaintiff kept a

13   complete record."

14          Mr. Klaus cites some particular email that the

15   Plaintiff herself had referenced in her blog that currently

16   was not on the privilege log and also wasn't produced.

17          Is that -- that right, Mr. Klaus?

18          **MS. COHN:**  Well, it was produced.  It was produced

19   after he drew our attention --

20          **THE COURT:**  Well, okay.

21          **MS. COHN:**  -- to the fact --

22          **THE COURT:**  Well, that's the same --

23          **MS. COHN:**  -- that we'd made an error --

24          **THE COURT:**  -- as not being --

25          **MS. COHN:**  -- in our privilege log.

1      **THE COURT:**  -- produced.  I mean --

2      **MR. KLAUS:**  That's one.  There are three others that

3  we introduced in my were -- in my -- with my supplemental

4  reply declaration, Your Honor.  They're Exhibits 21, 22 and

5  23.  They're not anywhere on the privilege log, so we don't

6  know where those documents came from.

7      It looks like what happened here is that in the

8  initial production they didn't produce one of the very

9  documents that was discussed in the order as the basis for the

10 waiver.

11     **THE COURT:**  Well, that's what I --

12     **MR. KLAUS:**  And we --

13     **THE COURT:**  -- I've read in the --

14     **MR. KLAUS:**  And that --

15     **THE COURT:**  (Inaudible - - due to simultaneous

16 colloquy.)

17     **MR. KLAUS:**  And that doc -- and the -- there is a --

18 the document that they produced that was on the privilege log

19 that apparently was stored in -- in Stephanie Lenz's Gmail

20 account is the document that's at Exhibit 24 to my

21 supplemental declaration.

22     That's where she's forwarding the notice from

23 YouTube and the copy of the video.  That's the last item on

24 their privilege log, item number 72.  Sorry for all the

25 numbers.  This comes from my Supplemental Declaration Exhibit

1   20.  But then there were Exhibits 21, 22 and 23, which are

2   other emails that she's having with Mr. Esguerra, who's one of

3   Ms. Cohn's colleagues at the EFF, about this matter that were

4   nowhere on the privilege log.

5         And what Ms. Lenz said -- Ms. Lenz does not say, "I

6   retained all of my emails."  That's what we were told during

7   the lead-up to a lot of this was that she, in fact, had

8   retained.  What she instead says is, "It was my practice to

9   retain," but that doesn't mean that she retained everything.

10        And if these three documents came from EFF's files,

11  as opposed to Ms. Lenz's files, which would explain why they

12  weren't on the privilege log, then that would -- that would

13  indicate right off the bat the inadequacy of just searching

14  her own files as opposed to the lawyers' files.

15        **THE COURT**:  And Ms. Cohn?

16        **MS. COHN**:  Yeah.  They didn't -- the documents are

17  all in Ms. Lenz's Gmail account.  We had a problem with the

18  privilege log.  Some of this has to do with emails chained

19  together, and the privilege log was improper.  And the minute

20  he drew it to our attention, we turned it over.

21        But there wasn't a problem it -- with Stephanie

22  Lenz's actual keeping of all of her counsel -- communications

23  with counsel.  The problem was when counsel put the privilege

24  log together, and you know, we corrected that.  Mistakes

25  happen, and we were sorry about that.

1          But that doesn't mean that we need to do duplicative

2     searches over the nine attorneys who have been handling this

3     case pro bono over three and a half years.  That would be

4     duplicative, and I think that would be a problem under the

5     Federal Rules of Procedure.

6          And again, this is another issue that -- that --

7     that came up now -- has come up now on contempt, didn't come

8     up before.  They didn't talk about the need for duplicative

9     searches in front of Judge Trumbull.  They didn't talk about

10    the need for duplicative searches under Judge Fogel.  Neither

11    of those --

12          **THE COURT:**  Well, they weren't -- they weren't --

13          **MS. COHN:**  -- Courts were asked.

14          **THE COURT:**  -- they weren't suspicious at that point

15    they're saying.  They didn't know you weren't going to turn

16    over some documents that prove they exist.

17          **MS. COHN:**  Well, Your Honor, the -- the problem

18    wasn't -- was with counsel in creating the privilege log.  The

19    problem was not in Ms. Lenz's keeping of the documents.  I --

20    I would represent to the Court.  That was the problem, and we

21    corrected it as soon as it was brought to our attention.

