ELECTRONIC FRONTIER FOUNDATION
CINDY COHN – #145997
cindy@eff.org
CORYNNE MCSHERRY – #221504
corynne@eff.org
KURT OPSAHL – #191303
kurt@eff.org
JULIE SAMUELS – *pro hac vice*
julie@eff.org
454 Shotwell Street
San Francisco, CA  94110
Telephone:     (415) 436-9333
Facsimile:     (415) 436-9993

KEKER & VAN NEST LLP
ASHOK RAMANI - # 200020
aramani@kvn.com
MICHAEL S. KWUN - # 198945
mkwun@kvn.com
MELISSA J. MIKSCH - # 249805
mmiksch@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     (415) 391 5400
Facsimile:     (415) 397 7188

Attorneys for Plaintiff
STEPHANIE LENZ

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| STEPHANIE LENZ,<br><br>        Plaintiff,<br><br>    v.<br><br>UNIVERSAL MUSIC CORP.,<br>UNIVERSAL MUSIC PUBLISHING, INC.<br>and UNIVERSAL MUSIC PUBLISHING<br>GROUP,<br><br>        Defendants. | Case No. C-07-03783-JF (HRL)<br><br>**PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT**<br><br>Date:      October 17, 2012<br>Time:     10:00 a.m.<br>Courtroom: 3, 5th Floor<br>Judge:    The Hon. Jeremy Fogel<br><br>**REDACTED** |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................1

II.   STATEMENT OF UNDISPUTED FACTS ........................................................................2

III.   LEGAL STANDARD...........................................................................................................6

IV.   ARGUMENT .........................................................................................................................7

    A.   Universal did not believe in good faith that the Video was infringing...................8

        1.   ████████████████████████ ..................................8

        2.   ██████████████████████████ .............................8

        3.   ██████████████████████████ .............................9

        4.   ███████████████████████████████ .............10

    B.   The Video is a fair use. ..........................................................................................13

    C.   At a minimum, Universal was willfully blind to whether the Video was a fair use...................................................................................................................18

        1.   Universal did not form the required good faith belief because it rendered itself willful blind to whether *any* given use was authorized by law. .................................................................................18

        2.   Universal's takedown practices ensured it would be blind to noninfringing fair uses, as it was in this case...........................................20

    D.   Universal sent the takedown pursuant to Section 512(f). .....................................21

    E.   Ms. Lenz was damaged by Universal's improper takedown. ...............................22

V.   CONCLUSION.....................................................................................................................24

678535.01

# TABLE OF AUTHORITIES

**Page(s)**

<u>Federal Cases</u>

*A&M Records, Inc. v. Napster, Inc.*
239 F.3d. 1004 (9th Cir. 2001) .................................................................................. 14

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986)..................................................................................................... 6

*Blanch v. Koons*
467 F.3d 244 (2d Cir. 2006)....................................................................................... 14

*by Flexible Lifeline Sys. V. Precision Lift, Inc.*
654 F.3d 989 (9th Cir. 2011) ..................................................................................... 16

*by Salinger v. Colting*
607 F.3d 68 (2d. Cir. 2010) ....................................................................................... 12

*Campbell v. Acuff-Rose Music, Inc.*
510 U.S. 569 (1994)..................................................................... 9, 12, 13, 14, 16

*Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc.*
150 F.3d 132 (2d Cir. 1998) ................................................................................ 14, 17

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986).................................................................................................... 6

*Dolman v. Agee*
157 F.3d 708 (9th Cir. 1998) ..................................................................................... 18

*Elvis Presley Enters., Inc. v. Passport Video*
349 F.3d 622 (9th Cir. 2003) ..................................................................................... 16

*Fisher v. Dees*
794 F.2d 432 (9th Cir. 1986) ................................................................................. 9, 16

*Gertz v. Welch*
680 F.2d 527 (7th Cir. 1982) ..................................................................................... 19

*Harper & Row Publishers, Inc. v. Nation Enters.*
471 U.S. 539 (1985)............................................................................................. 15, 16

*Harte-Hanks v. Connaughton*
491 U.S. 657 (1989)................................................................................................... 19

*Hunt v. Liberty Lobby*
720 F.2d 631 (11th Cir 1983) .................................................................................... 19

*In re Aimster Copyright Litig.*
334 F.3d 643 (7th Cir. 2003) ..................................................................................... 18

ii

678535.01

*Kane v. Comedy Partners*
   No. 00 Civ. 158 (GBD), 2003 WL 22383387 (S.D.N.Y. Oct. 16, 2003) ............................... 17

*Kelly v. Arriba Soft Corp.*
   336 F.3d 811 (9th Cir. 2003) ........................................................................... 14, 15

*Kramer v. Thomas*
   No. CV 05-8381 AG, 2006 WL 4729242 (C.D. Cal. Sept. 28, 2006) .............................. 17, 18

*L.A. News Serv. v. Reuters Television Int'l, Ltd.*
   149 F.3d 987 (9th Cir. 1998) ........................................................................... 11, 14

*Lennon v. Premise Media*
   556 F. Supp. 2d 310 (S.D.N.Y. 2008) ................................................................... 12, 15

*Lenz v. Universal Music Corp.*
   572 F. Supp. 2d 1150 (N.D. Cal. 2008) ................................................................... 1, 7

*Masson v. New Yorker*
   960 F.2d 896 (9th Cir. 1992) ............................................................................... 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
   475 U.S. 574 (1986) .......................................................................................... 6

*Mattel, Inc. v. Walking Mountain Prods.*
   353 F.3d 792 (9th Cir. 2003) ...................................................................... 9, 14, 16, 17

*New York Times Co. v. Sullivan*
   376 U.S. 254 (1964) ......................................................................................... 19

*Online Policy Grp. v. Diebold, Inc.*
   337 F. Supp. 2d 1195 (N.D. Cal. 2004) ................................................................. 7, 21

*Ouellette v. Viacom Int'l, Inc.*
   2012 WL 1435703 (D. Mont. April 25, 2012) .............................................................. 7

*Phelps-Roper v. City of Manchester, Mo.*
   738 F. Supp. 2d 947 (E.D. Mo. Sept. 8, 2010) ........................................................... 23

*Princeton Univ. Press v. Mich. Document Servs., Inc.*
   99 F.3d 1381 (6th Cir. 1996) ............................................................................... 17

*Ringgold v. Black Entm't Television, Inc.*
   126 F.3d 70 (2d Cir. 1997) .................................................................................. 9

*Rossi v. Motion Picture Ass'n of America*
   391 F.3d 1000 (9th. Cir. 2004) .............................................................................. 7

*Shropshire v. Canning*
   809 F. Supp. 2d 1139 (N.D. Cal 2011) ...................................................................... 7

*St. Amant v. Thompson*
   390 U.S. 727 (1968) ......................................................................................... 19

iii

678535.01

*U.S v. Real Property at 2659 Roundhill Dr., Alamo, Cal.*
 194 F.3d 1020 (9th Cir. 1999) ................................................................................ 18

*Viacom Intern., Inc. v. YouTube, Inc.*
 676 F.3d 19 (2d Cir. 2012)................................................................................ 19, 21

*Wright v. Warner Books, Inc.*
 953 F.2d 731 (2d Cir. 1991)...................................................................................... 17

*Yniguez v. Arizonans for Official English*
 69 F.3d 920 (9th Cir.1995) (*en banc*), vacated on other grounds, 520 U.S. 43
 (1997) ..................................................................................................................... 22

