KELLY M. KLAUS (SBN 161091)
Kelly.Klaus@mto.com
MELINDA E. LEMOINE (SBN 235670)
Melinda.LeMoine@mto.com
L. ASHLEY AULL (SBN 257020)
Ashley.Aull@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA  90071-1560
Telephone:    (213) 683-9100
Facsimile:    (213) 687-3702

Attorneys for Defendants
UNIVERSAL MUSIC CORP., UNIVERSAL MUSIC
PUBLISHING, INC. and UNIVERSAL MUSIC
PUBLISHING GROUP

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| STEPHANIE LENZ,<br><br>        Plaintiff,<br><br>vs.<br><br>UNIVERSAL MUSIC CORP., UNIVERSAL MUSIC PUBLISHING, INC. and UNIVERSAL MUSIC PUBLISHING GROUP,<br><br>        Defendants. | CASE NO.  C 07-03783 JF (HRL)<br><br>**PUBLIC REDACTED VERSION**<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Declarations of Kelly M. Klaus and Benjamin Edelman and Request for Judicial Notice filed concurrently]<br><br>Date:    October 17, 2012<br>Time:    10:00 A.M.<br>Ctrm:    3, Fifth Floor<br>Judge:  Hon. Jeremy Fogel |

# TABLE OF CONTENTS

Page

I.  INTRODUCTION AND SUMMARY OF ARGUMENT ................................................ 1

II. THE UNDISPUTED FACTS UNDERLYING THIS MOTION ...................................... 4

    A.  Unauthorized Use of Copyrighted Material on YouTube and the Internet............. 4

    B.  Universal's Administration of Prince's Copyrights.................................................. 5

    C.  Universal's Review of, and Request that YouTube Remove, Plaintiff's
       "Let's Go Crazy" Posting ........................................................................................ 8

    D.  What Universal Did Not Know, and Could Not Have Known, About
       Plaintiff's Use When It Sent the Notice.................................................................. 9

    E.  Plaintiff's Own Response to YouTube's Removal of Her Posting, and the
       Reactions of Those She Turned To, Demonstrate That Her Posting Was
       Not a "Self-Evident" Fair Use............................................................................... 10

    F.  Plaintiff Suffered No Damages as a Result of Universal's Notice ....................... 12

III. ARGUMENT ............................................................................................................... 13

    A.  There Is No Evidence That Universal Actually Knew It Was Making a
       Material Misrepresentation ................................................................................... 13

        1.  There Is No Evidence That Universal Actually Knew It Was
           Misrepresenting any Material Fact to YouTube ....................................... 14

        2.  Universal's Consideration of Plaintiff's Posting Gave All the
           "Proper Consideration" to Fair Use that § 512 Can Be Construed to
           Require ...................................................................................................... 15

           a.  "Proper Consideration" of Fair Use Can Require No More
              Than Consideration of Available Information Relevant to a
              Fair Use Inquiry .......................................................................... 16

           b.  Universal "Properly Considered" Fair Use ................................. 17

        3.  Plaintiff's Alternative Arguments to Establish That Universal
           Actually Knew It Was Making a Material Misrepresentation Fail .......... 21

           a.  Plaintiff's Insistence That Her Posting Was a "Self-Evident"
              Fair Use Does Not Establish Universal's Actual Knowledge
              of a Material Misrepresentation ................................................... 21

           b.  No Evidence Supports Plaintiff's "Willful Blindness"
              Charge ......................................................................................... 22

    B.  Plaintiff Incurred No Damages Under § 512(f) .................................................... 23

IV. CONCLUSION ............................................................................................................ 25

1

## TABLE OF AUTHORITIES

2

### FEDERAL CASES                                                      Page(s)

3

4

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) ............................................................... 19, 20, 21

5

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...................................................................... 13

6

*Global-Tech. Appliances, Inc. v. SEB S.A.*,
  131 S. Ct. 2060 (2011) ................................................................. 4, 22

7

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
  471 U.S. 539 (1985) .................................................................. 19, 21

8

9

*Higgins v. Detroit Educational Television Found.*,
  4 F. Supp. 2d 701 (E.D. Mich. 1998) ................................................. 18

10

*Jackson v. Warner Bros., Inc.*,
  993 F. Supp. 585 (E.D. Mich. 1997) .................................................. 18

11

*Jacobellis v. Ohio*,
  378 U.S. 184 (1964) ...................................................................... 16

12

*Leadsinger, Inc. v. BMG Music Publishing*,
  512 F.3d 522 (9th Cir. 2008) ................................................. 5, 18, 19

13

14

*Lenz v. Universal Music Corp.*,
  572 F. Supp. 2d 1150 (N.D. Cal. 2008) ........................................ passim

15

*Liberty Media Holding, LLC v. Tabora*,
  2012 WL 28788 (S.D. Cal. Jan. 4, 2012) ............................................ 22

16

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005) ....................................................................... 5

17

*Newton v. Diamond*,
  388 F.3d 1189 (9th Cir. 2004) ........................................................... 5

18

19

*Ringgold v. Black Entm't Television, Inc.*,
  126 F.3d 70 (2d Cir. 1997) .............................................................. 18

20

*Salinger v. Random House*,
  811 F.2d 90 (2d Cir. 1987) ......................................................... 19, 20

21

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
  667 F.3d 1022 (9th Cir. 2011) .......................................................... 16

22

*Viacom Int'l, Inc. v. YouTube, Inc.*,
  676 F.3d 19 (2d Cir. 2012) ........................................................... 5, 22

23

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
  227 F.3d 1110 (9th Cir. 2000) ...................................................... 19, 20

24

### STATUTES, RULES, AND LEGISLATIVE MATERIALS

25

17 U.S.C. § 107 ............................................................................ 17

26

17 U.S.C. § 115 ......................................................................... 7, 19

27

17 U.S.C. § 512(c) ........................................................................ 14

28

**TABLE OF AUTHORITIES**
(continued)

Page(s)

17 U.S.C. § 512(f) ................................................................................................................. passim

Fed. R. Civ. P. 56(a) ................................................................................................................. 13

N.D. Cal. Civil L.R. 7-4(a)(3) .................................................................................................... 1

H.R. Rep. No. 105-551, pt. 2 (1998) ........................................................................................ 17

S. Rep. No. 105-190 (1998) ...................................................................................................... 16

**OTHER AUTHORITIES**

3 *Nimmer on Copyright* § 12B.08 (Matthew Bender, Rev. Ed.) ................................................. 17

Restatement (Second) of Torts § 525 ......................................................................................... 23

Restatement (Second) of Torts § 549 ......................................................................................... 23

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

On October 17, 2012, at 10:00 a.m., Universal[1] will and hereby does move for summary judgment on Plaintiff's Second Amended Complaint, D.N. 34 ("SAC"), based on this Motion, all evidence and argument submitted in connection therewith, and the entire record in this action.[2]

Pursuant to Civil L.R. 7-4(a)(3), this Motion presents the questions whether Universal is entitled to summary judgment where the undisputed facts show that (1) Universal did not make a "knowing[] material[] misrepresent[ation]" regarding Plaintiff's "Let's Go Crazy" posting, 17 U.S.C. § 512(f); and (2) Plaintiff did not "incur[]" "any damages" and was not "injured by [the claimed] misrepresentation, as the result of" YouTube's temporary removal of her posting. *Id.*

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION AND SUMMARY OF ARGUMENT**

In denying Universal's motion to dismiss the SAC, the Court expressed "considerable doubt that Lenz will be able to prove that Universal acted with the subjective bad faith required by *Rossi* [*v. MPAA*, 391 F.3d 1000 (9th Cir. 2004)]." *Lenz v. Universal Music Corp.*, 572 F. Supp. 2d 1150, 1156 (N.D. Cal. 2008); D.N. 53 at 5 n.4. Plaintiff conducted nearly two years of discovery into Universal's request that YouTube remove her "Let's Go Crazy" posting. The undisputed facts make it clear that Universal did *not* act with subjective bad faith under *Rossi*. Summary judgment is proper for either or both of the following reasons:

*First*, Plaintiff has no evidence that Universal made a "*knowing*[] material[] misrepresent[ation] . . . that [the "Let's Go Crazy" posting] [wa]s infringing." 17 U.S.C. § 512(f) (emphasis added). "[K]nowing" means "actual knowledge" of the alleged falsehood. *Rossi*, 391 F.3d at 1005. To survive dismissal, Plaintiff alleged that Universal had "actual subjective knowledge" that the posting was a non-infringing fair use of "Let's Go Crazy," but nevertheless

---

[1] "Universal" refers to all Defendants named in the SAC.

