FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| STEPHANIE LENZ,<br>        *Plaintiff-Appellee/*<br>        *Cross-Appellant,*<br><br>        v.<br><br>UNIVERSAL MUSIC CORP.;<br>UNIVERSAL MUSIC PUBLISHING INC.;<br>UNIVERSAL MUSIC PUBLISHING<br>GROUP INC.,<br>        *Defendants-Appellants/*<br>        *Cross-Appellees.* | Nos. 13-16106<br>       13-16107<br><br>D.C. No.<br>5:07-cv-03783-<br>JF<br><br><br>OPINION |

Appeal from the United States District Court
for the Northern District of California
Jeremy D. Fogel, District Judge, Presiding

Argued and Submitted
July 7, 2015—San Francisco, California

Filed September 14, 2015

Before: Richard C. Tallman, Milan D. Smith, Jr.,
and Mary H. Murguia, Circuit Judges.

Opinion by Judge Tallman;
Partial Concurrence and Partial Dissent by Judge Milan D.
Smith, Jr.

# SUMMARY[*]

## Digital Millennium Copyright Act

The panel affirmed the district court's denial of the parties' cross-motions for summary judgment in an action under the Digital Millennium Copyright Act alleging that the defendants violated 17 U.S.C. § 512(f) by misrepresenting in a takedown notification that the plaintiff's home video constituted an infringing use of a portion of a Prince composition.

The panel held that the DCMA requires copyright holders to consider fair use before sending a takedown notification, and that failure to do so raises a triable issue as to whether the copyright holder formed a subjective good faith belief that the use was not authorized by law. Regarding good faith belief, the panel held that the plaintiff could proceed under an actual knowledge theory. The panel held that the willful blindness doctrine may be used to determine whether a copyright holder knowingly materially misrepresented that it held a good faith belief that the offending activity was not a fair use. The plaintiff here, however, could not proceed to trial under a willful blindness theory because she did not show that the defendants subjectively believed there was a high probability that the video constituted fair use. The panel also held that a plaintiff may seek recovery of nominal damages for an injury incurred as a result of a § 512(f) misrepresentation.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Judge M. Smith concurred in part, dissented in part, and concurred in the judgment. Dissenting from Part IV.C of the majority opinion, addressing good faith belief, he questioned whether § 512(f) directly prohibits a party from misrepresenting that it has formed a good faith belief that a work is subject to the fair use doctrine. He wrote that the plain text of the statute prohibits misrepresentations that a work is infringing, not misrepresentations about the party's diligence in forming its belief that the work is infringing. Judge M. Smith disagreed that there was any material dispute about whether the defendants considered fair use, and he wrote that the willful blindness doctrine does not apply where, as here, a party has failed to consider fair use and has affirmatively misrepresented that a work is infringing.

## COUNSEL

Kelly M. Klaus (argued) and Melinda LeMoine, Munger, Tolles & Olson LLP, Los Angeles, California, for Defendants-Appellants/Cross-Appellees.

Corynne McSherry (argued), Cindy Cohn, Kurt Opsahl, Daniel K. Nazer, and Julie Samuels, Electronic Frontier Foundation, San Francisco, California; Ashok Ramani, Michael S. Kwun, and Theresa H. Nguyen, Keker & Van Nest LLP, San Francisco, California, for Plaintiff-Appellee/Cross-Appellant.

Steven Fabrizio and Scott Wilkens, Jenner & Block LLP, Washington, D.C., for Amicus Curiae Motion Picture Association of America, Inc.

Jennifer Pariser, Of Counsel, Recording Industry Association of America, Washington, D.C.; Cynthia Arato, Marc Isserles, and Jeremy Licht, Shapiro, Arato & Isserles LLP, New York, New York, for Amicus Curiae Recording Industry Association of America.

Joseph Gratz, Durie Tangri LLP, San Francisco, California, for Amici Curiae Google Inc., Twitter Inc., and Tumblr, Inc.

Marvin Ammori and Lavon Ammori, Ammori Group, Washington, D.C., for Amicus Curiae Automatic, Inc.

Julie Ahrens and Timothy Greene, Stanford Law School Center for Internet and Society, Stanford, California, for Amici Curiae Organization fo Transformative Works, Public Knowledge, and International Documentary Association.

## OPINION

TALLMAN, Circuit Judge:

Stephanie Lenz filed suit under 17 U.S.C. § 512(f)—part of the Digital Millennium Copyright Act ("DMCA")—against Universal Music Corp., Universal Music Publishing, Inc., and Universal Music Publishing Group (collectively "Universal"). She alleges Universal misrepresented in a takedown notification that her 29-second home video (the "video") constituted an infringing use of a portion of a composition by the Artist known as Prince, which Universal insists was unauthorized by the law. Her claim boils down to a question of whether copyright holders have been abusing the extrajudicial takedown procedures provided for in the DMCA by declining to first evaluate whether the content

qualifies as fair use.   We hold that the statute requires copyright holders to consider fair use before sending a takedown notification, and that failure to do so raises a triable issue as to whether the copyright holder formed a subjective good faith belief that the use was not authorized by law.  We affirm the denial of the parties' cross-motions for summary judgment.

I

Founded in May 2005, YouTube (now owned by Google) operates a website that hosts user-generated content. *About YouTube*, YouTube.com, https://www. youtube.com/yt/about/ (last visited September 4, 2015).   Users upload videos directly to the website. *Id.*  On February 7, 2007, Lenz uploaded to YouTube a 29-second home video of her two young children in the family kitchen dancing to the song *Let's Go Crazy* by Prince.[1] Available at https://www.youtube.com/watch?v=N1Kf JHFWlhQ (last visited September 4, 2015). She titled the video "'Let's Go Crazy' #1."   About four seconds into the video, Lenz asks her thirteen month-old son "what do you think of the music?" after which he bobs up and down while holding a push toy.

At the time Lenz posted the video, Universal was Prince's publishing administrator responsible for enforcing his copyrights.   To accomplish this objective with respect to YouTube, Robert Allen, Universal's head of business affairs, assigned Sean Johnson, an assistant in the legal department,

---

[1] YouTube is a for-profit company that generates revenues by selling advertising.  If users choose to become "content partners" with YouTube, they share in a portion of the advertising revenue generated.  Lenz is not a content partner and no advertisements appear next to the video.

to monitor YouTube on a daily basis. Johnson searched
YouTube for Prince's songs and reviewed the video postings
returned by his online search query. When reviewing such
videos, he evaluated whether they "embodied a Prince
composition" by making "significant use of . . . the
composition, specifically if the song was recognizable, was
in a significant portion of the video or was the focus of the
video." According to Allen, "[t]he general guidelines are that
. . . we review the video to ensure that the composition was
the focus and if it was we then notify YouTube that the video
should be removed."