22          But requiring duplicative searches -- I mean, the

23    Fogel Firm doesn't even exist any -- Fogel -- the -- excuse me

24    -- the Folger and Levin Firm doesn't exist anymore.

25          **THE COURT:**  Where did they go?

1    **MS. COHN:**  You know, I think they got scattered, and

2    I'm not sure where everybody went --

3            **THE COURT:**  Okay.

4            **MS. COHN:**  -- but the firm doesn't exist anymore.

5            **THE COURT:**  I didn't know that.

6            **MS. COHN:**  You know, it happened to a lot of firms

7    in the last couple of years.

8            So the need to do -- you know, the -- the -- the

9    request to do duplicative searches, frankly, appears punitive

10   on -- on the behalf of Universal, and we don't think it's

11   needed.  Ms. Lenz is -- has it.

12           And we did a spot-check.  We had Ms. McSherry, who

13   was the main contact with Ms. Lenz, double-check her emails

14   and see if there was anything missing, and we didn't find

15   anything missing.  Her -- I mean, Ms. Lenz did her job.

16           **THE COURT:**  Yeah.  Well, what do you mean --

17           **MS. COHN:**  She kept all her --

18           **THE COURT:**  -- there was a problem in the creation

19   of the privilege log?  I mean, that's sort of vague.

20           **MS. COHN:**  Well, my understanding --

21           **THE COURT:**  You want -- you want to explain that

22   question (inaudible)?

23           **MS. COHN:**  Sure.  My -- my understanding of this is

24   that the -- the early communications with EFF were not with an

25   EFF lawyer.  They were with our intake coordinator, our non-

1   lawyer by the name of Richard Esguerra.

2          And I think when the privilege log was being

3   created, the -- the -- the searches were being done for

4   communications with counsel, and we had identified the lawyers

5   who had talked to her.  And the log just is incomplete with

6   regard to some of the early communications.

7          We actually did get one of them.  There is -- there

8   are emails with Mr. Esguerra on the log.  We didn't miss all

9   of them, but I think that's where the problem came up.

10         **THE COURT**:  Well, if -- if -- if there's some with

11  him, then you cannot explain the problem as the fact that he

12  wasn't a lawyer.

13         **MS. COHN**:  Yes, Your Honor.  I don't have a full

14  explanation for this from -- for -- for how this error came

15  up.  I really don't.  I can tell you for sure that the error

16  wasn't that Stephanie Lenz didn't keep the communications.

17  The error was in the creation log.

18         And it's true that we got a -- an early -- we did

19  get one of the early emails with Mr. Esguerra.  We just didn't

20  get a couple of the others.

21         **THE COURT**:  Okay.  What's your view behind this?

22         **MR. KLAUS**:  Okay.  So just a couple of things.  One

23  is we don't have -- what we're being told is, "We just don't

24  know why they weren't on there."  I don't think -- I don't

25  think that's a satisfactory explanation, so far as it goes.

1          But the second thing, Your Honor, is with -- with

2    respect to the idea of there being nine lawyers, multiple

3    lawyers, etcetera, they haven't -- when -- when Ms. Cohn says

4    that Ms. McSherry did a "spot-check" we don't know what that

5    spot-check consisted of.

6          What Ms. McSherry will say in her declaration is

7    that, "I -- I did some sort of a search that wasn't the type

8    of search I would have to do if I was responding to a court

9    order."

10          Now, if there's an issue about the -- the -- the

11    Folger and Levin Firm not having emails, or they're not being

12    around, well, there's not much we can do about that, but there

13    is EFF.

14          They haven't had -- I don't know how many of the --

15    the multiple lawyers who were on this case have communicated

16    with her repeatedly throughout the case.  It would seem to me

17    they could do a -- they could do a reasonable, diligent search

18    for responsive documents within the files of at least the main

19    lawyers at EFF and the main lawyers at Keker who have been on

20    this case for years.

21          These is not -- while there have been a number of

22    communications, this isn't in the context of this case and the

23    context of -- of what's been done -- in the context of the

24    resistance that we've gotten to this motion, to previous

25    motions where -- where their client has waived the privilege.

1   It's not too much to ask them to do a search for responsive

2   documents.

3           That's one part.  That deals with just the emails

4   that were actually -- the communications that were actually

5   exchanged between the two of them.