**Federal Statutes**

17 U.S.C. § 107 ......................................................................................................... 9, 13

17 U.S.C. § 512 .............................................................................................. 6, 7, 19, 21, 22

17 U.S.C. § 512(c)(1) & (k)(1)(B) ................................................................................ 21

17 U.S.C. § 512(c)(3) ...................................................................................................... 5

17 U.S.C. § 512(c)(3)(A) ................................................................................................ 21

17 U.S.C. § 512(f) .................................................................................................... *passim*

17 U.S.C. § 512(g) ........................................................................................................... 6

**Federal Rules**

Fed. R. Civ. P. 56(a)(2)................................................................................................... 6

**State Rules**

Rule 30(b)(6)............................................................................................................ 8, 11

**State Regulations**

34 Pa. Code § 231.101(2) ............................................................................................. 23

Sen. Rep. No. 105-190.................................................................................................. 20

**Other Authorities**

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05[A][4]
 (2005)...................................................................................................................... 17

PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT – FILED UNDER SEAL
CASE NO. C 07-03783-JF

678535.01

**NOTICE OF RENEWED MOTION AND STATEMENT OF RELIEF SOUGHT:**

PLEASE TAKE NOTICE that on October 17, 2012, at 10:00 a.m., or at such other time as the Court may direct, before the Honorable Jeremy Fogel, United States District Court, 280 South First Street, San Jose, California, 95113, Plaintiff Stephanie Lenz will, and hereby does, move the Court for entry of summary judgment.

This Renewed Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities below, the Declarations of Stephanie Lenz, Marcia Hofmann and Melissa Miksch (Volumes I-III) that are being filed herewith, and such other and further papers, evidence and argument as may be submitted to the Court in connection with the hearing on this motion.

678535.01

## I.      INTRODUCTION AND SUMMARY OF ARGUMENT

Every day, parents take pictures and make videos of their kids doing all sorts of things. Many of those pictures and videos incorporate copyrighted works in myriad ways—a child may be wearing a t-shirt with a copyrighted character on it, or she may be standing in front of a copyrighted sculpture, or there may be copyrighted music playing in the background.  This activity doesn't make the parents of America copyright scofflaws—even if the copyrighted work is, in some sense, the "focus" of the picture or video.  For example, sending a picture of someone in a (copyrighted) Disney t-shirt with the note, "My son went to Disneyland and all I got was this Mickey Mouse t-shirt," does not violate copyright law.  And everyone versed in copyright law (such as a major music publisher) knows *why*:  because these examples are fair uses.

To come to that conclusion, however, a person must perform one simple task:  consider whether the fair use doctrine applies.  *See Lenz v. Universal Music Corp.,* 572 F. Supp. 2d 1150, 1154-55 (N.D. Cal. 2008).  This is exactly what Universal[1] failed to do when it looked at the blurry 29-second home video at issue in this case (the "Video"). ████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████     *See id.* at 1154 ("[T]he plain meaning of 'authorized by law' is unambiguous. . . .  [F]air use is a lawful use of a copyright.").

This is precisely the type of improper practice that Congress meant to deter when it enacted Section 512(f) of the Digital Millennium Copyright Act ("DMCA").  Congress knew that Section 512's expedited "notice and takedown" provisions could be abused to take down lawful uses of copyrighted works, chilling free speech online.  In order to curb such abuse, Congress included an important deterrent, Section 512(f), which allows lawful users to hold copyright

---

[1] "Universal" is used herein to refer collectively to the defendants in this case, Universal Music Corporation, Universal Music Publishing, Inc., and Universal Music Publishing Group.

678535.01

1   owners accountable if they send takedown notices without a good faith belief that the material in

2   question actually infringes copyright. Ms. Lenz brought this lawsuit in order to do just that: hold

3   Universal accountable for a highly improper takedown of her 29-second home video.

4          Faced with this Court's ruling that the DMCA requires a fair use consideration, *id.* at

5   1154-55, Universal has done its best to try to recast its takedown practices as incorporating that

6   consideration. But it cannot avoid the undisputed facts. If Sean Johnson, the only Universal

7   employee who actually reviewed the Video prior to the takedown, ██████████████████

8   ████████ he could not helped but to have realized, based solely on looking at the Video, that

9   Ms. Lenz's use of the Prince song was a classic example of a non-infringing fair use. But

10  Mr. Johnson could not come to that realization because ████████████████████████

11  █████████████████████████ Indeed, Mr. Johnson's supervisor testified that

12  █████████████████████████████████████████ even though he was

13  acting as a copyright enforcement agent on behalf of a major record label well-versed in

14  copyright law.

15         Simply put, there is no genuine issue of material fact that Universal did not form *and*

16  *could not have formed* the requisite good faith belief that the Video was infringing prior to

17  sending the takedown notice. Universal is liable under Section 512(f) of the DMCA.

18         **II.    STATEMENT OF UNDISPUTED FACTS**

19         Plaintiff Stephanie Lenz is a mother, wife, writer and editor. Declaration of Stephanie

20  Lenz ("Lenz Decl.") ¶ 2. She and her husband have two children. *Id.* In early February 2007,

21  Ms. Lenz's children were playing in the family's kitchen and listening to a Prince CD. *Id.* ¶ 3.

22  Ms. Lenz had recently noticed that her youngest child, who was still learning to walk at the time

23  and using a push-toy, would pause with his toy in front of the CD player and "dance," particularly

24  if he heard her say the word "music." *Id.* Using her digital camera, Ms. Lenz decided to capture

25  the moment on film, especially her son's "dance." *Id.* Turning on her camera, and prompting her

26  son by asking him what he thought of the "music," she created a 29-second video recording of the

27

28

678535.01

children's activities. *Id.*; Exh.[2] A (electronic video file, Depo. Exh. 2)[3]; Exh. B (Lenz Depo.) at 40:15–25 (authenticating). The Video bears all the hallmarks of a family home movie—it is somewhat blurry, the sound quality is poor, and it focuses on documenting the child's "dance moves" in a kitchen, against a background of normal household activity, commotion and laughter. *See* Exh. A. Due to the noise and commotion made by the children, the song "Let's Go Crazy" can only be heard in the background for approximately 20 seconds of the 29-second Video and even then not all that clearly. *See id.*

Ms. Lenz's son was just learning to walk when Ms. Lenz made the Video. Lenz Decl. ¶ 3. Ms. Lenz thought her mother, who lives across the country in California, would enjoy seeing her son's new ability to dance as well. *Id.* ¶ 4. Ms. Lenz's mother had told her she had difficulty downloading video files sent via email. *Id.*; Exh. C (Morgan Depo.) at 41:4–42:8, 58:2–61:20; Exh. D (Depo. Exh. 61). In early February 2007, Ms. Lenz uploaded the Video from her computer to the YouTube[4] website for her family and friends to enjoy. Lenz Decl. ¶ 4.

Universal represents Prince and administers various copyrights on his behalf. Exh. Q (Allen Depo.) at 84:15–24, 175:25–176:20 & Exh. U (Depo. Exh. 83). ██████████████

---

[2] Unless otherwise indicated, all citations to Exhibits are to Exhibits to the Declaration of Melissa Miksch (Vol. I-III), submitted herewith. Exhibit A is attached to Volume I of the Miksch Declaration, manually filed herewith. Exhibits B-P are attached to Volume II of the Miksch Declaration, electronically filed herewith. Exhibits Q-AA are attached to Volume III of the Miksch Declaration, submitted herewith along with an administrative motion to seal.