[2] "D.N." refers, by number, to documents in the Court's Docket. Other record cites are to the Benjamin Edelman Declaration ("Edelman Decl."), Kelly Klaus Declaration ("Klaus Decl."), Robert Allen Declaration ("Allen Decl."), and Request for Judicial Notice ("RJN"). Mr. Allen's Declaration was filed with Universal's original motion, at D.N. 326 (confidential version filed under seal per D.N. 336). Mr. Allen left Universal in November 2011. The Court may take notice of Mr. Allen's declaration and the exhibits thereto, which are in the Court's own file. For the Court's convenience, the Allen Declaration and exhibits are reproduced at Ex. 3 to the RJN.

1    caved in to Prince's "demand[]" to take it down.  SAC ¶¶ 31, 35.  Discovery showed that

2    Universal's actual consideration of the "Let's Go Crazy" posting was the opposite of what

3    Plaintiff alleged.  Prince, whose compositions Universal administered in 2007, did complain

4    about the widespread, unauthorized use of his works on the internet and on YouTube.  But the

5    email to YouTube was not precipitated by Prince even mentioning Plaintiff's posting, let alone

6    "demanding" that Universal remove it.  Discovery also showed that Universal did not

7    unthinkingly include in takedown notices all postings that used a Prince composition—including

8    this one—without regard to their characteristics or the legal authority for them to be made.  When

9    Universal believed uses of Prince's music were authorized by law, Universal refused to pursue

10   takedowns.  Allen Decl. Ex. 2 at 1, Ex. 3 at 1 (at RJN 3, *see* n.2, *supra*).

11        In this case, a Universal employee, acting under counsel's guidance and supervision,

12   reviewed the "Let's Go Crazy" posting, along with hundreds of other unauthorized uses of Prince

13   compositions on YouTube in just the first week of June 2007.  The employee did not reflexively

14   place Plaintiff's posting on the list.  He reviewed it twice and ultimately included it based on a

15   good faith belief that Prince's composition was a central part of the posting.  The undisputed facts

16   supporting that belief include that the posting to the commercial YouTube site was titled "Let's

17   Go Crazy #1"; that Prince's song was prominent and played continuously throughout the posting;

18   and that an off-camera voice said, "What do you think of the music?"  There is no evidence that

19   the employee—or anyone at Universal—had any "actual knowledge" that they were materially

20   misrepresenting that the posting was infringing.  *Rossi*, 391 F.3d at 1005.  The absence of

21   evidence of Universal having had such "actual knowledge" ends Plaintiff's case.

22        Universal recognizes that the law of this case (with which Universal respectfully

23   disagrees) is that Universal had to make a "proper consideration" of fair use before sending the

24   notice.  572 F. Supp. 2d at 1155.  But there is no evidence that Universal knowingly

25   misrepresented making such a consideration.  The Court has not defined what is means to

26   "proper[ly] consider[]" fair use.  "Proper consideration" of fair use cannot require a full-blown

27   analysis of the highly indeterminate fair use doctrine.  That type of analysis cannot be required if

28   copyright owners are to be able to utilize notice-and-takedown procedures to deal with the

DEFTS' MOT. FOR SUMMARY JUDGMENT
CASE NO. CV-07-03783

proliferation of infringing content on the internet.  If "proper consideration" of fair use is required, then it must be sufficient if copyright owners take into account, from the information then available to them, facts that would be relevant in analyzing a fair use defense, were it raised.

The undisputed evidence here shows that, before it sent the notice, Universal considered every fact available to it that could be relevant to a fair use defense for "Let's Go Crazy," and those facts weigh *against* a finding of fair use.  There was no way that Universal could have known "the purpose and character" of Plaintiff's use instantaneously upon viewing the posting in June 2007.  Plaintiff's posting did not proclaim a purpose for the posting; it did not even identify Plaintiff by name.  Plaintiff did not even allege until April 2008 that she made her YouTube posting so her "mother in California," who had "difficulty downloading email files" could enjoy seeing her grandson dancing.  SAC ¶ 16.  Universal did not know and could not have known any of that in June 2007.  The facts that Universal could and did know from observing the posting— including that it was on a commercial site, that the title appropriated the composition's name, that the music played clearly and continuously throughout the posting, and that the music was a clear focus of the video—are among the very factors that federal courts and Plaintiff's own "expert" deem relevant to analyzing "incidental" uses of copyrighted works claimed to be fair use. Universal "properly considered" fair use under any standard that reasonably may be required.

Plaintiff's alternative arguments for claiming that Universal actually knew it was making a material misrepresentation have no legal or factual support.  First, Plaintiff alleges that Universal must have known her posting was fair use because that conclusion is "self-evident" to anyone who knows copyright law.  SAC ¶¶ 19, 34.  Plaintiff's "self-evident" fair use standard is contrary to the law of fair use and to *Rossi*, which requires subjective bad faith, not post-hoc second-guessing.  Plaintiff's claim that her posting was "self-evidently" fair use also is contrary to the facts, which show that a fair use finding is by no means obvious.  It was not obviously and instantaneously deemed to be fair use by those to whom Plaintiff turned for help.  It was not even obvious to Plaintiff, a writer and editor who said she was "sensitive to copyright" in June 2007, and who candidly admitted, within days of the posting's removal, "*[m]ine's not a 'fair use' case at all*."  Klaus Decl. Ex. 1 at 2 (emphasis added).  *See id*. Ex. 2 at 3, Ex. 3 at 2, Ex. 4 at 1.  If

1   Plaintiff and those she turned to (including EFF) did not instantly deem her posting to be fair use,

2   there is no basis for finding that Universal was bound to reach that conclusion.

3   Alternatively, Plaintiff has argued that Universal should be deemed to have "actual

4   knowledge" of making a misrepresentation because it "willfully blinded" itself to whether

5   Plaintiff's posting was a fair use.  Plaintiff, however, has no evidence to meet either of the

6   required elements for willful blindness laid down by the Supreme Court, namely, (1) that

7   Universal "*subjectively believe[d]* that there [wa]s a high probability that" it was asking YouTube

8   to remove postings despite the fact they were fair uses, *and* (2) that Universal took "*deliberate*

9   actions to avoid learning of that fact."  *Global-Tech. Appliances, Inc. v. SEB S.A.*, 131 S. Ct.

10  2060, 2070 (2011) (emphasis added).  Plaintiff has no evidence to support either element.

11  ***Second*, Plaintiff has not suffered any damages, as required for a § 512(f) claim**.

12  Plaintiff did not suffer any actual pecuniary loss as a result of YouTube temporarily removing her

13  posting.  As Plaintiff has admitted:  "*I don't care that YouTube doesn't want to host [the "Let's*

14  *Go Crazy" posting].  Not like I'm paying them.*"  Klaus Decl. Ex. 3 at 1 (emphasis added).

15  **II.    THE UNDISPUTED FACTS UNDERLYING THIS MOTION**

16  **A.    Unauthorized Use of Copyrighted Material on YouTube and the Internet**

17  Plaintiff has consistently referred to her YouTube posting as a "home video," as though it

18  were a simple family movie available for viewing only by a small circle of family and friends in

19  the confines of a personal residence.  The use in question is *not* making a home video.  The use is

20  incorporating the copyrighted work in a posting to YouTube.  In 2007, as today, YouTube was a

21  for-profit, commercial website, where postings are available to a mass audience.  RJN Ex. 1.

22  YouTube generates revenue by selling advertising—on its own behalf and for those who post

23  their videos on its site.  Klaus Decl. Ex. 5; Ex. 6B at 157:10-22.  It is often impossible to tell what

24  the true purpose is of a YouTube posting based solely on viewing the video alone.  Edelman Decl.