Johnson contrasted videos that met this criteria to those
"that may have had a second or less of a Prince song, literally
a one line, half line of Prince song" or "were shot in
incredibly noisy environments, such as bars, where there
could be a Prince song playing deep in the background . . . to
the point where if there was any Prince composition
embodied . . . in those videos that it was distorted beyond
reasonable recognition." None of the video evaluation
guidelines explicitly include consideration of the fair use
doctrine.

When Johnson reviewed Lenz's video, he recognized
*Let's Go Crazy* immediately. He noted that it played loudly
in the background throughout the entire video. Based on
these details, the video's title, and Lenz's query during the
video asking if her son liked the song, he concluded that
Prince's song "was very much the focus of the video." As a
result, Johnson decided the video should be included in a
takedown notification sent to YouTube that listed more than
200 YouTube videos Universal believed to be making

unauthorized use of Prince's songs.[2]  The notice included a
"good faith belief" statement as required by 17 U.S.C.
§ 512(c)(3)(A)(v): "We have a good faith belief that the
above-described activity is not authorized by the copyright
owner, its agent, or the law."

After receiving the takedown notification, YouTube
removed the video and sent Lenz an email on June 5, 2007,
notifying her of the removal.   On June 7, 2007, Lenz
attempted to restore the video by sending a counter-
notification to YouTube pursuant to § 512(g)(3).   After
YouTube provided this counter-notification to Universal per
§ 512(g)(2)(B), Universal protested the video's reinstatement
because Lenz failed to properly acknowledge that her
statement was made under penalty of perjury, as required by
§ 512(g)(3)(C). Universal's protest reiterated that the video
constituted infringement because there was no record that
"either she or YouTube were ever granted licenses to
reproduce, distribute, publicly perform or otherwise exploit
the Composition." The protest made no mention of fair use.
After obtaining *pro bono* counsel, Lenz sent a second
counter-notification on June 27, 2007, which resulted in
YouTube's reinstatement of the video in mid-July.

## II

Lenz filed the instant action on July 24, 2007, and her
Amended Complaint on August 15, 2007. After the district
court dismissed her tortious interference claim and request for

---

[2] "[T]he parties do not dispute that Lenz used copyrighted material in her
video or that Universal is the true owner of Prince's copyrighted music."
*Lenz v. Universal Music Corp.*, 572 F. Supp. 2d 1150, 1153–54 (N.D. Cal.
2008).

declaratory relief, Lenz filed her Second Amended Complaint on April 18, 2008, alleging only a claim for misrepresentation under § 512(f). The district court denied Universal's motion to dismiss the action.

On February 25, 2010, the district court granted Lenz's partial motion for summary judgment on Universal's six affirmative defenses, including the third affirmative defense that Lenz suffered no damages. Both parties subsequently moved for summary judgment on Lenz's § 512(f) misrepresentation claim. On January 24, 2013, the district court denied both motions in an order that is now before us.

The district court certified its summary judgment order for interlocutory appeal under 28 U.S.C. § 1292(b), and stayed proceedings in district court pending resolution of the appeal. We granted the parties permission to bring an interlocutory appeal.

### III

We review *de novo* the district court's denial of summary judgment. When doing so, we "must determine whether the evidence, viewed in a light most favorable to the non-moving party, presents any genuine issues of material fact and whether the district court correctly applied the law." *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). On cross-motions for summary judgment, we evaluate each motion independently, "giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

When evaluating an interlocutory appeal, we "may address any issue fairly included within the certified order

because it is the *order* that is appealable, and not the controlling question identified by the district court." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996) (emphasis in original) (quotation omitted). We may therefore "address those issues *material* to the order from which appeal has been taken." *In re Cinematronics, Inc.*, 916 F.2d 1444, 1449 (9th Cir. 1990) (emphasis in original) (permitting appellate review of a ruling issued prior to the order certified for interlocutory appeal).

## IV

Effective on October 28, 1998, the DMCA added new sections to existing copyright law by enacting five Titles, only one of which is relevant here: Title II—Online Copyright Infringement Liability Limitation Act—now codified in 17 U.S.C. § 512. Sections 512(c), (f), and (g) are at the heart of the parties' dispute.

## A

Section 512(c) permits service providers, e.g., YouTube or Google, to avoid copyright infringement liability for storing users' content if—among other requirements—the service provider "expeditiously" removes or disables access to the content after receiving notification from a copyright holder that the content is infringing. 17 U.S.C. § 512(c). Section 512(c)(3)(A) sets forth the elements that such a "takedown notification" must contain. These elements include identification of the copyrighted work, identification of the allegedly infringing material, and, critically, a statement that the copyright holder believes in good faith the infringing material "is not authorized by the copyright owner, its agent, or the law." *Id.* § 512(c)(3)(A). The procedures

outlined in § 512(c) are referred to as the DMCA's "takedown procedures."

To avoid liability for disabling or removing content, the service provider must notify the user of the takedown. *Id.* § 512(g)(1)–(2). The user then has the option of restoring the content by sending a counter-notification, which must include a statement of "good faith belief that the material was removed or disabled as a result of mistake or misidentification . . . ." *Id.* § 512(g)(3)(C). Upon receipt of a valid counter-notification, the service provider must inform the copyright holder of the counter-notification and restore the content within "not less than 10, nor more than 14, business days," unless the service provider receives notice that the copyright holder has filed a lawsuit against the user seeking to restrain the user's infringing behavior. *Id.* § 512(g)(2)(B)–(C). The procedures outlined in § 512(g) are referred to as the DMCA's "put-back procedures."

If an entity abuses the DMCA, it may be subject to liability under § 512(f). That section provides: "Any person who knowingly materially misrepresents under this section—(1) that material or activity is infringing, or (2) that material or activity was removed or disabled by mistake or misidentification, shall be liable for any damages . . . ." *Id.* § 512(f). Subsection (1) generally applies to copyright holders and subsection (2) generally applies to users. Only subsection (1) is at issue here.