6           There's a second issue, which is one of the things

7   that Ms. Cohn has said here this morning is that they realized

8   early on that they had a -- she wouldn't -- she didn't use

9   this words -- but a "problem" with respect to their client

10  waiving the privilege.

11          And so there was a -- we think -- a deliberate

12  effort not to communicate with their client in writing, for

13  fear that that would be sent out or disclosed to her friend,

14  her mother, a reporter, posted on her blog, who knows who, and

15  so there were numerous oral communications between the two

16  back and forth.

17          What they've said is, "It's unreasonable for you to

18  ask us to get those because every one of our doc -- every one

19  of our internal documents that memorializes anything that

20  we've said to Stephanie Lenz back and forth."

21          That necessarily is *Hickman Versus Taylor* opinion

22  work product because, Your Honor, what they say is, "She will

23  be a trial witness, and therefore, any reporting of any

24  conversation with her on any subject is a witness -- is akin

25  to a witness interview memo that reveals our mental

1   impressions," and that just can't be right.

2           If, as they have said, the reason for a paucity of

3   actual communications reported in electronic form between the

4   two of them is that they stopped talking -- they stopped

5   having basic conversations with her by email and talked with

6   her by phone, then that is just all the more reason to show

7   our substantial need to get what would be, at most, fact work

8   product under the Federal Rules.

9           **THE COURT:**  Your turn.

10          **MS. COHN:**  Your Honor, I -- Mr. Kel -- Mr. Klaus has

11  a -- quite an imagination.  We did not realize early on in

12  this case that there was a waiver problem.  I was trying to

13  make a joke about the fact that our client has now been caught

14  with three waivers in 2007.

15          This -- this is not a situation in which we made a

16  conscious effort to try to hide the ball by communicating

17  orally.  There's nothing wrong with communicating orally with

18  your client.

19          The problem is that they're now trying to, once

20  again -- the Work Product Doctrine is a different doctrine

21  than the Attorney-Client Privilege Doctrine.  It's a

22  completely different doctrine.  It has very different

23  standards.

24          This is, again, Universal trying to take an inch and

25  turn it into a mile.  There -- that -- that doctrine wasn't

1    discussed by them below.  They didn't ask for work product

2    below.  They weren't -- this wasn't considered by the Court.

3    It's not in either of the orders, and that's because they

4    wouldn't -- well, I don't know why it is.  I think it's

5    because as soon as they get something they try to expand it,

6    but work product just isn't at issue here.  It wasn't ordered

7    by --

8              **THE COURT:**  Okay.

9              **MS. COHN:**  -- Judge Trumbull.

10             **THE COURT:**  Thank you.  You made your point.  Last

11   word.

12             **MR. KLAUS:**  I think -- nothing further on the issue,

13   Your Honor.

14             I think -- I think it -- it's -- it's -- it -- it's

15   not -- it's not a burden for them to search.  They won't --

16   they won't even attempt to search.  And the undisputed fact,

17   really is, it's not been denied.  They didn't have very many

18   electronic communications.  So if there are communications

19   that they actually had that are fact that don't reveal any

20   mental impressions of the lawyers that just says, "I told you

21   the X, Y or Z," we should be entitled to have those, Your

22   Honor, so that what we don't get is when we take the court-

23   ordered deposition of Ms. Lenz on these -- on these waived

24   subjects, she will just come in and say over and over again,

25   "I don't know; I don't remember."

1    **THE COURT:**  Well, that might be the truth, I

2   suppose.  Okay.  Is the matter submitted?

3    **MS. COHN:**  It is.

4    **MR. KLAUS:**  I believe the -- the matter is

5   submitted, Your Honor.

6    **MS. COHN:**  Thank you.

7    **THE COURT:**  Thank you.

8    (Proceedings adjourned at 10:57 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                    **CERTIFICATE OF TRANSCRIBER**

5

6          I certify that the foregoing is a true and correct

7    transcript, to the best of my ability, of the above pages of

8    the official electronic sound recording provided to me by the

9    U. S. District Court, Northern District of California, of the

10   proceedings taken on the date and time previously stated in

11   the above matter.

12          I further certify that I am neither counsel for,

13   related to, nor employed by any of the parties to the action

14   in which this hearing was taken; and, further, that I am not

15   financially nor otherwise interested in the outcome of the

16   action.

17

18   _____   2/17/11

19          Signature of Transcriber      Date

20

21

22

23

24

25