[3] The cited CD-ROM includes a copy of the video file uploaded by Ms. Lenz to YouTube. The video can also be viewed on the YouTube site, at <http://www.youtube.com/watch?v=N1KfJHFWlhQ>; *see also* Exh. E (screen capture of the "view" page for the video on YouTube, taken shortly after this lawsuit was filed and previously submitted by Universal in support of its initial motion to dismiss (*see* 9/21/2007 Declaration of Kelly M. Klaus, Exh. B)).

[4] YouTube, LLC is a Delaware limited liability company with its principal place of business in San Bruno, California, and is a wholly owned subsidiary of Google Inc., a Delaware corporation with its principal place of business in Mountain View, California (collectively "YouTube"). Exh. V (Hubbard Aff.) ¶ 3. YouTube hosts (i.e., provides storage of and access to) videos provided by its users. *Id.* ¶ 4. At their direction (i.e., upon their decision to post their videos to the YouTube system), YouTube stores those videos on its servers, and allows others to access to them according to the choices made by the users posting those videos. *Id.* YouTube has registered a designated agent to receive notification of claimed infringement with the United States Copyright Office. *Id.* ¶ 5.

1   ███████████████████████████████████ Exh. Q (Allen Depo.) at 234:13–235:8.

2   Universal believes ████████████████████████████████

3   ████████████████████████████████████████████████████████

4   ██████████████████ *See id.* at 165:16–166:16; Exh. H at 13:9–15:8 (Universal's Supp.

5   Resp. To Request for Admission Nos. 32 & 33).  Universal also believes that ███████████

6   ████████████████████████████████████████████ Exh. Q (Allen

7   Depo.) at 61:24–63:1. As Universal put it in response to a media inquiry in connection with this

8   case:

9       Prince believes it is wrong for YouTube, or any other user-generated site, to

10      appropriate his music without his consent. . . . *That position has nothing to do

11      with any particular video that uses his songs.* It's simply *a matter of principle.*
        And legally, he has the right to have his music removed.  We support him and this

12      important principle.  That's why, over the last few months, we have asked
        YouTube to remove thousands of different videos that use Prince music without

13      his permission.

14  Exh. I (Exh. F to Second Amended Complaint (Depo. Exh. 110)) (emphasis added); *see also*

15  Exh. J (Lofrumento Depo. at 47:18–49:11) (authenticating).

16      Therefore, Universal's takedown guidelines mandated ████████████████

17  ████████████████████████████ Exh. Q (Allen Depo.) at 62:1–4.  In other

18  words, Universal would send a takedown notice for ████████████████████

19  ████████████████████████████████ *Id.* at 62:8-19.[5]  Indeed, it

20  is Universal's general policy, ████████████████████████████████

21  ████████████████████████████████████████████████████

22  ████████████████████████ *Id.* at 60:15–61:6; *see also* Exhs. X-

23  X (Depo. Exhs. 91, 92, 97).[6] ███████████████████████████████

24  ████████████████████████████ *See* Exh. R (Johnson Depo.) at

25  _____

26  [5] ████████████████████████████████████████████ *See,

27  e.g.,* Exh. Q (Allen Depo.) at 177:9–182:14; Exh. T (Depo. Exh. 85).

28  [6] *See also* Exh. Q (Allen Depo.) at 195:20–196:15, 199:3–16, 240:19–241:4 (authenticating
    exhibits).

678535.01

1    60:7–22.

2    ████████████████████████████████████████████████████████

3    *Id.* at 75:4–76:7.  Mr. Johnson had only a vague understanding of fair use.  *See id.* at 12:12–13:8.

4    ████████████████████████████████████████████████████████

5    ████████████████████████████ *See* Exh. Q (Allen Depo.) at 130:7–131:4; *see also*

6    Exh. H at 17:14–23:7 (Universal's Supp. Resp. to RFA Nos. 41–43).  Alina Moffatt, the attorney

7    who actually sent the notice that led to this case, did not consider whether the Video might be a

8    fair use – indeed, she had never had occasion to consider whether any given use of material was

9    fair in the entire course of her work for Universal.  Exh. F (Moffat Depo.) at 54:17–55:1.

10   ████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████

13   Exh. R (Johnson Depo.) at 35:17–36:1; Exh. S (Depo. Exh. 77).  Less than two hours later, at the

14   direction of her superior, Mr. Allen, Ms. Moffat sent the list to YouTube embodied in the

15   aforementioned notice.  *See* Exh. F (Moffat Depo.) at 14:16–15:25, 17:3–10, 30:25–31:6; Exh. P

16   (Depo. Exh. 70); Exh. S (Depo. Exh. 77).  Neither Ms. Moffat nor Mr. Allen reviewed the Video

17   before Ms. Moffat sent the notice.  Exh. F (Moffat Depo.) at 19:23–25; Exh. Q (Allen Depo.) at

18   26:15–19, 55:15–20.  The sole basis for Ms. Moffat's asserted belief that the listed videos were

19   infringing was that she was instructed to send the notice.  Exh. F (Moffat Depo.) at 22:16–24; *see*

20   *also id.* at 22:25–27:22.  ████████████████████████████████████

21   ████████████████████████ Exh. Q (Allen Depo.) at 57:15–20.

22   ████████████████████████ *Id.* at 60:11–14.

23      Universal sent this notice to the address designated by YouTube for DMCA notices.

24   Exh. V (Hubbard Aff.) ¶¶ 7-11 & Exh. B (to the Hubbard Aff.), intending to cause YouTube to

25   take it down.  Exh. H at 8:23–9:10 (Universal's Supp. Resp. to RFA No. 4).  The notice precisely

26   tracked the language specified for a notice of claimed infringement under Section 512(c)(3) of the

27   DMCA.  On June 4, 2007, YouTube disabled public access to the Video due to the accusation of

28   infringement.  Exh. V (Hubbard Aff.) ¶ 11.  YouTube also sent Ms. Lenz an email notifying her

5

678535.01

1   that it had done so in response to Universal's accusation of copyright infringement, and warning

2   her that repeated incidents of copyright infringement could lead to the deletion of her account and

3   all her videos. Lenz Decl. ¶ 5; Exh. G (Depo. Exh. 9); Exh. B (Lenz Depo.) at 110:3–6

4   (authenticating).

5          On June 7, 2007, Ms. Lenz sent a counternotice that did not comply with all of the

6   particulars of Section 512(g) of the DMCA. Lenz Decl. ¶ 6; Exh. K (Depo. Exh. 11); Exh. B

7   (Lenz Depo.) at 116:10–20 (authenticating). █████████████

8   ████████████████████. Exh. W (Depo. Exh. 72); Exh. F (Moffat

9   Depo.) at 32:13–19. Ms. Moffat reviewed the counternotice and concluded that the use must be

10  infringing because it was unlicensed. *See* Exh. F (Moffat Depo.) at 41:3-25, 45:15–46:6, 46:24–

11  47:8. Ms. Moffat wrote back to YouTube to insist that the Video was infringing and note that the

12  counternotice was invalid because it did not comply with the particulars of Section 512(g). *See*

13  Exh. W (Depo. Exh. 72). With the assistance of counsel, Ms. Lenz then sent YouTube a second

14  DMCA counternotice on June 27, 2007, demanding that the Video be reposted because it did not

15  infringe Universal's copyrights. Lenz Decl. ¶ 7. The Video was restored in mid-July,

16  approximately six weeks after it had been disabled. *Id.* ¶ 8.