25  Ex. 1 at ¶ 15.  Even videos of cute children playing in domestic settings appear in a commercial

26  setting, sometimes with explicit advertising appearing alongside the posting, Klaus Decl. Ex. 7,

27  but always on a commercial site whose economic objective is to draw the maximum number of

28  users to view what is posted there.

DEFTS' MOT. FOR SUMMARY JUDGMENT
CASE NO. CV-07-03783

It is beyond dispute that unauthorized uses of copyrighted works on the internet have proliferated to an extent never before imagined.  *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 928-29 (2005).  YouTube is no stranger to this phenomenon.  From its inception, YouTube hosted tremendous quantities of infringing material.  Edelman Decl. Ex. 1 at ¶ 9.  In 2006, Google hired analysts to review a random sample of hundreds of YouTube videos.  *Id.*  The study found that 63% of YouTube videos contained copyrighted material, or had been removed and taken down.  RJN Ex. 2 at ¶¶ 322, 362 & Ex. 328 at 60-68, 87-91, 95.  *See Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 32-34 (2d Cir. 2012) (summarizing some of the evidence of proliferation of infringements on YouTube 2005-2007).

The ease with which YouTube users can publicly post videos to a vast internet audience implicates an important right for songwriters:  the synchronization right.  This is the right to use music in timed-relation to video images.  It is an exclusive right of the composition copyright owner, *Leadsinger, Inc. v. BMG Music Publishing*, 512 F.3d 522, 527 (9th Cir. 2008), and the right to license composition synchronizations is separate from the rights that exist in the sound recording embodying the composition.  *Newton v. Diamond*, 388 F.3d 1189, 1191 (9th Cir. 2004).  Because the licensing of synchronization rights is within the composition copyright owner's exclusive control, the market for synchronization rights is very valuable.  Allen Decl. ¶¶ 5-6; Klaus Decl. Ex. 6B at 135:7-136:8.

### B.  Universal's Administration of Prince's Copyrights

Universal is a music publishing company that administers composition copyrights for hundreds of songwriters.  In 2007, Universal administered the copyrights for the songwriter Prince Rogers Nelson, professionally known as "Prince."  Allen Decl. ¶ 3 & Ex. 1.  Universal managed Prince's portfolio of valuable composition copyrights with the goal of maximizing their earnings, in accordance with Universal's agreements with Prince and the law.  █████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████  Allen Decl. ¶¶ 6-7, 10; Klaus Decl. Ex. 6B at 135:7-136:8. ██████████████████████████

DEFTS' MOT. FOR SUMMARY JUDGMENT
CASE NO. CV-07-03783

1    ████████████████████████████████████ *Id*.

2        In late 2006 and 2007, ███████████████████████████

3    ██████████████████████████████████ Allen Decl. ¶ 10.  The

4    works exploited through YouTube and other sites included Prince's most successful and valuable

5    copyrights, including works from the popular "Purple Rain" album (of which "Let's Go Crazy" is

6    one).  Allen Decl. ¶ 6; Klaus Decl. Ex. 6B at 135:16-136:19. ███████████████

7    ████████████████████████████████████████████

8    ████████████ Allen Decl. ¶¶ 7, 10; Klaus Decl. Ex. 6B at 61:15-62:19; 64:24-65:14; 96:9–

9    97:22; 135:7-136:8; 241:23-244:13. ████████████████████████

10   █████████████████████████████████████

11   ██████████████████ Allen Decl. ¶ 6; Klaus Decl. Ex. 6B at 135:16-136:8.

12   █████████████████████████████████████

13   Klaus Decl. Ex. 6B at 240:25-242:18.  In summer 2007, when Prince was set to play 21 shows in

14   London, ████████████████████████████████

15   ████████████████████ *Id*.; Allen Decl. ¶ 10.

16        At the pleading stage, Plaintiff alleged that Universal maintained a "Prince Policy,"

17   pursuant to which Universal removed uses of Prince's compositions from YouTube and the

18   internet without exception.  SAC ¶ 31.  The evidence showed that Universal followed no such

19   policy.  Universal did not automatically send a cease-and-desist or removal request for any use of

20   Prince's compositions—including uses that Prince or his representatives specifically complained

21   about.  Allen Decl. ¶¶ 8-9; Klaus Decl. Ex. 6B at 158:21-159:3.  Universal investigated and

22   determined whether the composition had been authorized by Prince, by one of his agents, or by

23   the law.  *Id*. & Allen Decl. Exs. 2-3.  If the use was so authorized, Universal did not send a

24   takedown notice or cease and desist letter in response.  *Id*.  For example, ███████████

25   ████████████████████████████████████████████

26   ████████████████████ Allen Decl. ¶ 9, Ex. 3. ██████████████

27   ████████████████████████████████████████████

28   ████████████████████████████████████

- 6 -                                                                 DEFTS' MOT. FOR SUMMARY JUDGMENT
                                                                      CASE NO. CV-07-03783

1   ███████████████████████████████████████████████████████

2   ███ *Id.*  Universal also confirmed whether a particular use was authorized by law.  The

3   composition copyright is subject to a statutory exception known as a compulsory license that

4   allow users to manufacture and distribute recordings of compositions without the consent of the

5   copyright owner.  Allen Decl. ¶ 8; 17 U.S.C. § 115.  This is why artists can make "cover"

6   recordings of previously recorded compositions.  ███████████████████████████

7   █████████████████████████████████████████████████████

8   ████████████████████████████████████████████

9   ███████████████████████████████████████████████████████

10  ████████████████████████████████   Allen Decl. ¶ 8, Ex. 2 (emphasis added).  ██████

11  ██████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████  *Id.*

13  (emphasis added).  Plaintiff's contention that Universal sought to remove uses without

14  considering if they were "authorized by law" has no support.

15      In responding to Prince's concerns regarding his works on YouTube, Universal

16  implemented a process of thoughtful review, and took action once it had convinced itself that a

17  video embodied a Prince composition to such a degree as to constitute an unauthorized or

18  infringing use.  Allen Decl. ¶ 11.  Universal began monitoring YouTube regularly for

19  unauthorized uses of Prince's most popular works.  Allen Decl. ¶ 11; Klaus Decl. Ex. 6B at

20  67:11-68:18; 120:25-121:11.  Robert Allen designated Sean Johnson, an assistant in the legal

21  department, to monitor YouTube.  Klaus Decl. Ex. 6B at 120:2-127:22.  Johnson and Allen

22  worked together to establish a process for reviewing postings and determining which should be

23  removed pursuant to guidelines.  *Id.* Ex. 6B at 60:15-61:6; 123:12-124:18; Ex. 8B at 94:23-97:25.

24  Johnson first entered the titles of the most popular Prince songs in the YouTube search field.  *Id.*

25  Ex. 8B at 40:9-20.  Then, Johnson viewed each returned posting to determine whether it should

26  be included on a list to be sent to YouTube.  *Id.* at 60:7-64:10.  To decide whether to include a

27  posting, Johnson considered whether it embodied a Prince composition to such a degree that the

28  composition was a focal point of the posting.  *Id.* Johnson assessed whether the posting used the

composition so much so that "there was a significant use of it . . . specifically if the song was recognizable, was in a significant portion of the video or was the focus of the video." *Id*. at 60:17-22, 64:1-10. Johnson did not include in notices to YouTube postings that did not meet these criteria. *Id*. at 60:25-63:15. *See id*. Ex. 6B at 56:20–57:13; 61:1–62:19; 64:9–17. Allen was always available for questions and follow-up, since Johnson sat outside Allen's office and communicated with him every day. *Id*. Ex. 6B at 123:23-124:18; 131:6–19.

The number of unauthorized uses of Prince's works that Universal discovered on YouTube was staggering. Allen Decl. ¶ 12, Exs. 4–8. Over a period of several months, Universal reviewed thousands of postings to determine whether they should be included on the list of requested removals. *Id.*; Klaus Decl. Ex. 6B at 99:19-100:9. Universal found that some users could and did re-post postings that Universal had requested YouTube remove, thereby exacerbating the "Whac-a-Mole" problem of trying to keep up with unauthorized uses. Klaus Decl. Ex. 6B at 199:3-201:3. Despite the formidable challenges of trying to keep up with this proliferation of unauthorized use, the facts show that Universal's review was careful and thoughtful, and the opposite of the unthinking and indiscriminate takedown campaign Plaintiff and her lawyers have alleged. *See id*. Ex. 40. ████████████

████████████████████████████████████

████████████████████████████████████

████████████ *Id*. Ex. 6B at 99:19-100:9; Allen Decl. ¶ 12.