## B

We must first determine whether 17 U.S.C. § 512(c)(3)(A)(v) requires copyright holders to consider whether the potentially infringing material is a fair use of a

copyright under 17 U.S.C. § 107 before issuing a takedown notification. Section 512(c)(3)(A)(v) requires a takedown notification to include a "statement that the complaining party has a good faith belief that the use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law." The parties dispute whether fair use is an authorization under the law as contemplated by the statute—which is so far as we know an issue of first impression in any circuit across the nation. "Canons of statutory construction dictate that if the language of a statute is clear, we look no further than that language in determining the statute's meaning. . . . A court looks to legislative history only if the statute is unclear." *United States v. Lewis*, 67 F.3d 225, 228–29 (9th Cir. 1995) (citations omitted). We agree with the district court and hold that the statute unambiguously contemplates fair use as a use authorized by the law.

Fair use is not just excused by the law, it is wholly authorized by the law. In 1976, Congress codified the application of a four-step test for determining the fair use of copyrighted works:

> Notwithstanding the provisions of sections 106 and 106A, *the fair use of a copyrighted work*, . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, *is not an infringement of copyright*. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

17 U.S.C. § 107 (emphasis added). The statute explains that the fair use of a copyrighted work is permissible because it is a non-infringing use.

While Title 17 of the United States Code ("Copyrights") does not define the term "authorize" or "authorized," "[w]hen there is no indication that Congress intended a specific legal meaning for the term, the court may look to sources such as dictionaries for a definition." *United States v. Mohrbacher*, 182 F.3d 1041, 1048 (9th Cir. 1999). Black's Law Dictionary defines "authorize" as "1. To give legal authority; to empower" and "2. To formally approve; to sanction." *Authorize*, Black's Law Dictionary (10th ed. 2014). Because 17 U.S.C. § 107 both "empowers" and "formally approves"

the use of copyrighted material if the use constitutes fair use, fair use is "authorized by the law" within the meaning of § 512(c). *See also* 17 U.S.C. § 108(f)(4) ("Nothing in this section in any way affects the *right* of fair use as provided by section 107 . . . ." (emphasis added)).

Universal's sole textual argument is that fair use is not "authorized by the law" because it is an affirmative defense that excuses otherwise infringing conduct. Universal's interpretation is incorrect as it conflates two different concepts: an affirmative defense that is labeled as such due to the procedural posture of the case, and an affirmative defense that excuses impermissible conduct. Supreme Court precedent squarely supports the conclusion that fair use does not fall into the latter camp: "[A]nyone who . . . makes a fair use of the work is not an infringer of the copyright with respect to such use." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 433 (1984).

Given that 17 U.S.C. § 107 expressly authorizes fair use, labeling it as an affirmative defense that excuses conduct is a misnomer:

> Although the traditional approach is to view "fair use" as an affirmative defense, . . . it is better viewed as a right granted by the Copyright Act of 1976. Originally, as a judicial doctrine without any statutory basis, fair use was an infringement that was excused—this is presumably why it was treated as a defense. As a statutory doctrine, however, fair use is not an infringement. Thus, since the passage of the 1976 Act, fair use should no longer be considered an

> infringement to be excused; instead, it is logical to view fair use as a right. Regardless of how fair use is viewed, it is clear that the burden of proving fair use is always on the putative infringer.

*Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1542 n.22 (11th Cir. 1996); *cf.* Lydia Pallas Loren, *Fair Use: An Affirmative Defense?*, 90 Wash. L. Rev. 685, 688 (2015) ("Congress did not intend fair use to be an affirmative defense—a defense, yes, but not an affirmative defense."). Fair use is therefore distinct from affirmative defenses where a use infringes a copyright, but there is no liability due to a valid excuse, e.g., misuse of a copyright, *Practice Management Information Corp. v. American Medical Ass'n*, 121 F.3d 516, 520 (9th Cir. 1997), and laches, *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950–51 (9th Cir. 2001).

Universal concedes it must give due consideration to other uses authorized by law such as compulsory licenses. The introductory language in 17 U.S.C. § 112 for compulsory licenses closely mirrors that in the fair use statute. *Compare* 17 U.S.C. § 112(a)(1) ("Notwithstanding the provisions of section 106, . . . it is not an infringement of copyright for a transmitting organization entitled to transmit to the public a performance or display of a work . . . to make no more than one copy or phonorecord of a particular transmission program embodying the performance or display . . . ."), *with id.* § 107 ("Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work . . . is not an infringement of copyright."). That fair use may be labeled as an affirmative defense due to the procedural posture of the case is no different than labeling a license an affirmative defense for the same reason. *Compare Campbell v. Acuff-Rose Music, Inc.*,

510 U.S. 569, 573 & n.3, 590 (1994) (stating that "fair use is
an affirmative defense" where the district court converted a
motion to dismiss based on fair use into a motion for
summary judgment), *with A&M Records, Inc. v. Napster,*
*Inc.*, 239 F.3d 1004, 1025–26 (9th Cir. 2001) ("Napster
contends that . . . the district court improperly rejected valid
affirmative defenses of . . . implied license . . . ."). Thus,
Universal's argument that it need not consider fair use in
addition to compulsory licenses rings hollow.

Even if, as Universal urges, fair use is classified as an
*"affirmative* defense," we hold—for the purposes of the
DMCA—fair use is uniquely situated in copyright law so as
to be treated differently than traditional affirmative defenses.
We conclude that because 17 U.S.C. § 107 created a type of
non-infringing use, fair use is "authorized by the law" and a
copyright holder must consider the existence of fair use
before sending a takedown notification under § 512(c).

## C

We must next determine if a genuine issue of material
fact exists as to whether Universal knowingly misrepresented
that it had formed a good faith belief the video did not
constitute fair use. This inquiry lies not in whether a court
would adjudge the video as a fair use, but whether Universal
formed a good faith belief that it was not. Contrary to the
district court's holding, Lenz may proceed under an actual
knowledge theory, but not under a willful blindness theory.