### III.   LEGAL STANDARD

18         A court may grant summary judgment when the submissions in the record "show that

19  there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

20  matter of law." Fed. R. Civ. P. 56(a)(2). A "genuine issue" of material fact means that there is

21  sufficient evidence in favor of the non-moving party to allow a jury to return a verdict in its favor.

22  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden is on the non- moving

23  party to designate specific facts showing a genuine issue for trial. *See Celotex Corp. v. Catrett*,

24  477 U.S. 317, 322 (1986). However, a mere "scintilla" of evidence will not suffice to meet that

25  burden. *Anderson*, 477 U.S. at 252. Nor is it enough for the non-moving party to show that there

26  is some "metaphysical doubt as to the material facts," provided that any inferences from the

27  underlying facts are viewed in the light most favorable to the non-moving party. *Matsushita Elec.*

28  *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

678535.01

# IV.   ARGUMENT

Ms. Lenz seeks summary judgment that Universal has violated 17 U.S.C. § 512(f).

Section 512(f) provides,

> Any person who knowingly materially misrepresents under this section . . . that material or activity is infringing . . . shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer . . . who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing . . . .

17 U.S.C. § 512(f ). A party is liable under Section 512(f) if it fails to form a good faith belief that the targeted material is not authorized by the copyright owner or by law prior to making a misrepresentation to the contrary. *See Lenz*, 572 F. Supp. 2d at 1155. "In order for a copyright owner to proceed under the DMCA" with the requisite good faith belief, "the owner must evaluate whether the material makes fair use of the copyright." *Id.* at 1154; *see also Shropshire v. Canning*, 809 F. Supp. 2d 1139, 1148 n.3 (N.D. Cal 2011) (same; citing *Lenz*); *Ouellette v. Viacom Int'l, Inc.*, 2012 WL 1435703, at *2 (D. Mont. April 25, 2012) (same; citing *Lenz*); Order Denying Mot. to Certify Interlocutory Appeal (Dkt. No. 53) at 4.  Assuming a copyright owner *does* make a "determination that a particular use is not fair use," this Court has held that a Section 512(f) plaintiff must show that that determination was made with "subjective bad faith." *See Lenz,* 572 F. Supp. 2d at 1156 (citing *Rossi v. Motion Picture Ass'n of America,* 391 F.3d 1000, 1004 (9th. Cir. 2004)). [7]

As set forth below, Ms. Lenz has made that showing.  The undisputed evidence demonstrates that Universal could not have formed a good faith belief that the Video was infringing because it never did what Section 512(f) requires as a predicate for such a belief: consider, *inter alia*, whether her Video was a fair use and therefore authorized by law. *See Lenz*,

---

[7] As set forth in detail in the briefing on Universal's first motion to dismiss, the parties dispute whether a subjective standard applies solely to the factual basis for the DMCA notice or to the legal basis as well. Lenz contends that *Rossi*, 391 F.3d 1000, sets out an "actual knowledge" standard for belief as to the *facts* regarding the use in question, while this Court's holding in *Online Policy Grp. v. Diebold, Inc.*, 337 F. Supp. 2d 1195 (N.D. Cal. 2004) presents the appropriate and controlling standard for belief as to whether the use is authorized by law. Opp'n to Mot. to Dismiss and Special Mot. to Strike (Dkt No. 21) at 4. Ms. Lenz reserves the right to re-raise this issue on appeal, if necessary.

7

1   572 F. Supp. 2d at 1154-55.  The evidence also demonstrates that any determination Universal

2   may have made as to the legal status of the Video was made with subjective bad faith because

3   Universal willfully blinded itself to facts that would have made clear that her Video was a fair

4   use. Universal has violated Section 512(f), and the Court should therefore grant summary

5   judgment in Ms. Lenz's favor.

6   **A.      Universal did not believe in good faith that the Video was infringing.**

7           Based on its own admissions, it is abundantly clear that Universal made no effort to

8   comply with its obligation to at least consider whether Ms. Lenz's video was authorized by law.

9   Therefore, it cannot have formed a good faith belief to the contrary.



13   Exh. Q (Allen Depo.) at 76:8–11.

15   *Id.* at 76:14–19, 77:12.

16   *Id.* at 77:13–25.

17                                                              Indeed, Mr. Allen claimed not to

18   even know whether a fair use would be one that would be "authorized by law." *Id.* at 18:25–

19   19:18.



28   *Id.* at 61:1–6.                                                              *Id.* at

8

61:22–62:4. ███████████████████████████████████████ whether the use was noncommercial or transformative.[8]  *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578– 579 (1994). ████████████████████████ whether the original work was creative or unpublished. ████████████████████ the amount and substantiality of the use, ██████████████████████████████████████████████████ ███████████████ Exh. Q (Allen Depo.) at 62:14–19. ████████████████ ████████ market harm.  *See also id.* at 64:19–23. ██████████████████████ Instead, ██████████████████████████████████████████ ██████████████.  *Id.* at 56:20–24.  Of course, any number of fair uses might fall within this rubric.  *See, e.g., Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 803 n.8 (9th Cir. 2003) ("[E]ntire verbatim reproductions are justifiable where the purpose of the work differs from the original."); *Fisher v. Dees*, 794 F.2d 432 (9th Cir. 1986) (finding "When Sonny Sniffs Glue," a 29-second parody of "When Sunny Gets Blue" that altered the original lyric line and borrowed six bars of the song, to be noninfringing fair use).

Simply put, ███████████████████████████████████████████ ████████████████████████████████████████ *See, e.g., Ringgold  v. Black Entm't Television, Inc.*, 126 F.3d 70, 75–76 (2d Cir. 1997) ("Though the concept of *de minimis* is useful in insulating trivial types of copying from liability . . . the concept is an inappropriate one to be enlisted in a fair use analysis.").  Forming a good faith belief regarding ███████████ ███████████ is not the same as forming a good faith belief that a video's use of a song is not authorized by law, and thus cannot pass muster under the Section 512(f) standard.

██████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

_____

[8]  The statutory fair use factors are set forth at 17 U.S.C. § 107.

9

678535.01

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████  Exh. R (Johnson Depo.) at 60:17–22.

4 ████████████████████████████████████████████████████

5 █████████████████████████████████████████████

6 ████████████████████████████████████████████████████████

7 ██████████████████████████████████████████

8 ████████████  *Id.* at 62:4-10; 63:3–15.  ████████████████  whether a given

9 use was transformative, noncommercial, or likely to cause market harm. *See id.* at 63:16–17.

10 ████████████████  whether the video maker might have used more or less than necessary to

11 achieve a transformative purpose. *See id.*

12 ██████████████████████████████████████████████

13 ████████████  █████████████████████████████████

14 █████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████

17 *Id.* at 75:16–76:7, 79:7–20.

18 ████████████████████████████████████████████████

19

20 Indeed, Universal finally admitted that Mr. Johnson was never told that a fair use was not

21 infringing (and therefore not an appropriate candidate for takedown), and that he was never

22 instructed to consider nor did he consider whether Ms. Lenz's use was fair. *See* Exh. H at 17:14–

23 23:7 (Universal's Supp. Resp. to RFA Nos. 41–43).        Hoping to soften the effect of its

24 admission, Universal paired it with a half-baked assertion that some of the facts Mr. Johnson

25 supposedly considered *might* bear on fair use, specifically:

26    1.  ████  The facts identified above that ████████████████████

27       ████████████████████████████;

28    2.  *For-Profit Website*: That the Video was posted on YouTube, a for-profit entity;

10

1    3.    *License*: That the use had not been authorized by Prince or Universal;

2    4.    *Significant Work*: That "Let's Go Crazy" is a "significant musical composition"

3          and a popular song.