### C. Universal's Review of, and Request that YouTube Remove, Plaintiff's "Let's Go Crazy" Posting

Among the postings Johnson reviewed was Plaintiff's, entitled "Let's Go Crazy #1," www.youtube.com/watch?v=N1KfJHFWlhQ. Johnson located the posting by searching for "Let's Go Crazy." When Johnson reviewed the posting, he "recognize[d] the song 'Let's Go Crazy' by Prince right off the bat." Klaus Decl. Ex. 8B at 76:3-81:16. The song was playing loudly in the background. *Id*. The title of the posting expressly took the name of the composition, "Let's Go Crazy." *Id*. Johnson noted that the videographer asked the child specifically about the music, and the child danced around in response. *Id*. Johnson distinguished

this posting from others he did not include on the removal lists because the Prince composition was immediately recognizable and not obscured by other sounds in the foreground. *Id.* Based on this review and in accordance with Universal's policies, Johnson concluded that the composition was a significant focus of the posting and that it should be included on the list to go to YouTube.

But that is not all he did. Johnson reviewed the posting a second time to confirm that his initial decision was correct. *Id.* at 85:15-88:24. Johnson testified that he "wanted to confirm what I initially thought watching it the first time so as to make a careful decision whether or not to put it on the list." *Id.* at 86:2-7. Johnson stated that the number of times he reviewed a posting would vary depending on what was required to make the decision for each video. *Id.* at 86:11-20, 87:22-88:24. He typically reviewed postings with multiple voices or other ambient noise a second time "to make sure that I'm making the right decision and confirm that the Prince clip—clips are significant portions of the videos." *Id.* at 88:8-13. After reviewing the "Let's Go Crazy" posting a second time, Johnson confirmed his initial decision was correct and put the posting on the list. *Id.* at 88:15-24; *id.* Ex. 9. Allen instructed another Universal employee, Alina Moffat, to transmit the list in an email to YouTube. *Id.* Ex. 6A at 52:4-53:25, Ex. 6B at 54:21-57:13, Ex. 10 at 14:22-17:25. Moffat incorporated the list into Universal's standing email format, which contained language dictated by YouTube's Terms of Use. *Id.* Ex. 9.

YouTube removed the "Let's Go Crazy" posting and sent Plaintiff an email notifying her that it had done so. Klaus Decl. Ex. 11. After receiving a conforming counter-notice from Plaintiff, YouTube restored Plaintiff's video to the site, where it remains.[3] *Id.* Ex. 14A at 228:22-229:21. To date, Plaintiff's posting has been viewed over one million times. *Id.* Ex. 7, Ex. 15.

### D. What Universal Did Not Know, and Could Not Have Known, About Plaintiff's Use When It Sent the Notice

In 2007, Universal could not know facts (or even allegations of fact) that only came to light after Plaintiff filed this suit, and in some cases only after Universal deposed Plaintiff in

---

[3] Plaintiff initially sent a non-conforming counter-notice, because Plaintiff did not want to consent to jurisdiction over any copyright suit, *i.e.*, she did not want to comply with the procedures that direct unresolved disputes about the propriety of a use of a copyrighted work to be resolved in an infringement action. Klaus Decl. Exs. 12, 13.

October 2009.  Universal could not have known that Plaintiff's posting was the *second* video of "Let's Go Crazy" she had filmed that day, and that she had set up the second video specifically to capture her son bouncing to the music.  Klaus Decl. Ex. 14A at 30:16-32:17, 37:6-21.  It could not have known that Plaintiff had chosen Prince's song specifically because the children had recently seen the Super Bowl halftime show and liked to dance to Prince.  *Id*. Ex. 16.  It could not have known that (as Plaintiff alleged for the first time in April 2008) she posted the video to YouTube because her mother in California had difficulty watching videos as email attachments.  SAC ¶ 16.  Universal also could not have known that Plaintiff told her mother that "Let's Go Crazy" made her son dance around the kitchen; or that Plaintiff's mother ██████████ ████████████████████████████████████████████████████████ when she watched the posting on YouTube.  Klaus Decl. Ex. 17 at 63:3-66:25.  None of that information was available to Universal in June 2007.  It was not even available to Universal after Plaintiff sent her counter-notice; at that time, a Universal employee contacted Plaintiff, and Plaintiff refused to talk to her.  *Id.* Ex. 14A at 150:24-151:25.

Plaintiff, however, knew that she could post the video privately if she wanted to do so.  *Id.* at 96:19-98:23.  She also knew that YouTube's Terms of Use required her to agree that she would only post works of her own, original creation.  *Id.* at 52:4-54:21; Ex. 18.  In fact, at the time Plaintiff made her posting, YouTube's "Copyright Tips" advised Plaintiff and other YouTube posters that YouTube would remove videos that incorporated copyrighted music as the music for the user's posting, as "Let's Go Crazy" did.  *Id.* Ex. 19; Ex. 14A at 113:24–116:8.

> **E.    Plaintiff's Own Response to YouTube's Removal of Her Posting, and the Reactions of Those She Turned To, Demonstrate That Her Posting Was Not a "Self-Evident" Fair Use**

Plaintiff's claim is premised on the allegation that her posting was a "self-evident" fair use.  But Plaintiff's communications contemporaneous with the posting's removal show that not even Plaintiff, her friends or lawyers instantly believed her posting to be "self-evident" fair use.

After YouTube removed the posting, Plaintiff consulted a friend, Theryn Fleming, whom she considered knowledgeable about legal issues.  Klaus Decl. Ex. 14A at 162:25-164:4.  Fleming said nothing about fair use.  She instead told Plaintiff: "using copyrighted music as background

1  music *is* copyright infringement, unless you have obtained permission." *Id.* Ex. 20 at 2.

2      A few days later, Plaintiff contacted EFF. ███████████████████████

3  ████████████████████████████████████████████████████████████

4  ████████████████████ *Id*. Ex. 21. ████████████████████████

5  ████████████████████████████████████████████████████████████

6  ████████████████ *Id.* Ex. 14B at 375:13–23, 376:11–15; 384:2–17. ██████████

7  ████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████

9  ████████████████████████████████████████████████

10 ████████████████████████" *Id.* Ex. 4.

11     Later that same day, Plaintiff recounted her communication with EFF on her blog, where

12 she had been writing about the takedown since it happened. *Id.* Ex. 1 at 1. Plaintiff's posting

13 referred to an EFF summary of a takedown dispute involving the commentator Michelle Malkin.

14 The following day, a poster named "Richard Z" (known to Plaintiff to be a reader of her blog, *id.*

15 Ex. 14 at 283:6-14) wrote Plaintiff that "the difference between your video and Malkin[]'s is that

16 she had some kind of commentary associated with the copyrighted material *whereas your video*

17 *was simply a home video with music playing in the background* (correct me if I'm wrong please).

18 *Malkin has the stronger fair use argument*." *Id.* Ex. 1 (emphasis added). This remark is flatly

19 inconsistent with the idea that Plaintiff's posting was self-evidently a fair use. Plaintiff did not

20 respond by saying that she believed her posting was a fair use. On the contrary, Plaintiff wrote:

21         *You're right Richard. Mine's not a "fair use" case at all.* Nor is it a parody. It's
           something different. I've never heard of anything like it, which is why I contacted
22         EFF.

23 *Id.* at 2 (emphasis added).

24     In an interview with "Zerogossip.com," Plaintiff said that she and an EFF lawyer only

25 came to the conclusion that her posting was non-infringing after discussing the matter:

26         [Plaintiff]:  When I contacted EFF, I did so at the suggestion of a
           friend of mine who's a lawyer in Canada. I wanted to know my
27         rights, how to protect myself in case UMPG sued me and in what
           way (if any) I had infringed copyright. *In discussing the situation*
28         *with one of the EFF lawyers, we came to the conclusion that I did*

                                    - 11 -          DEFTS' MOT. FOR SUMMARY JUDGMENT
                                                    CASE NO. CV-07-03783

*not infringe the copyright and eventually we decided to file this lawsuit*.