## 1

Though Lenz argues Universal should have known the
video qualifies for fair use as a matter of law, our court has

already decided a copyright holder need only form a subjective good faith belief that a use is not authorized. *Rossi v. Motion Picture Ass'n of Am. Inc.*, 391 F.3d 1000 (9th Cir. 2004). In *Rossi*, we explicitly held that "the 'good faith belief' requirement in § 512(c)(3)(A)(v) encompasses a subjective, rather than objective standard." *Id.* at 1004. We further held:

> In § 512(f), Congress included an expressly limited cause of action for improper infringement notifications, imposing liability only if the copyright owner's notification is a knowing misrepresentation. A copyright owner cannot be liable simply because an unknowing mistake is made, even if the copyright owner acted unreasonably in making the mistake. Rather, there must be a demonstration of some actual knowledge of misrepresentation on the part of the copyright owner.

*Id.* at 1004–05 (citations omitted). Neither of these holdings are dictum. *See United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (en banc) ("[W]here a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense.").

As a result, Lenz's request to impose a subjective standard only with respect to factual beliefs and an objective standard with respect to legal determinations is untenable. Such a request grafts an objective standard onto

§ 512(c)(3)(A)(v) directly in contravention to *Rossi*. *See Rossi*, 391 F.3d at 1004 ("When enacting the DMCA, Congress could have easily incorporated an objective standard of reasonableness. The fact that it did not do so indicates an intent to adhere to the subjective standard traditionally associated with a good faith requirement."). We therefore judge Universal's actions by the subjective beliefs it formed about the video.

**2**

Universal faces liability if it knowingly misrepresented in the takedown notification that it had formed a good faith belief the video was not authorized by the law, i.e., did not constitute fair use. Here, Lenz presented evidence that Universal did not form any subjective belief about the video's fair use—one way or another— because it failed to consider fair use at all, and knew that it failed to do so. Universal nevertheless contends that its procedures, while not formally labeled consideration of fair use, were tantamount to such consideration. Because the DMCA requires consideration of fair use prior to sending a takedown notification, a jury must determine whether Universal's actions were sufficient to form a subjective good faith belief about the video's fair use or lack thereof.

To be clear, if a copyright holder ignores or neglects our unequivocal holding that it must consider fair use before sending a takedown notification, it is liable for damages under § 512(f). If, however, a copyright holder forms a subjective *good faith* belief the allegedly infringing material does not constitute fair use, we are in no position to dispute the copyright holder's belief even if we would have reached the opposite conclusion. A copyright holder who pays lip

service to the consideration of fair use by claiming it formed a good faith belief when there is evidence to the contrary is still subject to § 512(f) liability. *Cf. Disney Enters., Inc. v. Hotfile Corp.*, No. 11-cv-20427, 2013 WL 6336286, at *48 (S.D. Fla. Sept. 20, 2013) (denying summary judgment of § 512(f) counterclaim due to "sufficient evidence in the record to suggest that [Plaintiff] Warner intentionally targeted files it knew it had no right to remove"); *Rosen v. Hosting Servs., Inc.*, 771 F. Supp. 2d 1219, 1223 (C.D. Cal. 2010) (denying summary judgment of § 512(f) counterclaim where the takedown notification listed four URL links that did not contain content matching the description of the purportedly infringed material); *Online Policy Grp. v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1204–05 (N.D. Cal. 2004) ("[T]here is no genuine issue of fact that Diebold knew—and indeed that it specifically intended—that its letters to OPG and Swarthmore would result in prevention of publication of that content. . . . The fact that Diebold never actually brought suit against any alleged infringer suggests strongly that Diebold sought to use the DMCA's safe harbor provisions—which were designed to protect ISPs, not copyright holders—as a sword to suppress publication of embarrassing content rather than as a shield to protect its intellectual property.").

In order to comply with the strictures of § 512(c)(3)(A)(v), a copyright holder's consideration of fair use need not be searching or intensive. We follow *Rossi*'s guidance that formation of a subjective good faith belief does not require investigation of the allegedly infringing content. *See* 391 F.3d at 1003, 1005. We are mindful of the pressing crush of voluminous infringing content that copyright holders face in a digital age. But that does not excuse a failure to comply with the procedures outlined by Congress. *Cf. Lenz*, 572 F. Supp. 2d at 1155 ("[I]n the majority of cases, a

consideration of fair use prior to issuing a takedown notice will not be so complicated as to jeopardize a copyright owner's ability to respond rapidly to potential infringements. The DMCA already requires copyright owners to make an initial review of the potentially infringing material prior to sending a takedown notice; indeed, it would be impossible to meet any of the requirements of Section 512(c) without doing so. A consideration of the applicability of the fair use doctrine simply is part of that initial review.").

We note, without passing judgment, that the implementation of computer algorithms appears to be a valid and good faith middle ground for processing a plethora of content while still meeting the DMCA's requirements to somehow consider fair use. *Cf. Hotfile*, 2013 WL 6336286, at *47 ("The Court . . . is unaware of any decision to date that actually addressed the need for human review, and the statute does not specify how belief of infringement may be formed or what knowledge may be chargeable to the notifying entity."). For example, consideration of fair use may be sufficient if copyright holders utilize computer programs that automatically identify for takedown notifications content where: "(1) the video track matches the video track of a copyrighted work submitted by a content owner; (2) the audio track matches the audio track of that same copyrighted work; and (3) nearly the entirety . . . is comprised of a single copyrighted work." Brief for The Org. for Transformative Works, Public Knowledge & Int'l Documentary Ass'n as Amici Curiae Supporting Appellee at 29–30 n.8 (citing the Electronic Frontier Foundation website (link unavailable)).

Copyright holders could then employ individuals like Johnson to review the minimal remaining content a computer program does not cull. *See* Brief for The Recording Indus.

Ass'n of Am. as Amici Curiae Supporting Appellants at 15
("[T]he RIAA has an entire department dedicated to
identifying infringement and issuing takedown requests.");
*see also Hotfile*, 2013 WL 6336286, at *14. During oral
argument Universal explained that service providers now use
screening algorithms. However, we need not definitively
decide the issue here because Universal did not proffer any
evidence that—at the time it sent the takedown notification to
Lenz—it used a computer program to identify potentially
infringing content.