4  Exh. H at 9:11–11:22 (Universal's Supp. Resp. to RFA No. 16); Exh. L at 6:4–17 (Universal's

5  Supp. Resp. to Interrog. No. 17).

6          Universal's attempt to manufacture a fair use consideration by Mr. Johnson after the fact

7  fails for at least two reasons.  First, ████████████████████████████████████

8  ██████████████████████████████████████████████████████████

9  ███████████████████████████████.  Exh. Q (Allen Depo.) at 76:8-77:25,

10  87:1–89:23.  Second, considering the facts Universal has identified falls far short of a

11  consideration of *fair use*.  Taking each in turn:

12    1.    ██████████████████████████████████████

13          █████████████████████████████████████████

14          ████████████████████████████████████

15          █████████████████████████████████████████

16          ███████████████████████████████Recommendation of the

17          Register of Copyrights in RM 2008-8; Rulemaking on Exemptions from

18          Prohibition on Circumvention of Copyright Prot. Sys. for Access Control Techs.

19          52 (June 11, 2010) (*available at* http://www.copyright.gov/1201/2010/initialed-

20          registers-recommendation-june-11-2010.pdf) ("Rulemaking Report").

21    2.    **For-Profit Website**: YouTube's for-profit nature has no bearing on whether a

22          given video is commercial or noncommercial. "The crux of the profit/non-profit

23          distinction is . . . whether *the user* stands to profit from exploitation of the

24          copyrighted material without paying the customary price." *L.A. News Serv. v.*

25          *Reuters Television Int'l, Ltd.*, 149 F.3d 987, 994 (9th Cir. 1998) (emphasis added)

26          (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562

27          (1985)). Indeed, in 2010 the Register of Copyrights expressly rejected a similar

28          argument.  Opponents of an exemption to the DMCA's prohibition on breaking

11

1    technical protection measures for purposes of making fanvids suggested that

2    videos placed on YouTube were necessarily commercial because YouTube

3    collects advertising revenue. Rejecting the claim, the Register observed that the

4    opponents did not "show why a vidder stands in the shoes of the website rendering

5    the works for purposes of the underlying fair use analysis." Rulemaking Report at

6    39 n.144.

7    3.    **License**: Whether the use is licensed also does not illuminate the question, because

8          (a) if the use is licensed, it is irrelevant whether the use is fair; and (b) if a use is

9          fair, no license is needed.

10   4.    **Significant work**: At best, the "significance" of the song might allude to the fact

11         that "Let's Go Crazy" is a widely published creative work, which is relevant to

12         analysis of the second fair use factor.  That is also true of any number of songs,

13         however, and recognizing that a work is creative cannot substitute for an actual

14         consideration of whether it has been fairly used.  *See generally Campbell*, 510 U.S.

15         at 578 (no single statutory factor determinative).  After all, courts have found uses

16         of any number of significant creative works to be fair, *see, e.g., id* (use of "Pretty

17         Woman" held fair); *Lennon v. Premise Media,* 556 F. Supp. 2d 310, 325 (S.D.N.Y.

18         2008) (use of "Imagine" held fair; wide publication of famous song "weighs a bit

19         in favor of fair use"), *declined to follow on other grounds by Salinger v. Colting*,

20         607 F.3d 68, 77 (2d. Cir. 2010).

21   In sum, a consideration of these facts does not amount to even the most cursory fair use

22   assessment.

23         As for the attorney who actually sent the notice, Alina Moffat, she did not even review the

24   Video, much less attempt to consider whether it was a fair use. Exh. F (Moffat Depo.) at 19:23–

25   25. According to Ms. Moffat, the sole basis for her belief that the listed videos were infringing

26   was that she was instructed to send the notice. *Id.* at 22:16–24; *see also id.* at 22:25–27:22.

27   Indeed, given a second opportunity to consider the matter (when Ms. Lenz counternoticed) it *still*

28   did not occur to Ms. Moffat to explore, however briefly, whether the Video might be sheltered by

PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT – REDACTED
CASE NO. C 07-03783-JF

the fair use doctrine.  Instead, Ms. Moffat considered only whether the use was licensed and,

because it was not, █████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ *See* Exh. W (Depo. Exh. 72) at

UMC-0000212. ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████

Thus, the undisputed evidence demonstrates that Universal was interested in only two

things: █████████████████████████████████████████████████████████

There was simply no room in its rubric to assess whether the fair use doctrine applied to *any*

video, much less Ms. Lenz's video.

**B.     The Video is a fair use.**

Based on nothing more than its review of the Video, Universal could not have believed, █

██████████████████, that Ms. Lenz's use was anything other than fair.  *See* 17 U.S.C.

§ 107.  It certainly did not have a sufficient basis to form a good faith belief that it was infringing.

**First, the *purpose and character of the use* was obviously both noncommercial and**

**transformative.**  There was no reason—none—to imagine that Ms. Lenz's blurry 29-second

home video was created for any commercial purpose.  *See Campbell,* 510 U.S. at 578. The Video

bears all the hallmarks of a family home movie:  like many such videos, it is blurry and somewhat

shaky, with poor sound quality, and documents nothing more or less than a brief moment in the

everyday chaos of a family life with young children.  *See* Exh. A. There were no ads attached to

it.[9]  In other words, the Video looked and sounded exactly like the personal, noncommercial

home movie that it was.  Indeed, Universal has never attempted to suggest that it actually thought

*Ms. Lenz* had any commercial purpose.  *See* Exh. M at 7:3–8:2 (Universal's Resp. to Interrog.

No. 3).  It has merely asserted that the video was placed in a "commercial, for-profit" setting.

---

[9] Indeed, YouTube did not even start to run ads with videos until 2009. Associated Press,
*YouTube Videos To Feature 'Overlay' Ads*, CBS News (February 11, 2009), available at
http://www.cbsnews.com/stories/2007/08/22/tech/main3193384.shtml (last visited July 12.
2012).

678535.01

1   Exh. H at 9:11–11:22 (Universal's Supp. Resp. to RFA No. 16); Exh. L at 6:4–17 (Universal's

2   Supp. Resp. to Interrog. No. 17). On that theory, the first factor could weigh against every video

3   on YouTube. But that is not the law: "[t]he crux of the profit/non-profit distinction is . . . whether

4   *the user* stands to profit from exploitation of the copyrighted material without paying the

5   customary price." *L.A. News Serv.*, 149 F.3d at 994 (quoting *Harper & Row*, 471 U.S. at 562).

6          Ms. Lenz's use was obviously transformative in that it made a use of the work—a use in

7   the genre of family home videos—that was distinct and separate from its original context and

8   added additional creative elements, such as a voice talking over the music and children dancing

9   and running around. *See generally A&M Records, Inc. v. Napster, Inc.*, 239 F.3d. 1004 (9th Cir.

10  2001) (transformative works are those which do not "merely supplant" the original work but

11  rather add "a further purpose or different character"); *Campbell*, 510 U.S. at 579 (transformative

12  works "lie at the heart of the fair use doctrine's guarantee of breathing space within the confines

13  of copyright . . ."). A transformative work "is the very type of activity that the fair use doctrine

14  intends to protect for the enrichment of society." *Castle Rock Entm't, Inc. v. Carol Pub. Grp.,*

15  *Inc.*, 150 F.3d 132, 142 (2d Cir. 1998). Again, the transformative aspect of the use was readily

16  apparent to Universal from the Video itself, namely, that the use of Prince's composition was not

17  for its own sake, but as what happened to be the background catalyst for some children to dance,

18  run and bop around in a kitchen.