*Id*. Ex. 2 at 3 (emphasis added); *see also id*. Ex. 22 ¶ 7.

At her deposition, Plaintiff testified repeatedly that someone could look at her posting and reasonably conclude that it was infringing and not a fair use.  Klaus Decl. Ex. 14A at 271:19-25. ("Q:  Do you think anybody watching the video would have had to have known that it was a fair use?  A:  In my opinion, *some people may have thought it was infringing, some wouldn't*.") (emphasis added); *id*. at 173:1-16, 194:24-195:2, 276:23-277:6.  *See also id*. Ex. 14B at 424:2-8

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████  Again, these admissions are inconsistent with the theory that Universal had to recognize the posting as a fair use.

**F.      Plaintiff Suffered No Damages as a Result of Universal's Notice**

Plaintiff has abandoned her contention, made to get her past the motion to dismiss, that she incurred "actual expense to get professional services" to respond to Universal's notice.  572 F. Supp. 2d at 1156-57; Tr. of Hr'g, July 18, 2008, at 5:15-24.  She has shifted her damages contentions multiple times, serving three different Initial Disclosures purporting to identify her claimed damages.  Klaus Decl. Exs. 23–25.  Plaintiff now identifies three categories of damages she contends she has suffered:  the loss of her time and "other resources" spent responding to YouTube's removal of her video; the loss of access to YouTube's hosting services and a "chilling" of her First Amendment rights; and attorneys' fees and costs.  *Id*. Ex. 25.  None of these categories represents any actual economic loss to Plaintiff.  *Id*. Ex. 14A at 28:18-29:17 (zero lost wages); *id*. at 216:1-217:1; 324:2-330:1 (zero incurred for counsel's time helping Plaintiff respond to the notice); *id*. Ex. 3 ("I don't care that YouTube doesn't want to host it.  Not like I'm paying them."); *id*. Ex. 26.  As for Plaintiff's claim of First Amendment "chill," there is not (and cannot be) a First Amendment claim here, because neither Universal nor YouTube is a state actor.  And Plaintiff has not been deterred at all in speaking her mind.  She has done that frequently, in the media and on "blogs" (including one devoted to this case).  *See* piggyhawk.wordpress.com/; edenza.wordpress.com/.  Nor is Plaintiff (as she alleges) "fearful"

DEFTS' MOT. FOR SUMMARY JUDGMENT
CASE NO. CV-07-03783

1    about posting videos—even videos with copyrighted content—to the internet.  *See*

2    edenza.wordpress.com/2010/09/23/reality-bites-2/ (five-minute clip of Letterman show, Klaus

3    Decl. Ex. 27); edenza.wordpress.com/ 06/29/blog-challenge-30-7/ (entire Monty Python

4    sketch, Klaus Decl. Ex. 28).

5    **III.    ARGUMENT**

6        "The court shall grant summary judgment if the movant shows that there is no genuine

7    dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

8    Civ. P. 56(a).  If the moving party demonstrates the absence of disputed issues, the burden shifts

9    to the non-moving party to present specific facts showing that there is a genuine issue for trial.

10   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).

11       In this case, Plaintiff has no evidence to support two critical and independent elements of

12   her § 512(f) claim.  There is no evidence that Universal had actual knowledge that it was making

13   a material misrepresentation that the "Let's Go Crazy" posting was infringing when it sent the

14   email to YouTube.  Section A, *infra*.  And there is no evidence that Plaintiff sustained any actual

15   damages as required for a § 512(f) claim.  Section B, *infra*.  The Court can and should grant

16   summary judgment to Universal for either one or both of these reasons.[4]

17       **A.    There Is No Evidence That Universal Actually Knew It Was Making a**
           **Material Misrepresentation**
18

19   Section 512(f) of Title 17 provides:

20       Any person who ***knowingly materially misrepresents*** under this section . . . that
         material or activity is infringing . . . shall be liable for any damages, including
21       costs and attorneys' fees, incurred by the alleged infringer . . . as the result of the
         service provider relying upon such misrepresentation in removing or disabling
22       access to the material or activity claimed to be infringing[.]  (Emphasis added.)

23       To prove a violation of § 512(f), Plaintiff bears the burden of showing that Universal had

24   the *subjective* mental state of "actual knowledge" that it was making a material misrepresentation

25   _____

26   [4] As Universal has pointed out previously, its notice to YouTube was not sent "under" 17 U.S.C.
     § 512, but rather pursuant to YouTube's terms of use.  Universal does not agree that YouTube is
27   eligible for protection under the DMCA's "safe harbor," or that Universal has to send notices
     under the DMCA in order to insist on the removal of infringing material.  Klaus Decl. Ex. 9 at 6.
28   *See, e.g.,* D.N. 11 at 9-10.  Universal does not move for summary judgment on this ground but
     reserves the issue for trial, if necessary.

                                        - 13 -        DEFTS' MOT. FOR SUMMARY JUDGMENT
                                                      CASE NO. CV-07-03783

1   that the "Let's Go Crazy" posting was infringing. *Rossi*, 391 F.3d at 1004-05. The Court in

2   *Rossi* held that the "interpretive case law and the statutory structure [of the DMCA] support the

3   conclusion that the 'good faith belief' requirement in § 512(c)(3)(A)(v) *encompasses a subjective,*

4   *rather than objective*, standard." *Id*. at 1004 (emphasis added).

5           *In § 512(f), Congress included an expressly limited cause of action* for improper
        infringement notifications, *imposing liability only if the copyright owner's*
6       *notification is a knowing misrepresentation. A copyright owner cannot be liable*
        *simply because an unknowing mistake is made, even if the copyright owner acted*
7       *unreasonably in making the mistake. Rather, there must be a demonstration of*
        *some actual knowledge of misrepresentation on the part of the copyright owner.*
8
    *Id*. at 1004-1005 (emphasis added) (citations omitted).
9

10                  **1.    There Is No Evidence That Universal Actually Knew It Was**
                            **Misrepresenting any Material Fact to YouTube**

11          Under the plain language of § 512 and *Rossi*, Universal is entitled to summary judgment.

12  There is no evidence that Universal made any material misrepresentation of fact in its email to

13  YouTube. There certainly is no evidence that Universal had actual, subjective knowledge that it

14  was materially misrepresenting in bad faith any fact, including the fact that Universal believed

15  "that use of the material in the manner complained of is not authorized by the copyright owner, its

16  agent, or the law." 17 U.S.C. § 512(c)(3)(A)(v). The evidence that came out in discovery is

17  diametrically opposed to what Plaintiff alleged the evidence would show in order to survive the

18  motion to dismiss. Plaintiff alleged that Universal had "*actual subjective* knowledge" that the

19  "Let's Go Crazy" posting was a non-infringing fair use of "Let's Go Crazy." SAC ¶ 35

20  (emphasis added). There is no evidence—*none*—that Universal had any such actual subjective

21  knowledge. Plaintiff also alleged that Universal "should have known, if [it] had acted with

22  reasonable care and diligence," that her posting was excused as fair use. *Id*. ¶ 36. But the

23  "should have known" standard is irreconcilable with *Rossi*. (Further, as we demonstrate in

24  Section 3.a, *infra*, Plaintiff is simply wrong that her posting was "self-evidently" fair use.)

25          Plaintiff also alleged that Universal sought to remove her video, despite subjectively

26  knowing that the "Let's Go Crazy" posting was a fair use, because "Prince himself demanded"

27  that Universal do so, and Universal's policy was unflinchingly to seek a takedown of anything on

28  the internet embodying Prince's compositions. *Id*. ¶ 31. Indeed, the Court cited this as a critical

                                    - 14 -                  DEFTS' MOT. FOR SUMMARY JUDGMENT
                                                           CASE NO. CV-07-03783

allegation enabling Plaintiff's SAC to survive.  572 F. Supp. 2d at 1156.  But no evidence

supports this allegation.  As just discussed, there is no evidence that Universal had actual

subjective knowledge the posting was a fair use.  And, there is no evidence that Prince (or anyone

acting for him) "demanded" that Universal remove the "Let's Go Crazy" posting, or indeed even

communicated with anyone at Universal about that posting.  Allen Decl. ¶ 13.  In addition, there

is no evidence that Universal automatically sought a takedown of anything and everything on the

internet embodying a Prince composition.  When Universal knew that copyrighted material was

authorized to be on the internet, including where a compulsory license provided "authoriz[ation]

... [by] law," Universal declined to seek a takedown.  Allen Decl. ¶¶ 8-9, Exs. 2-3.  And Universal

did not send takedown requests to YouTube where Universal did not believe the Prince

composition was a significant part or focus of the posting.  Klaus Decl. Ex. 8B at 60:17-64:10.