3

We hold the willful blindness doctrine may be used to
determine whether a copyright holder "knowingly materially
misrepresent[ed]" that it held a "good faith belief" the
offending activity was not a fair use. *See* 17 U.S.C.
§ 512(c)(3)(A)(v), (f). "[T]he willful blindness doctrine may
be applied, in appropriate circumstances, to demonstrate
knowledge or awareness of specific instances of infringement
under the DMCA." *Viacom Int'l, Inc. v. YouTube, Inc.*,
676 F.3d 19, 35 (2d Cir. 2012) (interpreting how a party can
establish the "actual knowledge"—a subjective belief—
required by § 512(c)(1)(A)(I)); *see also UMG Recordings,
Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1023
(9th Cir. 2013) ("Of course, a service provider cannot
willfully bury its head in the sand to avoid obtaining such
specific knowledge." (citing *Viacom*, 676 F.3d at 31)). But,
based on the specific facts presented during summary
judgment, we reject the district court's conclusion that Lenz
may proceed to trial under a willful blindness theory.

To demonstrate willful blindness a plaintiff must establish
two factors: "(1) the defendant must subjectively believe that

there is a high probability that a fact exists and (2) the
defendant must take deliberate actions to avoid learning of
that fact." *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S.
Ct. 2060, 2070 (2011). "Under this formulation, a willfully
blind defendant is one who takes deliberate actions to avoid
confirming a high probability of wrongdoing and who can
almost be said to have actually known the critical facts." *Id.*
at 2070–71. To meet the *Global-Tech* test, Lenz must
demonstrate a genuine issue as to whether—before sending
the takedown notification—Universal (1) subjectively
believed there was a high probability that the video
constituted fair use, and (2) took deliberate actions to avoid
learning of this fair use.

On summary judgment Lenz failed to meet a threshold
showing of the first factor. To make such a showing, Lenz
must provide evidence from which a juror could infer that
Universal was aware of a high probability the video
constituted fair use. *See United States v. Yi*, 704 F.3d 800,
805 (9th Cir. 2013). But she failed to provide any such
evidence. The district court therefore correctly found that
"Lenz does not present evidence suggesting Universal
subjectively believed either that there was a high probability
any given video might make fair use of a Prince composition
or her video in particular made fair use of Prince's song
'Let's Go Crazy.'" Yet the district court improperly denied
Universal's motion for summary judgment on the willful
blindness theory because Universal "has not shown that it
*lacked* a subjective belief." By finding blame with
Universal's inability to show that it "*lacked* a subjective
belief," the district court improperly required Universal to
meet its burden of persuasion, even though Lenz had failed to
counter the initial burden of production that Universal
successfully carried. *See Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986); *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Lenz may not therefore proceed to trial on a willful blindness theory.

## V

Section 512(f) provides for the recovery of "any damages, including costs and attorneys['] fees, incurred by the alleged infringer . . . who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing . . . ." 17 U.S.C. § 512(f). We hold a plaintiff may seek recovery of nominal damages for an injury incurred as a result of a § 512(f) misrepresentation.

Universal incorrectly asserts that Lenz must demonstrate she incurred "actual monetary loss." Section 512(k) provides a definition for "monetary relief" as "damages, costs, attorneys['] fees, and any other form of monetary payment." The term "monetary relief" appears in § 512(a), (b)(1), (c)(1), and (d), but is notably absent from § 512(f). As a result, the damages an alleged infringer may recover under § 512(f) from "any person" are broader than monetary relief.[3] *Cf. United States v. James*, 478 U.S. 597, 605 (1986) ("Congress' choice of the language '*any* damage' . . . undercuts a narrow construction."), *abrogated on other grounds by Cent. Green Co. v. United States*, 531 U.S. 425 (2001). Because Congress specified the recovery of "any damages," we reject

---

[3] Title I of the DMCA specifies recovery for "actual damages." 17 U.S.C. § 1203(c)(1)(A). If Congress intended to similarly limit the recovery of § 512(f) damages to pecuniary losses, it could have chosen to do so.

Universal's contention that Congress did not indicate its intent to depart from the common law presumption that a misrepresentation plaintiff must have suffered a monetary loss. *See Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) ("Where Congress includes particular language in one section of a statute but omits it in another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quotation omitted)).

Lenz may seek recovery of nominal damages due to an unquantifiable harm suffered as a result of Universal's actions.[4]   The DMCA is akin to a statutorily created intentional tort whereby an individual may recover nominal damages for a "knowingly material misrepresent[ation] under this section [512]." 17 U.S.C. § 512(f); *cf. Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 305 (1986) ("We have repeatedly noted that 42 U.S.C. § 1983 creates a species of tort liability in favor of persons who are deprived of rights, privileges, or immunities secured to them by the Constitution. Accordingly, when § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." (quotation and citations omitted)).

"In a number of common law actions associated with intentional torts, the violation of the plaintiff's right has generally been regarded as a kind of legal damage in itself. The plaintiff who proves an intentional physical tort to the person or to property can always recover nominal damages."

---

[4] Lenz may not recover nominal damages for "impairment of free speech rights." No authority supports the recovery of nominal damages caused by a private actor's chilling of free speech rights. All of the cases Lenz cites address challenges to governmental action.

3 Dan B. Dobbs et al., *The Law of Torts* § 480 (2d ed. 2011). The tort need not be physical in order to recover nominal damages. Defamation, for example, permits the recovery of nominal damages:

> A nominal damage award can be justified in a tort action only if there is some reason for awarding a judgment in favor of a claimant who has not proved or does not claim a compensable loss with sufficient certainty to justify a recovery of compensatory or actual damages. There may be such a reason in an action for defamation, since a nominal damage award serves the purpose of vindicating the plaintiff's character by a verdict of the jury that establishes the falsity of the defamatory matter.

W. Page Keeton et al., *Prosser and Keeton on Torts* § 116A, at 845 (5th ed. 1984). Also, individuals may recover nominal damages for trespass to land, even though the trespasser's "presence on the land causes no harm to the land [or] its possessor . . . ." Restatement (Second) of Torts § 163 & cmts. d, e (1965).

The district court therefore properly concluded in its 2010 order:

> The use of "any damages" suggests strongly Congressional intent that recovery be available for damages even if they do not amount to . . . substantial economic damages . . . . Requiring a plaintiff who can [show that the copyright holder knowingly

> misrepresented its subjective good faith] to
> demonstrate in addition not only that she
> suffered damages but also that those damages
> were economic and substantial would vitiate
> the deterrent effect of the statute.