19         **Second, while the *nature of the original work* is indisputably creative, this factor**

20  **tends to carry the least weight in the fair use analysis.** Indeed where, as here, the use is

21  transformative, the nature of the work is "not . . . terribly significant in the overall fair use

22  balancing." *Mattel*, 353 F.3d at 803 (finding fair use of the Barbie doll, a clearly creative work,

23  when the incorporation of the original work is necessary for the secondary use). Moreover, there

24  is no question that the original work was published many years ago, which means the composer

25  has already been amply compensated and this factor carries even less weight. *Kelly v. Arriba Soft*

26  *Corp.*, 336 F.3d 811, 820 (9th Cir. 2003) ("Published works are more likely to qualify as fair use

27  because the first appearance of the artist's expression has already occurred."); *Blanch v. Koons*,

28  467 F.3d 244, 256 (2d Cir. 2006) (second factor turns on (1) "whether the work is expressive or

14

678535.01

1   creative, such as a work of fiction, or more factual, with a greater leeway being allowed to a claim

2   of fair use where the work is factual or informational," and (2) "whether the work is published or

3   unpublished, with the scope of fair use involving unpublished works being considerably

4   narrower.") (quoting 2 Howard B. Abrams, *The Law of Copyright* § 15:52 (2006)); *see also*

5   *Lennon,* 556 F. Supp. 2d at 325 (wide publication of John Lennon's song "Imagine" weighed in

6   favor of fair use).  Given that it administers the copyrights to "Let's Go Crazy," Universal is

7   better positioned than most to evaluate this factor, and cannot claim it lacked the information

8   necessary to assess it.

9        **Third, the *amount and substantiality of the use* is minor.**  While Universal claims the

10  song was prominently featured, the entire Video is less than 30 seconds long.  *See* Exh. A.  In

11  fact, due to the noise and commotion made by the children, the song "Let's Go Crazy" can only

12  be heard in the background for approximately 20 seconds of the 29-second video and even then

13  not all that clearly.  *See id.*  Universal is also best positioned to be aware that this amount was

14  minimal—█████████████████████████.  Exh. AA at 12:1–9 (Universal's Resp. to

15  RFA No. 12); *see generally Harper & Row,* 471 U.S. at 564 ("[T]he Act directs us to examine the

16  amount and substantiality of the portion used in relation to the copyrighted work as a whole.").

17  Moreover, Universal cannot dispute that Ms. Lenz used no more than necessary to fulfill her

18  purpose:  a video of her newly-walking son "dancing" to music in her kitchen.  "If the secondary

19  user only copies as much as is necessary for his or her intended use, then this factor will not

20  weigh against him or her."  *Kelly,* 336 F.3d at 820-21.

21       Universal has tried to suggest that Mr. Johnson was struck by the "frenetic guitar solo"

22  that happened to coincide with the "frenetic" children.  *See* Exh. M at 7:27–28 (Universal's Resp.

23  to Interrog. No. 3).  In other words, Universal posits that Mr. Johnson might have imagined that

24  the home video was not a spontaneous recording but rather a carefully orchestrated production

25  that deliberately took "the heart of the work."  But Mr. ██████████████████

26  ███████████████████████████  *See* Exh. R (Johnson Depo.) at 75:16–76:781:16.

27  Moreover, a "heart of the work" theory makes no sense in this context.  The heart of the work

28  doctrine is rooted in the notion that even a small taking might not be fair if it nonetheless

15

678535.01

1  effectively supplants the original work by taking the most valuable aspects -- i.e., the portion

2  taken is precisely what an audience will value, with the effect being that audiences will ignore the

3  original work in favor of the secondary one. *See generally Harper & Row*, 471 U.S. at 565-66.

4  Here, no one who was remotely interested in Prince's music or his guitar solos would ever look to

5  Ms. Lenz's video rather than the original Prince song—no matter what portion she happened to

6  capture.

7      **Fourth, there is no remotely plausible *market harm*.**  As the entity responsible for

8  licensing "Let's Go Crazy," Universal knew that the snippet of the composition that plays in the

9  background (not dubbed as a soundtrack) of the Video could not substitute for the original Prince

10  song in any conceivable market, *Fisher v. Dees*, 794 F.2d 432, 438 (9th Cir. 1986), given the

11  brief use of the work, the low audio quality of the ordinary digital video camera Ms. Lenz used,

12  the household noises, laughter and talking that partially obscure the music, and the sounds made

13  by the toys that Ms. Lenz's children are pushing around the kitchen during the Video.  All of

14  these facts are apparent on the face of the Video.  Moreover, because Ms. Lenz's use was

15  noncommercial and transformative, market harm cannot be presumed and is in fact unlikely.

16  *Campbell*, 510 U.S. at 591 ("No 'presumption' or inference of market harm . . . is applicable to a

17  case involving something beyond mere duplication for commercial purposes."); *Elvis Presley*

18  *Enters., Inc. v. Passport Video*, 349 F.3d 622, 631 (9th Cir. 2003) ("The more transformative the

19  new work, the less likely the new work's use of copyrighted materials will affect the market for

20  the materials."), *overruling recognized on other grounds by Flexible Lifeline Sys. V. Precision*

21  *Lift, Inc.*, 654 F.3d 989, 994-95 (9th Cir. 2011).

22      Indeed, Universal has not tried seriously to contend that the Video itself could have a

23  demonstrable effect on an actual market for "Let's Go Crazy."  Universal itself declares that the

24  only relevant market is the "synchronization license" market for this specific song, and concedes

25  that it has never issued a synch license for the home video market.  Exh. H at 11:23–12:19

26  (Universal's Supp. Resp. to RFA No. 26).  Moreover, Universal has admitted that ███████

27  ████████████████████████████  Exh. X (Depo. Exh. 91); *see Mattel*, 353 F.3d at

28  806 (no market harm where copyright owner would not enter the relevant market).

16

678535.01

1    ████████████████████████████████████████████████

2    ████ it is preposterous to imagine that any parent would –or should—seek such a license in

3    order to share a video of her children playing in the kitchen.  Indeed, court after court has rejected

4    similar attempts to manufacture market harm where there was no *likely* market for the challenged

5    use of the copyrighted works.  *Id.*; *see also Wright v. Warner Books, Inc.,* 953 F.2d 731, 739 (2d

6    Cir. 1991) (affirming district court's finding of no reasonable likelihood of injury to alleged

7    market where, inter alia, alleged potential market was "highly improbable"); *Princeton Univ.*

8    *Press v. Mich. Document Servs., Inc.,* 99 F.3d 1381, 1387 (6th Cir. 1996) ("Only 'traditional,

9    reasonable, or likely to be developed markets' are to be considered in this connection, and even

10   the availability of an existing system for collecting licensing fees will not be conclusive."

11   (citation omitted)); *Castle Rock,* 150 F.3d at 145 (copyright owners may not preempt exploitation

12   of transformative markets, which they would not "in general develop or license others to

13   develop," by actually developing or licensing others to develop those markets); *Kane v. Comedy*

14   *Partners,* No. 00 Civ. 158 (GBD), 2003 WL 22383387, at *7 (S.D.N.Y. Oct. 16, 2003) (to avoid

15   danger of circularity, copyright owner not entitled to license fees for uses that otherwise qualify

16   as fair uses); 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05[A][4]

17   (2005) ("it is a given in every fair use case that plaintiff suffers a loss of a *potential* market if that

18   potential is defined as the theoretical market for licensing the very use at bar.").