There is no evidence that Universal made a knowing misrepresentation under § 512(f).  Summary

judgment should be granted to Universal on this ground.

## 2.  Universal's Consideration of Plaintiff's Posting Gave All the "Proper Consideration" to Fair Use that § 512 Can Be Construed to Require

In denying Universal's motion to dismiss, the Court stated that a copyright owner could be

liable under § 512(f) if it "issu[ed] a takedown notice without *proper consideration* of the fair use

doctrine."  572 F. Supp. 2d at 1155 (emphasis added).  For reasons Universal has set forth at

length in two rounds of motion to dismiss briefing (as well as briefing on the motion to certify the

Court's Order for interlocutory appeal), Universal respectfully disagrees with the Court's

construction of § 512.[5]  Because these Orders are law of the case in this Court, Universal will not

repeat its arguments but instead reserves its objections for appeal.

The Court has not defined what it means to "properly consider" fair use in this context.  In

denying interlocutory review, the Court stated that development of the factual record could help

inform the standard and how it applies here.  D.N. 53 at 4-5.  We submit that "proper

consideration" must be deemed satisfied if the party sending a notice considers information then

available to it that would be relevant to the fair use inquiry, were the defense actually to be raised

---

[5] *See* D.N. 11, 28, 38, 41, 47, 51.

DEFTS' MOT. FOR SUMMARY JUDGMENT
CASE NO. CV-07-03783

1    and litigated.  Universal's review of the "Let's Go Crazy" posting satisfied this standard.

2

               **a.**     **"Proper Consideration" of Fair Use Can Require No More Than Consideration of Available Information Relevant to a Fair Use Inquiry**

3

4         The Court's Orders expressly recognize that a "proper consideration" cannot require a

5    "full investigation," because any such requirement would be inconsistent with *Rossi*.  572 F.

6    Supp. 2d at 1155-56; D.N. 53 at 4.  Requiring a full investigation of fair also would be

7    inconsistent with the structure and purpose of the Copyright Act and the notice-and-takedown

8    provisions of the DMCA.  As the Ninth Circuit observed in *Rossi*, Congress intended for § 512 to

9    "balance *the need for rapid response to potential infringement* with the end-users legitimate

10    interests in not having material removed without recourse."  S. Rep. No. 105-190, at 21 (1998)

11    (emphasis added) (quoted in *Rossi*, 391 F.3d at 1003).  The need for copyright owners to respond

12    rapidly to infringement on the internet is particularly acute, given (i) the exponential growth of

13    infringing content on the internet (including the very type of "Whac-a-Mole" re-postings

14    Universal faced regarding postings embodying Prince compositions, Klaus Decl. Ex. 6B at 199:3-

15    201:3; and (ii) case law adopting the view that the notice-and-takedown procedure is the

16    copyright owner's primary recourse against various service providers (including, according to

17    these cases, user-generated content sites) for infringement facilitated through their sites.  *See*

18    *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022, 1037-38 (9th Cir. 2011).[6]

19    Requiring a party to analyze a fair use defense before sending a takedown notice necessarily

20    would slow down and thereby impede copyright owners' ability to avail themselves even of the

21    notice-and-takedown remedy.  Contrary to what Plaintiff has suggested, an analysis of fair use is

22    not an "I know it when I see it" exercise.  *Cf. Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964)

23    (Stewart, J., concurring).  Proceeding through four fair use factors, balancing the results, and

24    arriving at an opinion as to whether a particular use is a fair use necessarily is time-consuming.  It

25    also is bound up in uncertainty, since fair use determinations "[u]sually … are so clouded that one

26

---

[6] While Universal obviously disagrees with *Shelter Capital*—indeed it has a petition for rehearing

27    that remains pending before the Ninth Circuit—the result in that case to date (and other cases that

have reached similar results) is relevant when considering the burden to be imposed on copyright

28    holders in sending notices.

DEFTS' MOT. FOR SUMMARY JUDGMENT
CASE NO. CV-07-03783

1    has no sure idea how they will fare until the matter is litigated." 3 *Nimmer on Copyright*

2    § 12B.08 at 12B-93 n.16 (Matthew Bender, Rev. Ed.).  Such an inquiry in fact is impossible in

3    the context of reviewing content on sites like YouTube, because the copyright owner necessarily

4    will not have access to all the facts required to conduct such an investigation, including facts

5    related to the claimed purpose and character of the claimed fair use.

6         The Court's Orders have spoken of the importance of "prevent[ing] the abuse of takedown

7    notices," and not rendering § 512(f) "superfluous."  572 F. Supp. 2d at 1156.  If "proper

8    consideration" of fair use is required, and if the sender of a notice considers the available facts

9    that would be relevant to a fair use inquiry and decides to send the notice, the notice cannot be

10   described as an abuse of the process.  Someone may object and claim the decision was mistaken,

11   to be sure, but *Rossi* makes it clear that § 512(f) does not impose liability for mistakes, even

12   unreasonable ones.  *Rossi*, 391 F.3d at 1004-05.  And, the counter-notification and "put-back"

13   procedures—which Plaintiff fully availed herself of here—serve to protect "third parties' interests

14   in ensuring that material not be taken down."  H.R. Rep. No. 105-551, pt. 2, at 59 (1998).

15        For all these reasons, to the extent a copyright owner is required to "properly consider fair

16   use" before sending a takedown notice, the most that can be required for such consideration is

17   that the sender of the notice consider, from the information then available, the facts that would be

18   relevant to the type of fair use inquiry that would apply, were the defense to be raised.

19                      **b.      Universal "Properly Considered" Fair Use**

20        The undisputed facts here show that Universal gave all the "proper consideration" to fair

21   use that reasonably can be required.  Universal did not ignore "the particular characteristics" of

22   the "Let's Go Crazy" posting.  SAC ¶ 31.  Universal considered the facts then available that

23   would have been relevant to a fair use defense.  Plaintiff claims her use of "Let's Go Crazy" was

24   incidental and "background."  *Id.* ¶ 34.  Claims of "incidental" fair use are well-known in

25   copyright.  The critical questions in such cases—including whether the copyrighted work was the

26   focus of the use—are the questions Universal considered in reviewing Plaintiff's posting.

27                      (1)      **"The Purpose and Character of the Use"**

28        This factor considers whether the claimed fair use is (i) commercial, 17 U.S.C. § 107(1),

- 17 -

DEFTS' MOT. FOR SUMMARY JUDGMENT
CASE NO. CV-07-03783

1  and (ii) "transformative," *i.e.*, whether it merely supplants the original or repurposes it to create

2  something new. *Leadsinger*, 512 F.3d at 530.

3        Universal's review focused on the unauthorized use of Prince's composition in an

4  indisputably commercial setting. Allen Decl. ¶¶ 10-12; Klaus Decl. Ex. 6B at 156:16-157:22.

5  The use here is *not* a home movie. It is the posting of a synchronized composition to YouTube,

6  an ad-supported commercial site. *See* Section II.A, *supra*. In addition, the posting bore a title

7  that made it retrievable by a search for the popular Prince song it contained.

8        Plaintiff claims her purpose was "transformative" because she used the music as

9  background to a posting intended to be viewed by a far-away mother who had difficulty viewing

10  email attachments. Plaintiff's use fits within none of the examples in the preamble to Section 107

11  ("criticism, comment, news reporting, teaching . . ., scholarship, or research"). More important,

12  Plaintiff's summary contention of "transformative"-ness could not have been part of Universal's

13  analysis, since in June 2007, Universal had no way of knowing who Plaintiff was, much less her

14  claimed purpose in making the posting.