*Lenz v. Universal Music Corp.*, No. C 07-3783 JF, 2010 WL
702466, at *10 (N.D. Cal. Feb. 25, 2010).  Relying on this
opinion, the Southern District of Florida held the same.
*Hotfile*, 2013 WL 6336286, at *48 ("[T]he Court observes
that the quantity of economic damages to Hotfile's system is
necessarily difficult to measure with precision and has led to
much disagreement between the parties and their experts.
Notwithstanding this difficulty, the fact of injury has been
shown, and Hotfile's expert can provide the jury with a
non-speculative basis to assess damages.").

We agree that Lenz may vindicate her statutorily created
rights by seeking nominal damages.  Because a jury has not
yet determined whether Lenz will prevail at trial, we need not
decide the scope of recoverable damages, i.e., whether she
may recover expenses following the initiation of her § 512(f)
suit or *pro bono* costs and attorneys' fees, both of which arose
as a result of the injury incurred.

## VI

Copyright holders cannot shirk their duty to consider—in
good faith and prior to sending a takedown notification—
whether allegedly infringing material constitutes fair use, a
use which the DMCA plainly contemplates as authorized by
the law.  That this step imposes responsibility on copyright
holders is not a reason for us to reject it.  *Cf. Consumer Prod.
Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 123–24

(1980) ("[A]ny increased burdens imposed on the Commission as a result of its compliance with [the Consumer Product Safety Act] were intended by Congress in striking an appropriate balance between the interests of consumers and the need for fairness and accuracy with respect to information disclosed by the Commission. Thus, petitioners' claim that the Commission's compliance with the requirements of [the Act] will impose undue burdens on the Commission is properly addressed to Congress, not to this Court."). We affirm the district court's order denying the parties' cross-motions for summary judgment.

**AFFIRMED.** Each party shall bear its own costs.

M. SMITH, Circuit Judge, concurring in part, dissenting in part, and concurring in the judgment:

I concur in all but Part IV.C of the majority opinion, and concur in the judgment. Because I disagree with the majority's approach to three issues, I respectfully dissent from Part IV.C.

First, I question whether § 512(f) directly prohibits a party from misrepresenting that it has formed a good faith belief that a work is subject to the fair use doctrine. I construe the plain text of the statute to prohibit misrepresentations that a work is infringing, not misrepresentations about the party's diligence in forming its belief that the work is infringing. Second, I disagree that there is any material dispute about whether Universal considered fair use. Because Universal did not consider fair use, it may be held liable for "knowingly" misrepresenting that the video was infringing,

if it should be determined that the video is a non-infringing fair use. Universal's misrepresentation, if any, was knowing because Universal knew it had not considered fair use, and therefore knew it lacked a basis to conclude that the video was infringing. Third, I do not believe that the willful blindness doctrine applies where, as here, a party has failed to consider fair use and affirmatively misrepresents that a work is infringing.

I fully agree with the majority's conclusion that § 512(c)(3)(A)(v) requires copyright holders to consider whether potentially infringing material is a fair use before issuing a takedown notice. As the majority opinion explains, a takedown notice must contain "[a] statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law." 17 U.S.C. § 512(c)(3)(A)(v). Because fair use of copyrighted material is not an infringement of copyright, such use is "authorized by . . . the law." *See id.* § 107. Therefore, in order to form "a good faith belief that use of the material in the manner complained of is not authorized by . . . the law," *id.* § 512(c)(3)(A)(v), a party must consider the doctrine of fair use.

Where I part ways with the majority is in the proper analysis of Universal's misrepresentation. The majority concludes that "Universal faces liability if it knowingly misrepresented in the takedown notification that it had formed a good faith belief the video was not authorized by the law, i.e., did not constitute fair use." An unstated premise of this conclusion is that Universal impliedly represented that it had considered fair use when it certified in its takedown notification that it held a good faith belief that the video was

not authorized by the law. Under the majority's approach, Universal's liability depends upon the truth or falsity of its implied assertion that it held a good faith belief about whether the video was a fair use.

However, I do not construe § 512(f) to directly prohibit a party from falsely implying that it has considered fair use. *Cf. Rossi v. Motion Picture Ass'n of Am., Inc.*, 391 F.3d 1000, 1004–05 (9th Cir. 2004) (noting that § 512(f) is "an expressly limited cause of action"). Section 512(f) provides that "[a]ny person who *knowingly* materially misrepresents under this section . . . *that material or activity is infringing* . . . shall be liable for any damages." (emphases added). The plain text of the statute prohibits parties from misrepresenting that *a work is infringing*, not from misrepresenting that they have considered fair use.

In my view, the relevant representation in this case is Universal's assertion that the video is infringing. Universal's liability under § 512(f) depends initially on the disputed issue of whether the video is subject to the fair use doctrine. If the video is a fair use, Universal's representation that the video is infringing was false.

This does not end the inquiry, of course, because § 512(f) only applies to "knowing[]" misrepresentations, not to innocent or negligent misrepresentations. The majority approach does not squarely address § 512(f)'s "knowingly" requirement. In *Rossi v. Motion Picture Association of America Inc.*, we observed that "[a] copyright owner cannot be liable [under § 512(f)] simply because an unknowing mistake is made, even if the copyright owner acted unreasonably in making the mistake. Rather, there must be a demonstration of *some actual knowledge of*

*misrepresentation* on the part of the copyright owner."
391 F.3d at 1005 (citation omitted) (emphasis added).
Universal urges us to construe *Rossi* to mean that a party
must subjectively believe that the fact it asserts is false in
order to be liable under § 512(f).  If this is indeed the
meaning of *Rossi*, it is difficult to see how Lenz can possibly
prevail.[1]

Section 512(f)'s "knowingly" requirement should not be
construed this restrictively.  Universal may be held liable for
knowingly misrepresenting that the video was infringing if,
knowing it had not considered whether the video was a fair
use, it erroneously asserted that it was infringing.  A party
cannot truthfully represent that a work subject to the fair use
doctrine is infringing if the party has knowingly failed to
consider whether the doctrine applies.  Section 107 plainly
states that "the fair use of a copyrighted work . . . is not an
infringement of copyright."  The requirement that a party
hold a "good faith" belief that "the infringing material is not
authorized by the law" would be rendered meaningless if
parties could wholly omit to consider whether the material
was a fair use, and was therefore not an "infringing material"
at all.