19        Universal has also tried to suggest that this factor turns on consideration of all of the

20   possible effects of "unrestricted and widespread" uses like the Video.  Exh. M at 8:24-9:16

21   (Universal's Resp. to Interrog. No. 5).  Courts have rejected similar efforts to ignore the key issue

22   of substitution, particularly where the copyrighted work is embedded in another, transformative

23   work.  In *Kramer v. Thomas*, No. CV 05-8381 AG (CTx), 2006 WL 4729242 (C.D. Cal. Sept. 28,

24   2006), for example, the court found that there was no market harm where a composition was

25   embedded in a DVD collection, and specifically rejected the plaintiff's "unrestricted and

26   widespread" use theory:

27        Nobody who wanted to listen to the compositions would choose to do so by paying
         $65 for a 12-hour 3-DVD set in which sonically limited portions of the
28

                                              17

678535.01

compositions are anonymously nested in less than 1% of the work. . . . Unrestricted and wide-spread collection of these DVD's would not result in a substantially adverse impact on the potential market for the original composition.

*Id.* at *11. Similarly, unrestricted and widespread use of "Let's Go Crazy" as incidental background music in 30-second home videos could not possibly harm any market for Prince's works.

Universal had all the facts it needed to recognize that Ms. Lenz's use was lawful ███

███████████████████████

### C.   At a minimum, Universal was willfully blind to whether the Video was a fair use.

#### 1.   Universal did not form the required good faith belief because it rendered itself willful blind to whether *any* given use was authorized by law.

Universal is liable under Section 512(f) for yet another reason: it could not possibly have formed a good faith belief that the Video infringed copyright because it ██████████████ ██ ensured it would be willfully blind to facts showing that a given use (including Ms. Lenz's use) is in fact authorized by law.

Under copyright law, as with any other body of law,[10] proof of willful blindness will suffice to establish knowledge and, therefore, bad faith. "Willful blindness is knowledge, in copyright law . . . as it is in the law generally." *In re Aimster Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003). In *Dolman v. Agee*, 157 F.3d 708 (9th Cir. 1998), for example, a record producer was found to have willfully infringed where it continued to produce and market a song collection "despite knowing that *someone* owned the copyrights in the music, and being presented with evidence regarding [plaintiff]'s claim of ownership." *Id.* at 715 (emphasis in original). In other words, the producer was charged with knowledge when it was shown that he knew certain facts but actively disregarded their implications.

Moreover, the Second Circuit Court of Appeals recently assessed the specific relationship between willful blindness and the DMCA. In that case, the court concluded that actual knowledge

---

[10] *See, e.g., U.S v. Real Property at 2659 Roundhill Dr., Alamo, Cal.,* 194 F.3d 1020, 1028 (9th Cir. 1999) ("An owner cannot deliberately avoid actual knowledge through 'willful blindness.'").

678535.01

sufficient to potentially remove the protection of the Section 512 safe harbors could be shown via proof of willful blindness:

> As a general matter, we interpret a statute to abrogate a common law principle only if the statute "speak[s] directly to the question addressed by the common law." *Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir.2009) (internal quotation marks omitted). . . . Because the statute does not "speak[ ] directly" to the willful blindness doctrine, § 512(m) limits—but does not abrogate—the doctrine. Accordingly, we hold that the willful blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of specific instances of infringement under the DMCA.

*Viacom Intern., Inc. v. YouTube, Inc.*, 676 F.3d 19, 35 (2d Cir. 2012). Citing *Aimster*, the Court remanded for consideration of whether the defendants had made a "deliberate effort to avoid guilty knowledge." *Id.* The analysis is no different for Section 512(f).

Even under what may well be the most rigorous knowledge standard in U.S. law, the "actual malice" standard applicable to defamation claims against public figures, knowledge may be inferred from circumstance. *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964); *see St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) ("[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."). The Ninth Circuit has held that a plaintiff may show actual malice by showing that despite obvious reasons to doubt the truth of an author's statements, the "publisher failed to take reasonable steps to dispel those doubts." *Masson v. New Yorker*, 960 F.2d 896, 900 (9th Cir. 1992); *see also Hunt v. Liberty Lobby,* 720 F.2d 631, 643-44 (11th Cir 1983) ("[E]vidence which shows that the statement was inherently implausible or that there were obvious reasons to doubt the veracity of the informant is relevant to establishing actual malice." (citing cases)). Thus, a defendant "cannot feign ignorance *or profess good faith* when there are clear indications present which bring into question the truth or falsity of defamatory statements." *Gertz v. Welch*, 680 F.2d 527, 538 (7th Cir. 1982) (emphasis added). Moreover, "the purposeful avoidance of the truth" can establish actual malice. *See Harte-Hanks v. Connaughton*, 491 U.S. 657, 692 (1989) (likelihood that a newspaper made "a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity" of facts in its story supported a finding of actual malice).

In varying ways, each of these doctrines recognizes the injustice of absolving malfeasors

19

678535.01

1   who took steps to avoid gaining actual knowledge of their improper acts.  Such injustice would be

2   particularly improper here, given that the entire purpose of Section 512(f) is to help carry out

3   Congress's intent to facilitate the growth of the Internet as a platform for free speech.  *See* Sen.

4   Rep. No. 105-190 at 21 (1998 ("The Committee was acutely concerned that it provide all end-

5   users . . . with appropriate procedural protections to ensure that material is not disabled without

6   proper justification.  The provisions in the bill balance the need for rapid response to potential

7   infringement with the end-users' legitimate interests in not having material removed without

8   recourse.").  Adopting a rule that gives credence to willful blindness as a strategy to avoid

9   liability under Section 512(f) would eviscerate the protections Congress intended to create.

10  Indeed, it would encourage all copyright holders to develop systems designed to ensure ignorance

11  as a means of excusing improper takedowns, creating the opposite policy result.

12      **2.      Universal's takedown practices ensured it would be blind to noninfringing**
             **fair uses, as it was in this case.**

13

14          Based on its own admissions, it is abundantly clear that Universal purposefully avoided

        acquiring the knowledge it needed to form a genuine good faith belief that the Video was

15      infringing, *i.e.*, that it was not authorized by law.  It ███████████████████████████████

16  ████████████████████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████

18  ██████████████████████████████████████████████████████████████████

19  ██████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████████████

22  ██████████████████████████████████████████████████████████

23  ██████████████████████████████████████████████████████████████████████

24  ████████████████████████

25          In short, Universal was confronted with actual facts establishing fair use (and thus non-

26  infringement).  It willfully ignored those facts—indeed, it set up a takedown system that would

27  inevitably *require* ignoring those facts–and, therefore, rendered itself incapable of forming a good

28

20

678535.01

1  faith belief that Ms. Lenz's video, or any other video, was not authorized by law. Such a system

2  cannot, and does not, pass muster under the DMCA.

3  **D.     Universal sent the takedown pursuant to Section 512(f).**

4         The remaining elements of a Section 512(f) claim can be addressed quickly.  There is no

5  dispute that Universal asserted that the Video was not authorized by a copyright holder or the law.