15        Universal's consideration of whether the composition was the focus of the posting and the

16  compositions use as the synchronized soundtrack, *id.* Ex. 8B at 75:4-81:16, include the pivotal

17  questions that courts analyze when confronted with claims that "incidental" uses are fair uses.

18  *See Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 79 (2d Cir. 1997) (incidental use of

19  copyrighted poster of painting in episode of television program not a fair use where poster's

20  "decorative effect"—"a central purpose for which it was created"—was "plainly evident");

21  *Higgins v. Detroit Educational Television Found.*, 4 F. Supp. 2d 701, 707 (E.D. Mich. 1998)

22  (finding fair use where use of composition that was not "by any means the focal point of the

23  action"); *Jackson v. Warner Bros., Inc.*, 993 F. Supp. 585, 589 (E.D. Mich. 1997) (analyzing

24  whether copyrighted paintings were the "focus" of the motion picture).[7] Universal's knowledge

25

---

[7] Plaintiff's proffered "expert" on fair use, Prof. Peter Jaszi, categorizes Plaintiff's use as an
26  example of "incidental" fair use, and his organizations' publications specifically list as
considerations for fair use whether the work said to be "incidentally" used is the focus of a user-
27  generated video. *See* Klaus Decl. Ex. 29 at 130:1–4 (discussing Ex. 30 at 33 & n.230); Ex. 31 at
12; Ex. 32 at 6–7 ("the video maker should be sure . . . that the use is not so extensive that it calls
28  attention to itself as the primary focus of interest . . .").

DEFTS' MOT. FOR SUMMARY JUDGMENT
CASE NO. CV-07-03783

that the music was the soundtrack for the posting also would be relevant to a full fair use analysis: copyrighted compositions frequently are used as soundtracks for video postings, and a use "for the same intrinsic purpose as the copyright holder's . . . seriously weakens a claimed fair use." *Worldwide Church of God v. Philadelphia Church of God, Inc*., 227 F.3d 1110, 1117 (9th Cir. 2000).  Universal also knew such a use is not subject to compulsory licensing.  Allen Decl. ¶ 5.  If synchronization with visual images were all it took to make a secondary work "transformative," then presumably Congress would not have implicitly recognized the copyright holder's right to control synchronization rights.  Where Congress intended to recognize a compulsory license for compositions, it did so in § 115.  There is no basis to conclude Congress intended that kind of compulsory license for synch rights through a broad fair use defense for video synchronizations.[8]

(2)     **"The Nature of the Copyrighted Work"**

Universal's review assessed how publicly posted videos incorporated Prince's musical compositions, which indisputably are core works of artistic expression.  Musical compositions are "precisely the sort of expression that the copyright law aims to protect." *Leadsinger*, 512 F.3d at 531; *see also Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994).  ███████

████████████████████████████████████████████████████████████

██████████████████████████████  Allen Decl. ¶¶ 6, 10; Klaus Decl. Ex. 6B at 96:9-97:22.  "Let's Go Crazy" is one of his most artistically significant works.  Allen Decl. ¶ 6.

(3)     **"The Amount and Substantiality Of The Use"**

The third factor considers what portions of the copyrighted work were taken in relation to the whole, and conversely to what degree the copyrighted work is embodied in the second work. *See Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 565-66 (1985).  The inquiry has both qualitative and quantitative dimensions—what was taken is as significant as how much was taken. *Salinger v. Random House*, 811 F.2d 90, 98-99 (2d Cir. 1987).  Universal observed that the soundtrack was *immediately recognizable* as "Let's Go Crazy," that it played

---

[8] All this may explain why Fleming first told Plaintiff that her use was infringing. Klaus Decl. Ex. 20 at 2, ███████████████████████████████████████████████ *Id*. Ex. 4.

DEFTS' MOT. FOR SUMMARY JUDGMENT
CASE NO. CV-07-03783

1    *throughout the posting* and was integral to it, and that the off-camera voice specifically called

2    attention to the music.  *See* Klaus Decl. Ex. 8B at 75:4-81:16.  Universal's review clearly gave

3    proper consideration to the facts relevant to this factor.

(4)    **"The Effect of the Use On the Potential Market For Or Value of the Copyrighted Work"**

5
This factor does *not* ask whether the "Let's Go Crazy" posting *by itself* resulted in any

6    lost revenue.  Rather, it asks "'whether unrestricted and widespread conduct of the sort engaged

7    in by [Lenz] . . . would result in a substantially adverse impact on the potential market' for the

8    original." *Campbell*, 510 U.S. at 590. ███████████████████████████████████████

9    ███████████████████████████████ Allen Decl. ¶¶ 6, 10; Klaus Decl. Ex. 6B at 96:9-22.

10   ████████████████████████████████████████████████████████████████████████

11   ███████████████████████████████████████████████████████████████████████

12   █████  Allen Decl. ¶ 6; Klaus Decl. Ex. 6B at 135:7-136:8.

13   ████████████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████  The case law holds otherwise. ██████

15   ████████████████████████████████████████████████████████████████████████

16   ████████████████████████████████████████  *Salinger*, 811 F.2d at 99.

17   This factor looks to the *potential* market for the synchronization of "Let's Go Crazy," and

18   protects the copyright holder's "right to change his mind." *Worldwide Church of God,* 227 F.3d

19   at 1119. █████████████████████████████████████████████████████████

20                                    *    *    *

21
Universal discusses the fair use factors and case law *not* because Universal's review was

22   required to proceed through such an analysis (that cannot have been required), or because

23   Universal is obligated to show that Plaintiff's use was not a fair use (that is not and cannot be

24   Universal's burden here).  Rather, the foregoing shows that the facts that informed Universal's

25   consideration satisfy any obligation to "properly consider" fair use that reasonably may be

26   required.  Assuming the Court adheres to its interpretation of § 512 to require such pre-notice

27   consideration, the undisputed facts show that Plaintiff cannot show that Universal violated such a

28

- 20 -

requirement.  Universal is entitled to summary judgment.

> **3.      Plaintiff's Alternative Arguments to Establish That Universal Actually Knew It Was Making a Material Misrepresentation Fail**

Plaintiff offers two alternative arguments to impute to Universal actual knowledge that Plaintiff's posting was a non-infringing fair use.  Neither has legal or factual support.

> **a.      Plaintiff's Insistence That Her Posting Was a "Self-Evident" Fair Use Does Not Establish Universal's Actual Knowledge of a Material Misrepresentation**

Plaintiff tries to bypass any analysis of what Universal actually knew by insisting that her posting was a "self-evident" fair use, so that regardless of what Universal actually knew, Universal would had to have known Plaintiff's posting was a fair use if Universal was acting in good faith.  SAC ¶ 34, 36.  This contention is legally and factually baseless.

*First*, the claim of "self-evident" use is legally untenable.  The Supreme Court has made it clear that fair use does not lend itself to "bright-line rules."  *Campbell*, 510 U.S. at 577.  "Since the doctrine is an equitable rule of reason, no generally applicable definition is possible, and *each case raising the question must be decided on its own facts*."  *Harper & Row,* 471 U.S. at 560 (emphasis added) (quotation and alteration omitted).  Plaintiff's assertion of "self-evident" fair use is inconsistent with this controlling law.[9]

*Second*, the claim of "self-evident" fair use is inconsistent with *Rossi*, since the "self-evident" theory asks what the defendant should have known, rather than what it actually knew.

*Third*, even if there were such a creature as a "self-evident" fair use, Plaintiff's posting is not it.  As demonstrated in the preceding section, based on the information Universal knew from the posting, the claim for fair use certainly is not "self-evident."  Indeed, on these facts and in

---

[9] Plaintiff undoubtedly will argue that the recent decision in *Brownmark Films, LLC v. Comedy Partners*, ___ F.3d ___, 2012 WL 2044806 (7th Cir. June 7, 2012), a case in which Plaintiff's counsel filed an amicus brief, establishes that some fair uses are obvious.  The court there did say that the defendant's parody of plaintiff's video in an episode of *South Park* was "an obvious case of fair use," *id*. at *4, but that was pure dictum.  The plaintiff in that case did not address whether the defendant's use was a fair use at all, instead arguing exclusively that the court could not adjudicate the fair use defense on a 12(b)(6) motion.  The Seventh Circuit held that fair use could be raised on a 12(b)(6) motion in that case, and therefore held that the plaintiff had waived any right to contest whether the defendant's use was fair use.  *Id*.  Moreover, the court discussed the use there as a parody, *id*., which Plaintiff has admitted her use was not.  Klaus Decl. Ex. 1 at 2.