This reading of § 512(f) does not conflict with our
decision in *Rossi*.  A party that knowingly fails to consider

---

[1] The majority opinion implies that Universal would be liable if its
actions were not sufficient to form a good faith belief about fair use, and
that this is a disputed issue for the jury.  But if Universal's proposed
construction of *Rossi* is correct, Universal would not be liable merely
because its actions were not sufficient to form a good faith belief about
fair use.  Instead, it would only be liable if it *knew* its actions were not
sufficient.   Otherwise, Universal would not have "knowingly"
misrepresented that it had formed a good faith belief about fair use.

fair use before erroneously asserting that a work is infringing has "some actual knowledge of misrepresentation," *Rossi*, 391 F.3d at 1005, because the party knows that, having failed to consider fair use, it lacks a basis to assert that the work is infringing.

This construction of "knowingly" is consistent with common law principles of deceit and fraudulent misrepresentation. Under these principles, a misrepresentation is knowing if the party knows it is ignorant of the truth or falsity of its representation. For example, in *Cooper v. Schlesinger*, 111 U.S. 148, 155 (1884), the Supreme Court stated that "a statement recklessly made, without knowledge of its truth, [is] a false statement knowingly made, within the settled rule." *See also Sovereign Pocahontas Co. v. Bond*, 120 F.2d 39, 39–40 (D.C. Cir. 1941); *Knickerbocker Merch. Co. v. United States*, 13 F.2d 544, 546 (2d Cir. 1926); *L J Mueller Furnace Co. v. Cascade Foundry Co.*, 145 F. 596, 600 (3d Cir. 1906); *Hindman v. First Nat'l Bank*, 112 F. 931, 944 (6th Cir. 1902).

Construing "knowingly" to include assertions made in conscious ignorance of their truth or falsity is also consistent with the principles of the Second Restatement of Torts. The Second Restatement provides that "[a] misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of his representation that he states or implies, or (c) *knows that he does not have the basis for his representation that he states or implies*." Restatement

(Second) of Torts § 526 (emphasis added).[2] Under these principles, Universal faces liability if it misrepresented that the video was infringing, knowing that it lacked a basis to conclude that the video was not a fair use.

It is undisputed that Universal did not consider fair use before sending the takedown notice. Its policy was to send takedown notices if "the composition was the focus of the video," that is, where "[t]he music [was] prominently featured in the video." I disagree with the majority's conclusion that there is a factual dispute regarding whether applying this policy in this case could have been "sufficient to form a subjective good faith belief about the video's fair use or lack thereof." Section 107 explicitly enumerates the factors to be considered in assessing whether a work is a fair use. 17 U.S.C. § 107. Universal's policy of determining whether "the composition was the focus of the video" simply did not permit it to form an opinion about how the fair use factors applied to the video.[3] Moreover, Universal *knew* it lacked a

---

[2] The Second Restatement refers to "fraudulent misrepresentation," rather than "knowing" misrepresentation. *See* Restatement (Second) of Torts § 526. However, as the Restatement clarifies, the requirement that a misrepresentation be "fraudulent" "solely" refers to the party's knowledge of misrepresentation. *Compare id.* cmt. a. ("The word 'fraudulent' is here used as referring solely to the maker's knowledge of the untrue character of his representation. This element of the defendant's conduct frequently is called 'scienter' by the courts."), *with Rossi*, 391 F.3d at 1005 ("[T]here must be a demonstration of some actual knowledge of misrepresentation on the part of the copyright owner."). It is therefore instructive to examine the Restatement definition of "fraudulent" in construing the meaning of "knowingly."

[3] The majority opinion implies that a copyright holder could form a good faith belief that a work was not a fair use by utilizing computer programs that automatically identify possible infringing content. I agree that such

basis to conclude that the work was infringing, because it knew that if this video was a fair use, it was not infringing. Section 107 states as much explicitly. *Id.*

The sole disputed issue in this case was whether Universal's representation that the video was infringing was false–that is, whether the video was a fair use. Universal knew that a fair use was not infringing, knew that it had not considered fair use, and nonetheless asserted that the video was infringing. Universal may be held to account if the video was not infringing, because it knew it lacked a basis to assert that it was.

I also have doubts about whether the willful blindness doctrine is relevant to analyzing whether a misrepresentation is "knowing[]" under § 512(f). The doctrine was originally applied to "criminal statutes requir[ing] proof that a defendant acted knowingly or willfully." *See Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011). Courts reasoned that defendants could not avoid criminal liability under such statutes "by deliberately shielding themselves from clear evidence of critical facts that are

---

programs may be useful in identifying infringing content. However, the record does not disclose whether these programs are currently capable of analyzing fair use. Section 107 specifically enumerates the factors to be considered in analyzing fair use. These include: "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes"; "the nature of the copyrighted work"; "the amount and substantiality of the portion used in relation to the copyrighted work as a whole"; and "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. For a copyright holder to rely solely on a computer algorithm to form a good faith belief that a work is infringing, that algorithm must be capable of applying the factors enumerated in § 107.

strongly suggested by the circumstances." *Id.* at 2068–69. Federal courts have applied the doctrine to non-criminal statutes that include a requirement that a party have acted knowingly or willfully, including intellectual property statutes. *See id.* at 2068–71 (active inducement of patent infringement under 35 U.S.C. § 271(b)); *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 34–35 (2d Cir. 2012) ("actual knowledge" under 17 U.S.C. § 512(c)'s safe harbor provision); *In re Aimster Copyright Litig.*, 334 F.3d 643, 650–51 (7th Cir. 2003) (contributory infringement of copyright); *Dolman v. Agee*, 157 F.3d 708, 714–15 (9th Cir. 1998) ("willful" copyright infringement under 17 U.S.C. § 504(c)(2)). It does not necessarily follow, however, that we should apply the doctrine to construe § 512(f). Section 512(f) creates a statutory misrepresentation action, and it is likely Congress intended the action to mirror analogous common law torts like fraud, deceit, and misrepresentation. Therefore, we should examine common law tort principles to construe "knowingly," rather than import a doctrine that developed from the criminal law. As I explain above, common law principles of misrepresentation establish that a misrepresentation is knowing if the party knows it is ignorant of the truth or falsity of its representation.