6  *See* Exh. P (Depo. Exh. 70) at UMC-0000625.  That misrepresentation was material: YouTube

7  removed the Video in response to Universal's notice, as Universal intended.  Exh. H at 8:23-9:10

8  (Universal's Supp. Resp. to RFA No. 4); Exh. V (Hubbard Aff.) ¶ 11; *Online Policy Group v.*

9  *Diebold, Inc.*, 337 F. Supp. 2d 1195, 1204 (N.D. Cal. 2004) ("'[m]aterial' means that the

10  misrepresentation affected the ISP's response to a DMCA letter.")

11        If Universal nonetheless insists that its Notice of Infringement was not made pursuant to

12  Section 512 of the DMCA, that claim can be dismissed as a matter of law.  First, Universal sent

13  its notice to the email address "copyright@youtube.com," *see* Exh. P (Depo. Exh. 70), the address

14  designated by YouTube for receipt of DMCA notices.[11]  Obviously, it intended to take advantage

15  of the DMCA process.

16        Second, the Notice carefully tracks *every requirement* of a Section 512 notice:  It is (1) a

17  written communication; (2) provided to the designated agent of a service provider; (3) signed;

18  (4) identifying a work claimed to be infringed; (5) identifying allegedly infringing material;

19  including the submitter's contact information; (6) alleging a good faith belief that the alleged

20  infringement is not authorized by the copyright owner or by the law; and (7) stating that the

21  information in the notification is accurate and that the complaint is authorized by the copyright

22  holder.  *Compare* Exh. P (Depo Exh. 70) *with* 17 U.S.C. § 512(c)(3)(A).

23        Third, Universal cannot dispute that YouTube is a service provider as defined by the

24  DMCA.  *See* 17 U.S.C. § 512(c)(1) & (k)(1)(B); Exh. V (Hubbard Aff.) ¶¶ 4–5.  The Second

25  Circuit Court of Appeals has determined that YouTube was such a provider for all relevant

26  purposes. *See Viacom Intern., Inc. v. YouTube Inc.*, 676 F.3d 19, 39 (2d Cir. 2012)

27

28  [11] Indeed, YouTube's Terms of Service specify that "only DMCA notices" should be sent to this
    address. *See* Exh. N (Depo. Exh. 5) § 8; Exh. B (Lenz Depo.) at 51:14-23 (authenticating).

21

678535.01

1    Finally, everyone involved in the takedown process—Universal, YouTube, and

2    Ms. Lenz—treated the notice as a Section 512 notice. YouTube advised Ms. Lenz of her right to

3    counternotice, and directed her to its help-center, which explains how to draft a DMCA-compliant

4    counternotice. *See* Exh. G (Depo. Exh. 9). When Ms. Lenz did counternotice, ██████████████

5    ████████████████████████████████████████████████████████████████████

6    ██████████████████████████████████████████ Exh. C to Exh. V (Hubbard

7    Aff.) at YT00001236-37. ████████████████████████████

8    ████████████████████████████████████████████████████████████████████

9    ██  Ms. Lenz then submitted a fully DMCA-compliant notice and the material was restored

10   following a second waiting period. *See* Exh. E to Exh. V (Hubbard Aff.).

11   Having obtained the benefits of a takedown notice mapped to the requirements of the

12   DMCA—including delayed restoration when Ms. Lenz submitted a noncompliant

13   counternotice—Universal cannot avoid its concomitant obligations under Section 512(f) by

14   claiming that the notice was not sent pursuant to that statute.

15   **E.    Ms. Lenz was damaged by Universal's improper takedown.**

16   There can be no dispute that Ms. Lenz was damaged by Universal's action; the Court has

17   already held as much.  Exh. O (2/25/2010 Order Granting Partial Summary Judgment) at 16:19–

18   21 ("Accordingly, because there is no genuine issue of material fact as to whether Ms. Lenz

19   incurred *some* damages as defined under the statute, Ms. Lenz's motion will be granted as to

20   Universal's affirmative defense of no damages.")

21   First, Ms. Lenz's video was unavailable on YouTube for many weeks as a result of

22   Universal's takedown notice, and her sense of her freedom to express herself, including

23   expressing herself by making home videos, making particular kinds of videos as opposed to other

24   kinds, and sharing home videos with her friends and family, was diminished as a result of

25   Universal's takedown notice. Lenz Decl. ¶ 10. As with other kinds of speech harms, however,

26   these losses are difficult to translate into economic numbers. Thus, Ms. Lenz seeks only an award

27   of nominal damages for these harms. *See generally Yniguez v. Arizonans for Official English,* 69

28   F.3d 920, 949 (9th Cir.1995) *(en banc), vacated on other grounds,* 520 U.S. 43 (1997) (holding

22

678535.01

1   employee entitled to nominal damages for free speech violation); *Phelps-Roper v. City of*

2   *Manchester, Mo.*, 738 F. Supp. 2d 947, 960 (E.D. Mo. Sept. 8, 2010) (awarding nominal damages

3   of $1 for violations of free speech rights).

4         Second, Ms. Lenz was forced to expend time and resources to get her video restored.  She

5   spent at least ten hours before filing this lawsuit on tasks such as obtaining counsel, determining

6   how to send a counternotice, sending the counternotice, sending a revised counternotice after

7   Universal objected to the first counternotice, and ensuring that access to her video had been

8   restored.  Lenz Decl. ¶ 9.  Ms. Lenz's time can be valued at the Pennsylvania minimum wage at

9   the time, which was $6.25/hour.  34 Pa. Code § 231.101(2).  For her time, Ms. Lenz therefore

10   claims an amount of $62.50 for her time prior to filing this lawsuit.  Ms. Lenz also expended

11   resources on her pre-lawsuit efforts, including the use of her computer, Lenz Decl. ¶ 9, but seeks

12   only nominal damages for her pre-lawsuit expenditure of these resources.

13         Finally, Ms. Lenz retained attorneys, acting *pro bono*, to advise her in connection with

14   ensuring access to her video was restored.  Lenz Decl. ¶ 7; *see also* Exh. O (2/25/2010 Order

15   Granting Partial Summary Judgment) at 15:26–16:1 ("any fees incurred for work in responding to

16   the takedown notice and prior to the institution of suit under § 512(f) are recoverable under that

17   provision").  Specifically, Ms. Lenz seeks compensation for Ms. Hofmann's time in the amount

18   of $1,275.  *See* Declaration of Marcia Hofmann ¶¶ 1–7.[12]

19         In sum, Ms. Lenz seeks damages in the amount of $1,337.50, plus nominal damages for

20   the harm to her speech rights and her expenditure of personal resources in connection with

21   ensuring restoration of the Video on YouTube.

---

[12] Ms. Lenz contends that time and resources attributable to efforts spent on this litigation are recoverable as damages under Section 512(f).  Ms. Lenz recognizes that the Court has held that "any fees incurred for work in responding to the takedown notice and prior to the institution of suit under § 512(f) are recoverable under that provision, [but] recovery of any other costs and fees is governed by § 505."  Exh. O (2/25/2010 Order Granting Partial Summary Judgment) 15:26-16:1.  Ms. Lenz reserves the right to challenge the latter aspect of this holding on appeal.

23

678535.01

1

## V.   CONCLUSION

2

For the foregoing reasons, the Court should grant summary judgment in Ms. Lenz's favor.

3

Dated:  July 13 2012

*Respectfully Submitted,*

4

KEKER & VAN NEST LLP

5

6

*/s/ Ashok Ramani*

By:   ASHOK RAMANI

7

MICHAEL S. KWUN
MELISSA J. MIKSCH

8

Attorneys for Plaintiff

9

STEPHANIE LENZ

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT – REDACTED
CASE NO. C 07-03783-JF

678535.01