1   light of the law on "incidental" fair uses, the claim for fair use is weak; Universal clearly was not

2   bound to find Plaintiff's use to be a fair use.  And, as demonstrated by the undisputed facts

3   summarized in Section II.E, *supra*, it was not even "self-evident" to Plaintiff (who was

4   knowledgeable about copyright and fair use, given her experience as a writer and editor, Klaus

5   Decl. Ex. 14B at 384:2-17; *id*. Ex. 33), or to those she contacted about the posting and takedown

6   (including Creative Commons and EFF, which admittedly take an expansive view of fair use, *id*.

7   Ex. 39), that the posting was a fair use.  Given these undisputed facts, no fact-finder could find

8   that fair use was self-evident to Universal simply from viewing the posting.

9               **b.      No Evidence Supports Plaintiff's "Willful Blindness" Charge**

10          Plaintiff at times has asserted that Universal's "actual knowledge" and "subjective bad

11  faith" can be established because Universal "willfully blinded" itself to whether her posting was a

12  fair use.  Plaintiff has no evidence to support this charge.

13          The Supreme Court defined the standard for willful blindness in *Global-Tech*:

14              While the Courts of Appeals articulate the doctrine of willful
                blindness in slightly different ways, all appear to agree on two basic
15              requirements: (1) the defendant must subjectively believe that there
                is a high probability that a fact exists and (2) the defendant must
16              take deliberate actions to avoid learning of that fact. *We think these
                requirements give willful blindness an appropriately limited scope*
17              *that surpasses recklessness and negligence. Under this formulation,*
                *a willfully blind defendant is one who takes deliberate actions to*
18              *avoid confirming a high probability of wrongdoing and who can*
                *almost be said to have actually known the critical facts*.
19
20  *Global-Tech*, 131 S. Ct. at 2070-71 (emphasis added).  While *Global-Tech* involved a

21  claim for inducing patent infringement, the standard the Court articulated is generally applicable

22  to claims of "willful blindness," as other courts (including in copyright cases) have recognized.

23  *See, e.g., Viacom*, 676 F.3d at 34-35; *Liberty Media Holding, LLC v. Tabora*, 2012 WL 28788, at

24  *6 (S.D. Cal. Jan. 4, 2012).

25          Plaintiff cannot show "willful blindness" under *Global-Tech*.  There is no evidence that at

26  the time in issue, Universal "subjectively believe[d]" that there was a "high probability" that

27  Plaintiff's posting (or indeed any postings that were the subject of its notices to YouTube) were

28  fair uses of the underlying works.  To the contrary, the facts show that Universal confronted a

1    tremendous number of unauthorized uses of Prince's compositions on YouTube, and had no

2    subjective belief that such uses in general (or Plaintiff's in particular) were subject to the fair use

3    defense. *See* Klaus Decl. Ex. 6B at 99:19-100:9, 199:3-201:3; Allen Decl. ¶ 12. There is no

4    evidence that Universal acted deliberately and consciously to avoid learning about fair uses. The

5    facts show that Universal employed a careful procedure to deal with a burgeoning proliferation of

6    unauthorized uses. *See* Section II.B, *supra*. Plaintiff's willful blindness argument fails.

7               **B.      Plaintiff Incurred No Damages Under § 512(f)**

8               Damages are a required element of a claim for a knowing misrepresentation under

9    § 512(f), just as damages are an essential element of any claim for misrepresentation. *See*

10   Restatement (Second) of Torts § 525 (1977). Section 512(f) requires proof of damages "incurred

11   by the alleged infringer . . . who is injured by such misrepresentation, as the result of the service

12   provider relying upon such misrepresentation." 17 U.S.C. § 512(f). This Court has construed

13   § 512(f) to mean that Plaintiff must prove that she "incurred" damages "proximately caused by

14   the misrepresentation to the service provider and the service provider's reliance on the

15   misrepresentation." D.N. 250 at 14. With respect to Universal's affirmative defense that Plaintiff

16   had "no damages"—a defense relevant to Plaintiff's request for injunctive relief (which requires a

17   showing of irreparable harm)—the Court further construed § 512(f) to mean that damages need

18   not be "economic and substantial." *Id*. at 14, 16. Universal respectfully disagrees with the

19   Court's holding as applied to Universal's affirmative defense and reserves its objections for

20   appeal. We submit that, for purposes of Plaintiff's affirmative claim for relief, Plaintiff must

21   prove *actual economic loss*. *See* Restatement (Second) of Torts §§ 525, 549 (*pecuniary loss* is an

22   element of misrepresentation claims). It is one thing to say that Congress may have wanted to

23   give a § 512(f) plaintiff the ability to seek immediate injunctive relief—on a schedule even faster

24   than that provided for in the DMCA put-back provisions—where a plaintiff has no evidence of

25   actual economic loss. Nothing in the text, structure or legislative history of § 512 shows that

26   Congress intended to reverse the common law presumption that a misrepresentation plaintiff

27   cannot obtain judgment on her claim without having suffered any actual pecuniary loss.

28               Plaintiff has no evidence showing any pecuniary loss in any of her three categories of

claimed damages.  *See* Klaus Decl. Ex. 25.

***The Loss of YouTube's Hosting Services and "Chilling" of Plaintiff's First Amendment Rights***.  YouTube has always been free to Plaintiff, and she has admitted she has no damages on this score:  "I don't care that YouTube doesn't want to host it.  Not like I'm paying them.  That's their business."  *Id.* Ex. 3 (emphasis added); *accord id.* Ex. 21.  In addition, Plaintiff did not lose access to YouTube for her other postings. Id. Ex. 14A at 73:3-74:1.  As for claimed First Amendment damages:  there is no state action, and the claim that Plaintiff has been "chilled" in exercising her rights has no factual support (and indeed is contrary to the facts).  *See, e.g., id.* Exs. 27-28.

***Lost Time and Resources***.  Plaintiff claims she lost five to 10 hours of time responding to Universal's notice, and that such time should be compensated at the applicable minimum wage. *Id.* Ex. 25.  But Plaintiff admits that this alleged lost time did not translate into any actual loss; Plaintiff did not lose any actual wages.  *Id.* Ex. 14A at 28:18-20; 315:2-24.

***Attorney's Fees and Costs***.  Finally, Plaintiff claims that she has "incurred" damages from pre-litigation work done by her lawyers in responding to Universal's notice.  Plaintiff testified that she has no obligation to pay those lawyers anything for any of this work.  *Id.* Ex. 14A at 325:3-23.  The only document that speaks of any contingent obligation Plaintiff may have to pay those lawyers is for ███████████████, *id.* Ex. 34, which this Court has held is not "damages" under § 512(f).  D.N. 250 at 15-16.  Moreover, the work that Plaintiff claims her counsel at EFF did on trying to ensure that her posting was restored is not separable from her and EFF's litigation plan. ████████████████████████

████████████████████████████████████████

█████████████████████████████████   *See* Klaus Decl. Ex.

35 ████████████████████████████████████

█████   Exs. 36-38.  Because claimed litigation expenses are not "damages" under § 512(f), the claimed "damages" for attorney time or costs on the put-back notice do not satisfy Plaintiff's burden.

DEFTS' MOT. FOR SUMMARY JUDGMENT
CASE NO. CV-07-03783

In sum, Plaintiff has no damages for purposes of § 512(f).  This is an independent ground justifying summary judgment for Universal.

## IV.     CONCLUSION

Universal respectfully requests that the Court grant its motion.

DATED:  July 13, 2012                                MUNGER, TOLLES & OLSON LLP


                                                     By:  _____ */s/ Kelly M. Klaus*_____
                                                                KELLY M. KLAUS

                                                     Attorneys for Defendants