Because the common law of torts already provides ample insight into what Congress meant by "knowingly," there is no need to also apply the more stringent, and confusing, willful blindness test. To demonstrate willful blindness a plaintiff must establish two factors: "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech*, 131 S. Ct. at 2070. It makes little sense in this case to ask whether Universal subjectively believed that there was a high probability the

34          LENZ V. UNIVERSAL MUSIC

video was a fair use. The evidence was that Universal knowingly failed to form any belief about whether the video was fair use. This suffices to satisfy § 512(f)'s requirement that the misrepresentation be "knowing[]."

In sum, I would hold that parties must individually consider whether a work is a fair use before representing that the work is infringing in a takedown notice. If they do not, and the work is a non-infringing fair use, they are subject to liability for knowingly misrepresenting that the work is infringing.

For the foregoing reasons, I respectfully dissent in part.

## United States Court of Appeals for the Ninth Circuit

### Office of the Clerk
95 Seventh Street
San Francisco, CA 94103

### Information Regarding Judgment and Post-Judgment Proceedings

**Judgment**
- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36. Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**
- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise. To file a motion to stay the mandate, file it electronically via the appellate ECF system or, if you are a pro se litigant or an attorney with an exemption from using appellate ECF, file one original motion on paper.

**Petition for Panel Rehearing  (Fed. R. App. P. 40; 9th Cir. R. 40-1)**
**Petition for Rehearing En Banc (Fed. R. App. P. 35; 9th Cir. R. 35-1 to -3)**

(1)  A. **Purpose (Panel Rehearing):**
- A party should seek panel rehearing only if one or more of the following grounds exist:
    - ▶ A material point of fact or law was overlooked in the decision;
    - ▶ A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
    - ▶ An apparent conflict with another decision of the Court was not addressed in the opinion.
- Do not file a petition for panel rehearing merely to reargue the case.

B. **Purpose (Rehearing En Banc)**
- A party should seek en banc rehearing only if one or more of the following grounds exist:

> ► Consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions; or
> ► The proceeding involves a question of exceptional importance; or
> ► The opinion directly conflicts with an existing opinion by another court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.

**(2)   Deadlines for Filing:**
- A petition for rehearing may be filed within 14 days after entry of judgment.  Fed. R. App. P. 40(a)(1).
- If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment.  Fed. R. App. P. 40(a)(1).
- If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.
- *See* Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).
- An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication.  9th Cir. R. 40-2.

**(3)   Statement of Counsel**
- A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist.  The points to be raised must be stated clearly.

**(4)   Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**
- The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.
- The petition must be accompanied by a copy of the panel's decision being challenged.
- An answer, when ordered by the Court, shall comply with the same length limitations as the petition.
- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

- The petition or answer must be accompanied by a Certificate of Compliance found at Form 11, available on our website at www.ca9.uscourts.gov under *Forms.*
- You may file a petition electronically via the appellate ECF system. No paper copies are required unless the Court orders otherwise. If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper. No additional paper copies are required unless the Court orders otherwise.

## Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)
- The Bill of Costs must be filed within 14 days after entry of judgment.
- See Form 10 for additional information, available on our website at www.ca9.uscourts.gov under *Forms.*

## Attorneys Fees
- Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
- All relevant forms are available on our website at www.ca9.uscourts.gov under *Forms* or by telephoning (415) 355-7806.

## Petition for a Writ of Certiorari
- Please refer to the Rules of the United States Supreme Court at www.supremecourt.gov

## Counsel Listing in Published Opinions
- Please check counsel listing on the attached decision.
- If there are any errors in a published opinion, please send a letter **in writing within 10 days** to:
  - ▶ Thomson Reuters; 610 Opperman Drive; PO Box 64526; St. Paul, MN 55164-0526 (Attn: Jean Green, Senior Publications Coordinator);
  - ▶ and electronically file a copy of the letter via the appellate ECF system by using "File Correspondence to Court," or if you are an attorney exempted from using the appellate ECF system, mail the Court one copy of the letter.

Form 10. Bill of Costs ...........................................................................................................*(Rev. 12-1-09)*

## United States Court of Appeals for the Ninth Circuit

## BILL OF COSTS

This form is available as a fillable version at:
*http://cdn.ca9.uscourts.gov/datastore/uploads/forms/Form%2010%20-%20Bill%20of%20Costs.pdf*.

**Note:** If you wish to file a bill of costs, it MUST be submitted on this form and filed, with the clerk, with proof of service, within 14 days of the date of entry of judgment, and in accordance with 9th Circuit Rule 39-1. A late bill of costs must be accompanied by a motion showing good cause. Please refer to FRAP 39, 28 U.S.C. § 1920, and 9th Circuit Rule 39-1 when preparing your bill of costs.

| | v. | | 9th Cir. No. | |

The Clerk is requested to tax the following costs against:

| Cost Taxable under FRAP 39, 28 U.S.C. § 1920, 9th Cir. R. 39-1 | REQUESTED *(Each Column Must Be Completed)* | | | | ALLOWED *(To Be Completed by the Clerk)* | | | |
|---|---|---|---|---|---|---|---|---|
| | No. of Docs. | Pages per Doc. | Cost per Page* | TOTAL COST | No. of Docs. | Pages per Doc. | Cost per Page* | TOTAL COST |
| **Excerpt of Record** | | | $ | $ | | | $ | $ |
| **Opening Brief** | | | $ | $ | | | $ | $ |
| **Answering Brief** | | | $ | $ | | | $ | $ |
| **Reply Brief** | | | $ | $ | | | $ | $ |
| **Other**\*\* | | | $ | $ | | | $ | $ |
| | | | **TOTAL:** | $ | | | **TOTAL:** | $ |

\* *Costs per page*: May not exceed .10 or actual cost, whichever is less. 9th Circuit Rule 39-1.

\*\* *Other*: Any other requests must be accompanied by a statement explaining why the item(s) should be taxed pursuant to 9th Circuit Rule 39-1. Additional items without such supporting statements will not be considered.

Attorneys' fees **cannot** be requested on this form.

*Continue to next page*

**Form 10. Bill of Costs -** *Continued*

I, [                    ] , swear under penalty of perjury that the services for which costs are taxed were actually and necessarily performed, and that the requested costs were actually expended as listed.

Signature [                              ]
("s/" plus attorney's name if submitted electronically)

Date [                    ]

Name of Counsel: [                              ]

Attorney for: [                                                        ]

*(To Be Completed by the Clerk)*

Date [                    ]        Costs are taxed in the amount of $ [                    ]

Clerk of Court

By: [                              ] , Deputy Clerk